## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GREATER BOSTON LEGAL SERVICES;
DEMISSIE & CHURCH;
SUSAN CHURCH;
ARAUJO & FISHER, LLC;
ANNELISE M. ARAUJO;
STEFANIE FISHER; and
WILLIAM E. GRAVES, JR.,

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; ALEJANDRO
MAYORKAS, in his official capacity as United
States Secretary of Homeland Security;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UR M. JADDOU,
in her official capacity as Director of United
States Citizenship and Immigration Services;
IMMIGRATION AND CUSTOMS
ENFORCEMENT; TAE D. JOHNSON, in his
official capacity as Acting Director of
Immigration and Customs Enforcement;
UNITED STATES CUSTOMS AND BORDER
PROTECTION; and CHRIS MAGNUS, in his
official capacity as Commissioner of United
States Customs and Border Protection,

               Defendants.

**AMENDED COMPLAINT
FOR DECLARATORY
AND INJUNCTIVE
RELIEF**

No. 1:21-cv-10083-DJC

Leave to file granted
January 13, 2022

## INTRODUCTION[1]

1.      This action challenges the systematic failure of the Department of Homeland Security ("DHS") to produce to noncitizens and their counsel the records that are necessary to support their claims and defenses or eligibility for benefits in a range of civil immigration proceedings.[2]  The Plaintiffs—attorneys, small law firms, and a nonprofit legal services organization who represent noncitizens in immigration matters—seek declaratory and injunctive relief against the Defendants' policy of non-disclosure under the Administrative Procedure Act ("APA").

2.      Plaintiffs have decades of experience representing noncitizens in a range of immigration matters, including bond hearings, removal proceedings, applications for affirmative asylum, and applications for other benefits including visas, permanent resident status, and citizenship.  This work repeatedly exposes Plaintiffs to Defendants' policy and practice of denying noncitizens and their counsel timely access to relevant records in the government's possession (the "Nondisclosure Policy" or "Policy").

---

[1]      In light of the Court's leave, Plaintiffs have limited their amendments to this complaint as follows:  (i) in response to the Court's finding that Plaintiffs had failed to allege a discrete agency action other than as to asylum, ECF No. 50 at 17, Plaintiffs have added paragraphs 41-50 and added material to paragraphs 30-31 to provide additional allegations about the removal and post removal order context, and other USCIS proceedings, (ii) in light of the Court's discussion of 8 C.F.R. 103.2(b)(16), ECF No. 50 at 6 n.3,  Plaintiffs have added footnote 3 to clarify the meaning of this regulation, (iii) in light of the Court's ruling relating to due process, ECF No. 50 at 10, Plaintiffs have edited paragraph 95 to clarify their claims, and (iv) Plaintiffs have updated the parties involved in the case.  This complaint otherwise retains the facts and claims as they existed at the time of the original filing in light of Rule 15(c) of the Federal Rules of Civil Procedure.

[2]      Although this complaint refers to individuals involved in immigration legal proceedings as "noncitizens," the policy challenged here also impacts U.S. citizens petitioning for noncitizen family members and individuals in removal proceedings ultimately established to be U.S. citizens.

3.      Under their Nondisclosure Policy, Defendants ignore their legal obligations—including those arising under the Due Process Clause of the Constitution and under immigration laws and regulations—to disclose records that are relevant to a noncitizen's case.  For example, they do not turn over records when disclosure is necessary to ensure a "fundamentally fair proceeding," *Davis v. Lynch*, 802 F.3d 168, 177 (1st Cir. 2015), when the records demonstrate a noncitizen's eligibility for relief or are otherwise "favorable to" a noncitizen threatened with removal, *cf. Brady v. Maryland*, 373 U.S. 83, 87 (1963), or when disclosure of records is required by specific provisions of immigration law, *see* 8 U.S.C. § 1229a(c)(2)(B); 8 C.F.R. § 103.2(b)(16).

4.      Instead, Defendants' response to any suggestion that they have a duty to disclose relevant records in any individual matter is, "go file a FOIA."

5.      For example, even though DHS has acknowledged that disclosure should be made in certain proceedings, *see, e.g.*, 8 C.F.R. § 103.2(b)(16), it has adopted regulations reiterating that the Freedom of Information Act ("FOIA") is the only mechanism for disclosure.  *See* 8 C.F.R. §§ 208.12, 240.69.

6.      But while they require noncitizens to use FOIA, Defendants take no responsibility for assuring that a FOIA response actually provides the relevant records or arrives in time to be of use to noncitizens and their counsel.  Routinely, it has not even come close.  Indeed, FOIA is not designed to provide records relevant to any ongoing immigration proceeding, and FOIA responses often omit records that are key to a noncitizen's case.  Moreover, because Defendants have often taken many

months to a year to respond to FOIA requests, immigration matters routinely end—and noncitizens are removed—before FOIA responses arrive, rendering the responses practically useless.

7.    To protect their noncitizen clients from prejudice, Plaintiffs are required to structure their legal practices around Defendants' Nondisclosure Policy.  As attorneys and law offices dedicated to providing quality representation to clients in immigration matters, Plaintiffs must work diligently to chase down documents from sources that may be spread across the country or even in other countries—even though the government has already collected these records in a file that a DHS adjudicator or attorney is holding just a few feet away.  And the Plaintiffs must scrupulously prepare often already-traumatized clients for immigration proceedings where DHS attorneys predictably use withheld records to conduct trials by ambush.

