**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GREATER BOSTON LEGAL SERVICES, *et al*.<br><br>        Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND<br>    SECURITY, *et al*.<br><br>        Defendants. | Case No.: 1:21-cv-10083-DJC |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

PROCEDURAL HISTORY............................................................................................... 2

FACTUAL BACKGROUND.............................................................................................. 3

    A.     The Record Before an Asylum Officer ............................................... 3

    B.     The Government's Unwritten Nondisclosure Policy ............................... 5

    C.     The Government's Interpretation of 8 C.F.R. § 103.2(b)(16) ................... 7

ARGUMENT ................................................................................................................ 9

I.      PLAINTIFFS HAVE DEMONSTRATED THAT THE GOVERNMENT UTILIZES AN UNWRITTEN NONDISCLOSURE POLICY FOR AFFIRMATIVE ASYLUM CASES. ................................................................ 10

II.     THE GOVERNMENT'S NONDISCLOSURE POLICY VIOLATES THE APA BECAUSE IT IS ARBITRARY AND CAPRICIOUS. ................................... 14

III.    THE GOVERNMENT'S NONDISCLOSURE POLICY IS CONTRARY TO ITS OBLIGATIONS UNDER 8 C.F.R. § 103.2(b)(16). ......................................... 20

    A.     Under the Nondisclosure Policy, the Government does not permit asylum applicants to "inspect the record of proceeding which constitutes the basis for the decision," and instead insists that 8 C.F.R. § 103.2(b)(16) does not require it. ....................................................................................... 21

    B.     The Government's interpretation of its obligations under 8 C.F.R. § 103.2(b)(16) is inconsistent with the plain meaning of the regulation. ............. 24

CONCLUSION.............................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                    **PAGE(S)**

*Abtew v. DHS*,
   47 F. Supp. 3d 98 (D.D.C. 2014) ...........................................................................28

*Al Otro Lado, Inc. v. Mayorkas*,
   No. 23-CV-1367-AGS-BLM, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .................10, 11

*Andriasian v. INS*,
   180 F.3d 1033 (9th Cir. 1999) ...............................................................................19

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................10, 11

*Boateng v. Holder*,
   2012 WL 12893987 (D. Mass. Aug. 16, 2012) ......................................................21

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) ...............................................................................9, 10

*Camp v. Pitts*,
   411 U.S. 138 (1973) .........................................................................................2, 9

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .......................................................................................27, 29

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ...........................................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...........................................................................................10

*D&B Boat Rentals, Inc. v. United States*,
   508 F. Supp. 3d 87 (E.D. La. 2020) .....................................................................24

*Dent v. Holder*,
   627 F.3d 365 (9th Cir. 2010) ...............................................................................25

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ...............................................................................................15

*Dopico v. Goldschmidt*,
   687 F.2d 644 (2d Cir. 1982) ................................................................................10

*Employer Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*,
   833 F.3d 480 (5th Cir. 2016) ...............................................................................26

*Encino Motorcars, LLC v. Navarro*,
　579 U.S. 211 (2016)......................................................................................15, 17

*Gebhardt v. Nielsen*,
　879 F.3d 980 (9th Cir. 2018) ...............................................................................14

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
　283 F. Supp. 2d 1249 (D.N.M. 2003) ..................................................................11

*Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*,
　No. 21-cv-10083, 2022 WL 138629 (D. Mass. Jan. 13, 2022)...............................10

*Home Box Off., Inc. v. FCC*,
　567 F.2d 9 (D.C. Cir. 1977)...................................................................................9

*I.N.S. v. Cardoza-Fonseca*,
　480 U.S. 421 (1987)...............................................................................................26

*Judulang v. Holder*,
　565 U.S. 42 (2011).........................................................................15, 16, 20

*Kinda v. Jaddou*,
　8:22CV3037, 2023 WL 3624677 (D. Neb. Mar. 16, 2023)...................................27

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ......................................................................28

*Mayburg v. Sec'y of Health & Hum. Servs.*,
　740 F.2d 100 (1st Cir. 1984)..................................................................................24

*Morning Star Co. v. State Bd. of Equalization*,
　38 Cal. 4th 324 (2006) ...........................................................................................11

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
　463 U.S. 29 (1983)............................................................................... *passim*

*Nava v. Dep't of Homeland Sec.*,
　435 F. Supp. 3d 880 (N.D. Ill. 2020) ...................................................................10

*New York v. U.S. Dep't of Homeland Security*,
　969 F.3d 42 (2d Cir. 2020).....................................................................................18

*Ohio v. EPA*,
　603 U.S. 279 (2024)...............................................................................................18

*Perrin v. United States*,
　444 U.S. 37 (1979)..................................................................................................28

*R.I.L.-R v. Johnson*,
　80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................................11, 14

*Rapanos v. United States*,
    547 U.S. 715 (2006)...........................................................................................24

*Reyes-Vargas v. Barr*,
    958 F.3d 1295 (10th Cir. 2020) .......................................................................29

*Roe v. Mayorkas*,
    No. 22-CV-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ...............19

*Sehgal v. Lynch*,
    813 F.3d 1025 (7th Cir. 2016) ..........................................................................27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    No. 2:20-cv-00396-LEW, 2022 WL 2953075 (D. Me. July 26, 2022) ..................9

*Sustainable Fisheries Coalition v. Raimondo*,
    589 F. Supp. 3d 162 (D. Mass. 2022) ...............................................................15

*Tourus Records, Inc. v. DEA*,
    259 F.3d 731 (D.C. Cir. 2001) .........................................................................15

*Vara v. Devos*,
    No. 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ...............15, 16

*Vasquez v. Dep't of Pesticide Regul.*,
    68 Cal. App. 5th 672 (2021) ............................................................................11

*Venetian Casino Resort, L.L.C. v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) .......................................................10, 11, 12, 14

*Victim Rts. L. Ctr. v. Cardona*,
    552 F. Supp. 3d 104 (D. Mass. 2021) ...............................................................15

*Zerezghi v. US Citizenship & Immigr. Serv.*,
    955 F.3d 802 (9th Cir. 2020) ...........................................................................27

**STATUTES**

5 U.S.C. § 706...........................................................................................9, 15, 20

8 U.S.C. § 1101...................................................................................................3

8 U.S.C. § 1158...................................................................................................3

**OTHER AUTHORITIES**

8 C.F.R. § 103.2 ..................................................................................... *passim*

8 C.F.R. § 208.12 ...........................................................................................6, 14, 17

8 C.F.R. § 208.14 ..................................................................................4, 22

8 C.F.R. § 292.4(b) (2010) ...........................................................6, 14, 17

32 Fed. Reg. 6798 (May 3, 1967) ..............................................................17

32 Fed. Reg. 9633 (July 4, 1967) ...............................................................17

Ballentine's Law ...................................................................................24, 27

Black's Law Dictionary .........................................................................27, 28

Merriam-Webster Law ...........................................................................24, 27

## PRELIMINARY STATEMENT

The Plaintiffs are a legal services organization, a law firm, and individual lawyers who represent non-citizens in immigration proceedings, including representing applicants seeking asylum in the United States from dangerous conditions in their countries of origin. They challenge a longstanding policy of the Defendants (or, the "Government") of failing to disclose documents from a noncitizen's file to the noncitizen and their counsel. The documents that the Government refuses to disclose to the Plaintiffs often form "the basis for the decision" by the Government to grant or not grant asylum. A regulation, 8 C.F.R. § 103.2(b)(16), requires the disclosure of such documents to applicants and counsel. But Defendants do not disclose these documents, and when a question about their disclosure comes up, Defendants point to the possibility of a request under the Freedom of Information Act ("FOIA"), despite knowing that the full record that forms the basis for an asylum officer's decision will not be provided through FOIA, even if a FOIA response arrives on time. Asylum applicants and their counsel, therefore, face the unusual situation of being in a high stakes legal proceeding in which they must appear before an adjudicator who may decide the case on the basis of documents that the applicant and counsel will not be permitted to see—not because the documents are classified, but simply because the Government does not wish to disclose them.