8.    Defendants' refusal to provide records in a timely manner pursuant to the Policy substantially interferes with the just administration of the immigration system and harms Plaintiffs by hamstringing their ability to represent clients in need of their services.  Plaintiffs seek declaratory and injunctive relief against its continued implementation and an order compelling DHS to provide the disclosures required by immigration laws and the Constitution.

## PARTIES

9.    Plaintiff Greater Boston Legal Services ("GBLS") is a Boston organization that provides free legal assistance to low-income clients, including in immigration matters.

10.     Plaintiff Demissie & Church is a Cambridge, Massachusetts law firm that has a practice in immigration law and criminal defense.

11.      Plaintiff Susan Church is an immigration attorney residing and licensed to practice in the Commonwealth of Massachusetts.  She is a partner at Demissie & Church.

12.     Plaintiff Araujo & Fisher, LLC is a Boston law firm that has a practice in immigration law.

13.     Plaintiff Annelise M. Araujo is an immigration attorney residing and licensed to practice in the Commonwealth of Massachusetts.  She is a partner at Araujo & Fisher, LLC.

14.     Plaintiff Stefanie Fisher is an immigration attorney residing and licensed to practice in the Commonwealth of Massachusetts.  She is a partner at Araujo & Fisher, LLC.

15.     Plaintiff William E. Graves, Jr. is an immigration attorney residing and licensed to practice in the Commonwealth of Massachusetts.

16.     Defendant DHS is an executive agency of the United States.  DHS is responsible for administering and enforcing the country's immigration laws.  DHS acts through component agencies, including U.S. Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP").

17.     Defendant Alejandro Mayorkas is the Secretary of DHS and is responsible for administering and enforcing the immigration laws.  He is sued in his official capacity.

18.     Defendant USCIS is a component agency of DHS and is responsible for administering the immigration system, including adjudicating requests for benefits.

19.     Defendant Ur M. Jaddou is the Director of USCIS and is responsible for overseeing USCIS.  She is sued in her official capacity.

20.     Defendant ICE is a component agency of DHS and is responsible for immigration enforcement, including prosecuting removal proceedings in immigration court.

21.     Defendant Tae D. Johnson is the Acting Director of ICE and is responsible for overseeing ICE.  He is sued in his official capacity.

22.     Defendant CBP is a component agency of DHS and is responsible for enforcing laws regarding the entry and exit of people and goods at the U.S. border.

23.     Defendant Chris Magnus is the Commissioner of CBP and is responsible for overseeing CBP.  He is sued in his official capacity.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1651 (All Writs Act).  Defendants have waived sovereign immunity for purposes of this suit.  5 U.S.C. §§ 702, 706.

25.     Venue is proper under 28 U.S.C. § 1391(e) because the Defendants are federal agencies and officers and the Plaintiffs reside or have their principal place of business in this district.

## STATEMENT OF FACTS

26.     DHS maintains electronic and paper records concerning each noncitizen that it interacts with through a range of immigration proceedings.   Despite possessing these records, when DHS deals with a noncitizen's case, the agency follows a policy and practice of refusing to turn over records that may aid the noncitizen.

27.     Under this Nondisclosure Policy, the government contends that any disclosure obligation is satisfied through FOIA, and leaves to happenstance whether the FOIA response will include documents key to the noncitizen's immigration proceeding, or whether it will arrive before it is too late.

28.     Defendants' refusal to disclose records harms noncitizens and forces Plaintiffs to practice law with their hands tied behind their backs—losing time, money, and the ability to represent many of the individuals that they seek to serve.

## I.     Defendants' Nondisclosure Policy Unlawfully Withholds Critical Documents From Noncitizens And Their Counsel.

29.     The Nondisclosure Policy applies across a broad range of Defendants' interactions with noncitizens, certain of which may have particularly serious consequences for noncitizens.

30.     First, DHS withholds information that may be used to deny applications with USCIS.   When USCIS adjudicates an application, it reviews information in a noncitizen's file and marshals records from other U.S. agencies, such as records relating to prior visa applications or interactions with border officials.   But despite its duty to allow applicants to "inspect the record of proceeding which constitutes the basis for the decision," 8 C.F.R. § 103.2(b)(16), USCIS does not share these records

with noncitizens even when they are used to deny a benefit, and even when noncitizens could establish eligibility or bolster their case if they were permitted to review and address the information being considered.[3]   In fact, in regulations permitting its asylum officers to rely on records provided by U.S. agencies and other "credible sources," USCIS disavows the right of any applicant to "conduct discovery directed toward the records," providing instead that "[p]ersons may continue to seek documents available through a [FOIA] request."  8 C.F.R. § 208.12; *see also* 8 C.F.R. § 240.69 (specifying that discovery is similarly unavailable in connection with certain other applications).