Plaintiffs have established through discovery ordered by the Court that this unwritten policy (the "Nondisclosure Policy," or the "Policy") exists, and that it was adopted without regard to the affirmative obligations contained in the regulation, without consideration of the fact that records provided through FOIA do not constitute the entire "basis for the decision," without regard to the impact of nondisclosure on applicants and their counsel, and without any consideration of the underlying goal of the regulation to provide a fair process for asylum applicants. The Policy is also inconsistent with and contrary to the plain language of the applicable regulation requiring

1

disclosure of the records that provide the basis for decision on an asylum application. Accordingly, for the reasons set forth more fully below, Plaintiffs seek summary judgment that Defendants' unwritten policy is arbitrary, capricious, and otherwise not in accordance with law.

## PROCEDURAL HISTORY

On January 15, 2021, Plaintiffs filed this Administrative Procedure Act ("APA") action, asserting that Defendants' Policy of not disclosing immigration records to noncitizens and their counsel and requiring them instead to rely on FOIA requests is an arbitrary and capricious and unlawful agency policy, and seeking declaratory and injunctive relief. *See* ECF No. 1. Defendants moved to dismiss the Complaint. ECF No. 23, at 1. On January 12, 2022, the Court issued a decision denying Defendants' motion to dismiss as to affirmative asylum proceedings before USCIS. ECF No. 50, at 17. The Court also dismissed Plaintiffs' claim with respect to other immigration proceedings, *id.* at 16, but granted Plaintiffs leave to amend the Complaint to "allege the existence of a discrete agency action under the APA" as to removal and other proceedings. *Id.* at 17.

On February 14, 2022, Plaintiffs filed an Amended Complaint with additional allegations regarding the removal and post-removal order context, and other USCIS proceedings. *See* ECF No. 57 at 7-9, 13-17. The Government moved to dismiss, and the Court again granted the Government's motion as it pertained to removal and other immigration proceedings, leaving Plaintiffs' claim concerning affirmative asylum proceedings to proceed. *See* ECF No. 80.

On May 24, 2023, the Government produced the administrative record, ECF No. 96, which generally serves as the "focal point" for a court's review on summary judgment in an APA action. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). Plaintiffs challenged the sufficiency of the Administrative Record because, among other things, it failed to provide any rationale for the

Department of Homeland Security's ("DHS") adoption of the Nondisclosure Policy. *See* ECF No. 109.

On February 2, 2024, this Court allowed Plaintiffs to supplement the administrative record with written discovery, document discovery, and three depositions. *See* ECF No. 115. The Court acknowledged that, "to conduct effective judicial review, the Court must understand the basis on which Defendants have decided to provide certain documents to asylum applicants and their counsel, but not others." *Id.* The Court also expressed "particular concern" with "the lack of any records relating to the promulgation and application of 8 C.F.R. § 103.2(b)(16), which imposes a duty on Defendants to allow asylum applicants to inspect the record of proceeding." *Id.*

On August 9, 2024, the Parties agreed that the discovery allowed by the Court was complete. Plaintiffs now bring this Motion for Summary Judgment.

## FACTUAL BACKGROUND

### A.    The Record Before an Asylum Officer

Asylum officers must decide whether an applicant is statutorily eligible for asylum and if so, whether the applicant merits a favorable exercise of discretion. An asylum applicant is statutorily eligible for asylum if the applicant is a "refugee"—generally, someone with a "well-founded fear of persecution" in their home country on account of a protected ground. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A). An asylum applicant's testimony "may be sufficient to sustain the applicant's burden" of proof, if it "is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). If an asylum officer does not find that the applicant met their burden of proof to demonstrate that they are a "refugee," or does not merit a favorable exercise of discretion, the asylum officer will not grant asylum. That decision takes the form of a denial of the application if the noncitizen has valid underlying status,

or a referral of the applicant to immigration court for removal proceedings if the applicant does not have a valid underlying status.  *See* 8 C.F.R. § 208.14.

In deciding asylum cases, asylum officers consider an asylum applicant's submissions and testimony, as well as other available documents.  The record forming the basis for the asylum officer's decision includes, for example, the applicant's affirmative asylum application and any documentation submitted in support thereof, notices sent to the applicant in connection with the application, and any requests for evidence and responses to such requests.  SOF ¶ 80.  But it also includes other documents that are not part of the back-and-forth correspondence between the agency and the asylum applicant regarding the asylum application.  SOF ¶ 83.  For example, the record on which the asylum officer bases their decision includes documentation of the applicant's prior interactions with U.S. agencies, including other immigration applications filed with USCIS, visa applications filed with the Department of State, records of encounters with U.S. Customs and Border Protection ("CBP") at the U.S.-Mexico border, and background and security checks run on the applicant.  SOF ¶¶ 84, 86.[1]

By regulation, an asylum applicant must be permitted access to the record before the asylum officer.  Specifically, 8 C.F.R. § 103.2(b)(16), enacted in 1964, provides that an asylum applicant "shall be permitted to inspect the record of proceeding which constitutes the basis for the decision," with exceptions involving classified documents.  SOF ¶ 16.  Senior USCIS officials have acknowledged that this regulation creates an obligation for the agency to disclose certain materials to affirmative asylum applicants.  SOF ¶¶ 21, 24.

---

[1] Many of these documents are kept in a file known as the Alien file, or "A-file," which is maintained by USCIS and serves as a repository for many of a noncitizen's immigration records.  SOF ¶ 11.

### B.    The Government's Unwritten Nondisclosure Policy

The Government has adopted an unwritten policy of declining to give asylum applicants and their counsel access to the records before the asylum officer, and directing these applicants to make any requests for documents through FOIA.  *See* SOF ¶ 29.  Immigration attorney Stefanie Fisher encountered this policy during an October 2023 visit to the Boston Asylum Office, when she was informed by a supervisory asylum officer that it would not be possible for her to see the "record of proceeding" of her affirmative asylum client upon request, and that the only way for Ms. Fisher to view her client's records would be to file a request under FOIA.  SOF ¶ 42.  Similarly, in August 2023, a senior asylum officer sent an email internally at USCIS in connection with request by a representative at the Northwest Immigrant Rights Project to review derogatory information in an asylum applicant's record of proceeding.  SOF ¶ 41.  The senior asylum officer forwarded the request to a team at USCIS to confirm that "counsel should do a FOIA if they want access to any documents we can provide."  *Id*.