31.   Second, DHS withholds information from noncitizens in removal proceedings.  Noncitizens in removal proceedings may have lived in the United States for decades; may be lawful permanent residents; may face persecution or death if removed; and may face permanent separation from spouses and children.  In removal proceedings, a noncitizen must square off against an ICE attorney in an adversarial process in front of an immigration judge, who is part of the Executive Office of Immigration Review ("EOIR").  The ICE attorney has a noncitizen's file and receives information from multiple agencies, but ICE recognizes no obligation to disclose that

---

[3]      In addition, 8 C.F.R. § 103.2(b)(16)(i) requires USCIS to provide notice and "an opportunity to rebut the information" before it can deny an application based on "derogatory information . . . of which the applicant or petitioner is unaware."   And under 8 C.F.R. § 103.2(b)(16)(ii), USCIS may not determine "statutory eligibility" for an immigration benefit based on information outside the record that is disclosed to a noncitizen, with limited exceptions.  Although this Court's Memorandum and Order on the Defendant's motion to dismiss might be read to characterize these provisions as creating exceptions to the duty to allow inspection of the record of proceedings, ECF No. 50 at 6 n.3, they are more properly understood to provide additional requirements regarding USCIS's use of records and information, not to create exceptions to the duty to allow a noncitizen to inspect the record of proceeding.  *See Boateng v. Holder*, No. 12-cv-10057-FDS, 2012 WL 12893987, at *4 (D. Mass. Aug. 16, 2012); *Ghafoori v. Napolitano*, 713 F. Supp. 2d 871, 879-80 (N.D. Cal. 2010).

information to the noncitizen even where the records would help defeat removability or demonstrate eligibility for relief. This is reflected in asylum regulations providing that, when noncitizens apply for asylum and related relief in immigration court, they may not "conduct discovery directed toward the records, officers, agents, or employees of" DHS and other agencies, but "may continue to seek documents available through a [FOIA] request." 8 C.F.R. § 1208.12; *see also* 8 C.F.R. § 1240.69 (specifying that discovery is similarly unavailable to noncitizens seeking certain other forms of relief in immigration court).

32.    Third, DHS withholds information from noncitizens whom it detains and removes based on prior removal orders. Although records of the prior removal proceeding are essential in evaluating whether a noncitizen has grounds to reopen that case or would otherwise qualify for some relief, DHS endeavors to promptly remove such noncitizens without providing them the records that show why they are being removed.

33.    Various types of documents that Defendants do not disclose are crucial to noncitizens who are facing adverse immigration action in various types of proceedings. These can include, but are not limited to:

- **Form I-213, Record of Deportable/Inadmissible Alien.** The I-213 summarizes a noncitizen's immigration record, encounter with ICE, biographical information, and any criminal history. ICE prepares an I-213 when initiating removal proceedings and often introduces it as evidence against a noncitizen in immigration court.

- **Notes from asylum or credible fear interviews.** These notes summarize answers given by noncitizens during asylum interviews

before USCIS or "credible fear" interviews.[4]  Months or years later, ICE attorneys rely on these notes in cross-examining asylum applicants in immigration court.

- **Prior application materials.**  DHS also does not disclose records of any prior applications in a noncitizen's file.  Such materials often directly bear on a noncitizen's eligibility for a benefit or for relief from removal.

- **Records of prior removal proceedings.**   Noncitizens who have previously been ordered removed are not provided with their Notice to Appear or other charging documents, removal decision, or other records from their prior removal proceedings, which are typically held by both DHS and the immigration court.

- **Visa application materials.**   Records relating to prior visa applications are commonly provided by the Department of State to DHS attorneys and adjudicators and used to cross-examine noncitizens in immigration court or to question noncitizens in interviews at USCIS.  It is all but impossible for a noncitizen to obtain these records, even through FOIA.

- **Criminal history records.**  DHS has criminal history information that is amassed from different jurisdictions through databases and information sharing.  Such materials are generally available through public records but are frequently difficult or impossible for noncitizens to obtain, especially if they are detained.

- **Identification documents.**  DHS confiscates the passports or other identification documents of noncitizens it detains.   Detained noncitizens are then routinely denied bond or other immigration relief because they cannot establish their identity, even when their identity documents are in the possession of DHS.

---

[4]      "Credible fear" interviews occur in the context of expedited removal.  Noncitizens who arrive at ports of entry without documents and certain noncitizens who enter the United States unlawfully are subject to expedited removal under 8 U.S.C. § 1225(b)(1)(A).  But if they express a fear of return and are found after an interview to have a "credible fear" of persecution in their home country, noncitizens are placed into full proceedings in which they can apply for asylum or other relief as a defense to removal.  *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).  By contrast, "asylum interviews" occur in the context of affirmative asylum applications filed by noncitizens who are in the United States and who are not in removal proceedings.  8 U.S.C. § 1158; 8 C.F.R. § 208.9.  If asylum is not granted by USCIS and the asylum seeker is removable, the noncitizen is placed in removal proceedings and may seek asylum and other defenses to removal.  8 C.F.R. § 208.14(c)(1).

34.     Many of these records—including the I-213, a noncitizen's prior immigration applications, and, sometimes, records of credible fear and asylum interviews—are contained within a folder compiled by the government that is known as the A-file.  The A-file serves as the primary record of a noncitizen's immigration history.  A-files were traditionally paper files shipped by DHS to different sub-agencies and offices that were involved in a noncitizen's case.  Some A-files are now digital or comprised of a hybrid of both paper and electronic files.

35.     Other records that noncitizens may need are not in their A-files.  Among records that are typically not in an A-file are visa applications, records of border crossings, identification documents taken from detained noncitizens, and immigration court records.

36.     The records withheld largely document a noncitizen's own interactions with immigration and other authorities.  But the precise details of these interactions are critical, and expecting noncitizens to recall these details without access to their records is like asking them to describe all their prior dental work in detail, including the dates, identities of dentists and assistants, implements used, names and doses of medications administered, and everything that was said—over their entire lifetimes.