While discovery has revealed that this Nondisclosure Policy is largely unwritten, its existence is corroborated by various internal USCIS documents and by testimony from various USCIS personnel. [2]  *See, e.g.*, SOF ¶¶ 31-33, 35-36, 43, 45-50, 52-53, 55.  For example, a 2007 USCIS Interoffice Memorandum (the "2007 Memo")—introduced by the Government's Rule 30(b)(6) witness as evidence of the Government's document disclosure practices, *see* SOF ¶ 30—spoke about a narrow circumstance in which certain people impacted by a particular settlement agreement would be entitled to receive copies of their asylum application upon request, without

---

[2] If an affirmative asylum application was filed in a new online system, rolled out in recent years, the asylum applicant may now view the application and notices sent to them, and any responses submitted online, through an online portal. But to date, only a small portion of cases filed on paper have been digitized. SOF ¶¶ 111-13. And the documents that are available online are only a subset of the universe of documents an affirmative asylum officer might consider.  *See* SOF ¶ 111; *see also* SOF ¶¶ 83-85.

filing a FOIA.  SOF ¶¶ 31-32.  But even these class members would have to utilize FOIA to obtain documents in their immigration records beyond those limited materials.  SOF ¶ 33.  And all other non-class member asylum seekers would have to utilize FOIA to obtain any records relating to their asylum proceeding.  SOF ¶ 32.  The 2007 Memo further acknowledged the right to inspect the record of proceeding, SOF ¶ 35, but provided that, in cases where an asylum office intends to deny an application based on materials in an applicant's A-File, such an inspection is "***best accomplished through the applicant's submission of a FOIA request.***"  SOF ¶ 36 (emphasis added).  Consistent with the directives set forth in the 2007 Memo, USCIS personnel, including senior officials, have confirmed in deposition testimony that the Government's primary means of disclosing immigration records to affirmative asylum applicants and their counsel is to direct them to request their records through  FOIA.  SOF ¶¶ 43, 45, 46.

Notwithstanding the disclosure obligations codified since the 1964 adoption of 8 C.F.R. § 103.2(b)(16), the Government's Nondisclosure Policy is also corroborated by later changes to other regulations. In 1997, the Government adopted 8 C.F.R. § 208.12, which stated in relevant part that asylum applicants may not take "discovery" of U.S. agencies, but may "seek documents available through a Freedom of Information Act (FOIA) request." SOF ¶ 38.  And in 2011, USCIS revised a regulation regarding attorney appearances to remove language providing that noncitizens and their counsel "shall be permitted to examine the record of proceeding in a DHS office," *see* 8 C.F.R. § 292.4(b) (2010), replacing it with a requirement that they "will be permitted to examine the record of proceeding in accordance with [regulations governing FOIA requests]." *Id.*; *see also* SOF ¶ 39.  Decades after the adoption of 8 C.F.R. § 103.2(b)(16), these changes embody USCIS's departure from compliance with its regulatory obligation to allow inspection of the "record of proceeding," and its adoption of a Policy of not disclosing documents except through FOIA.  *See*

SOF ¶ 40.  The regulatory histories of these regulations do not provide any explanation for the agency's departure from its regulatory disclosure obligations, and do not reveal the factors considered by USCIS in adopting of the Nondisclosure Policy.  *See* SOF ¶¶ 38-39.

C.    **The Government's Interpretation of 8 C.F.R. § 103.2(b)(16)**

Primarily through its deposition witnesses in this litigation, the Government has articulated an interpretation of 8 C.F.R. § 103.2(b)(16) that attempts to align its practices under the unwritten Nondisclosure Policy with its regulatory obligations.  Specifically, USCIS interprets the word "inspect" within the regulation narrowly, and considers any inspection requirement satisfied (i) when an applicant sends a document to USCIS or receives an initial copy of any notice issued by USCIS, SOF ¶¶ 68-70, and (ii) if an asylum officer *discusses the content* of the documents that constitute the applicant's record of proceeding with the applicant during that applicant's affirmative asylum interview, SOF ¶ 67.  Under this interpretation, the Government believes it has an obligation, at most, to provide applicants with only a *single* opportunity to inspect documents in the record of proceeding, and that opportunity often does not involve any actual inspection of the documents, or occurs when the applicant initially receives or submits a document.  SOF ¶¶ 71-74.[3]

USCIS also interprets "record of proceeding which constitutes the basis for the decision" to mean a narrow sub-set of the documents contained within an applicant's A-File.  SOF ¶ 78. Specifically, USCIS defines an affirmative asylum applicant's record of proceeding to only include documents exchanged between the applicant and USCIS.  SOF ¶ 79.  The record of proceeding, as defined by USCIS, therefore excludes many of the documents that an asylum officer might

---

[3] As counsel for the Government articulated in several meet and confers with counsel for Plaintiffs, the Government does not believe it has an obligation to allow affirmative asylum applicants or their counsel to take a "second look" at any documents, beyond this single, initial review.

evaluate in their consideration of whether to deny, grant, or refer an affirmative asylum application, such as documents related to the applicant's background and security checks, prior benefits applications, and previously submitted visa applications.  SOF ¶¶ 83-86.

What is more, for most asylum applicants, USCIS does not recognize a right to inspect the record of proceeding at all.  That is because USCIS narrowly interprets the word "decision" within the regulation to limit the right to inspect the record to cases that have already been decided and have resulted in grants or denials of the affirmative asylum application, excluded in cases resulting in referrals of an application to immigration court.  SOF ¶¶ 75-77.

Along with USCIS's narrow application of the regulation under its Nondisclosure Policy, the agency uses FOIA as the only generally available method of document disclosure.  But FOIA is a general transparency law not designed to provide asylum applicants with access to the record of proceeding that constitutes the basis for an asylum officer's decision in their case.  SOF ¶¶ 56, 59.  And some key documents before an asylum officer, such as records of prior visa applications, are not easily accessible to affirmative asylum applicants and their counsel and are not accessible through a FOIA request.  SOF ¶¶ 58, 60.

Yet, asylum officers will ask affirmative asylum applicants questions about these materials that the applicants and their counsel do not have access to, and that the applicants may not have seen in many years, if ever.  SOF ¶ 87.  This means that in some instances, the first time that an affirmative asylum applicant and their counsel are seeing or hearing about a document is *during the asylum interview itself.  See id.; see also* SOF ¶ 63.  As a result, asylum applicants and their attorneys may go into asylum interviews blind and feeling unprepared, which would not be the case if they had an opportunity to review the actual record that serves as the basis for USCIS's decision.  SOF ¶¶ 61-63.  Moreover, the Government has also been inconsistent in its ability to

respond timely to FOIA requests over the years, and even when response times are shorter, the timelines of FOIA do not always allow records to be obtained in a time needed for an asylum case. *See* SOF ¶¶ 56-57.  For the Plaintiffs, the Government's reliance on FOIA is ineffective, time consuming, and hinders their ability to prepare clients for asylum interviews and run their law practices efficiently.  SOF ¶¶ 62-63, 65.

## ARGUMENT

In an ordinary civil case, summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(a).  However, in the administrative law context, courts review agency action on summary judgment to determine whether it is arbitrary, capricious, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), rather than "to determine whether a dispute of fact remains." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (internal citation omitted).

At the center of review of an APA case is an adequate record of the challenged agency action.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Home Box Off., Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977); *see also Bos. Redevelopment Auth.*, 838 F.3d at 48.  A court's review of final agency action under the APA is to be based on "the whole record or those parts of it cited by a party."  5 U.S.C. § 706.