37.     The Defendants' Nondisclosure Policy applies notwithstanding legal obligations to disclose information.  For example, the Immigration and Nationality Act ("INA") provides noncitizens in removal proceedings a "reasonable opportunity to examine the evidence against" them and specifically requires that they "shall have access" to non-confidential "records and documents . . . pertaining to [their] admission

or presence in the United States" when seeking to demonstrate their lawful presence. 8 U.S.C. § 1229a(b)(4), (c)(2)(B).  Despite this clear obligation, DHS takes the position that it is *not* in fact required to turn over records, other than in response to a FOIA request.  On information and belief, USCIS similarly uses FOIA as a substitute for its obligation to allow an applicant to "inspect the record of proceeding which constitutes the basis for the decision."  8 C.F.R. § 103.2(b)(16).

38.     Defendants apply their Nondisclosure Policy without regard to their due process obligations.  Noncitizens are entitled to due process in proceedings before USCIS, before immigration courts, and in connection with legal remedies that may be available after an order of removal.  *See Davis*, 802 F.3d at 177; *Devitri v. Cronen*, 289 F. Supp. 3d 287, 294-95 (D. Mass. 2018).  In immigration court, ICE also has an obligation to provide records that are "material" to the proceedings and "favorable to" a noncitizen.  *See Brady*, 373 U.S. at 87.[5]  But under the Policy, DHS does not disclose these records, even when they show that a noncitizen is eligible for relief.

39.     Defendants also apply their Nondisclosure Policy without regard to whether the records are contained in an A-file; include information that the government has deemed confidential; are relevant to an ongoing immigration matter; or would help a noncitizen demonstrate legal errors in a prior removal proceeding, or establish U.S. citizenship, eligibility for lawful status or relief, or suitability for a favorable exercise of discretion.

---

[5]     These obligations apply to the removal context due to the serious liberty interests involved. *See Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993); *United States v. Edwards*, 777 F. Supp. 2d 985 (E.D.N.C. 2011).

40.    Defendants also apply their Nondisclosure Policy without regard to whether the records would be released in response to a FOIA request, and regardless of whether a FOIA response would arrive before an immigration matter concludes or a noncitizen is ordered removed.  Without considering these factors, the Defendants simply maintain that any disclosure obligation is satisfied by FOIA.  But when FOIA fails to timely produce the crucial documents to noncitizens and their counsel, the Defendants simply shrug.

41.    Defendants have utilized various internal procedures to implement the Nondisclosure Policy, and those procedures were updated following the Ninth Circuit's ruling in *Dent v. Holder*, 627 F.3d 365 (9th Cir. 2010).

42.    In *Dent*, the Ninth Circuit construed 8 U.S.C. § 1229a(c)(2)(B) as a "mandatory access law" that required the government to disclose A-files in removal proceedings.  The Court held that the government's failure to turn over the A-file deprived Mr. Dent of the "opportunity to fully and fairly litigate" his claims, and opined that it was "unable to imagine a good reason for not producing the A-file routinely, without a request."  *Dent*, 627 F.3d at 374-75.

43.    After the Ninth Circuit's ruling in *Dent*, ICE decided that it would follow the *Dent* decision only in the Ninth Circuit and that FOIA would remain the appropriate mechanism for obtaining documents in a noncitizen's A-file in other Circuits.  Even within the Ninth Circuit, Defendants have narrowly interpreted the *Dent* decision to apply to a limited set of documents, and, on information and belief,

have continued to respond to *Dent* requests by informing immigration attorneys that they may file FOIAs.

44.     Under the Nondisclosure Policy, ICE attorneys in the Ninth Circuit routinely decline to grant access to noncitizens' A-files and other records.   For example, an immigration clinic that requested records was informed by ICE attorneys within the Ninth Circuit that it was ICE policy not to release asylum officer notes, and that they could file a FOIA.  And in a 2013 letter from the San Francisco Office of the Chief Counsel of DHS to an attorney requesting A-files for a married couple scheduled for a removal hearing, DHS/ICE stated that "[g]eneral requests for an entire A-file are appropriately processed pursuant to a Freedom of Information (FOIA) request[.]"

45.     After *Dent*, Defendant DHS also issued formal policy statements to many of its offices nationwide concerning its disclosure obligations in removal proceedings.  In 2011, ICE even developed a form response letter that its attorneys could use to deny requests for A-files and refer the requester to the FOIA process. The form letter begins, "I received your letter dated Month Date, 2011, requesting that the Office of Chief Counsel copy and provide you with your client's A-file. At this time, I must decline your request."  The letter continues by inviting recipients to "direct" their request to USCIS under FOIA provisions.  It states, "general requests for an entire A-file are appropriately processed pursuant to a Freedom of Information Act (FOIA) request[.]"



"I received your letter dated Month Date, 2011, requesting that the Office of Chief Counsel copy and provide you with your client's A-file. At this time, I must decline your request. You may direct your request to U.S. Citizenship and Immigration Services (USCIS) pursuant to 8 C.F.R. §§ 103.10 (2010) (Requests for Records Under the Freedom of Information Act) and 103.20 (related to the Privacy Act of 1974)."

"Beyond such specific requests, general requests for an entire A-file are appropriately processed pursuant to a Freedom of Information Act (FOIA) request..."

46.    In 2013, ICE's Office of the Principal Legal Advisor ("OPLA") distributed formal guidance to all OPLA attorneys and field offices titled "Responding to Requests for Documents from Respondents in Removal Proceedings." This guidance stated that "[i]n those cases where the respondent requests the entire A-file, makes repeated requests for confidential documents or documents not contained in the A-file, or is unsatisfied with the documents produced," OPLA attorneys may respond that "a request under the Freedom of Information Act (FOIA) is the appropriate recourse."