The administrative record consists of "all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision."  *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 2:20-cv-00396-LEW, 2022 WL 2953075, at *1 (D. Me. July 26, 2022) (quoting *Maine v. McCarthy*, No. 1:14-cv-00264-JDL, 2016 WL 6838221, at *1 (D. Me. Nov. 18, 2016)).  Where, as here, a record produced by the Government is not adequate to permit judicial review, courts allow limited discovery to complete or supplement the record with

additional materials.  *See, e.g.*, *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[I]t may be that the only way there can be effective judicial review is by examining the decisionmakers themselves."); *Bos. Redevelopment Auth.*, 838 F.3d at 48.

I.    **PLAINTIFFS HAVE DEMONSTRATED THAT THE GOVERNMENT UTILIZES AN UNWRITTEN NONDISCLOSURE POLICY FOR AFFIRMATIVE ASYLUM CASES.**

Plaintiffs have demonstrated the existence of an unwritten Nondisclosure Policy that is challengeable under the APA.  As this Court has explained, the "[f]ailure to allege a written policy is not fatal to Plaintiffs' claim since 'agency action need not be in writing to be judicially reviewable as a final action.'"  *Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 21-cv-10083, 2022 WL 138629, at *7 (D. Mass. Jan. 13, 2022) (quoting *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018)).  Other courts have similarly held that whether a rule is reviewable under the APA does not depend on whether it is written.  *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135-36 (D.D.C. 2018) (holding that unwritten policy can be actionable under the APA); *see also Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 165 (1997)) (reviewing an unwritten policy where it "was surely a 'consummation of the agency's decisionmaking process'" that impacted plaintiff's rights); *Al Otro Lado, Inc. v. Mayorkas*, No. 23-CV-1367-AGS-BLM, 2024 WL 4370577, at *10 (S.D. Cal. Sept. 30, 2024) (finding that despite being unwritten, plaintiffs sufficiently alleged challengeable agency policy in which different officers turned away asylum applications for the same reason); *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 901-02 (N.D. Ill. 2020) (finding that plaintiffs' challenge of "ICE's alleged policy and practice of failing to comply with a specific, mandatory, unambiguous statutory provision" survived although they did not "identif[y]

a written policy").[4]  A contrary rule "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing."  *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)

To demonstrate the existence of an unwritten policy, Plaintiffs must provide evidence that shows a consistent pattern or practice that can be attributed to the agency decision-making process. *See Venetian Casino Resort*, 530 F.3d at 935 (finding consistent practice by EEOC was an unwritten policy actionable under the APA).  Courts may infer the existence of an unwritten policy from consistent agency practices.  *See R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding unwritten, reviewable policy existed based on firsthand knowledge of various immigration experts and collection of data on ICE practices showing consistent actions by ICE officers even where defendants denied any reviewable policy existed); *see also Al Otro Lado, Inc.*, 2024 WL 4370577, at *10 (finding that plaintiffs sufficiently alleged unwritten, challengeable policy).  Courts may also consider testimony and other government documents to prove that an unwritten policy exists.  *See Aracely, R.* 319 F. Supp. 3d at 141 (concluding upon review of the record—which included data, government policy statements and orders, public statements by high level government officials, declarations and reports from immigration lawyers, nongovernmental organizations and other experts, as well as Plaintiff's own experience with the policy—that Plaintiff's evidence of an unwritten policy "outweigh[ed] Defendants' self-serving declaration to the contrary"); s*ee also Venetian Casino Resort*, 530 F.3d at 929 (concluding that "the record" as a whole "leaves no doubt" that a policy exists).

---

[4] *See also Morning Star Co. v. State Bd. of Equalization*, 38 Cal. 4th 324, 332-36 (2006) (not allowing an agency "to avoid APA requirements simply by driving its regulations further underground" where the action was as "fixed and far reaching as would be the case if a written policy had been issued"); *Vasquez v. Dep't of Pesticide Regul.*, 68 Cal. App. 5th 672, 686 (2021) (finding the application, not the form of an agency rule, determines whether it is reviewable under the APA).

In this case, the factual record demonstrates the existence of a challengeable unwritten agency policy whereby affirmative asylum applicants and their counsel are denied access to records and told to file a FOIA if they request to review their immigration record. *See, e.g.*, SOF ¶ 29. In addition to the direct experience of the immigration attorney Stefanie Fisher who was told she would need to file a FOIA to see her client's record of proceeding, SOF ¶ 42, agency correspondence regarding a similar inquiry in San Francisco corroborates the existence of the Nondisclosure Policy. SOF ¶ 41. Testimony from agency officials (including a subject matter expert on document disclosure and the Rule 30(b)(6) witness)[5] also confirms that the agency consistently denies affirmative asylum applicants access to records and directs applicants and their counsel to request their records through FOIA, corroborating the existence of an unwritten Nondisclosure Policy. For example, testimony from K.S.,[6] an asylum officer at the Asylum Division Headquarters at USCIS, confirmed that, apart from reviewing certain documents (i) during the affirmative asylum interview and (ii) online, if the asylum application was electronically filed, FOIA is the only means that she is familiar with through which an affirmative asylum applicant or that applicant's counsel obtains copies of the documents. SOF ¶ 43. Similarly, D.P., a Special Assistant at USCIS, designated as a 30(b)(6) witness, confirmed that for cases that are not filed electronically, the standard practice is for asylum offices to direct affirmative asylum applicants requesting to review their records to FOIA. SOF ¶ 45. These two senior officials also both corroborated the existence of the Policy by testifying that the Government views its disclosure obligations under 8 C.F.R. § 103.2(b)(16) as limited to discussing documents from an asylum

---

[5] D.P., a Special Assistant at USCIS, served as the Asylum Division of USCIS's 30(b)(6) witness. D.P., in his capacity as USCIS's 30(b)(6) representative, gave testimony corroborating the existence of the Nondisclosure Policy. *See, e.g.*, SOF ¶ 30.

[6] Asylum Officer K.S. identified herself as a subject matter expert on the policies and practices of the Asylum Division of USCIS with respect to document disclosure in the context of affirmative asylum. SOF ¶ 44.

applicant's record of proceeding with that applicant in their asylum interview.  SOF ¶¶ 67, 72.  In other words, the Government does not believe there is any obligation to allow for inspection of any documents in the record of proceeding upon request—rather, the primary means to inspect documents is through FOIA.  SOF ¶ 73.  Furthermore, testimony from a R.T., a supervisory asylum officer at the Boston Asylum Office confirmed that this agency practice and policy is "unwritten" and passed down through trainings from higher up USCIS officials.  SOF ¶ 47.

Internal USCIS policy statements, trainings, and guidance also corroborate the existence of the Nondisclosure Policy, although such policy is not formally documented or described as a "Nondisclosure Policy."  *See, e.g.*, SOF ¶¶ 31-33, 48-50, 52-53, 55.  For example, a 2007 USCIS Interoffice Policy memo confirms that outside of a narrow exception providing a small set of documents to class members of a 1990 settlement agreement, USCIS's policy is to direct applicants seeking immigration records to FOIA.  *See* SOF ¶¶ 31-32 (providing that that "Asylum Office personnel are not required to provide copies of the I-589 and any supporting documents to non-ABC-eligible asylum applicants").  In his deposition testimony, the 30(b)(6) witness stated that based on this memo, officers are informed that there is no obligation to provide copies of documents to applicants and their counsel.  SOF ¶ 32.  Furthermore, the Affirmative Asylum Procedures Manual contains corroborating statements about DHS's reliance on FOIA as the primary means to allow applicants and their counsel to inspect their records.  SOF ¶¶ 48-50.  Additionally, training materials provided to asylum officers during training implicitly acknowledge that affirmative asylum applicants and their counsel must utilize FOIA to access or review the applicants' record of proceeding.  *See* SOF ¶¶ 52-53.  USCIS's web page also encourages benefits applicants to use FOIA to access their immigration record.  SOF ¶ 55.