47.    One portion of this guidance allowed for limited disclosures in removal proceedings, stating that "[i]f requested by the respondent, OPLA attorneys should generally also provide the respondent with a copy of the Record of Deportable or Inadmissible Alien (Form 1-213); a copy of any applications for benefit or relief; a copy of the respondent's visa or other entry document, if such is present in the A-file; and,

if applicable, a copy of conviction records that relate to offenses implicating grounds of removability or inadmissibility." On information and belief, however, and based on the Plaintiffs' substantial experience, even this suggestion of a limited disclosure obligation was reversed or superseded by the nationwide application of the Nondisclosure Policy, or is simply not followed. Thus, on information and belief, it is not the policy in effect for ICE attorneys.

48. On information and belief, the Nondisclosure Policy reflected in these documents also applies to prevent the disclosure of records relating to noncitizens who already have final removal orders.

49. As one Court noted, "FOIA is the primary, if not the only, mechanism for accessing A-Files" by noncitizens "applying for immigration benefits, challenging removal orders, or seeking release from detention." *Nightingale v. USCIS*, 507 F. Supp. 3d 1193, 1202-04 (N.D. Cal. Dec. 17, 2020). DHS did not meaningfully disagree that noncitizens must generally access A-files through FOIA. *Id.* at 1199 n.2.

50. Upon information and belief, DHS's Nondisclosure Policy and the deficiencies of using the FOIA process for discovery are widely recognized and acknowledged throughout various government offices. For example, in a 2019 letter from a Director at the Office of Government Information Services ("OGIS") to Bennie G. Thompson, the Chairman of a Congressional Committee on Homeland Security, OGIS stated that it "hears on a regular basis from requesters and counsel who are frustrated with the lengthy process of obtaining access to Alien (A)-files through

FOIA. We question why FOIA is being used in immigration proceedings as the primary mechanism for accessing A-files[.]"

## II.   FOIA Requests Are An Inadequate Means Of Providing Disclosures.

51.   The FOIA is a transparency law designed to provide people with access to information about the actions of their government.

52.   The FOIA is not designed to protect the rights of noncitizens facing adverse immigration actions, or the rights of individuals in legal proceedings with U.S. government agencies generally.  The FOIA is also not designed as a means of providing discovery or records relevant to any ongoing immigration action or any other administrative matter.  And, not surprisingly, the FOIA does not in fact operate to provide those protections, discovery materials, and records.

53.   A related statute, the Privacy Act of 1974, governs federal agencies' collection and use of personal information.  It allows U.S. citizens and lawful permanent residents to view and seek to correct information about themselves that is held by federal agencies.  *See* 5 U.S.C. § 552a(d)(1).  The Privacy Act is also not designed as a means to protect noncitizens facing adverse immigration actions, or as a means of providing discovery or disclosures relevant to any ongoing immigration action or other administrative matter.  In fact, DHS processes requests for access to records under the Privacy Act as FOIA requests.  *See* 6 C.F.R. § 5.20(a)(1).

54.   Federal agencies are generally required to respond to FOIA requests within 20 business days, with the possibility of an additional 10 business days in "unusual circumstances."  5 U.S.C. § 552(a)(6)(A)(i).  However, Defendants have

regularly failed to meet these deadlines, resulting in significant delays in FOIA responses.

55.    In recent years, USCIS has regularly taken one year or more to respond to requests for a noncitizen's A-file. *See Nightingale*, 507 F. Supp. 3d at 1202-04.

56.    While USCIS claims to make faster processing available to noncitizens who are scheduled for hearings before immigration judges—under what it calls "Track Three"—in recent years, USCIS has regularly taken many months or longer to respond to Track Three requests.  And Track Three is not available to noncitizens seeking benefits in front of USCIS or those facing imminent removal on the basis of a prior removal order.

57.    Moreover, an A-file is not the only set of documents that a noncitizen may seek to obtain through FOIA.  Because the A-file does not contain all of the records that a noncitizen may need to defend against an adverse immigration proceeding, the noncitizen and his or her counsel must often send additional FOIA requests—including to CBP—in order to obtain other relevant records.  Responses to these requests are plagued by similar delays, often rendering them useless to the noncitizens and their counsel because the underlying immigration matter has ended or the noncitizen has already been removed.

58.    These delays are particularly harmful to individuals who face deadlines to respond to a potential adverse decision by USCIS, noncitizens who face imminent removal under a prior order of removal, and detained noncitizens in removal proceedings whose cases are processed under an accelerated detained docket.  And

even if a FOIA response were provided within the statutory time limit, that is no guarantee that it would be in time to be of use, given the accelerated pace of many immigration processes.

59.    Moreover, even when FOIA responses arrive in time, these responses often omit relevant documents or redact information that is critical to a noncitizen's defense against removal.

60.    Filing a FOIA request has been futile in many types of cases due to the accelerated timelines for certain immigration processes and the significant limitations of FOIA as a means of providing disclosures relevant to any ongoing immigration proceeding.

## III.    The Nondisclosure Policy Harms Noncitizens And The Integrity Of The Immigration System.

61.    Defendants' Nondisclosure Policy harms noncitizens and the ability of the immigration system to deliver correct and just outcomes.