Finally, the fact that the Government adopted language in 8 C.F.R § 208.12(b) and 8 C.F.R. § 292.4(b)—which both reflect the Nondisclosure Policy in their references to using FOIA to access documents—decades after the adoption of 8 C.F.R. § 103.2(b)(16), demonstrates the Government's decision to move away from the meaningful disclosure obligation articulated in § 103.2(b)(16) to the practice of directing affirmative asylum applicants to "seek documents . . . through a Freedom of Information Act (FOIA) request."  8 C.F.R § 208.12(b); SOF ¶¶ 37-40; *see also* 8 C.F.R. § 292.4(b) (permitting examination of "the record of proceeding in accordance with [regulations governing FOIA requests]").  These regulations and the manifestations of the Policy articulated above, as well as the agency's testimony, the testimony of other USCIS officials, and USCIS's internal guidance and trainings, demonstrate the Government's unwritten policy of directing affirmative asylum applicants and their counsel to seek documents through FOIA.  *See R.I.L-R*, 80 F. Supp. at 184 (holding that "DHS's policy of considering deterrence" in making custody determinations is challengeable agency action under the APA); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018) (quoting *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 872–73 (9th Cir. 2009)) ("[W]e retain jurisdiction over challenges to an agency's 'pattern and practice.'"); *Venetian Casino Resort*, 530 F.3d at 935 (finding that consistent EEOC practice was challengeable unwritten policy).

## II.    THE GOVERNMENT'S NONDISCLOSURE POLICY VIOLATES THE APA BECAUSE IT IS ARBITRARY AND CAPRICIOUS.

The Government's Nondisclosure Policy is arbitrary and capricious because there is no satisfactory explanation for this harmful, irrational policy, and the Government did not rely on reasonable, relevant factors in adopting and utilizing it.  The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Victim Rts. L. Ctr. v. Cardona*, 552 F.

Supp. 3d 104 (D. Mass. 2021) (citing 5 U.S.C. § 706); *Sustainable Fisheries Coalition v. Raimondo*, 589 F. Supp. 3d 162, 167 (D. Mass. 2022). The Government fails that test here because it failed to provide any rationale for its adoption and use of the Nondisclosure Policy, and for its failure to adhere to its regulatory disclosure obligations under 8 C.F.R. 103.2(b)(16).[7]

While the arbitrary and capricious standard of review under the APA "is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "One basic procedural requirement of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). When changing its position, the reasoned-explanation standard requires the agency first to "display awareness that it *is* changing position," and then to "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. 502, 515 (2009). If the agency has not provided a satisfactory explanation for its actions, the court must hold unlawful such action. *See Vara v. Devos*, No. 19-12175-LTS, 2020 WL 3489679, at *26 (D. Mass. June 25, 2020) (internal citation omitted); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (stating that the requirement for an agency to provide grounds for its decision is designed "not only to ensure the agency's careful consideration . . . but

---

[7] At the motion to dismiss stage of this case, the Court stated that there is "no . . . legal obligation" for "the disclosure of the entirety of the A-file[] in removal proceedings," and held that Plaintiffs did not plausibly allege an arbitrary and capricious policy under the APA with respect to removal proceedings. *See* ECF No. 80, at 8. In other words, this Court indicated that absent the existence of an underlying legal obligation to disclose documents, Plaintiffs could not allege an arbitrary and capricious agency policy for failure to disclose documents. In the course of discovery, the Government has now acknowledged that it *does* have a regulatory obligation, in the context of affirmative asylum, to allow applicants and their counsel to inspect the record of proceeding that serves as the basis for the asylum officer's decision. *See, e.g.*, SOF ¶¶ 21, 24. Accordingly, there *is a legal obligation* for the Government to disclose certain documents to affirmative asylum applicants and their counsel, and the Government consistently fails to meet these obligations through its adoption and use of the Nondisclosure Policy. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (recognizing agency action as arbitrary and capricious even in absence of a legal duty); *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (holding BIA application of law was arbitrary and capricious even though statute was not violated).

also gives parties the opportunity to apprise the agency of any errors it may have made and, if the agency persists in its decision, facilities judicial review"). To do so, the court "must 'carefully review' the record to 'satisfy[] themselves that the agency has made a reasoned decision[.]" *Vara*, 2020 WL 3489679, at *22 (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)). Moreover, agency action must "be based on non-arbitrary, 'relevant factors,'" which in the immigration context means that an agency's policy "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).

**First**, the Government has provided no valid reason for the adoption of the Nondisclosure Policy, and in fact did not even acknowledge that there was a change in its document disclosure policies. While the existence of the Nondisclosure Policy is clear, *see* SOF ¶¶ 29, 37, 41, the Government has not acknowledged that this Policy is a departure from its prior disclosure practices articulated in its own regulations. *See, e.g.*, 8 C.F.R. 103.2(b)(16); *see also Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 56 (holding that an agency "is obligated to explain its reasons" for changing its rules views). The administrative and discovery records do not reveal that the Government considered *any relevant factors* in enacting the Nondisclosure Policy. SOF ¶ 34. There is no record in agency policy memoranda, manuals, or other internal documents of any reason for adopting a policy requiring asylum applicants and their counsel to seek documents through FOIA, rather than allowing for inspection of such documents upon request. SOF ¶¶ 17-20, 25, 29. Even the Government's proclaimed expert on document disclosure in the affirmative asylum context could not articulate any explanation for why DHS utilizes the FOIA process as the primary means of document disclosure. SOF ¶ 44; *see also* SOF ¶¶ 102, 103. Additionally, the regulatory histories of 8 C.F.R. § 208.12 and 8 C.F.R § 292.4(b) provide no explanation for the agency's

16

decision to direct applicants to review their immigration records through FOIA, while otherwise refusing to disclose records upon request.  *See* 32 Fed. Reg. 9633 (July 4, 1967) (later amended to 8 C.F.R. § 292.4(b)); 32 Fed. Reg. 6798 (May 3, 1967) (later amended to 8 C.F.R. § 292.4(b)). While the Government's 30(b)(6) witness, after considerable prompting from defense counsel, suggested that USCIS's reason for the continued use of Nondisclosure Policy is resource constraints, SOF ¶ 34, this reasoning is not reflected in any documents or agency materials, nor did the witness give any indication as to how the agency evaluated or balanced any such consideration against the requirements of its own regulation.