62.    As a result of the Policy, noncitizens are not only systematically deprived of the opportunity to examine the evidence against them, but they are also prevented from learning about evidence in the government's possession that is favorable to them, resulting in reduced fairness and accuracy across a range of immigration proceedings.

63.    For example, noncitizens appearing before USCIS may be forced to respond to adverse evidence that they are not permitted to see, or to respond to Requests for Evidence seeking information that the government already has in its possession but does not make available to the noncitizen.  In many cases, noncitizens

who seek to document their eligibility for relief using records already in DHS's possession must first go through an additional process to obtain those records with a FOIA or separate application for duplicate records.

64.    In immigration court, Defendants' Policy frequently transforms bond hearings and removal proceedings into trials by ambush.  The Policy places noncitizens at a significant disadvantage before a bond or merits hearing even starts. In preparation for the bond or merits hearing, ICE attorneys receive the noncitizen's immigration history and other records from multiple agencies.  Then they use any negative or inconsistent information contained in these records to cross-examine the noncitizen or rebut the noncitizen's claims, while declining to recognize any duty to reveal records that would bolster the noncitizen's case.  If the noncitizen becomes flustered or fails to explain minor inconsistencies between his or her testimony and an asylum interview that was conducted years earlier, for example, the noncitizen may be found not credible, which can irreparably sink the noncitizen's entire case and result in their removal to a place where they fear persecution.

65.    For noncitizens with prior final orders of removal, lack of access to records demonstrating the basis for their removal order and their prior immigration history makes it all but impossible to investigate available defenses.  Records may reveal that they received Notices to Appear that are invalid under *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), or that their removal proceedings contained other legal errors. Records are also essential to the preparation of motions to reopen on behalf of noncitizens for whom changed country conditions now render removal life-

threatening.  The imminent threat of removal in such cases means that any action must be taken quickly, but investigating and advancing available claims without a noncitizen's records can be impossible.

66.   Across a range of interactions with immigration authorities, noncitizens are unable to use evidence in Defendants' possession that could aid their cases— including responding to USCIS inquiries, seeking bond, defending against DHS's allegations at the removal hearing, or assessing potential defenses to removal.

67.   Among other things, Defendants' Nondisclosure Policy prevents individuals and their attorneys from investigating and demonstrating a noncitizen's eligibility for certain forms of relief, and even from proving claims of U.S. citizenship. Eligibility for an immigration benefit can turn on precise details about a client's previous interactions with immigration authorities—whether a specific form was filed or a particular action was taken decades ago, or the exact date and manner of a noncitizen's arrival in the country.  The government's files are often the only place to obtain necessary information.  But the Defendants do not provide access to these records even when USCIS is poised to deny an immigration application or ICE is actively pursuing a noncitizen's removal.

68.   The gamesmanship promoted by Defendants' Nondisclosure Policy is at best, in tension—and, at worst, inconsistent—with the obligations of ICE and other attorneys under Massachusetts Rule of Professional Conduct 3.4.  Under Rule 3.4, which promotes "[f]airness to opposing party and counsel," attorneys "shall not . . . (a) unlawfully obstruct another party's access to evidence . . ." or "(d) in pretrial

procedure . . . fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party."  Comment [1] to the rule provides, "The procedure of the adversary system contemplates that the evidence in a case is to be marshalled competitively by the contending parties.  Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, . . . obstructive tactics in discovery procedure, and the like."  But under DHS's Nondisclosure Policy, ICE attorneys make no effort to comply with legally proper discovery requests and routinely prevent the competitive marshalling of evidence and fair competition contemplated by the rule, even in the life-and-death stakes of an immigration removal case.

69.     The Nondisclosure Policy has particularly dire consequences for the unrepresented.  On information and belief, the government does not inform noncitizens facing adverse immigration actions about the procedures for using the FOIA to obtain records that may aid in their defense.  Detained noncitizens also face additional obstacles to obtaining a FOIA response due to transfers and delays with mail.  Without disclosures from DHS or significant help on the outside, they often have almost no chance of obtaining records that may help them.

70.     In recent years, Defendants' Nondisclosure Policy has operated against a backdrop of increased immigration enforcement, a swell of immigration court caseloads, and a suite of policies designed to move immigration court dockets—particularly the cases of detained noncitizens—at breakneck pace.

71.     Since 2017, DHS has stepped up enforcement against noncitizens without criminal convictions.  The agency has also prioritized the removal of all noncitizens with final orders of removal, in many cases detaining and abruptly seeking to remove even noncitizens with old removal orders who it had permitted to live in the United States for years under supervision.  *See, e.g.*, *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1150 (C.D. Cal. 2018).  DHS has sought prompt removal of individuals who lacked timely access to their records in hundreds of cases involving life-threatening conditions in a noncitizen's home country.  *See, e.g.*, *Hamama v. Adducci*, 261 F. Supp. 3d 820, 823-27 (E.D. Mich. 2017), *vacated*, 912 F.3d 869 (6th Cir. 2018); *Devitri*, 289 F. Supp. 3d at 291, 298.

72.     Since 2018, the Department of Justice ("DOJ") has instructed immigration courts to complete the removal proceedings of detainees in 60 days and created new performance metrics for immigration judges.  These metrics require judges to complete at least 700 cases per year, achieve an appellate remand rate of less than 15 percent, and meet other time-based metrics to receive a "satisfactory" performance review.  Immigration judges now sit on the bench with a dashboard on the screen in front of them that tracks their rate of case completions like a car's speedometer—a constant reminder of the government's preference for speed over fairness.[6]

---

[6]     These metrics were in place at the time that Plaintiffs filed the original Complaint.  Plaintiffs acknowledge that these metrics are no longer in effect under the current administration.  *See supra* note 1.