As this Court noted in its order allowing for limited discovery, discovery was appropriate in this case in part because the initial administrative record submitted by the Government did not "reveal the reasoning behind the agency's decision to enact the Nondisclosure Policy, or the relevant factors it considered in adopting the Policy."  ECF No. 115 (internal quotations omitted). After limited discovery, the Government has still failed to provide any explanation for why the Nondisclosure Policy was adopted, how it was adopted, and what relevant factors the agency considered in deciding to utilize the Nondisclosure Policy.  Accordingly, the failure of the Government to articulate any explanation for its adoption of the Policy, which harms affirmative asylum applicants and their counsel by impeding them from adequately preparing for their asylum interviews, renders this Policy arbitrary and capricious in violation of the APA.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at  43; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

**Second**, the Nondisclosure Policy is arbitrary and capricious because the Government failed to consider important factors in adopting the Policy—namely, the Government did not consider that its regulatory obligations require disclosure of the record of proceeding that serves as the basis for the decision, *see* 8 C.F.R. 103.2(b)(16), the regulation's evident purpose to protect

17

the fairness of the asylum process, or the fact that documents considered by asylum officers are often not available to applicants and their counsel through the FOIA process,  *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983) ("[A] court should normally find an agency rule is arbitrary and capricious where the agency entirely failed to consider an important aspect of the problem."); *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (holding that agency action was arbitrary and capricious because it failed to consider how individual states would be able to compete in the energy market); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 64 (2d Cir. 2020) (holding that DHS changing their longstanding interpretation of "public charge" was arbitrary and capricious because "DHS failed to provide a reasoned explanation for its changed definition").  There is no indication in the record that the Government considered the fact that it is required to allow inspection of the "record of proceeding which constitutes the basis for the decision" when deciding that it would refuse to disclose crucial records that asylum officers consider when making their decision.  Rather, the Government limits the materials it is willing to allow 'inspection' of to the notices and submissions that are already 'inspected' (in the Government's view) by virtue of having been at some point submitted or sent to the applicant during the asylum process.  SOF ¶¶ 67-73.  Although that set of documents is a subset of the record that the asylum officer ultimately considers, the Government entirely failed to consider how the regulation's text or purpose can be satisfied when an asylum seeker lacks access to important portions of the record before the decision-maker.

And although FOIA is often not an effective means to obtain many of the documents that the asylum officer considers in making their decision, both because of the timelines of FOIA and because of the incompleteness of what is provided, *see* SOF ¶¶ 57-65, there is no indication that the Government considered the shortcomings of FOIA when adopting a Policy that makes FOIA the primary means of disclosing immigration records.  The Government's failure to consider these

important, relevant facts in its employment of the Nondisclosure Policy renders it arbitrary and capricious in violation of the APA. *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.

**Third**, "[i]t is well established that an agency acts arbitrarily . . . when it does not follow its own procedures." *Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *12 (D. Mass. May 12, 2023) (citing *Bos. Dist. Council of Carpenters v. U.S. Dep't of Hous. & Urb. Dev.*, No. 93-cv-10439, 1993 WL 131445, at *2 (D. Mass. Apr. 13, 1993)); *see also Andriasian v. INS*, 180 F.3d 1033, 1046 (9th Cir. 1999) ("It is the failure to abide by its own regulations that renders the [Board of Immigration Appeals'] decision 'contrary to law' and therefore an abuse of discretion." (internal citation omitted)). Here, as is explained in further detail below in Section III, *infra*, the Government has failed to "abide by its own regulation[]," 8 C.F.R. § 103.2(b)(16), and therefore its policy is arbitrary and capricious.

**Fourth**, the Nondisclosure Policy is arbitrary and capricious in violation of the APA because it creates distinctions that fail to take any account of the needs of the asylum process or the disclosure obligations and purposes of 8 C.F.R. § 103.2(b)(16). Under the Policy, although 8 C.F.R. § 103.2(b)(16) provides a right to inspect the record, whether there is any opportunity for inspection depends on the happenstance of whether a FOIA response arrives on time or not. SOF ¶ 34. And even if a FOIA response does arrive on time, the extent to which it provides the disclosure contemplated by 8 C.F.R. § 103.2(b)(16) depends on whether those documents are included or withheld in the FOIA response. SOF ¶ 58. Under the Policy, the statements made by the asylum applicant in connection with their asylum application are part of the "record of proceeding" and might be obtained through a FOIA response; the statements made by the applicant in immigration applications other than the asylum application are not part of the "record of proceeding" but might nevertheless be obtained through a FOIA response; and the statements made

by the applicant in connection with a visa application are not part of the record of proceeding and will not be obtained through a FOIA response.  *See* SOF ¶¶ 56, 60, 78-80, 84.  And these and a host of other documents will be considered by an asylum officer and form part of the basis of the decision, but may or may not be provided through a FOIA response for reasons that have no connection to the asylum process or the needs of an asylum case.  Because this unexplained Policy lacks any nexus to "the purposes of the immigration laws or the appropriate operation of the immigration system," it is arbitrary and capricious.  *Judulang*, 565 U.S. at 55.

## III.    THE GOVERNMENT'S NONDISCLOSURE POLICY IS CONTRARY TO ITS OBLIGATIONS UNDER 8 C.F.R. § 103.2(b)(16).

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (holding that an agency disclosure that violates a statute is "'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)").  That remedy is appropriate here.  The Nondisclosure Policy is "not in accordance with law" because, while 8 C.F.R. § 103.2(b)(16) imposes a requirement to allow an asylum applicant to "inspect the record of proceeding which constitutes the basis for the decision"—subject to exceptions for classified information that Plaintiffs do not challenge here[8]—under the Nondisclosure Policy that inspection of the record is not permitted to occur.  Instead, the Policy leaves noncitizens and their counsel with FOIA as the only recourse for

---

[8] The four subparagraphs of 8 C.F.R. § 103.2(b)(16) provide additional detail regarding the Government's obligations.  Subparagraph (i) requires that an applicant who is going to receive an adverse decision that is based on derogatory information must be affirmatively advised of the derogatory information and have a chance to rebut it.  That affirmative obligation applies without regard to whether the applicant has requested or viewed the record of proceeding.  Subparagraph (ii) requires USCIS to rely only upon information contained in the record of proceeding and disclosed to the applicant when they are determining an applicant's statutory eligibility.  *See Boateng v. Holder*, No. 12-10057-FDS, 2012 WL 12893987, at *4 (D. Mass. Aug. 16, 2012) (noting (i) and (ii) "do not contradict or limit the requirement of inspection" but "add additional disclosure requirements in certain situations").  Subparagraph (iii) and (iv) address exceptions to the disclosure requirement for classified information.

obtaining some but not all of the documents that are part of that record, if they can even be obtained in time.

The Government has attempted to justify the Nondisclosure Policy with creative interpretations of the requirements of 8 C.F.R. § 103.2(b)(16). But those interpretations find no textual support, and only underscore how the Nondisclosure Policy has rendered the regulation's disclosure requirements a nullity.

A.    **Under the Nondisclosure Policy, the Government does not permit asylum applicants to "inspect the record of proceeding which constitutes the basis for the decision," and instead insists that 8 C.F.R. § 103.2(b)(16) does not require it.**

The Government's Nondisclosure Policy is not in accordance with law because, contrary to USCIS's regulatory obligations under 8 C.F.R. § 103.2(b)(16), the Government does not allow affirmative asylum applicants and their counsel to inspect the record of proceeding which constitutes the basis for the outcome of their asylum applications. Instead, the Government leaves applicants and their counsel to see what they might get through the FOIA process. SOF ¶ 78. But that process does not produce to applicants and their counsel the record on which Asylum officers base their decisions. SOF ¶¶ 79-80. Under the Government's Nondisclosure Policy, affirmative asylum applicants and their counsel therefore cannot access critical documents that the asylum officer considers, leaving them to enter interviews without knowing what the asylum officer will be considering in making the decision, and being left to guess at the reasons for an application being denied. SOF ¶ 91; *see also* SOF ¶¶ 62-63. This Policy is clearly inconsistent with the legal disclosure requirements under 8 C.F.R. § 103.2(b)(16).