73.     The administration has urged not just speed, but speedy denials.  For example, at a training program for immigration judges, then-Attorney General Jefferson Sessions demanded that immigration judges aid in curbing illegal immigration, noting "[v]olume is critical" and maintaining that "the vast majority of the current asylum claims are not valid."[7]  The DOJ "trains" immigration judges in a manner that actively disincentivizes and impedes immigration judges' ability to develop the record and explore all relevant facts.  These actions make uneven access to critical records all the more troublesome.

74.     The challenges have only been exacerbated by the Covid-19 pandemic. The Boston immigration court is in "chaos" and "disarray," as efforts to keep dockets moving lead some cases to be abruptly advanced even as other hearings are

---

[7]      Jefferson Sessions III, *Remarks to the Executive Office for Immigration Review Legal Training Program* (June 11, 2018), perma.cc/458L-A79B; *see also* Innovation Law Lab & Southern Poverty Law Center, *The Attorney General's Judges: How U.S. Immigration Courts Became a Deportation Tool* (2019), splcenter.org/sites/default/files/com_policyreport_the_attorney_generals_judges_final.pdf.

cancelled.[8]   With little warning about which cases will move forward when, noncitizens and their counsel have even less chance of obtaining relevant documents in time to adequately prepare for ICE's use of withheld records at hearings.

75.     Pursuant to a March 26, 2020 standing order, the Boston immigration court allows noncitizens and their counsel to appear telephonically, but provides that "[a]ny party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document."   Under this order, noncitizens and their attorneys who appear by phone for their safety and the safety of others can be prevented from examining documents introduced by DHS in court, while DHS remains free to ambush noncitizens unimpeded by any disclosure responsibility.

## IV.   Plaintiffs Are Required To Structure Their Representation To Mitigate Harm To Their Clients From Defendants' Nondisclosure Policy.

76.     Plaintiffs are experienced attorneys; small, closely held law firms; and a nonprofit legal services organization.   They are committed to applying their skills and tireless work to ensure access to justice for noncitizens in the immigration system.   Defendants' Nondisclosure Policy requires them to undertake considerable work designed to mitigate the Policy's harms to their clients.   These efforts increase the time the Plaintiff attorneys spend on each case, cost money, and impede all of the Plaintiffs from achieving their mission and goal of providing help to those who need their services.

---

[8]     Shannon Dooling, *After Increasing Its Caseload, Attorneys Say Boston's Immigration Court Is In 'Disarray'*, WBUR (July 24, 2020), wbur.org/news/2020/07/24/boston-immigration-court-disarray.

77.     Plaintiffs, and the immigration attorneys they employ, have practiced immigration law collectively for many decades.

78.     They are keenly aware that representing noncitizens in any immigration matter requires detailed investigation into clients' immigration history and any criminal record.  Defendants' Nondisclosure Policy and delays in responding to FOIA requests have been a persistent impediment to these efforts.

79.     In cases where time is of the essence, the Nondisclosure Policy poses particular threats to noncitizens' ability to defend themselves and to the fairness of the proceedings.  In such cases, Defendants' Policy typically forces Plaintiffs and their staff to do hours of additional work, under significant time pressure, to attempt to make up for information shortfalls and reduce the chance of prejudice to their clients.

80.     First, Plaintiffs and staff in their offices make herculean efforts to obtain urgently-needed information and records that DHS and the immigration courts often will not turn over.  Plaintiffs are often forced to rely principally on interviews with clients to attempt to understand their immigration histories, even though such reliance is both inefficient and ineffective.  Additional efforts to obtain records can include contacting family members and prior attorneys, going to or contacting multiple state courts, making appointments to view records of proceedings in the Boston immigration court, and locating attorneys to retrieve or review records in out-of-state courts.

81.     Although Plaintiffs do not always file FOIA requests due to their futility, in some cases Plaintiffs' efforts to obtain records also include filing and tracking FOIA requests and even pursuing FOIA appeals.

82.     Efforts to obtain records also include contacting DHS attorneys between hearings and speaking to them in court in the hope that they might accede to a narrow request for a single document—a rare occurrence, but still one worth hoping for.

83.     Second, Plaintiffs must take steps to compensate for their inability to access their clients' complete files.  Plaintiffs know that their clients are often questioned by USCIS adjudicators about undisclosed records.  And they have repeatedly experienced the selective use by ICE attorneys of such records—including prior statements in old visa applications or in credible fear or asylum interviews—to attack clients' credibility in immigration court based on minor or perceived inconsistencies.  Plaintiffs must attempt to prepare for this kind of ambush through extensive additional investigation and work with clients aimed at anticipating and guessing at records that DHS might be withholding.

84.     In other cases, protecting clients in the absence of records requires seeking continuances.  Plaintiffs seek and are sometimes granted continuances in the hopes that a FOIA response will materialize or in order to review a previously undisclosed record introduced by ICE in court.

85.     In some cases, the Nondisclosure Policy has caused some Plaintiffs to prepare entire applications—such as an alternate or duplicative application for relief,

or an application for relief that a noncitizen is not qualified for—that would have been wholly unnecessary if they had been provided access to their client's file.