The government's deposition witnesses in this litigation have attempted to show that the Nondisclosure Policy actually complies with 8 C.F.R. § 103.2(b)(16) by advancing interpretations of the requirement to allow applicants to "inspect the record of proceeding which constitutes the

basis for the decision" that strip that obligation of any meaning.  These interpretation of (1) "record of proceeding," (2) "decision," and (3) "inspect" are themselves a manifestation of the Government's commitment to the Nondisclosure Policy.

**First**, the Government construes the definition of "decision" narrowly to exclude cases in which an asylum officer's decision not to grant asylum results in the case being *referred* to the immigration court for removal proceedings, rather than denied.  *See* 8 C.F.R. § 208.14(c) (providing that an asylum officer that does not grant an asylum application shall "deny" the application for where a noncitizen has a valid status, and refer the case to the immigration court for removal proceedings if the noncitizen appears inadmissible or deportable); *see also* SOF ¶¶ 76-77.  In other words, in the view of the Government, a "referral" does not qualify as a "decision" under the regulation, and applicants whose affirmative asylum applications are referred to immigration court—which is most asylum applicants whose cases are not granted—never have any right to "inspect the record of proceeding which constitutes the basis for the decision."  SOF ¶ 77.

**Second**, the Government interprets the inspection requirement under 8 C.F.R. § 103.2(b)(16) to be satisfied by means which do not require USCIS to provide any actual opportunity for an affirmative asylum applicant or their counsel to review the documents that form the basis for the asylum officer's decision.  According to the Government's 30(b)(6) witness, the primary means through which an applicant may "inspect" the "record of proceeding which constitutes the basis for the decision" occurs either (1)  during the application process when documents are submitted or received by the applicant through the mail, or (2) when an asylum officer describes documents from the record of proceeding (and sometimes other documents in the A-File) to the applicant during that applicant's affirmative asylum interview.  *See* SOF ¶¶ 67-72.

Indeed, according to the Government, simply ***discussing*** the documents during the interview is sufficient to satisfy the Government's duty to permit ***inspection*** under 8 C.F.R. § 103.2(b)(16). *See* SOF ¶ 67.  Consistent with the allegations in Plaintiffs' Amended Complaint, *see* ECF No. 57 ¶ 39, this interpretation allows the Government to question affirmative asylum applicants using evidence the applicant may not have been aware of prior to the interview, preventing the applicant or their counsel from adequately preparing for the interview ahead of time.

**Third**, and relatedly, the Government interprets the definition of "record of proceeding" narrowly to mean a very limited subset of documents within the larger record that forms the basis for an asylum officer's decision.  *See* SOF ¶ 78.  As defined by the Asylum Division, that record includes only documents exchanged between the applicant and USCIS in connection with the affirmative asylum application process.  SOF ¶ 79.  Meanwhile, asylum officers often rely on additional records in making their decisions, beyond just those included in what the Asylum Division defines as an applicant's affirmative asylum "record of proceeding."  SOF ¶¶ 81, 83.  For example, an asylum officer might consider State Department records, records of encounters at the U.S.-Mexico border, and records of prior benefits applications submitted to the Government, despite the fact that these documents are not a part of the affirmative asylum "record of proceeding," as defined by the Government.  SOF ¶¶ 84-86.  Under this interpretation, the Government does not believe it has any obligation to allow affirmative asylum applicants or their counsel to review many of the documents that might serve as the basis for the asylum officer's decision, despite the plain language of 8 C.F.R. § 103.2(b)(16) permitting inspection of such documents.

**B.    The Government's interpretation of its obligations under 8 C.F.R. § 103.2(b)(16) is inconsistent with the plain meaning of the regulation.**

The Government's interpretation of its obligations under 8 C.F.R. § 103.2(b)(16) is not in accordance with the law in violation of the APA because it is contrary to the regulation's plain meaning.  *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (rejecting agency's "expansive interpretation" because it was not a permissible construction of the statute based on the text and interpretive canons); *Mayburg v. Sec'y of Health & Hum. Servs.*, 740 F.2d 100, 103 (1st Cir. 1984) (rejecting agency's interpretation of statute based on a dictionary definition and failure of the interpretation to "carry out Congress's intent"); *D&B Boat Rentals, Inc. v. United States*, 508 F. Supp. 3d 87, 96 (E.D. La. 2020) (finding that defendant agency's interpretation was not reasonable because it "essentially renders the final sentence of the regulation meaningless").  At each turn, these interpretations only underscore the Government's effort to circumvent its regulatory obligations through the adoption and use of the Nondisclosure Policy.

First, 8 C.F.R. § 103.2(b)(16) requires an applicant or petitioner be "permitted to **inspect** the record of proceeding."  § 103.2(b)(16) (emphasis added).  Merriam-Webster Law Dictionary defines "inspect" to mean "to view closely in critical appraisal," to "look over" or to "examine officially."  *Inspect*, Merriam-Webster Law Dictionary (2016 ed.).   Other dictionaries define "inspect" similarly—for example, Ballentine's Law Dictionary defines it as "[t]o look upon; to examine for the purpose of determining quality, detecting what is wrong, and the like; to view narrowly and critically; as to inspect conduct."  *Inspect*, Ballentine's Law Dictionary (3rd ed. 2010).  The Government has improperly construed the "inspection" requirement as satisfied if the record of proceeding is *discussed* with the applicant at their affirmative asylum interview, or if the applicant has *at any point* had the document in their possession, whether or not the applicant was able to truly examine or view critically any particular document in the record of proceeding.  This

24

interpretation—which does not actually require providing an applicant with any opportunity to view any records at all—is inconsistent with the plain English definition of the word "inspect."

Moreover, the Government's interpretation of inspect essentially means that the first time affirmative asylum applicants will be provided with an opportunity to "inspect" certain documents that are considered by the asylum officer in reaching a decision will be during the asylum interview itself. SOF ¶¶ 62-63. This interpretation leaves applicants and their counsel to walk in and be surprised with questions about documents that might contribute to the asylum officer's decision, that they have not seen or inspected previously or in many years, or to be left in the dark about such documents entirely. *Id.* In *Dent v. Holder*, the Ninth Circuit explained that "[i]t would indeed be unconstitutional if the law entitled an alien in removal proceedings to his A-file, but denied him access to it until it was too late to use it." 627 F.3d 365, 374 (9th Cir. 2010). So too here, it makes little sense to interpret § 103.2(b)(16)'s inspection requirement to deny an applicant access to their record of proceeding "until it [i]s too late to use it." *Id.*

The next element of 8 C.F.R. § 103.2(b)(16) requires an agency to permit an applicant or petitioner "to inspect the ***record of proceeding*** which constitutes the basis for the decision." 8 C.F.R. § 103.2(b)(16) (emphasis added). But contrary to the plain text of the provision, the Government interprets that "record of proceeding" to comprise a narrow set of documents, not all of the documents constituting a "basis for the decision." Materials from other applications filed before USCIS, visa records, records of encounters at the U.S.-Mexico border, and other information in the Government's possession but not submitted by the applicant in support of the application for asylum, are not part of what the Government recognizes as the "record of proceeding" that the regulation provides a right to inspect.