86.     All told, the Nondisclosure Policy leads to more trips to detention centers to interview and work with clients, extra time with clients and other witnesses, added days in court due to continuances, repeated travel to state courthouses, the hiring of out-of-state counsel to obtain needed records, numerous communications with anyone who might have relevant information or records, and even the preparation of otherwise unnecessary applications.

87.     But these additional efforts come at great cost to the Plaintiffs.  As a result of the government's refusal to turn over records by any means other than the FOIA, Plaintiffs' representation of noncitizens in immigration matters is rendered vastly more costly and time-consuming.

88.     The additional time that Plaintiffs spend on each case stretches them thin and prevents them from taking on additional clients.  This not only hampers the mission of GBLS—to provide free legal aid to help low-income clients achieve justice and meet their basic needs—but it also impedes the missions and goals of the private attorney and private law firm Plaintiffs.  Not unlike GBLS, each of the attorney Plaintiffs runs their law offices for the primary purpose of helping people achieve justice in the legal system, including those with limited resources.  As part of that mission, the attorney Plaintiffs represent many pro bono clients and clients receiving part of their representation pro bono.  When Plaintiffs divert their time and resources

towards superfluous work created as a result of the Nondisclosure Policy, all of them are pulled away from their mission of helping more people.

89.    In some cases, moreover, the Nondisclosure Policy directly prevents representation by making success unlikely.  When a noncitizen is detained based on an old removal order and has none of his or her documents, Plaintiffs are often constrained to decline the representation because there is little that they can do to obtain the documents necessary to investigate potential legal claims before a noncitizen is removed from the United States.

90.    The Nondisclosure Policy is also financially costly, requiring the expenditure of time by attorneys and support staff, and of funds associated with document requests and travel to retrieve records and information.

91.    Even though they charge clients for representation, the Plaintiff law firms and attorneys often cannot recover the costs incurred as a result of the Nondisclosure Policy.  That is because these law firms serve many clients with limited resources and operate in a legal market in which much of the representation is paid through flat fees.  The firms are therefore often not fully financially rewarded for the time and resources they must spend attempting to recreate records in government files.  Instead, the additional time spent chasing down documents in Defendants' possession or preparing clients for the unknown would otherwise be spent representing additional clients, thereby increasing revenue and/or advancing the mission of each firm to assist as many clients as possible.

92.     The Plaintiffs joined the legal profession and founded their organizations in order to help people in vulnerable situations access justice. Defendants' Nondisclosure Policy skews the immigration system and impairs Plaintiffs' ability to help noncitizens achieve accurate and just results.

## CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706

93.     The above paragraphs are incorporated by reference.

94.     The APA instructs courts to "set aside agency action" if it fails to meet statutory, procedural, or constitutional requirements, or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706.

95.     Under DHS's Nondisclosure Policy, whether a noncitizen is given records critical to their immigration case depends on the happenstance of when a FOIA response arrives and what it includes, or on the relatively rare voluntary disclosure by a DHS attorney or other official. It also depends on a noncitizen's access to an attorney or other assistance to undertake the substantial task of attempting to obtain records that the government could easily turn over. The Nondisclosure Policy interferes with Plaintiffs' ability to protect and secure the due process rights of their non-citizen clients and their rights under existing statutory and regulatory obligations to disclose records. *See* 8 U.S.C. §§ 1229a(a)(4)(B), (c)(2)(B); 8 C.F.R. § 103.2(b)(16).[9]  It is also incompatible with the operation of any legal system that

---

[9]     Plaintiffs acknowledge the Court's ruling that they are not entitled to make a claim of a "violation of third-party due process rights" on the basis of the allegations in this Complaint. ECF No. 50 at 10. Plaintiffs do not seek to do so. Plaintiffs' claim is that the Nondisclosure Policy is an arbitrary

seeks accurate or just outcomes.  The Policy is arbitrary, capricious, an abuse of discretion, unconstitutional, and otherwise incompatible with law.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1.    Declare that Defendants' Nondisclosure Policy violates the APA;

2.    Enjoin Defendants' Nondisclosure Policy and order compliance by Defendants with regulatory, statutory, and constitutional disclosure obligations;

3.    Award attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d);

4.    Retain jurisdiction after entry of judgment to monitor compliance by Defendants with the provisions of the judgment;

5.    Order any further relief this Court deems just and proper.


Dated: February 14, 2022                    Respectfully submitted,


                                            /s/   Adriana Lafaille
                                            Matthew R. Segal (BBO #654489)
                                            Adriana Lafaille (BBO #680210)
                                            Krista Oehlke (BBO #707566)
                                            AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION OF MASSACHUSETTS, INC.
                                            One Center Plaza, Suite 850
                                            Boston, MA 02108
                                            (617) 482-3170
                                            ALafaille@aclum.org

---

and capricious means of providing records to noncitizens, including complying with regulatory, statutory, and constitutional disclosure obligations that arise in a range of immigration proceedings.

/s/   John T. Montgomery

John T. Montgomery (BBO #352220)
Amanda L. Pine (BBO #707611)
Thanithia Billings (BBO #699018)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7000
John.Montgomery@ropesgray.com


Meghan Gilligan Palermo (admitted pro hac vice)
Deanna Minasi (admitted pro hac vice)
Lauren Bergelson (admitted pro hac vice)
Ricardo Mullings (admitted pro hac vice)
Phillip Kraft (admitted pro hac vice)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
Meghan.GilliganPalermo@ropesgray.com