Even if the regulation's requirement to provide the record "which constitutes the basis for the decision" left any room for doubt—though it does not—the Government's view that this record includes only the back-and-forth submissions of the asylum process is also dispelled by subparagraphs (ii) and (iii) of 8 C.F.R. § 103.2(b)(16).  Whereas subparagraph (iii) allows an asylum officer's exercise of discretion to be based on "classified information not contained in the record and not provided to the applicant," subparagraph (ii) requires a determination of statutory eligibility for asylum to be "based only on information contained in *the record of proceeding which is disclosed to the applicant or petitioner*" (emphasis added).  These subparagraphs confirm that the "record of proceeding" on which an asylum officer is permitted to rely is the same record that must be disclosed to the applicant, with exception for classified information.[9]  And that is also how USCIS itself interprets the "record of proceeding" in the context of naturalization and adjustment of status applications, for which the record is defined to include "any other evidence relied upon in the adjudication process." SOF ¶ 90.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (holding that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view" (internal citation omitted)); *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 490 (5th Cir. 2016) ("[A]n agency's statements are unpersuasive when they are 'internally inconsistent' and 'fail to provide clear direction to regulated parties . . . .'" (citation omitted)); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (striking down an interpretation that clashed with the Department of

---

[9] An exception to subparagraph (ii) provides specific procedures that may be used in order to consider classified information in determining statutory eligibility for asylum. *See* 8 C.F.R. § 103.2(b)(16)(ii) & (iv).

Labor's longstanding definition of "outside salesman" because the interpretation was inconsistent with DOL's history and promoted "unfair surprise" in the pharmaceutical industry).[10]

Finally, the Government's disclosure obligations under 8 C.F.R. § 103.2(b)(16) extend to inspection of those documents "which constitutes the basis for the ***decision***." § 103.2(b)(16) (emphasis added). Black's Law Dictionary has several definitions of "decision," one of which is "[a] judicial or agency determination after consideration of the facts and the law." *Decision*, Black's Law Dictionary (12th ed. 2024). It also defines "decision" as "judgment on a disputed matter, action of deciding." *Id.* Nowhere does Black's Law Dictionary require finality with respect to a "decision." Instead, there is a separate definition of "final decision," which means "[a] court or other tribunal's final determination of the rights and obligations of the parties in a case; also, the act or action of making such a determination," which is a term that is not invoked in 8 C.F.R. § 103.2(b)(16). Other dictionaries define "decision" similarly—for example Merriam-Webster Law Dictionary defines it as "an authoritative determination (as a decree or judgment) made after a consideration of facts or law," while Ballentine's Law Dictionary defines it as "[t]he report of a conclusion reached." *Decision*, Merriam-Webster Law Dictionary (2016 ed.); *Decision*, Ballentine's Law Dictionary (3rd ed. 2010).

The Government's interpretation of "decision" in the regulation is plainly inconsistent with these definitions. The Government asserts that "decision" only encompasses grants or denials of the affirmative asylum benefit, but excludes referrals of affirmative asylum applications to immigration court—an indisputably significant development in the course of the asylum process.

---

[10] Other courts have interpreted the "record of proceeding" broadly, requiring disclosure of all information relied upon. *See, e.g.*, *Zerezghi v. U.S. Citizenship & Immigr. Serv.*, 955 F.3d 802, 811-12 (9th Cir. 2020) (indicating that USCIS routinely includes evidence in prior applications as part of the record before it); *Sehgal v. Lynch*, 813 F.3d 1025, 1031 (7th Cir. 2016) (requiring USCIS to produce  all the information that they relied upon before they can properly deny an application); *Kinda v. Jaddou*, 8:22CV3037, 2023 WL 3624677, at *11-12 (D. Neb. 2023) (defining USCIS record as including all the "agency action and evidence" and "unredacted versions of every document in the USCIS file").

SOF ¶ 77.  And since it cannot be known whether a pending asylum case will be granted or not, the Government's reading has the practical implication of making the "record of proceeding" unavailable until after the affirmative asylum process is complete and after it becomes too late to be useful.  The Government's distinction between referrals, denials, and grants is unsupported by the plain text.  All of these outcomes are a "decision" under the plain language definition of the term as they are determinations after consideration of the facts and law.  *See Decision*, Black's Law Dictionary (12th ed. 2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 581 (2019) (holding that a court must enforce the "plain meaning" of a statute's text when interpreting its meaning); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  A referral is an outcome for an affirmative asylum applicant—it is a *decision* by the asylum officer that they do not feel the applicant has shown that they should be granted the affirmative asylum benefit, which results in the noncitizen being placed in removal proceedings. *See Abtew v. DHS*, 47 F. Supp. 3d 98, 106 (D.D.C. 2014) (holding that a referral notice posted by USCIS directing an asylum petition to an immigration judge constituted a "final decision" because it "officially disposes of the asylum petition on behalf of USCIS").  Excluding referrals—the most common outcome for an affirmative asylum applicant—from the definition of "decision" illogically limits the scope of 8 C.F.R. § 103.2(b)(16), removing any obligation to allow for inspection of the record of proceeding for many applicants.

The Government's interpretation of 8 C.F.R. § 103.2(b)(16) violates the plain meaning of the statutory terms and renders it a nullity.  "A well-established canon of construction requires that courts give all language in a statute operative effect."  *Morales*, 524 F.3d at 59.  This applies equally to interpretations of regulations.  *Id.*  Therefore, "a court should interpret a regulation so

that, 'if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Id.* (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). Yet, the Government's interpretation of 8 C.F.R. § 103.2(b)(16) renders certain key terms superfluous and insignificant, failing to give them proper meaning. The Government's narrow constructions of "inspect," "decision," and "record of proceeding" do not give these terms operative effect, and instead constricts their meaning in a manner that violates the APA. *See, e.g.*, *Christopher*, 567 U.S. at 159-60, 163 (invalidating Department of Labor interpretation because it used language "flatly inconsistent" with a federal law and is "much too narrow" and would defeat Congress' intent); *Reyes-Vargas v. Barr*, 958 F.3d 1295, 1305 (10th Cir. 2020) (invalidating DHS's interpretation of regulation because the "regulation's plain language leads to a sensible result").

Requiring asylum applicants to resort to FOIA strips applicants of any meaningful opportunity to "inspect the record of proceeding which constitutes the basis for the decision," thereby rendering these terms futile. Accordingly, the Nondisclosure Policy, which the Government has attempted to prop up with a confounding interpretation of its regulatory obligations, is contrary to law in violation of the APA. This interpretation harms affirmative asylum applicants and their counsel by preventing their access to crucial records that serve as the basis for the asylum officer's decision, preventing adequate preparation for their asylum interviews, and costing Plaintiffs valuable time and money.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment and grant declaratory and injunctive relief.[11]

---

[11] Plaintiffs respectfully request an opportunity to confer with the government and, if necessary, provide additional briefing to address the question of appropriate relief after the resolution of the parties' motions for summary judgment.

## **REQUEST FOR ORAL ARGUMENT**

The Court has scheduled oral argument for April 3, 2025.  Pursuant to Local Rule 7.1(d), Plaintiffs' counsel respectfully confirm their belief that oral argument will assist the Court in evaluating the claims asserted.

Dated: November 22, 2024

Respectfully submitted,

By: /s/ *Adriana Lafaille*
Adriana Lafaille (BBO #680210)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
ALafaille@aclum.org

/s/ *John T. Montgomery*
John T. Montgomery (BBO#352220)
Amanda L. Pine (BBO #707611)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7000
John.Montgomery@ropesgray.com

Deanna Minasi (admitted pro hac vice)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
Deanna.Minasi@ropesgray.com

*Attorneys for Plaintiffs*