# Exhibit 2

# AFFIRMATIVE ASYLUM PROCEDURES MANUAL

## Table of Contents

**I. BACKGROUND INFORMATION** ........................................................................................... 1

**I.A. MANUAL CONTENTS** ..................................................................................................... 1
    1. Manual Structure ...................................................................................................... 1
    2. How to Search the Manual ....................................................................................... 1
    3. General Notes ............................................................................................................ 1

**I.B. REFERENCES** ................................................................................................................ 2
    1. Written and Electronic Materials .............................................................................. 2
    2. Sources of Authority ................................................................................................. 2
    3. Systems Used During Asylum Adjudications ............................................................. 2

**II. THE AFFIRMATIVE ASYLUM APPLICATION** ............................................................. 5

**II.A. INSTRUCTIONS FOR FILING FOR ASYLUM AFFIRMATIVELY WITH USCIS** ....................................... 5

**II.B. AFFIRMATIVE VS. DEFENSIVE ASYLUM APPLICATIONS** ..................................................... 6

**II.C. NONCITIZEN FILES FORM I-589 AFFIRMATIVELY WITH USCIS** ............................................ 7
    1. Forms I-589 Filed by Mail with USCIS Not Subject to Special Filing Instructions (Lockbox) .................. 7
    2. Forms I-589 Filed Online .......................................................................................... 7
    3. Forms I-589 Subject to Special Filing Instructions Filed by Mail (Asylum Vetting Center) ...................... 8
    4. Forms I-589 Filed Directly with the Local Asylum Office ........................................... 8

**II.D. GLOBAL CASE CREATION FOR A FORM I-589** .................................................................. 9
    1. Form I-589 Filing Dates and Receipt Notices ........................................................... 9
    2. Correcting Filing Dates and Receipt Notices for Pending Forms I-589 ....................... 9
    3. Paper File Transfer Requests .................................................................................... 10
    4. Automated Records Checks and Other Automated Activity ...................................... 10

**II.E. PAPER A-FILE IS TRANSFERRED TO ASYLUM OFFICE** ....................................................... 11
    1. From Other USCIS or DHS Locations ....................................................................... 11
    2. From the Asylum Vetting Center (ZGA) ................................................................... 11

**II.F. ASYLUM OFFICE RECEIVES PAPER A-FILE** ....................................................................... 12

**II.G. ASYLUM OFFICE SCHEDULES INTERVIEW** ...................................................................... 13
    1. Asylum Office Creates an Interview Calendar in RAPS .............................................. 13
    2. Cases are Selected for Interview Scheduling ............................................................ 13

USCIS00004082

3. Asylum Office Generates and Mails Interview Notice ........................................................................14

**II.H. ASYLUM OFFICE PULLS PAPER FILES FOR INTERVIEW** ...................................................... **15**

**II.I. APPLICANT ARRIVES FOR INTERVIEW** ........................................................................................ **16**
1. CPMS-IVT .............................................................................................................................................16
2. Asylum Office Verifies that Applicant Complied with Biometrics Collection Requirements ..................16
3. Interview Assignment Log ....................................................................................................................20
4. Random Assignment ...........................................................................................................................20
5. AO Prepares for the Interview .............................................................................................................21
6. Delays in Interviewing ........................................................................................................................21
7. AO Calls the Applicant for the Interview .............................................................................................21
8. AO Meets and Greets the Applicant ...................................................................................................22

**II.J. AO CONDUCTS AN ASYLUM INTERVIEW** ................................................................................... **23**
1. Minimum Requirements for an Interview .............................................................................................23
2. Placing the Applicant Under Oath .......................................................................................................23
3. Dependents .........................................................................................................................................23
4. Interpreters .........................................................................................................................................24
5. Legal Representative ...........................................................................................................................31
6. Witnesses ...........................................................................................................................................36
7. Submission of Documents ..................................................................................................................36
8. Retention of Applicant's Original Documents in the File ....................................................................36
9. Note-taking by the AO During an Asylum Interview ............................................................................37
10. Applicant Testifies to Fraudulent Entry or Violation of Status ..........................................................38
11. Conducting an Interview in a Language other than English ...............................................................39
12. Applicants Unable to Testify on their Own Behalf.............................................................................40
13. Re-interviews of Asylum Applicants ..................................................................................................41
14. Discovery of Adverse Information After an Asylum Interview ...........................................................42

**II.K. AO CONCLUDES AN ASYLUM INTERVIEW** ................................................................................ **44**
1. I-589 Application .................................................................................................................................44
2. AO Informs the Applicant About the Next Step in the Process ..........................................................44

**II.L. UPDATING THE CASE MANAGEMENT SYSTEM (GLOBAL)** ...................................................... **46**
1. Summary Tab ......................................................................................................................................46
2. Entry Tab ............................................................................................................................................46
3. Checks Tab .........................................................................................................................................48
4. Risks Tab ............................................................................................................................................48
5. Adjudication Tab .................................................................................................................................48
6. Documents Tab ...................................................................................................................................49
7. Application Tab ...................................................................................................................................49
8. Case Log.............................................................................................................................................49

**II.M. AO RESEARCHES A CASE** ............................................................................................................ **50**
1. Asylum Division ECN Page..................................................................................................................50

2. The RAIO Research Unit ..................................................................................................................50

3. The Department of State (DOS) ......................................................................................................51

4. Fraud Detection and National Security (FDNS) Directorate .........................................................52

5. U.S. Embassies and Consulates Overseas .......................................................................................52

6. Foreign Embassies and Consulates in the U.S. ...............................................................................52

7. Homeland Security Investigations Forensics Laboratory (HSI-FL) ...............................................53

8. INTERPOL ..........................................................................................................................................53

9. Federal Law Enforcement Agencies ................................................................................................53

**II.N. AO PREPARES A DECISION** ............................................................................................... 54

1. Applicant Appears Eligible for Asylum ...........................................................................................54

2. Applicant Appears Ineligible for Asylum .......................................................................................55

**II.O. SAO REVIEWS A FILE** ....................................................................................................... 58

1. Case Review Checklist ......................................................................................................................58

2. Signature on Documents .................................................................................................................58

3. Standard of Review ..........................................................................................................................58

**II.P. ASYLUM OFFICE SERVES THE DECISION ON THE APPLICANT** .......................................... 59

**II.Q. ASYLUM OFFICE SERVES THE DECISION ON THE APPLICANT** .......................................... 60

1. Recommended Approval ..................................................................................................................60

2. Asylum Approval ..............................................................................................................................60

3. Referral .............................................................................................................................................61

4. Notice of Intent to Deny (NOID) .....................................................................................................62

5. Denial ................................................................................................................................................63

**II.R. POST-SERVICE PROCESSING** ............................................................................................ 64

1. Recommended Approval ..................................................................................................................64

2. Asylum Approval ..............................................................................................................................64

3. Referral or Case Forwarding ...........................................................................................................64

4. Notice of Intent to Deny (NOID) .....................................................................................................66

**III.     EXPANDED TOPICS** .......................................................................................................67

**III.A. ADDRESS CHANGES** ....................................................................................................... 67

1. Applicant's Obligation to Notify USCIS of a Change of Address....................................................67

2. Recording Change of Address .........................................................................................................67

**III.B. CATEGORIES OF CASES** ................................................................................................... 69

1. Children Filing as Principal Asylum Applicants ..............................................................................69

2. Coercive Family Planning (CFP) .......................................................................................................78

3. Credible Fear-Screened Affirmative Asylum Applicants ...............................................................79

4. Deceased Applicants – DRAFT .........................................................................................................81

5. Deferred Enforced Departure (DED) ...............................................................................................82

6. Disabilities - Physical and Mental ...........................................................................82
7. Expeditious Processing Required ...........................................................................83
8. Legalization/Special Agricultural Workers (SAW) ..............................................84
9. National Security Matters, Including Known or Suspected Terrorists and Human Rights Abusers .......85
10. NTA Issuance at Applicant's Request ..................................................................87
11. Special Groups ....................................................................................................88
12. Temporary Protected Status (TPS) .....................................................................90
13. Issues Affecting LGBTI Applicants .....................................................................90
14. Trafficking Victims ..............................................................................................92
15. Previously Issued NTAs .......................................................................................96
16. Previously in Removal Proceedings (PRP) Asylum Applications ........................99

**III.C. CONFIDENTIALITY ISSUES ....................................................................... 103**
1. Asylum Interviews ...............................................................................................103
2. Protecting Confidentiality – Written Materials ................................................103
3. Access to Asylum Files by Non-DHS Federal Law Enforcement Agencies (FLEAS) ............103
4. Disclosure to Third Parties – General ...............................................................104
5. Testimony of Other Applicants ..........................................................................104

**III.D. DEPARTING THE U.S. BEFORE A FINAL DECISION ................................... 106**
1. Discovering DEPARTURE FROM U.S. before an Asylum Interview ....................106
2. Discovering Departure from the U.S. During an Asylum Interview ...................107
3. Discovering Departure from the U.S. After an Asylum Interview ......................107

**III.E. DEPENDENTS ............................................................................................ 109**
1. Adding a Dependent After Principal Applicant's Initial Filing ..........................109
2. Family Members Filing as Separate Principal Applicants .................................113
3. Simultaneous Filing as a Principal Applicant and a Dependent ......................113
4. Dependent's Failure to Appear at Asylum Interview .......................................115
5. Child Status Protection Act – DRAFT .................................................................116
6. Loss of Derivative Status After Initial Filing but Before Final Decision ............117
7. Loss of Derivative Status After Asylum Approval but Before Adjustment of Status ...........118
8. Effect of Principal Applicant's Administrative Closure on a Dependent's Claim ...............122
9. "Split Decisions" ................................................................................................123
10. Dependent Subject to Reinstatement or FARO ..............................................124
11. Dependent Subject to Mandatory Bar to Asylum ..........................................125
12. Previously Issued NTAs and Dependents ........................................................125
13. Polygamous Marriages and Impact on Ability to Qualify as a Dependent .........................129

**III.F. EMPLOYMENT AUTHORIZATION DOCUMENT (EAD) ............................... 130**
1. Pre-reform Cases ...............................................................................................130
2. Reform Cases INA § 208(d)(2) ...........................................................................130
3. 180-Day Asylum EAD Clock ...............................................................................130
**4. Employment Authorization of Asylees ...........................................................131**

USCIS00004085

**III.G. EXTENSIONS OF NONIMMIGRANT STAY** ............................................................................. **132**

**III.H. EXTENSIONS TO SUBMIT DOCUMENTATION** ...................................................................... **133**
    1. Requested by Applicant at Conclusion of Interview ........................................................................133
    2. Requested by AO at Conclusion of Interview ..................................................................................133
    3. Requested by Applicant after Service of NOID ...............................................................................134

**III.I. FAILURE TO APPEAR** ......................................................................................................... **135**
    **1. Asylum Interview – Applicant Submits Excuse Prior to Interview Date** ...........................136
    **2. Asylum Interview – Applicant Submits Excuse on or After Interview Date** ....................136
    **3. Asylum Interview – Applicant Fails to Submit Excuse** .........................................................142
    **4. Failure to Appear at a Pick-up Appointment** .........................................................................144

**III.J. FILE MANAGEMENT** ......................................................................................................... **145**
    1. Multiple A-Numbers ......................................................................................................................145
    2. Requesting Copies of A-Files from the Law Enforcement Support Center (LESC) – DRAFT .................147
    3. Work Folders ("W-files") ................................................................................................................148
    4. Temporary Files ("T-files") .............................................................................................................148
    5. Record Order ..................................................................................................................................150

**III.K. IDENTITY AND SECURITY CHECKS** ..................................................................................... **152**
    1. Failure to Follow Requirements for Identity Check Procedures ....................................................152

**III.L. JURISDICTION** ................................................................................................................... **156**
    1. USCIS Jurisdiction ..........................................................................................................................156
    2. Asylum Office Geographical Jurisdiction ........................................................................................162
    3. Aliens Not Entitled to Proceedings under Section 240 of the INA .................................................164
    4. Federal Court Jurisdiction ..............................................................................................................168
    5. Applicants for Admission at Land Border Ports of Entry ................................................................169
    6. Form I-589 Filed by Individual in Expedited Removal ....................................................................169

**III.M. MOTIONS TO REOPEN AND RECONSIDER** ........................................................................ **173**
    1. Types of Motions ...........................................................................................................................173
    2. Asylum Office Processing of a Motion ...........................................................................................173
    3. Jurisdiction ....................................................................................................................................173
    4. Denying or Dismissing a Motion ....................................................................................................174
    5. Granting a Motion .........................................................................................................................175

**III.N. PAROLEES INELIGIBLE FOR ASYLUM** ................................................................................. **177**
    1.    Applicants in a Current Period of Parole at Time of Adjudication ...........................................177
    2. Applicants Whose Parole is Expired or Terminated at Time of Final Decision ................................178
    3. Dependents Who Are Parolees .......................................................................................................180

**III.O. PRE-REFORM VS. REFORM APPLICATION PROCESSES** ......................................................... **182**
    1. Overview of Processing Procedures – Pre-Reform vs. Reform .......................................................182
    2. Applications Interviewed before January 4, 1995 but Still Pending a Final Decision ......................182

USCIS00004086

**III.P. PROHIBITONS ON FILING AN ASYLUM APPLICATION** .............................................................. **184**
   1. Categories of Aliens who May not Apply for Asylum ............................................................ 184
   2. One-Year Filing Deadline ........................................................................................................ 184
   3. Previous Denial of Asylum by EOIR ....................................................................................... 189
   4. U.S.-Canada Safe Third Country Agreement – DRAFT ........................................................ 193

**III.Q. QUALITY ASSURANCE REVIEW** ............................................................................................ **195**
   1. HQASM/TRAQ .......................................................................................................................... 195
   2. QA/T at the Local Asylum Office ............................................................................................ 196

**III.R. RAPS REPORTS** ..................................................................................................................... **197**
   1.Types of RAPS Reports ............................................................................................................ 197
   2. Security Procedures for RAPS Reports ................................................................................... 199
   3. Global Reports ......................................................................................................................... 199

**III.S. REINSTATEMENT OF A PRIOR ORDER PURSUANT TO SECTION 241(a)(5) OF THE INA AND FINAL ADMINISTRATIVE REMOVAL ORDERS (FARO) PURSUANT TO SECTION 238(b) OF THE INA** 200
   1.   Reinstatement of a Prior Order pursuant to INA §241(a)(5) ......................................... 200
   2.   Final Administrative Removal Order (FARO) pursuant to INA §238(b) ......................... 203

**III.T. RESCHEDULE REQUESTS** ....................................................................................................... **205**
   1. Requests to Reschedule Interview .......................................................................................... 205
   2. Reschedules Due to Interpreter Problems ............................................................................. 207
   3. Reschedules Due to Asylum Office Geographical Jurisdiction ............................................. 207
   4. Applicant Requests to Reschedule Pick-up Date ................................................................... 207
   5. Canceling a Pick-up Date at the Fault of USCIS ..................................................................... 207

**III.U. RESCISSION OF AN ASYLUM APPROVAL** ............................................................................... **209**
   1.   Issue Motion to Reconsider ............................................................................................ 209
   2. Wait 45 days or until response is received, whichever comes first ....................................... 209
   3. Review response, if any, and issue letter affirming or rescinding grant ............................... 209

**III.V. TERMINATION OF AN ASYLUM APPROVAL** ........................................................................... **211**
   1. Overview of Termination Proceedings ................................................................................... 211
   2. Asylum Office Processing of a Motion ................................................................................... 213
   3. Sources of Adverse Information ............................................................................................. 214
   4. Notifying Asylee of USCIS's Intent to Terminate Asylum Status .......................................... 216
   5. FOIA Requests During Termination Proceedings .................................................................. 218
   6. Conducting the Termination Interview ................................................................................... 218
   7. Making a Determination ......................................................................................................... 219
   8. Asylum Office Terminates Asylum Status .............................................................................. 221
   9. Reversing a Decision to Terminate ........................................................................................ 221
   10. EOIR Proceedings & Issuance of NTA for Terminated Cases .............................................. 221
   11. Effect of Termination on Employment Authorization ......................................................... 222
   12. Asylum Office Continues the Individual's Asylum Status .................................................... 222
   13.   Termination by EOIR When the Asylum Office Issued the Asylum Approval ............... 222

USCIS00004087

**III.W. WITHDRAWAL REQUESTS**..................................................................................**224**
    1. Documenting the Applicant's Intent to Withdraw..................................................................224
    2. Closing the Case in RAPS.............................................................................................224

**III.X. INDIVIDUALS WHO HAVE ADJUSTED TO LAWFUL PERMANENT RESIDENT (LPR) STATUS OR WHO HAVE NATURALIZED** .........................................................................**226**
    1. Dismissal of Asylum Application of Lawful Permanent Resident (LPR)....................................226
    2. Dismissal of Asylum Application of U.S. Citizen (USC) ........................................................230

**IV. "HOW TO... "** ......................................................................................................**232**

**IV.A. WRITE AN ASSESSMENT OR NOID**......................................................................**232**

**IV.B. PREPARE A DECISION LETTER** ............................................................................**232**

**IV.C. PREPARE A NOTICE TO APPEAR (NTA)** ..............................................................**232**

**IV.D. PREPARE A FORM I-213 RECORD OF DEPORTABLE/INADMISSIBLE ALIEN**..............**233**

**V. APPENDICES – LIST OF DOCUMENTS** .....................................................................**235**

USCIS00004088

# I. BACKGROUND INFORMATION

## I.A. MANUAL CONTENTS

This manual provides information on how to process an affirmative asylum application within an Asylum Office. Unless specifically indicated, an Asylum Office Director determines which personnel (e.g., Asylum Officer, Asylum Clerk) perform certain procedures outlined in this manual.

### 1. Manual Structure

The manual is divided into five (5) sections. Section I, "Background Information," lists references with which all asylum personnel should be familiar in order to process an asylum application. Section II, "The Affirmative Asylum Application," follows the processing of an application from the point at which an applicant receives a blank asylum application, through the issuance of a decision by U.S. Citizenship and Immigration Services (USCIS), an agency within the U.S. Department of Homeland Security (DHS).

Section III, "Expanded Topics," the lengthiest section, provides more detail on some topics referenced in Section II, and includes topics that may cause an asylum application to be handled differently from the norm. While it is not possible to anticipate all possible variations, this section addresses the most common.

Section IV, "How To..." explains how to prepare certain documents that Asylum Office personnel issue to applicants in support of a decision to approve, deny, or refer an asylum application.

Section V, "Appendices," contains the appendices referred to in the manual.

### 2. How to Search the Manual

This manual contains a Table of Contents with links to each page. For information on the Table of Contents (including screenshots), click here.

The manual is searchable with the Search Box on the AAPM Home page or by selecting "This Site: AAPMwiki" in the scope selector on the ECN search box in the top-right of the screen. For detailed explanations with screenshots, go to "How to Use the AAPM", located here.

### 3. General Notes

"Day" as used in this manual refers to a calendar day unless "business day" is specified.

USCIS00004089

## I.B. REFERENCES

### 1. Written and Electronic Materials

This manual is the main procedural guide to processing affirmative asylum applications. The following reference materials are available to Asylum Office personnel and should be consulted for additional procedural guidance:

- Refugee Asylum and Parole System User's Manual (issued June 1, 1995 (will be updated)) (hereinafter referred to as RAPS User's Manual)
- ROPES Quick Reference for RAPS Users (issued February 1996 (will be updated)) (hereinafter referred to as ROPES Reports Manual)
- ABC/NACARA Procedures Manual
- Records Operations Handbook (M-407)
- PC-RAFACS User Manual
- NFTS (National File Tracking System) User Manual
- RAIO CT and ADOTC Training Materials (specific Lesson Plans are referred to in this manual)
- Credible Fear Procedures Manual
- Reasonable Fear Procedures Manual
- Identity and Security Checks Procedures Manual (ISCPM)
- Asylum Virtual Library
- USCIS web site.

See Section II.M.1 for more information on the AVL.

Samples of selected USCIS forms (e.g., the I-94 card or the Form G-28) may be found at http://www.uscis.gov.

### 2. Sources of Authority

**See RAIO Combined Training Module: Sources of Authority. The adjudication of an asylum application is governed by:**

- Immigration and Nationality Act (INA), particularly Sections 208 and 235.
- Title 8, Code of Federal Regulations (8 C.F.R.), particularly Part 208.
- Precedent Board of Immigration Appeals (BIA) decisions.
- Federal Court decisions (including, U.S. District Courts, U.S. Courts of Appeal, and the U.S. Supreme Court).
- USCIS Office of Chief Counsel (formerly INS General Counsel (GENCOU)) Opinions.

### 3. Systems Used During Asylum Adjudications

Asylum Office personnel use several computer databases for adjudications, case processing, and case management, including:

2

USCIS00004090

**Alien Change of Address Card System (AR-11)**
AR-11 allows Asylum Office personnel to search for a noncitizen's address history. Asylum Office personnel may obtain a noncitizen's address information by accessing Central Index System 2 (CIS2) and using the "81" command. The address information may be searched by A-number, FIN (Fingerprint Identification Number), or admission number.

**Central Index System 2 (CIS2)**
CIS2 is a repository of electronic data that summarizes the immigration history of a noncitizen. It serves as the focal point for many USCIS systems to consolidate/associate information about a noncitizen requesting benefits. CIS2 contains information about file location, duplicate filings, and whether a particular benefit has been granted to a noncitizen. Some Asylum Office personnel have access to update and change information in limited areas of the database.

**Computer-Linked Application Information Management System 3.0 (CLAIMS 3)**
CLAIMS 3 tracks the processing of applications for employment authorization documents (EADs), and many fee-based benefit applications that are submitted to USCIS. Asylum Office personnel may access CLAIMS 3 data via Person Centric Query Service (PCQS). Asylum Office personnel only have "Look" access and are unable to make edits to CLAIMS 3 data. For more information about PCQS, Asylum Office personnel may consult the Issuance of Identity and Security Checks Procedures Manual (ISCPM).

**ELIS Electronic Immigration System (ELIS)**
ELIS is the main case management system for USCIS adjudications outside of RAIO, including Field Operations Directorate (FOD) and Service Center Operations (SCOPS).

**Global RAIO Asylum Case Management System (Global)**
Global is the primary case management system used by the Asylum Division and is used for the adjudication and processing of affirmative asylum (Form I-589), suspension/special rule cancellation (NACARA 203) (Form I-881), Asylum Pre-Screening (APSO), and Asylum Merits Interview (AMI) cases. Global links to multiple external systems to allow users to preliminarily review security check results and jurisdiction issues related to affirmative cases.

Asylum Office personnel are granted access to Global based on their role. Lockbox personnel have access to Global for the purposes of entering new filings and adding dependents. Certain Service Center Operations (SCOPS) personnel have access to Global for the purposes of entering information for noncitizens who require biometrics for their defensive asylum application before the Executive Office for Immigration Review (EOIR). Other DHS entities who are granted access are generally limited to "Read-Only" access to this system.

Note: Prior to the launch of Global, the primary case management system used by the Asylum Division was the Refugee Asylum and Parole System (RAPS). RAPS was decommissioned in 2018.

**RAILS**
RAILS is the current records tracking system used by USCIS. RAILS tracks the physical location of an Alien-file (A-file), Temporary file (T-file) or Work Folder (W-file), including within an Asylum Office. Asylum Office personnel have access to change and update information in this system, with permissions varying by user roles. See the RAILS Training Page for more information.

USCIS00004091

Note: RAILS was formerly known as the National File Tracking System (NFTS).

Asylum Office personnel also use several other U.S. Government systems for security checks, vetting, and identity verification purposes. For information on these databases, Asylum Office personnel may consult the Issuance of Identity and Security Checks Procedures Manual (ISCPM).

USCIS00004092

# II.    THE AFFIRMATIVE ASYLUM APPLICATION

## II.A. INSTRUCTIONS FOR FILING FOR ASYLUM AFFIRMATIVELY WITH USCIS

- Please refer to https://www.uscis.gov/i-589 for the most current:
    - o   Form I-589, Application for Asylum and for Withholding of Removal,
    - o   Form I-589 Instructions, and
    - o   Information on how and where applicants file for asylum with USCIS.

USCIS00004093

## II.B. AFFIRMATIVE VS. DEFENSIVE ASYLUM APPLICATIONS

A noncitizen can file for asylum either affirmatively with USCIS or defensively with the Executive Office for Immigration Review (EOIR) with the Department of Justice (DOJ).

- Affirmative Application: A noncitizen is eligible to file with USCIS affirmatively if they are:
  - Not a United States Citizen;
  - Physically present in the United States; and
  - Not in proceedings before the Executive Office for Immigration Review (EOIR) unless they are currently, or were previously determined to be, an "Unaccompanied Alien Child (UAC)."
    - Note: Only noncitizens who are currently a UAC, or were previously determined to be a UAC, are eligible to apply for asylum with USCIS while in removal proceedings.

- Defensive Application: If a noncitizen is in removal proceedings before an immigration judge or the Board of Immigration Appeals (BIA) and is not an "Unaccompanied Alien Child (UAC)", the noncitizen is not within the jurisdiction of USCIS. Therefore, the noncitizen is not eligible to file for asylum with USCIS affirmatively and must file with EOIR as a defense to removal.

- Please refer to https://www.uscis.gov/i-589 for the most current information on where to file a Form I-589, Application for Asylum and for Withholding of Removal with USCIS..

USCIS00004094

## II.C. NONCITIZEN FILES FORM I-589 AFFIRMATIVELY WITH USCIS

When a noncitizen files for asylum affirmatively with USCIS, how and where they file will vary based on whether they are eligible to file online or are required to file by paper, as well as whether they are subject to special filing instructions. *See* https://www.uscis.gov/i-589. Once USCIS receives a Form I-589 that meets all of the requirements provided in 8 CFR 208.3(c)(3), a file for the Form I-589 record of proceedings (ROP) is created. Depending upon the filing method, the file may be paper (in an A or T-file) or digital in CMS/STACKS or CMS ELIS. The file containing the entire record of proceedings for the adjudication of a Form I-589 generally should not contain a hybrid of both paper and digital record materials, except for rare circumstances outlined in the Records Policy Manual. Asylum applicants may have immigration records relating to other USCIS filings or DHS enforcement encounters held in either digital or paper files.

### 1. Forms I-589 Filed by Mail with USCIS Not Subject to Special Filing Instructions (Lockbox)

Certain affirmative asylum applicants are required to submit a paper application as outlined in the instructions available at https://www.uscis.gov/i-589. Applicants not required to file a paper application may still choose to file a paper application, if they prefer to file by mail. Affirmative asylum filers who submit a paper application and are not subject to the special filing instructions must submit their paper Forms I-589 at the USCIS Lockbox location with jurisdiction over their address of residence. For information about how to file with Lockbox, see the Form I-589 filing instructions available at https://www.uscis.gov/i-589.

Lockbox will scan the paper application and all supporting materials to create a digital file for each included member on the application. Once digitized, the paper application and supporting materials submitted by the applicant will be shipped to the Harrisonburg File Storage Facility (HBG) for retention and destruction as non-official records materials. Asylum staff will access the digital record via the Global case management system. After service of the decision, the complete finalized digital file will be housed in CMS/ELIS and will be accessible by other DHS components with appropriate ELIS access.
With the transition to intake being completed at Lockbox in May of 2023, Forms I-589 are no longer filed with or processed at any USCIS Service Centers (SCOPS). Applications previously filed with SCOPS, where SCOPS completed intake, resulted in the creation of a paper file for each included dependent family member on the application..

### 2. Forms I-589 Filed Online

Since online filing became available in November 2022, affirmative filers who are not required to submit a paper application may submit a Form I-589 online via the myUSCIS portal at https://myaccount.uscis.gov/. Upon successful filing, a digital file is also created for each included dependent family member on the application. Asylum staff will access the digital records via the Global case management system. After service of the decision, the complete finalized digital file will be housed in CMS/STACKS and will be accessible by other DHS components with appropriate STACKS access.

USCIS00004095

### 3. Forms I-589 Subject to Special Filing Instructions Filed by Mail (Asylum Vetting Center)

Certain asylum applications must be filed on paper directly with the Asylum Vetting Center (ZGA). ZGA will review the filing for completeness, enter the case in Global, and create a paper file for each included dependent family member on the application.

For a list of case types currently subject to the special filing instructions, please refer to the "Special Instructions" section of the website available at https://www.uscis.gov/i-589.

### 4. Forms I-589 Filed Directly with the Local Asylum Office

Local Asylum Offices generally will not accept paper Forms I-589 from potential applicants attempting to file directly with the office. Asylum Offices will direct potential applicants to file online or by submitting a paper Form I-589 with the Lockbox or the Asylum Vetting Center as appropriate. In the rare circumstances in which filing with the local asylum office is permitted, this requires the approval of the Asylum Office Director or Asylum Headquarters..

USCIS00004096

## II.D. GLOBAL CASE CREATION FOR A FORM I-589

As outlined above, a Form I-589 can be filed online via a myUSCIS account or submitted on paper by mail to the Lockbox, the Asylum Vetting Center (ZGA), or in rare circumstances a local asylum office. The information included in a Form I-589 submitted online via a myUSCIS account is transmitted into Global and the case is created. Paper filings submitted to Lockbox are scanned and the data from the scan is converted into the information used to create a case in Global. For paper filings subject to the special filing instructions, which are submitted either to ZGA or the local offices, ZGA or local office personnel are responsible for the review for acceptance and data entry of the required information from the paper Form I-589 into the Global Entry Tab. For general Form I-589 data entry guidance, please refer to your local standard operating procedure (SOP) and intake point of contact (POC).

### 1. Form I-589 Filing Dates and Receipt Notices

The Form I-589 filing date is the date USCIS first receives a Form I-589 that meets all of the requirements provided in 8 CFR 208.3(c)(3). The Form I-589 filing date is used for:

- case creation in Global;
- analyzing the one-year filing deadline;
- determining asylum application processing prioritization; and
- determining employment authorization eligibility based on a pending asylum application.

Once case creation in Global is complete, a Form I-589 Receipt Notice with the filing date listed will be automatically generated and issued through Global and the Enterprise Print Management Service (EPMS) to the applicant and any representative of record listed in Global.

Certain affirmative filers who were previously in removal proceedings with EOIR may be entitled to retain the filing date of a previously filed Form I-589. Only applicants whose removal proceedings were either dismissed or terminated by an immigration judge will be assigned the filing date of a prior Form I-589 that was filed either with USCIS or EOIR in the first instance when a new Form I-589 is filed with USCIS. The correct filing date for these cases should be determined at intake and populated in Global at case creation, though there may be instances in which the filing date must be corrected by Asylum staff. Instructions for correcting a filing date are outlined below. If the applicant's removal proceedings were either terminated or dismissed and no Form I-589 was filed previously (either with USCIS or EOIR), they will be assigned the filing date of the current Form I-589 filing per 8 CFR 208.3(c)(3).

### 2. Correcting Filing Dates and Receipt Notices for Pending Forms I-589

In limited circumstances, the filing date of a pending application must be modified by Asylum staff to reflect the correct filing date and a new receipt notice that reflects the correct date must be issued. This most commonly arises in the following scenarios:

- Applicants Previously in Removal Proceedings with a Prior Form I-589: As outlined above, applicants whose removal proceedings were either dismissed or terminated by an immigration judge are entitled to the earlier filing date of their prior Form I-589 that was first filed either with USCIS or EOIR. See AAPM Section III.B.16 Previously in Removal Proceedings for more information on how to identify whether there was a previous asylum application for an applicant whose removal proceedings were dismissed or terminated.
- Applicants who Successfully Submitted Multiple Filings: When an applicant has successfully submitted multiple filings, regardless of the filing method, the first case that was processed and

9

USCIS00004097

entered into Global may not actually have been the first filing properly received by USCIS. The pending or surviving application in Global must reflect the earliest correct filing date. In these instances, the received dates of the various submissions must be compared to confirm which date is the earliest and the pending case in Global may need to be corrected by Asylum staff. If the situation also necessitates the consolidation of records or A numbers, processing steps in Global, or systems corrections, please refer to and carefully review the appropriate guidance for completing such tasks.

While these are the most common reasons for filing date corrections, additional scenarios may arise and need to be addressed on a case-by-case basis considering these same principles. Please note that, while the existence of properly rejected Form I-589 filings may be considered in the One Year Filing Deadline Mandatory Bar to Filing analysis, they are not a factor for determining the correct filing date under 8 CFR 208.3(c)(3).

If an applicant brings this issue to the attention of the Asylum Office and requests that the asylum office correct their From I-589 filing date, asylum staff will review the relevant USCIS records in consideration of this guidance to determine whether the filing date should be corrected.

Certain asylum records management staff in each office are responsible for correcting the filing date in Global and can issue new Receipt Notices reflecting the updated filing as needed. For online filings and for paper filings submitted via Lockbox, the Filing Date field must be edited on the Application Tab in Global. For applications in paper files, the Filing Date field must be edited on the Entry Tab in Global. After correcting the date, users with appropriate permissions will have the ability to issue a new Receipt Notice by selecting "Submit Receipt Notice" in the Entry Tab. Completing this workflow in Global will automatically generate and issue a new receipt notice for the case. Please refer to the Digital Processing guidance for detailed instructions and information.

Once updated in Global, this earlier filing date will be used for the purposes of the one-year filing deadline analysis, employment authorization eligibility based on a pending asylum application, and asylum application processing prioritization.

### 3. Paper File Transfer Requests

Global updates CIS2 and generates an File Transfer Request (FTR) for any case entered as a new application that has an existing paper file in another USCIS or DHS location. This information is automatically sent via the Global interface through a pull ticket order in RAILS to the USCIS or DHS location housing the paper A-file. The FTR requests that the paper A-file be sent to the asylum office where the newly filed Form I-589 is pending.

### 4. Automated Records Checks and Other Automated Activity

Global interfaces with CIS2 to create new records in CIS2 for applicants who did not have an existing A-number and to update existing records in CIS2. Asylum staff should confirm relevant updates in CIS2.

Upon case creation, Global initiates automated biographic checks of DHS and other US Government systems. Additionally, Global initiates requests to schedule applicants for fingerprinting and biometrics enrollment at Application Support Centers (ASCs) through the National Appointment Scheduling System (NASS). For additional information, please refer to the Identity and Security Checks Procedures Manual (ISCPM).

USCIS00004098

## II.E. PAPER A-FILE IS TRANSFERRED TO ASYLUM OFFICE

Records materials for Forms I-589 filed online or at a Lockbox facility are digital records and are not housed in paper files. Records materials for Forms I-589 subject to the special filing instructions requiring filing at the Asylum Vetting Center and local office filings will continue to be housed in paper files. Applications previously filed with USCIS that were received prior to online filing or the transition to Lockbox intake are also paper records.

Applicants and dependents may have existing immigration records across various official USCIS content repositories, including paper files, CMS-ELIS, and CMS-STACKS. RAILS will point to the locations of all the applicant's USCIS and DHS immigration records. Asylum staff will access the digital records of asylum applicants via the Documents Tab in the Global case management system

### 1. From Other USCIS or DHS Locations

Upon case creation, Global generates a File Transfer Request (FTR) for any existing paper A-file in another USCIS or DHS location that is associated with the applicant's A-number. This information is automatically sent via the Global case management system's interface through a pull ticket order in RAILS to the USCIS or DHS location housing the physical A-file. The FTR requests that the paper A-file be sent to the asylum office where the newly filed Form I-589 is pending.

### 2. From the Asylum Vetting Center (ZGA)

When ZGA completes the intake of a case, they will forward the paper file(s) to the appropriate Asylum Office. The paper files of family groups will be sent rubber-banded together.

USCIS00004099

## II.F. ASYLUM OFFICE RECEIVES PAPER A-FILE

As outlined above, asylum applicants may have DHS immigration records in paper files and/or digital files. Forms I-589 filed online or via the Lockbox will be digital records and will not be held in paper files. Asylum staff will access those records via the Global case management system. This section outlines how paper files are received by the Asylum Office when the file is not already in the office's possession. When an Asylum Office receives a pre-existing paper A-file from another USCIS or DHS location, Asylum Office personnel take the following actions:

- Check the file in Global to verify that it has been received by the correct Asylum Office according to the assigned Case Control Office (CCO).
- Update RAILS to confirm the Asylum Office "received" the file to the appropriate RAILS code.
- Check Global for any affirmative case holds that may apply or may need to be removed as a result of receiving the file.
- Enter the file into RAILS and confirm whether there is any corresponding T-file in the office.
- Following local procedures, locate any corresponding W-file that the office may have created while awaiting receipt of the paper file.
- Physically consolidate any paper T-file or W-file into the A-file. Consolidate the T-file with the A-file in RAILS, which will automatically update the record in RAILS to show the files have been "Merged". Following the Records Policy Manual and any local procedures, empty the W-file and destroy the jacket.
- If review of the file or systems indicates that the consolidations of multiple A-numbers is required, follow the procedures for doing so in the Records Policy Manual.

USCIS00004100

# II.G. ASYLUM OFFICE SCHEDULES INTERVIEW

Asylum applicants entered into the case management system become ready to be scheduled for an asylum interview after the applicant and any dependents have been scheduled for a biometrics appointment at an ASC or USCIS otherwise has the applicant and any dependents' biometrics on file. The Asylum Office creates an interview calendar and sets scheduling parameters that are determined by the number of AOs that will be available to interview during that period.

### 1. Asylum Office Creates an Interview Calendar in RAPS

An Asylum Office creates a monthly interview calendar in RAPS using the Create Daily Calendar (CCAL) command. The number of cases that are scheduled for an interview in any given month depends upon each office's scheduling system that takes into consideration staffing resources and no-show rates. Through the CCAL screen, the Asylum Office tells RAPS how many asylum applicants to call-in for an interview by "opening" a certain number of interview slots. The number of slots the Asylum Office opens is based upon each office's staffing resources.

Once the Asylum Office creates an interview calendar, it may be viewed by using the Calendar Query (CALQ) command.

### 2. Cases are Selected for Interview Scheduling

**a. Automatic (Batch) Scheduling**

Approximately 21 days before a particular interview day, the case management system fills that day's opened interview slots with cases eligible for interview scheduling. "Grace Period" cases, where the applicant filed Form I-589 with USCIS 21 days or fewer after an NTA was filed and docketed with EOIR, are accepted by USCIS but are not scheduled for an interview. See AAPM Section III.L.1. USCIS Jurisdiction for more information about Grace Period cases.

**b. Manual Scheduling**

Cases may be manually scheduled to available interview days by utilizing the Add Case to Schedule (ADDC) command in RAPS. Reasons for manually scheduling a case may include the need to schedule an expedited interview for a particular I-589 or to reschedule an interview due to lack of available AOs to interview on a given day.

Before using the ADDC command, Asylum Office personnel check to see if interview slots have been opened for a particular day by viewing the Calendar Query (CALQ) command.

**c. Scheduling Priorities**

All cases within the pool are categorized into priorities. RAPS automatically schedules cases in the following order, exhausting each priority listed before scheduling cases from the next priority group:

> **Priority 1:** Rescheduled cases (including any special group codes) – from newest to oldest, based on the filing date.

> **Priority 2:** Eligible cases aged within 21 days of the filing date, in order of filing, based on the filing date

USCIS00004101

**Priority 3:** Eligible cases aged between 22 and 100 days after the filing date, from newest to oldest, based on the filing date.

**Priority 4:** Eligible cases over 100 days after the filing date, from newest to oldest, based on the filing date.

### d. RAPS/CLAIMS Interface for Certain Administratively Closed Cases

The Asylum Offices administratively closed many pre-reform asylum applications after applicants failed to appear for an interview. Many of the individuals were not placed before the Immigration Court because the Asylum Office did not have sufficient information to establish their deportability.

If an applicant in this category files an application for an Employment Authorization Document (EAD), a CLAIMS/RAPS interface triggers RAPS to reopen the case for interview scheduling. CLAIMS also updates RAPS with the new address. If the new address puts the case into a different jurisdiction, RAPS automatically transfers the case to the new Asylum Office.

### 3. Asylum Office Generates and Mails Interview Notice

RAPS automatically generates Interview Notices for interviews within 45 days of the current date for manually scheduled cases and 21 or 22 days for batch scheduled cases. If a case is manually scheduled fewer than 45 days from the current date, the notice will be printed overnight. If an applicant's representative is recorded in RAPS, RAPS generates an identical Interview Notice to the representative of record. An Interview Notice is printed in the Asylum Office overnight. Within three (3) business days of the Notices being printed and no fewer than 18 days before the scheduled interview date, Asylum Office personnel mail the Interview Notice to the applicant and any representative of record. Asylum Office personnel file the mailers in the applicant's file within twelve (12) days of their printing.
Exceptions to these requirements can be made in particular cases at the discretion of the Director for special circumstances, as long as the applicant receives adequate notice of the interview.

USCIS00004102

# II.H. ASYLUM OFFICE PULLS PAPER FILES FOR INTERVIEW

As outlined above, asylum applicants may have various immigration records in paper or digital files. While applicants may simultaneously have digital and paper records due to having multiple immigration encounters or records of proceedings, the entire record of proceedings for a Form I-589 adjudication will only be stored in one record format except in rare circumstances. When records for a single Form I-589 adjudication are split between paper and digital files, this is considered a hybrid record. Please carefully review the guidance for when hybrid records are permitted in the Records Policy Manual.

While digital records are available electronically and do not require the asylum office to specifically pull the file, each asylum office has its own system for pulling paper files scheduled for an interview. At a minimum, the system must ensure that:

- Paper files activated from file storage are assigned to a responsible party in the system of records in such a way that they are traceable throughout the processing of the Form I-589.

- Any paper A-files of all applicants scheduled for an interview are physically in the Asylum Office prior to the day of interview. If the Asylum Office cannot locate a paper file by the date of the interview, the staff responsible for distributing files for interviews must be informed. If the paper file that includes the Form I-589 is not accessible to the Asylum Office and the applicant appears for their interview, the applicant may be interviewed, in the discretion of the Asylum Office, only if the applicant has brought a copy of their Form I-589 and systems records (Global, CPMS Query) indicate that they complied with the biometrics collection requirement.

USCIS00004103

# II.I. APPLICANT ARRIVES FOR INTERVIEW

Last updated: 7/8/2020

### 1. CPMS-IVT

When an asylum applicant appears for the interview, Asylum Office personnel locate him or her and all dependents 14 years old and older in the Customer Profile Management System (CPMS) Identity Verification Tool (IVT), which verifies the subjects' identity and compares the subjects' biometric identifying information to information contained in various databases. USCIS formerly used the US-VISIT application for identity verification, and references to it may still appear in USCIS records. Each Asylum Office has a CPMS-IVT coordinator and established local operating procedures that facilitate CPMS-IVT processing while maintaining efficient processing of asylum applications. For additional information on CPMS-IVT, please see the ISCPM (forthcoming).

The applicant is called by number rather than name in the manner dictated by local policy to verify his or her identity in CPMS-IVT or through visual verification. See Section II.I.7, AO Calls the Applicant for the Interview.

### 2. Asylum Office Verifies that Applicant Complied with Biometrics Collection Requirements

Prior to or at the time an applicant appears for his or her scheduled asylum interview, Asylum Office personnel verify whether the applicant and any dependents, regardless of age, who require biometrics collection, have completed biometrics collection and enrollment at an Application Support Center (ASC). All applicants, regardless of age, have their full-frontal photographs, digital signatures, and right-index fingerprints captured at an ASC. In addition to these three biometric captures, a 10-print fingerprint record is taken from applicants who are 12 years, 9 months old and older. If CPMS indicates that the applicant has provided a photograph, digital signature, right-index fingerprints, and, depending on his or her age, a 10-print fingerprint record, then the applicant has complied with biometrics collection and enrollment requirements. If the evidence indicates that the applicant and any dependents have complied with biometrics collection requirements, the asylum interview proceeds as usual. However, if the applicant or any dependent has not complied with biometrics collection requirements, the asylum office will reschedule the asylum interview, along with the biometrics collection appointments of those who have not had their biometrics collected, in accordance with the guidance set forth below.

Asylum Office personnel first check the Fingerprint Response column on the RAPS INTL screen. In this column, a Y indicates that a response has been received, an N indicates that one has not, and an X indicates that one is not required, because the applicant is under 14 years old. If a Y or an X appears in the Fingerprint Response column, the asylum interview proceeds as scheduled.

#### a. Fingerprint Response Column Indicates that No Response Has Been Received
If the Fingerprint Response column indicates that no response has been received, Asylum Office personnel should perform the following steps:
- Check if there is a Fingerprint Sent Date or Response Date in RAPS. (These fields can be found adjacent to the FBI Response on the first page of the CSTA screen.) If either of those dates is present, this indicates that the applicant has complied with biometrics collection requirements,

16

USCIS00004104

and Asylum Office personnel can resume case processing as normal. (Procedures for dealing with delayed FBI responses are set forth below.)

- If RAPS shows neither a Sent Date nor a Response Date, Asylum Office personnel verify in the Customer Profile Management System (CPMS)-Query whether the applicant has complied with biometrics collection requirements. If CPMS indicates that the applicant complied with biometrics collection requirements, Asylum Office personnel can resume case processing as normal. If neither RAPS nor CPMS-Query indicates that the applicant has complied with biometric requirements, then Asylum Office personnel query the applicant when he or she appears for the interview as to whether he or she received the notice and appeared at the ASC for fingerprinting.

- If the applicant states that he or she complied with biometrics collection requirements when there is no evidence of such compliance in RAPS or CPMS, Asylum Office personnel request that the applicant present proof of such compliance in the form of the ASC appointment notice, stamped to show attendance at the ASC, or a notice from the ASC rescheduling the biometrics appointment for a date after the asylum interview. If the applicant presents such proof, Asylum Office personnel proceed with the interview and document the form of proof in the A-file.

## b. After Verification Efforts, Asylum Office Personnel Conclude that Applicant Did Not Appear at ASC Appointment

After exhausting the verification procedures listed above, if Asylum Office personnel conclude that the applicant did not appear at the ASC appointment, they should determine by looking at documentation in the A-file and/or the Case Log screen in Global whether the failure to appear at the ASC was the first or second time the applicant failed to appear at the ASC.

### i. Applicant Failed to Appear for ASC Appointment Once

If it is the applicant's first failure to appear at the AS C, the interview will be rescheduled. If the need to reschedule the interview for failure to comply with biometrics collection requirements is caused by the applicant, a delay will be attributed accordingly, unless the applicant can show good cause for failing to attend the ASC appointment. If the need to reschedule the interview to allow the applicant to comply with biometrics collection requirements is caused by USCIS, no delay will be attributed to the applicant.

### (a) Failure to Attend ASC Appointment Caused by Applicant

If it is determined that the failure to attend the ASC appointment was caused by the applicant, Asylum Office personnel must then determine whether the applicant can establish good cause. For guidance on determining whether the applicant caused the failure to appear and on whether the applicant can establish good cause , see Langlois, Joseph E. Securing Compliance with Fingerprinting Requirements Prior to the Asylum Interview and Amending Procedures for Issuance of Recommended Approvals, Memorandum to All Asylum Office Personnel (Washington, DC: 12 September 2006, revised 4 October 2006).

If the applicant shows good cause for failure to attend the ASC appointment, Asylum Office personnel proceed as follows:

- Obtain documentation from the applicant supporting the good cause finding and include this documentation in the A-file with a memo explaining the good cause finding.
- Obtain Supervisory Asylum Officer (SAO) approval for any good cause finding made by Asylum Office personnel and document the SAO approval in the memo included in the A-file.

17

USCIS00004105

- Provide the applicant a Notice of Scheduling of Fingerprinting Appointment (*Appendix 6*), explaining the consequences for unexcused failure to appear at this appointment.
- Schedule the applicant, or dependent where appropriate, for a biometrics appointment to occur within the two days following the interview date by handing the applicant a biometrics collection appointment letter generated in the National Appointment Scheduling System (NASS). To the extent practicable, Asylum Office personnel will schedule the ASC appointment and asylum interview in time to meet the 60-day timeliness standard for asylum case processing.
- Reschedule the asylum interview in Global on the Adjudications tab. Select "Asylum Reschedule Request" from the Interview Outcome dropdown menu so that no delay is attributed to the applicant.
- Document in the A-file (e.g., by placing a copy of the above-referenced notice in the file) that the applicant was scheduled for another biometrics appointment.

If the applicant caused the failure to attend the ASC appointment and cannot show good cause for the failure to attend, Asylum Office personnel proceed as follows:

- Provide the applicant a Notice of Scheduling of Fingerprinting Appointment Employment Authorization Clock Stopped (*Appendix 5*), informing the applicant that he or she (or a dependent, where applicable) will receive notice to appear at an ASC and explaining the consequences for unexcused failure to appear.
- Schedule the applicant, or a dependent where appropriate, for another biometrics appointment using the FREQ command in RAPS.
- Reschedule the asylum interview in Global on the Adjudications tab. Select "Applicant Reschedule Request" from the Interview Outcome dropdown menu to create an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock.
- Document in the A-file (e.g., by placing a copy of the above-referenced notice in the file) that the individual was scheduled for another biometrics appointment.

**(b) Failure to Attend ASC Appointment Caused by USCIS**
For guidance on determining whether USCIS caused the failure to appear, see Langlois, Joseph E. Securing Compliance with Fingerprinting Requirements Prior to the Asylum Interview and Amending Procedures for Issuance of Recommended Approvals, Memorandum to All Asylum Office Personnel (Washington, DC: 12 September 2006, revised 4 October 2006).

If the applicant's failure to comply with biometrics collection requirements was caused by USCIS, Asylum Office personnel should perform the following tasks:

- If necessary, update the applicant's address on the Entry tab in Global.
- Provide the applicant a Notice of Scheduling of Fingerprinting Appointment (*Appendix 6*), informing the applicant that he or she will receive notice to appear at an ASC and explaining the consequences for unexcused failure to appear.
- Schedule the applicant for another biometrics appointment using the FREQ command in RAPS.
- Reschedule the asylum interview in Global on the Adjudications tab. Select "Asylum Reschedule Request" from the Interview Outcome dropdown menu so that no delay is attributed to the applicant .
- Document in the A-file (e.g., by placing a copy of the above-referenced notice in the file) that the individual was scheduled for another biometrics appointment.

USCIS00004106

**(c) Expired Fingerprint Results, REJECTS, and Waivers**

If an applicant appearing for his or her scheduled asylum interview previously complied with fingerprinting requirements, and an FBI response was allowed to expire, case processing should continue as normal and the applicant should be interviewed, with the following additions:

- If the expired FBI response was "NON-IDENT," Asylum Office personnel should use the refresh capability in CPMS-Query to resubmit the applicant's fingerprints to the FBI. If the refresh capability is unavailable, or if the applicant's initial biometrics collection did not meet Asylum Division requirements, the applicant may be scheduled for another ASC appointment. If the applicant fails to appear at the ASC during the allotted window and otherwise appears eligible for asylum, Asylum Office personnel schedule the applicant for a biometrics appointment one more time and send the applicant a Notice of Scheduling of Fingerprinting Appointment - Applicant Caused Delay(Appendix 5).
- If the applicant does not appear eligible for asylum for reasons unrelated to biometrics collection compliance, the application should be denied or referred for those reasons.
- If the expired FBI response was "IDENT", an updated Identity History Summary may be obtained from the FBI without requiring the applicant to be re-fingerprinted.

If the applicant's fingerprints were rejected or if, in the rare instance, the ASC provided a waiver to the applicant, case processing should continue as normal and the applicant should be interviewed.

**(d) Dependents Added After the Submission of the Asylum Application**

If a dependent has not yet complied with biometrics collection requirements because he or she was added to the asylum application after its original submission but prior to the interview, the failure to comply will be deemed to be caused by the applicant.  In this situation, Asylum Office personnel should perform the following tasks:

- Provide the dependent a Notice of Scheduling of Fingerprinting Appointment - Applicant Caused Delay (Appendix 5), informing the dependent that he or she will receive notice to appear at an ASC and explaining the consequences for unexcused failure to appear.
- If it has not already been done, schedule the dependent for a biometrics appointment using NASS.
- Reschedule the asylum interview in Global on the Adjudications tab. Select "Applicant Reschedule Request" from the Interview Outcome dropdown menu to create an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock .

If, during an asylum interview, an applicant expresses the desire to add a dependent to his or her application, the Asylum Officer should proceed with the interview, relaying to the applicant the instructions for adding dependents set forth in Section III.E.1.  Any request to add a dependent to an application on the day of the interview should be considered "during an asylum interview."

### ii. Applicant Failed to Appear for ASC Appointment More Than Once

If an applicant fails to appear for biometrics collection after receiving the second ASC appointment notice, and the failure is not excused, his or her asylum application will be referred or dismissed. Asylum Office personnel dismiss or refer the asylum application, as appropriate, by updating FDEC with codes D7 (in the case of dismissals) or I7 (in the case of referrals). If the applicant is maintaining valid immigrant or nonimmigrant status, or if the applicant filed his or her application prior to 1/4/1995 (i.e., pre-reform), and

USCIS00004107

there is insufficient evidence to support NTA issuance, Asylum Office personnel dismiss the asylum application by updating FDEC with D7 and prepare and issue a Dismissal of Asylum Application Based on Failure to Comply with Identity and Security Check Procedures notice (Appendix 29).

If the applicant filed his or her application after 1/4/1995 (i.e., reform cases), and Asylum Office personnel establish from the asylum application that the applicant is not maintaining valid immigrant or nonimmigrant status, Asylum Office personnel refer the asylum application to Immigration Court by updating FDEC with I7 and issuing an NTA (code A1). The Asylum Office prepares and issues a Referral Notice, checking box 8.

If the applicant has complied with biometrics collection requirements, but a dependent failed to appear for biometrics collection after receiving the second ASC appointment notice, and the failure is not excused, only the dependent's case should be dismissed or referred in accordance with the guidance set forth above. In addition, if the applicant is found eligible for asylum, the Asylum Officer must issue to the applicant a Denial of Derivative Asylum Status letter (Appendix 19). This letter must include the A-number of the applicant and the A-number of the dependent who is being denied derivative asylum status, but not the A-numbers of any other dependents included in the asylum application.

When Asylum Office personnel first discover that the applicant or dependent failed to appear for biometrics collection without good cause after receiving the second ASC appointment notice, Asylum Office personnel will, to the extent practicable, immediately process the case for referral or dismissal prior to the interview according to the guidance above so that the referral or dismissal can be served on the individual in-person while he or she is at the office. The decision documents may be prepared prior to the applicant's arrival for interview or the applicant may be requested to wait while the documents are prepared. In either case, failure to comply without good cause must be confirmed when the applicant appears for interview.

### 3. Interview Assignment Log

As applicants arrive, the Immigration Information Officer/Contact Representative (IIO/CR) notes the time of each applicant's arrival by date/time-stamping the Interview Notice. As a general rule, cases are assigned on a "first come, first served" basis within the allotted appointment period. Asylum Office Directors may set up criteria for exceptions to this general rule. A case assignment log is either created at this time, or noted to indicate an applicant's arrival (depending on whether the cases are pre-assigned). As soon as an SAO becomes aware of an AO's absence, he or she informs Asylum Office personnel responsible for distributing cases of the AO's unavailability for interviews. If the Asylum Office pre-assigns cases, the appropriate Asylum Office personnel reassign the cases of the AO who is absent for the day.

### 4. Random Assignment

Whether the Asylum Office pre-assigns cases or assigns them when applicants appear for their interviews, the assignment of a case to an AO is done at random. In offices where cases are not pre-assigned, random assignment may be ensured by use of assignment lists or logs that alternate the order of Asylum Officers each day. Only an Asylum Office Director or Deputy Director can make any exceptions to random case assignment. Any attempt by Asylum Office personnel to improperly influence case assignment is to be immediately reported to the Security Officer (SO).

USCIS00004108

The IIO/CR updates RAPS using the Assignment of Officers to Cases (ASGN) command if the assignment is made prior to the interview day. The IIO/CR Updates RAPS using the Modify Officer Assignment (MODA) command if the assignment is made on the day of the interview.

One exception to the policy of random assignment is where an asylum applicant was previously denied asylum, but not placed into removal proceedings, and subsequently re-applies in the same office. In such a case, Asylum Office personnel will make a reasonable attempt to assign the case to the same officer who made the original decision. If the same Asylum Officer is unavailable, the case is assigned to another Asylum Officer supervised by the SAO who reviewed the original decision, or if the SAO is no longer with the office, randomly according to regular office procedures.

An AO may not refuse to interview a particular case without cause. Under certain limited circumstances, the AO may feel that it is inappropriate to interview a particular applicant. When this occurs, the AO must obtain SAO approval prior to returning the case for assignment to another AO.

Acceptable reasons may include but are not limited to:

- The AO determines that the interpreter is inadequate.
- The applicant specifically requests an AO of a different gender. (A female officer for a female rape victim, for example).

If the AO has a prior personal or professional relationship with the applicant, interpreter, or representative of the case, the AO must notify his or her SAO. If there is an actual conflict of interest or the appearance of a conflict of interest, the case will be reassigned to a different AO.


### 5. AO Prepares for the Interview

**See RAIO Combined Training Modules:**

- Interviewing - Eliciting Testimony
- Interviewing - Introduction to the Non-Adversarial Interview
- Interviewing - Note Taking
- Interviewing - Survivors of Torture
- Interviewing - Working with an Interpreter


### 6. Delays in Interviewing

An AO begins interviewing the applicant as expeditiously as possible. Asylum Office personnel should explain to the applicant any lengthy anticipated delay.


### 7. AO Calls the Applicant for the Interview

Asylum Office Directors establish procedures for calling an applicant for the interview by number rather than name, to preserve an applicant's confidentiality in the waiting room.

Examples of acceptable practices include, but are not limited to, the following:

USCIS00004109

- When appearing for the interview, the applicant is issued one part of a two-part coupon or set of twin tickets with a number printed on both parts. The second part is attached to the file, where it remains until after the decision is served, or a second set of tickets is used on the date of pick-up. The applicant is called using the number on the coupon or ticket.
- The applicant is called using the last three or four digits of the A number. A number is pointed out on appointment mailer, or Asylum Office personnel give the principal applicant a piece of paper with the digits to be called.
- The applicant is given a laminated card with a number that is recorded on a master list and written on the appointment mailer for the interviewing officer or the pick-up notice for the IIO/CR. Interview numbers start daily at "1"; Pick-up numbers start at "101".

### 8. AO Meets and Greets the Applicant

Prior to calling an applicant for an interview, the AO notes whether the case includes any dependents or a representative of record. When meeting and greeting the principal applicant in the waiting room, the AO accounts for all parties before escorting everyone involved in the case to the AO's office.

The AO must not discuss any aspect of the applicant's case in the waiting room. If confusion arises in the waiting room as to who should be present at the interview, the AO escorts all the parties concerned to a separate area apart from the waiting room to resolve the matter.

USCIS00004110

# II.J. AO CONDUCTS AN ASYLUM INTERVIEW

### 1.Minimum Requirements for an Interview

See RAIO Combined Training Module: Interviewing - Introduction to the Non-Adversarial Interview.

### 2. Placing the Applicant Under Oath

The AO places the principal applicant and any dependents who will testify on the asylum claim under oath prior to discussing any merits of the asylum claim. The applicant, AO, and interpreter, if any, execute the appropriate oath.

- When the applicant elects to speak English, the AO uses the Record of Applicant Oath During Interview (Using English) (Appendix 103).
- When the applicant does not speak English and provides their own interpreter, the AO uses the Record of Applicant and Applicant-Provided Interpreter Oaths During an Interview (Appendix 3).
- When USCIS provides a contract interpreter for a UAC who cannot fulfill the general requirement under 8 C.F.R. § 208.9(g) to provide an interpreter (see Section III.B.1.a.viii) or a hearing-impaired applicant requiring a sign language interpreter (see Section III.B.6.a)), the AO uses the Record of Applicant Consent to Using USCIS-Provided Interpreter (Appendix 102).
- When permitted, if the AO conducts the interview in a language other than English, the AO uses the Record of Applicant Oath During an Interview Conducted by the Asylum Officer in a Language Other than English (Appendix 119). See Section II.J.11, Conducting an Interview in a Language Other than English, for additional information on the requirements for conducting an interview in a language other than English.

### 3. Dependents

The AO must personally meet each dependent (a.k.a. "derivative") included on a principal applicant's application. It is not necessary for the dependent(s) to be present for the entire interview, and it is often advisable to dismiss minors to the waiting room for the duration of the interview as long as there is an adult who can supervise the children.

Generally, an AO should consult with the principal applicant to determine his or her preference before dismissing any dependent. At the AO's discretion, a dependent spouse may be dismissed to the waiting room and/or interviewed separately, but a dependent minor should not be interviewed without his or her parent present. For procedural guidance on issues involving dependents, see Section III.E.

In addition to personally meeting any dependents included as derivatives on the I-589, the AO verifies the dependent's identity, his or her relationship to the principal applicant, and ascertains the dependent's date, place, and manner of entry. The AO also ensures the dependent is not under the jurisdiction of the Immigration Court, and ascertains whether any mandatory bars apply. For guidance on cases where there is evidence that a dependent is subject to a mandatory bar, see Section III.E.11, Dependent Subject to Mandatory Bar to Asylum.

USCIS00004111

### 4. Interpreters

Under the requirements of 8 CFR 208.9(g)(1), applicants applying affirmatively for asylum with USCIS who are unable to proceed with the interview in English must provide, at no expense to USCIS, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. Failure without good cause to comply with the requirement to provide an interpreter may be considered a failure to appear for the interview for purposes of § 208.10. See Section II.J.4.a.iv, Individuals Prohibited from Serving as Interpreters, for additional requirements regarding who can serve as an interpreter.

#### a. The Applicant's Interpreter

As described above, affirmative asylum applicants who are unable or do not wish to proceed with the asylum interview in English must provide their own interpreter. If the applicant does not provide an interpreter fluent in their chosen language and English without good cause, this may be considered a failure to appear for the interview for purposes of 8 CFR 208.10, and the asylum application may be referred or dismissed.

Good cause is a case-by-case analysis in the adjudicator's discretion and may be defined as a reasonable excuse for being unable to appear for an asylum interview because the applicant was unable to provide a competent interpreter. What may be a reasonable excuse for one applicant may not be reasonable when looking at the circumstances of another applicant. Therefore, it is extremely important to review the excuses and requests for rescheduling due to the lack of a competent interpreter on a case-by-case basis before determining whether the request to reschedule will be honored. If good cause is established and the interview is rescheduled, this is considered an applicant-caused delay for the purposes of employment authorization.

If good cause is not shown, the Asylum Officer will record the case as a failure to appear in the case management system, issue the Referral Notice for Failure to Appear (Appendix 68), and, if the applicant is not in status, issue the Notice to Appear.

#### i. Placing the Interpreter Under Oath

The AO places the applicant's interpreter under oath and has the interpreter sign the Record of Applicant and Applicant-Provided Interpreter Oaths (Appendix 3). The AO signs the Record as a witness.

#### ii. Interpreter's Role

See RAIO Combined Training Module: Interviewing - Working with an Interpreter.

#### iii. Identity

Regulations give an AO the authority to verify the identity of the interpreter, which an AO can best accomplish through the review of identity documents. Like asylum applicants, interpreters are not required to present identity documents to interpret for an asylum applicant. An AO may not terminate or reschedule an interview if the interpreter is lacking identity documents or presents identity documents that the AO does not wish to accept. The AO should photocopy any identity documents of an interpreter and indicate on the Record of Applicant and Interpreter Oaths the type of identity documents, if any, the interpreter provided. AOs must base an individual's ability to interpret on interpretation skills and not on questions of identity.

There may be instances where an AO believes that the issue of an individual's identity is material to their ability to interpret, including whether the individual is prohibited from serving as an interpreter as

24

USCIS00004112

outlined in Section II.J.4.a.iv. below. The AO must consult with their SAO in these circumstances. Only the Asylum Office Director or their designee has the authority to dismiss an interpreter from a specific interview or bar an individual permanently from interpreting in an office. Asylum office personnel should follow the procedures in Section II.J.4.a.vi.d below to dismiss an interpreter from an interview and may contact Asylum Headquarters for further guidance when considering barring an individual permanently from interpreting in an office.

#### iv. Individuals Prohibited from Serving as Interpreters

Under 8 CFR 208.9(g)(1) the following individuals are prohibited from serving as interpreters:

- Individuals under the age of 18;
- Attorneys and accredited representatives of the applicant;
- A witness testifying on the applicant's behalf; and
- Representatives or employees of the applicant's country of nationality, or, if stateless, country of last habitual residence.

Additionally, the Asylum Division does not permit the following individuals from serving as an interpreter:

- Individuals with pending asylum applications for which they have not been interviewed.

#### v. Solicitation of Interpreter Services

Solicitation is prohibited on federal property. Asylum offices must take measures to prevent soliciting of or by interpreters in the vicinity of the office..

#### vi. Inability to Perform, or Abuse of, the Interpreter's Role

An AO may believe that a particular interpreter is unable to perform the role of interpreter or is abusing their role as an interpreter by engaging in one or more of the types of conduct outlined below. Section (d) describes the process for dismissing an applicant's interpreter from an asylum interview where one of the circumstances outlined in (a)-(c) applies.

#### (a) Misrepresentation

The interpreter appears to be changing, creating, omitting, or otherwise misrepresenting the applicant's oral testimony.

#### (b) Incompetence

The interpreter is unable to perform the required service due to insufficient language skills. This may involve vocabulary and diction, as well as pronunciation and other accent problems, and applies to both languages used. A competent interpreter must be:

- Sufficiently fluent in both English and the applicant's and/or witness's language(s);
- Able to interpret competently between English and the applicant's and/or witness's language(s); and
- Able to interpret impartially and without bias.

#### (c) Other Improper Conduct

In certain instances, the AO may find that the interpreter is engaging in other improper conduct, including the following:

- The interpreter uses abusive or intimidating language or otherwise disrupts the interview process or other administrative procedures;
- The interpreter is soliciting business on asylum office premises;
- The interpreter helped or assisted in the preparation of the applicant's Form I-589 but failed to complete Part E of the form to declare having done so;
- The interpreter helped or assisted in the preparation of the applicant's Form I-589 but is found to be trying to disguise or hide their participation; and/or
- The interpreter is engaging in behavior leading the AO to believe that they have engaged or are engaged in criminal conduct including, but not limited to, trafficking or other physical or mental mistreatment or abuse, as it relates to the applicant.

### (d) Dismissing an Applicant's Interpreter from an Asylum Interview

If one or more of these scenarios applies, the AO (if occurring in the AO's office during an interview) or supervisory asylum office personnel (if occurring elsewhere in the asylum office) may inform the interpreter of the problem and ask the interpreter to correct the behavior (if appropriate under the circumstances). If the behavior continues or the applicant brings a prohibited interpreter, the appropriate asylum office personnel will:

- With SAO approval, terminate or cancel the interview.
- Explain to all parties (the applicant, interpreter, and representative) the reason for the termination or cancellation of the interview.
- The interpreter is engaging in behavior leading the AO to believe that they have engaged or are engaging in criminal conduct including, but not limited to, trafficking or other physical or mental mistreatment or abuse relating to the applicant.
- Complete a Rescheduling of Asylum Interview – Interpretation Problems (Appendix 7), providing the original to the applicant and maintaining a copy in the file. Attach copies of any identity documents submitted by the interpreter to the file copy of the letter.
- Explain to all parties that the applicant will be rescheduled only once and that the applicant must reappear with a different interpreter who is competent, who is not prohibited from interpreting, and who has not previously been found to have abused their role as an interpreter.
- Reschedule the interview in the case management system, indicating the rescheduling is caused by the applicant.

If the applicant does not provide an interpreter fluent in their chosen language and English at the rescheduled interview without good cause, this may be considered a failure to appear for the interview for purposes of 8 CFR 208.10, and the asylum application may be referred or dismissed.

As outlined above, good cause is a case-by-case analysis in the adjudicator's discretion and may be defined as a reasonable excuse for being unable to appear for an asylum interview because the applicant was unable to provide a competent interpreter. What may be a reasonable excuse for one applicant may not be reasonable when looking at the circumstances of another applicant. Therefore, it is extremely important to review the excuses and requests for rescheduling on a case-by-case basis before determining whether the request to reschedule will be honored. If good cause is established and the interview is rescheduled, this is considered an applicant-caused delay for the purposes of employment authorization.

USCIS00004114

If good cause is not shown, the AO will record the case as a failure to appear in the case management system and issue the Referral Notice for Failure to Appear [Appendix 68] using the case management system and, if the applicant is not in status, the Notice to Appear.

### b. Asylum Office Provision of a Contract Monitor or Contract Interpreter

Asylum Offices use contract interpreters to monitor the interview where an applicant does not speak English and is required to provide their own interpreter. See Section II.J.4.a, The Applicant's Interpreter, to review the requirements for applicant-provided interpreters. The Asylum Division has contracted with several interpretation services companies to provide monitoring and interpretation during affirmative asylum and credible and reasonable fear interviews. For information on contacting the appropriate interpretation services company for affirmative asylum interviews, please see the Interpreter Services ECN site.

The Asylum Division does not currently provide direct interpretation services, except in limited circumstances, including for individuals with disabilities who are hearing impaired and require sign language interpretation. If an applicant requires the services of a sign language interpreter, the asylum office will work with Asylum Headquarters to provide in person interpretation by a professional sign language interpreter using the interpreter services contract. See Section III.B.6 below for additional information on accommodations for applicants with disabilities.

#### i. Determining the Language of Interpretation

Asylum Offices can use responses on Form I-589 to "What is your native language? (Include dialect, if applicable.)," "Are you fluent in English?," and "What other languages do you speak fluently?" to determine the language of interpretation for an asylum interview. If it appears that the interview will be conducted in an infrequently used language, the Asylum Office may contact the interpretation services company in advance of the interview to preschedule an interpreter monitor in that language if they believe monitoring is needed for the interview and requires prescheduling. However, care should be used when prescheduling. If the office is unable to start the interview on time, USCIS will be charged for the call. Asylum Office personnel should be aware that applicants sometimes indicate that they are fluent in English, when they are not, or indicate that they speak a language in which they are not fluent. In such cases, it may be necessary to use the interpretation services company to determine the language of interpretation monitoring at the time of the interview.

#### ii. Connecting to a Telephonic Interpreter Monitor

When connecting to a telephonic interpreter monitor, Asylum Division staff should use the dialing instructions associated with their office for the vendor they are calling. Staff may be assigned a personal identification number (PIN) for each vendor. This PIN is used during the dialing process to identify the caller for billing purposes. Staff should contact their local point of contact to obtain a PIN.

Where more than one vendor has been awarded a contract for interpretation services with the Asylum Division, Asylum Offices will be assigned a priority order for contacting vendors. Offices are required to follow the assigned vendor order, calling the primary vendor first and only calling other vendors in the designated order if the primary vendor is unable to accommodate the call. This helps to ensure the distribution of the workload across contracted vendors. If the Asylum Officer is not connected with a contract interpreter monitor from the office's primary vendor within the designated time as outlined in the most updated guidance, the officer may disconnect from the call and contact the next vendor assigned to that office. This procedure will repeat until all contracted vendors are exhausted or a contract

27

USCIS00004115

interpreter monitor has been secured. If none of the assigned vendors can connect the Asylum Officer with a monitor within the designated amount of time, the Asylum Officer can proceed with the interview without monitoring by the contract interpreter.

All calls placed must be documented in the case management system, regardless of whether the call was connected to an interpreter/monitor. Asylum Officers may wait for a connection beyond the designated amount of time if convenient to do so, but Asylum Officers should note the connection time on the interview monitoring call record. Call information documented in the case management system is used by the Contracting Officer's Representative (COR) for billing reconciliation and contract enforcement purposes.

An Asylum Officer may only use a contract interpreter monitor who has cleared the required USCIS security process to serve on the contract. If the operator indicates that there is no cleared contract interpreter available to monitor in the required language, the interview cannot be conducted using a monitor from that vendor and other vendors should be contacted to secure a cleared contract interpreter monitor.

See the Interpreter Services ECN site for more information.

### iii. Arranging an On-Site Interpreter or Interpreter Monitor

There may be some instances where in-person interpretation must be arranged for the purposes of an accommodation or in which the Asylum Office Director determines that an interpreter's or an interpreter monitor's physical presence is required at the interview site. Any interviews where an interpreter's or interpreter monitor's physical presence is required requires notification of the Asylum Division's CORs and Program Manager at Headquarters for scheduling coordination and to ensure there are sufficient travel funds available. See Section III.B.6 below for guidance on applicants with disabilities.

While in general the Asylum Division is currently only providing in-person direct interpretation services for applicants who require sign language interpretation, there may be other limited circumstances where in-person direct interpretation or interpreter monitoring is authorized under the contract. This may include rare circumstances involving interviews of applicants deemed to be high security risks, interviews of minors, or interviews of applicants who are not mentally competent or who are physically incapacitated.

### iv. Role of the Contract Interpreter when Acting as Monitor

The role of the contract interpreter monitor is generally limited to monitoring interpretation by the interpreter provided by the applicant. However, contract interpreters may be expected occasionally to interject if the applicant's interpreter fails to provide adequate, accurate, and neutral interpretation. For example, the contract interpreter should not call attention to minor misinterpretations, such as an adjective that might not be the monitor's choice but that accurately conveys the meaning of the applicant's statement. If the contract interpreter frequently interjects, the Asylum Officer must determine whether frequent interjections occur because the applicant's interpreter has performed incompetently or abused their role, or whether the contract interpreter misunderstands their role as a monitor and take appropriate action. In addition, the Asylum Officer should not permit any arguments between the contract interpreter and the applicant's interpreter. If there is a dispute in interpretation between the contract interpreter and the applicant's interpreter, the Asylum Officer should note both interpretations in their interview notes. However, the Asylum Officer should accept the contract interpreter's interpretation in adjudicating the case, as it can be presumed to reflect more accurately the applicant's testimony. Under no circumstances should the contract interpreter discuss material aspects of the applicant's asylum claim with the Asylum Officer or the applicant's interpreter.

USCIS00004116

##### v. Working with the Contract Interpreter Monitor
#### (a) Introduction and Orientation

At the beginning of the interview, the Asylum Officer explains to the applicant, through the applicant's interpreter, that a contract interpreter will be monitoring the interview to ensure the accuracy of interpretation by the applicant's interpreter. The Asylum Officer should also remind the contract interpreter, in the presence of the applicant, of the confidentiality requirements of the interview and should inform the applicant that the interpreter has pledged to keep all information the applicant provides during the interview confidential.

The Asylum Officer administers an oath to the contract interpreter monitor, in addition to administering an oath to the applicant and to the applicant's interpreter. The Asylum Officer should use the following language for the contract interpreter's oath:

> Do you affirm that you will truthfully, literally, and fully report to the Asylum Officer any material misinterpretation observed during this asylum interview? Do you affirm that you will immediately notify the officer in this case if you become aware of your inability to monitor in a neutral manner, on account of a bias for or against the applicant or the applicant's race, religion, nationality, membership in a particular social group, or political opinion? Do you affirm that you understand that all matters discussed in this interview are confidential and that you will not share what you hear today with any person?

This oath should be interpreted for the applicant by the applicant's interpreter so the applicant is aware of the oath taken by the interpreter monitor. The Asylum Officer should record in the interview notes that the Asylum Officer administered the oath to the contract interpreter monitor. Interviews that use a contract interpreter monitor should be recorded in the case management system.

#### (b) Problems with Applicant's Interpreter

If, based on information provided by the contract interpreter or other factors, the Asylum Officer determines that the applicant's interpreter is prohibited from serving as an interpreter, has abused their role, as described above, or if the applicant's interpreter is not competent to interpret, the Asylum Officer may use the contract interpreter monitor, if available, to help support direct interpretation. If a contract interpreter is not available or the applicant declines the use of the contract interpreter, after consulting with an SAO, the interview will be rescheduled at the fault of the applicant. The rescheduling of the interview will result in an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock. See Section II.J.4.a.vi, Inability to Perform, or Abuse of, the Interpreter's Role, above.

#### (c) Problems with the Contract Interpreter Monitor

If the Asylum Officer experiences problems with the contract interpreter monitor, such as inappropriate interjections, apparent bias or prejudice, unavailability, absence, or unresponsiveness of the contract interpreter when prompted by the Asylum Officer, the Asylum Officer may request another contract interpreter monitor using the office's assigned vendor priority. Any difficulty with the contract interpreter monitor should be noted in the documentation of the call in the case management system. If a contract interpreter monitor's performance issue is egregious in nature such that it requires immediate attention, the issue should be brought to the attention of the Asylum Office management, which will in turn notify the COR and/or Program Manager at Asylum Headquarters.

#### (d) Conclusion of the Interview

USCIS00004117

At the conclusion of the interview, in the presence of the applicant and their interpreter, the Asylum Officer should ask the contract interpreter monitor if they have any final or overarching concerns about the interpretation provided by the applicant's interpreter, including apparent bias or prejudice by either party. If the contract interpreter monitor has comments, the Asylum Officer should address them with the applicant before concluding the interview. If the contract interpreter monitor has no comments, the Asylum Officer may disconnect the call. Once the call is disconnected, the Asylum Officer records the disconnect time in the case management system.

### vi. Working with the Contract Interpreter when Acting as Interpreter

#### (a)   Introduction and Orientation

In the limited circumstances where USCIS may provide an interpreter for the interview, the Asylum Officer explains to the applicant, through the contract interpreter, that a government-contracted interpreter will be providing direct interpretation in the interview to ensure the accuracy of interpretation. The Asylum Officer will also ensure that the applicant and the contract interpreter speak and understand the same language and that they can clearly understand each other. The Asylum Officer should confirm with the applicant that they feel comfortable using the interpreter provided. If the applicant wishes to use an interpreter of a specific gender, the Asylum Office should attempt to obtain an interpreter of that gender, if available. The Asylum Officer should also remind the contract interpreter, in the presence of the applicant, of the confidentiality requirements of the interview and should inform the applicant that the interpreter has pledged to keep all information the applicant provides during the interview confidential. The Asylum Officer should confirm with the interpreter that they are not a representative or employee of the applicant's country of nationality, or, if stateless, the applicant's country of last habitual residence. The Asylum Officer should also confirm with the interpreter that they do not have a close relationship with the applicant. The Asylum Officer will record these checks for understanding in the interview notes.

The Asylum Officer administers an oath to the contract interpreter, in addition to administering an oath to the applicant. The Asylum Officer should use the following language for the contract interpreter's oath:

> Do you affirm that you will truthfully, literally, and fully interpret the matters to be discussed? Do you affirm that you will immediately notify the officer in this case if you become aware of your inability to interpret in a neutral manner, on account of a bias for or against the applicant or the applicant's race, religion, nationality, membership in a particular social group, or political opinion? Do you affirm that you understand that all matters discussed in this interview are confidential and that you will not share what you hear today with any person?

This oath should be interpreted for the applicant by the contract interpreter. The Asylum Officer should record in the interview notes that the asylum officer administered the oath to the contract interpreter. The Asylum Officer should inform the applicant that they should immediately tell the Officer if they feel that the interpreter is biased against the applicant or one of their protected characteristics, or if the applicant feels uncomfortable with the interpreter. In this case, the Asylum Officer may request a new interpreter as described below..

#### (b)   Problems with the Contract Interpreter

If the Asylum Officer experiences problems with the contract interpreter, such lack of fluency in English or the language of interpretation, inappropriate interjections, apparent bias or prejudice, breach of confidentiality, any unprofessional conduct, unavailability, absence, or unresponsiveness of the contract interpreter when prompted by the Asylum Officer, the Asylum Officer may request another contract interpreter using the office's assigned vendor priority or through working with Asylum Headquarters if the

USCIS00004118

interpreter was directly coordinated by HQ. Any difficulty with the contract interpreter should be noted in the interview notes and on the interpreter log or in coordination with Asylum Headquarters where prior coordination with HQ was required. If a contract interpreter's performance issue is egregious in nature such that it requires immediate attention, the issue should be brought to the attention of the Asylum Office management, which will in turn notify the COR and/or Program Manager at Asylum Headquarters.

If the applicant experiences problems with the contract interpreter, such as lack of fluency, frequent and/or inappropriate interjections, apparent bias or prejudice, any unprofessional conduct, unavailability, absence, or unresponsiveness, then the Asylum Officer must record any difficulties in the interview notes. The Asylum Officer must attempt to resolve these types of problems with the contract interpreter, and, as needed, the Asylum Officer may request another contract interpreter as outlined above. If a suitable interpreter is not available, the Asylum Officer will reschedule the interview and attribute the interview delay to USCIS for the purposes of employment authorization pursuant to 8 CFR 208.7. The Officer will complete a Rescheduling of Asylum Interview – USCIS Interpreter Unavailable (Appendix 2) form, providing the original to the applicant and maintaining a copy in the file.

### (c)  Conclusion of the Interview

At the conclusion of the interview, in the presence of the applicant, the Asylum Officer should ask the contract interpreter and the applicant if they have any final or overarching concerns about the interpretation, including apparent bias or prejudice by either party. If the contract interpreter or the applicant has comments, the Asylum Officer should address them with the applicant before concluding the interview. If the contract interpreter has no comments, the Asylum Officer may dismiss the interpreter once the interview is complete. The Asylum Officer records the end time in the case management system.

#### vii. Requirements for Documenting Contracted Interpretation in Case Management System

Asylum Division personnel are responsible for entering all the information regarding contracted interpretation and monitoring into the case management system for every call or interpretation request that is attempted, regardless of whether the request is connected to an interpreter/monitor. This information is important for contract enforcement and helps to ensure proper billing and the identification of performance issues. See the Interpreter Services ECN for specific guidance.

#### viii. Other Issues

For any issues relating to the interpreter services contract, please contact the Asylum Division's COR(s) and Program Manager. This includes scheduling sign language or other in person interpreters, identifying interpretation scheduling needs for holidays and overtime, issues in securing interpreters, and vendor performance issues that require immediate attention.

### 5. Legal Representative

**a. Representative Qualifications**

An applicant may be represented by:

USCIS00004119

- An attorney (a member in good standing of the bar);
- A Board of Immigration Appeals (BIA) Accredited Representative;
- A law student or law graduate not yet admitted to the bar (with certain restrictions described at 8 C.F.R. 292.1(a)(2)); or
- A reputable person who fits certain criteria. See 8 C.F.R. 292.1(a)(3). 8 C.F.R. 292.1 outlines the qualifications for a representative.

### b. Representative Appearances  (8 C.F.R. 292.4)

A Form G-28, Notice of Entry or Appearance as Attorney or Representative must be properly executed. "Properly executed" is defined as follows:

### i. For a Form G-28 filed prior to February 10, 1994

Only the representative's signature is required on the form. If the applicant signed the form but the representative did not, the form is not properly executed. In this scenario, USCIS does not recognize that the applicant is represented. If the representative appears at the interview, the Asylum Officer requests the representative to sign the form prior to the interview. See 56 FR 61201 and 59 FR 1455-1466 for supplemental information regarding the change in G-28 requirements effective 02/10/94.

### ii. For a Form G-28 filed on or after February 10, 1994

The signatures of the applicant and the representative are required on the form. If both signatures are not present, USCIS does not recognize that the applicant is represented. However, the Asylum Officer may obtain the missing signatures at the time of the interview to cure the defect.

If a Form G-28 is not in the file, and the applicant appears with a legal representative, the AO has the representative and the applicant complete and sign a G-28 prior to beginning the interview. This should be done even when the file already contains a Form G-28 executed by a different attorney from the same law firm as the attorney representing the applicant at the interview.

### iii. Remote Attorney or Representative Participation

The USCIS Asylum Division permits an attorney or representative of record to participate remotely via telephone in an affirmative asylum or NACARA 203 interview. Attorneys or representatives will need to affirmatively elect to participate remotely by completing the REMOTE ATTORNEY OR REPRESENTATIVE PARTICIPATION IN AN AFFIRMATIVE ASYLUM AND/OR NACARA 203 INTERVIEW opt-in form (Appendix 113). The form must be fully completed and submitted to the local asylum office at least ten (10) days prior to the scheduled interview. If the local asylum office receives a completed form fewer than ten (10) days prior to the scheduled interview, then the asylum interview may be rescheduled and any rescheduled interview caused by this modification will result in an applicant-caused delay for purposes of employment authorization.

### 1. Officer Conference Calls the Attorney or Representative

If an attorney or representative is scheduled to participate in an interview remotely the officer will call the attorney or representative at the telephone number listed in the record, e.g., Form G-28.

### 2. Verifying the Attorney's or Representative's Identity

When an attorney or representative affirmatively joins the interview telephonically, the officer will verify the attorney's or representative's identity by name, state bar or registration number (if applicable), business address, and business phone number before beginning the interview. admitting the attorney or

USCIS00004120

representative to the interview. The officer should also allow the attorney or representative to briefly greet their client, have the applicant verify that the attorney or representative who is on the telephone is their attorney or representative of record, and confirm with the applicant that they consent to the attorney or representative participating remotely. Lastly, the officer should remind the attorney or representative of the importance of maintaining confidentiality and the prohibition against recording of the interview. The above reminders and confirmations should be documented in the interview notes.

### 3. Opt-In Form
On the REMOTE ATTORNEY OR REPRESENTATIVE PARTICIPATION IN AN AFFIRMATIVE ASYLUM AND/OR NACARA 203 INTERVIEW opt-in form, attorneys or representatives must declare that they received their client's consent for remote participation, they understand the importance of maintaining confidentiality, and will not have present any other individuals who can hear or participate in the asylum interview without the express consent of the applicant and the officer, and they will not record any part audio or video of the interview.

### 4. Requests to Modify Election of Remote Appearance
If the attorney or representative requests to modify their election of remote participation to in-person participation, the asylum office should make every effort to continue with the interview. If not practicable due to any local social distancing requirements in place at the time of interview, the asylum office may reschedule the asylum interview. Any rescheduled interview caused by the attorney or representative's modification of their election of remote participation to in person participation will be considered a delay at the fault of the applicant for purposes of the applicant's employment authorization adjudication.

### c. Representative Role
See RAIO Combined Training Module: Interviewing - Introduction to the Non-Adversarial Interview.

### d. Failure of Representative to Attend Interview
If the representative on the G-28 is not present at the interview, the AO should ask the applicant whether he or she is still represented by the individual listed on the G-28.

If the applicant is no longer represented by the individual listed on the G-28, the AO:

- Asks the applicant to sign a brief statement that he or she wishes to withdraw the individual listed on the G-28 from the asylum claim.
- Attaches the signed statement to the G-28 and places the G-28 on the right-hand side of the file.
- Removes the representative from the case management system.
- Proceeds with the interview.

If the applicant continues to be represented by the individual listed on the G-28, the AO explains to the applicant that he or she may proceed without the representative, but is not required to do so:

- If the applicant wishes to proceed with the interview, the applicant signs a Waiver of Presence of Representative During an Asylum or a NACARA 203 Interview (Appendix 8).
- If the applicant does not wish to proceed without representation, the AO permits the applicant to reschedule the interview and completes a Case Reschedule History (Appendix 9).
- SAO consultation is required before rescheduling an interview.

USCIS00004121

- If the applicant wishes to reschedule the interview, the AO determines whether the failure of the representative to appear could be the fault of USCIS. The AO ascertains whether the Asylum Office properly sent notice of the interview to the representative by:
  - o Questioning the applicant
  - o Checking to see if the representative is listed in the case management system.
  - o Seeing if a copy of the representative's Interview Notice is in the file.

If a copy of the representative's Interview Notice is in the case management system, the Asylum Office presumes that USCIS properly sent notice of the interview to the representative. Therefore, the failure of the representative to appear is not the fault of USCIS. Asylum Office personnel update the case management system to indicate that rescheduling is caused by the applicant. The rescheduling of the interview will result in an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock. If the representative was retained after the Interview Notice was issued, USCIS is not at fault for failing to notify the representative about the scheduled interview date.

If a copy of the representative's Interview Notice is not in the case management system, the failure of the representative to appear is the fault of USCIS. Asylum Office personnel update the case management system, indicating the rescheduling is at the fault of USCIS.

**e. Abuse of Representative's Role**
It is the AO's duty to ensure that the representative follows the rules of the interview as explained at the outset of the interview, which includes turning off all cellular phones or beepers.

With concurrence of an SAO, an AO may ask a representative who continuously fails to abide by the rules after repeated warnings, to leave the interview. If the attorney is asked to leave, the AO either continues with the interview or suspends the interview at the applicant's request. If the interview is suspended, the rescheduling of the appointment is at the fault of the applicant, so the 180-day Asylum EAD Clock stops. The AO must clearly outline in the interview notes what occurred during the interview that prompted the representative's dismissal from the AO's office. An AO must consult with an SAO prior to dismissing an attorney from an interview.

**f. Attorney's License to Practice Law**
An Immigration Judge, the BIA, or the Attorney General may suspend or bar from further practice before the EOIR or USCIS, or may take other appropriate disciplinary action against, an attorney or representative if it is found that it is in the public interest to do so. A formal proceeding to suspend or bar an individual attorney pursuant to 8 C.F.R. 292.3 may occur if he or she is under any order of any court revoking or suspending his or her license to practice law in a particular state, possession, territory, commonwealth, or the District of Columbia. Orders suspending or expelling attorneys are periodically forwarded to the Asylum Offices, and a list of such attorneys is maintained on the EOIR web site at http://www.justice.gov/eoir/legalrepresentation.htm. See 8 C.F.R. 292.3

If the Asylum Office learns that an attorney who has filed an appearance with the Asylum Office has been suspended or expelled by EOIR or the Attorney General, the Asylum Office may not permit the attorney to act as a representative in connection with the interview or other proceeding during the term of the suspension or expulsion. Such an attorney may not act as an interpreter in any case for which he or she has previously filed an appearance (G-28). The representative code is removed from RAPS only when the attorney has been permanently expelled from practice before USCIS or EOIR in accordance with 292.3.

USCIS00004122

Although 8 C.F.R. 1.2 defines an attorney as someone who is not under any order of any court, suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law, the USCIS Office of Chief Counsel has advised the Asylum Division that an Asylum Office cannot ban an attorney from representing asylum applicants, absent a formal proceeding to suspend or bar the individual under 8 C.F.R. 292.3, even if the licensing state, possession, territory, commonwealth, or the District of Columbia has taken such action.

Therefore, if an Asylum Office becomes aware that an attorney's license has been revoked in a particular state, possession, territory, commonwealth, or the District of Columbia, the Asylum Office cannot ban that attorney from representing asylum applicants. An Asylum Office may require the attorney to assert his or her eligibility to act in a representative capacity each time he or she appears at the Asylum Office.

When an attorney, who the Asylum Office has learned is no longer licensed to practice law in a particular state, possession, territory, commonwealth, or the District of Columbia, appears at the Asylum Office to represent an asylum applicant, an SAO, the Deputy Director or the Director informs the attorney that:

- The Asylum Office is aware that a particular state, possession, territory, commonwealth, or the District of Columbia revoked his or her license to practice law.
- If he or she is licensed to practice in another state, possession, territory, commonwealth, or the District of Columbia, he or she may complete a new Form G-28 and can list the area where he or she has a license to practice law. Call to the attorney's attention question #1 on the form which states "... and am not under a court or administrative agency order suspending..."
- The Asylum Office will report his or her appearance to DHS Counsel for appropriate action.

If the attorney completes a Form G-28, the Asylum Office allows him or her to appear at the interview.

An SAO, Deputy Director, or Director takes the preceding steps each time the same attorney wants to represent an applicant. In addition, the SAO, Deputy Director or Director copies the Form G-28 in the file and any new G-28 the attorney completes, and writes a brief outline of any conversations with the attorney for forwarding to the USCIS Area Counsel. The Area Counsel's Office may notify EOIR, and the bar within the state, territory, commonwealth, or the District of Columbia that revoked the attorney's license, if appropriate.


### g. Request to Confer in Private

For all interviews, whether the attorney or representative participates remotely or in person, applicants may communicate privately with their attorney or representative. If the applicant or attorney or representative requests to confer privately, the officer will ensure that all record of proceedings materials and computers are secure before briefly stepping away from their desk and/or removing their headset to signal to the relevant parties that they may proceed with their conversation in private. Officers should then clearly announce when they are returning to the call.

USCIS00004123

### 6. Witnesses

Pursuant to regulation, an asylum applicant may present witnesses to testify on his or her behalf. There are no restrictions on witnesses with regard to the number of witnesses, age, their own asylum or immigration status, or the relationship to the applicant, except that an interpreter of record or the representative of record may not act as a witness.

An AO may not refuse a witness the opportunity to testify; however, an AO may place a reasonable limit on the length and subject matter of a witness's statement(s), and may request a witness's statement in writing. See 8 C.F.R. 208.9.

### 7. Submission of Documents

The applicant may present documents in support of his or her case during the interview. Documents submitted must be in duplicate, and accompanied by a certified English translation if they are not in English. Documents that do not meet these requirements need not be accepted. If they are accepted without translations, Asylum Office personnel explain to the applicant that translation is required for them to be considered in support of the application. While applicants may submit facsimile or photostatic copies as documentation, they are not given the same weight as an original. No restriction applies to the amount or nature of documentation an applicant may submit; including videotapes, audiotapes, and photographs. See 8 C.F.R. 103.2(b)(3) for requirements on certified translations.

When the applicant presents an original document, the AO copies the document (if copies are not submitted by the applicant), and writes on it, "original seen and returned," signing and dating below the statement.

### 8. Retention of Applicant's Original Documents in the File

An asylum applicant may submit documentation in support of his or her application that the Asylum Officer, in consultation with the office's fraud coordinator, may believe is fraudulent or fraudulently obtained or that the applicant admits is fraudulent or fraudulently obtained. When an applicant admits that a document is fraudulent or fraudulently obtained, the Asylum Officer takes a sworn statement detailing the applicant's admission.

An Asylum Officer may receive a document as evidence and consider it in conjunction with the adjudication of the asylum application. The Asylum Officer may retain the document for purposes of determining its authenticity until the conclusion of the adjudication.

When an adjudication is complete and a document has been determined to be authentic and to belong to the bearer and is not needed by USCIS for any other lawful purpose, USCIS must promptly return the document to the applicant. The Asylum Office may give the original document to the applicant at the time he or she picks up the decision or may mail the document to the applicant. If the Asylum Office returns the document to the applicant in person, the applicant should sign on the file copy of the document that he or she received the original. If the Asylum Office mails the document, it must be sent via certified mail with a return receipt.

After the completion of the adjudication by the Asylum Officer, a fraudulent document or document that was fraudulently obtained may be retained. The Asylum Officer does not need the applicant's permission to retain the document. See Lynden Melmed, Chief Counsel, USCIS. Authority of Asylum Officers to Retain

USCIS00004124

Fraudulent Documents or Documents Fraudulently Obtained. Memorandum to Lori Scialabba, Associate Director, RAIO and Greg Smith, Acting Associate Director, National Security and Records Verification. (Washington, DC: November 30, 2007), 4 p.

The Asylum Office sends the applicant a *Retention of Original Documents* letter (Appendix 10) informing him or her that USCIS is retaining the document(s). A copy of the letter is also placed in the file along with the fraudulent document, which is placed in an evidence envelope on the non-record side of the file

Forensic examination may take place either at the ICE Homeland Security Investigations Forensic Laboratory (HSI-FL) or at another DHS facility, such as a fraudulent document unit or intelligence unit at a port-of-entry. Submission of a document for analysis should be done only if the AO or SAO believes that the analysis of such a document may affect the outcome of the decision. See Section II.M.7 for information on the HSI-FL.

Local Asylum Office policy determines whether an AO must consult with an SAO or other office personnel if an AO wants to send a document for analysis. If the AO retains an original document, he or she notes on a Form I-72 or an office equivalent form the name of the document and the reason it is being retained. The AO gives the original Form I-72 or office equivalent form to the applicant as a receipt

Given the circumstances of a particular case, an Asylum Office Director may place a case on hold while awaiting a report on the analysis of a document. This authority cannot be delegated. Please note that by placing a case on hold for awaiting documentation, the result is an applicant-cause delay as it pertains to the 180-day Asylum EAD Clock .

The submission of fraudulent documents by an applicant may affect his or her eligibility for asylum. AOs must be familiar with guidance on this issue that has been provided by HQASM. *See* Langlois, Joseph E. Matter of O-D-, Int. Dec 3334 (BIA 1998), Memorandum to Asylum Directors, Supervisory Asylum Officers, and Asylum Officers, 29 April 1998, 3p., and Langlois, Joseph E. Discovery of Fraudulent Documents After the Asylum Interview, Memorandum to Asylum Directors, Supervisory Asylum Officers and Asylum Officers, 27 May 1998, 2p.

### 9. Note-taking by the AO During an Asylum Interview

Most interviews will require standard note-taking as outlined in the RAIO Combined Training Module: Interviewing - Note Taking; however, HQASM requires notes in sworn statement format under the following circumstances:

- The applicant admits, or there are serious reasons to believe, he or she is associated with an organization included on either the Foreign Terrorist Organizations List or the Terrorist Exclusion List, both of which are compiled by the Department of State and are available at http://www.state.gov/s/ct/, or that he or she is or has been a member of any other terrorist organization.
- The applicant admits, or there are serious reasons to believe, she or he is involved in terrorist activities.
- The applicant admits, or there are serious reasons to believe, he or she assisted or otherwise participated in the persecution of others on account of one of the 5 enumerated grounds.
- There are serious reasons for considering the applicant a threat to national security.

USCIS00004125

- The applicant admits that or there are serious reasons to believe that he or she committed or was convicted of a serious crime outside of the U.S. and the file does not contain a record of the conviction.
- The applicant admits, or there are serious reasons to believe, he or she committed human rights abuses.

The circumstances noted above all relate to mandatory bars to asylum. Because an applicant's admission may be used as a basis to institute deportation or removal proceedings against him or her, or as a basis for DHS to detain the applicant, it is crucial for the AO to take notes in a sworn statement format about the mandatory bar.

When an AO determines that an applicant has provided information that pertains to one of the circumstances listed above, the AO begins taking notes in the Q&A format on a new sheet of paper in order to separate them from any notes the AO may have already recorded. Once the AO uses this format, he or she continues to use it until the end of interview, even if the discussion surrounding a possible mandatory bar has concluded. The sworn statement Q&A does not have to be a verbatim account of every comment made during the interview, but it must provide a full and accurate record to the specific questions asked of the applicant and the applicant's specific answers. Each page of the sworn statement should contain the applicant's A-number, the date of the interview, and the AO's name. AOs may be required to inform their SAO or other Asylum Office personnel if they know prior to the interview that they will need to take notes in Q&A format. Check with local Asylum Office management for requirements.

At the conclusion of the interview, the AO incorporates the Q&A notes into the sworn statement template (Appendix 63) and reviews the sworn statement with the applicant, making any corrections requested by the applicant. The applicant initials the bottom right-hand corner of each page. Both the AO and the applicant print and sign their names below the last recorded answer.

The AO draws a diagonal line from the end of the testimony to the bottom of the page to ensure that no one adds additional comments. If the applicant refuses to sign and/or initial the sworn statement, the AO writes a note to that effect on the last page. The AO prints and signs his or her name and draws a diagonal line from the end of the testimony to the bottom of the page.

If requested, the Asylum Office may give the applicant a copy of the sworn statement without requiring the applicant to file a request under the Freedom of Information Act (FOIA).


## 10. Applicant Testifies to Fraudulent Entry or Violation of Status

Asylum Office personnel may encounter an applicant who was inspected and admitted, and whose authorized period of stay has not expired, but who testifies that he or she gained admission to the U.S. through fraud or that he or she has violated the conditions of his or her status.

Cases presenting substantiated fraud or misrepresentation are among DHS's enforcement priorities. Aliens falling under INA § 212(a)(6)(C), removable aliens who "have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency," and removable aliens who have abused any program related to receipt of public benefits are all priorities for removal. While the NTA is not required to include the charge of fraud or misrepresentation (INA §§ 212(a)(6)(C)), efforts should be made to include this charge whenever evidence in the record supports

USCIS00004126

such a charge. *See Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens*, USCIS Policy Memorandum 602-0050.1, 28 June 2018, 11 p.

Asylum Office Directors maintain discretion to establish local policies, in consultation with local USCIS Area Counsel and/or ICE Office of the Principal Legal Advisor (OPLA), as to note-taking, documentation of the file, whether to treat such an applicant as in- or out-of-status for the purposes of issuing a Notice of Intent to Deny (NOID), whether and how a charging document is prepared, and whether consultation with the Director is required in making any of the above determinations. Asylum Office Directors establish local policies in accordance with the following priorities:

- A charging document issued by the Asylum Office will be sustained by the Immigration Court, i.e., proceedings will not be terminated, regardless of whether the alien appears for his or her hearing before the Immigration Judge.
- Charges on an NTA are substantiated, i.e., if fraud is charged, there is sufficient evidence for DHS to prevail on that charge before the Immigration Judge.
- The file is documented with a reliable record of the applicant's testimony and copies of evidence in the applicant's possession.
- The asylum application is processed and completed in a timely manner.

### 11. Conducting an Interview in a Language other than English

If local Asylum Office policy allows eligible staff to conduct interviews in a language other than English, staff members must follow the language certification process defined in the Asylum Division's language certification procedures memo. See Caudill-Mirillo, Ashley B. Guidance on Language Certification Procedures, Memorandum to Asylum Division Staff (Washington, DC: 11 April 2022).

Because 8 CFR 208.9(g) requires an applicant who is not competent in English to bring an interpreter to an asylum interview, as a general rule, asylum applicants are required to bring interpreters regardless of whether there are Asylum Office personnel available to conduct interviews in languages other than English. Nevertheless, the Asylum Office Director maintains the discretion to allow qualified Asylum Office personnel to conduct or assist in the conducting of an interview in the applicant's preferred language, with the applicant's consent, if there are extraordinary circumstances for doing so, such as (but not limited to) the disqualification of an interpreter through no fault of the applicant combined with the applicant's having traveled a very long distance for the interview.

As noted above, applicants not fluent in English must bring an interpreter with them to their asylum interview. In this scenario, depending upon local policy and with the asylum applicant's approval, the AO can either conduct the interview in the applicant's language, if the applicant agrees, or use the services of the interpreter. The AO must make a clear notation in the interview notes that the interview was conducted in a language other than English and indicate the language used by the AO. If the AO conducts an interview in the applicant's language, a competent interpreter should preferably be present during the interview to monitor the level of understanding between the Asylum Officer and applicant. The AO uses the Record of Applicant Oath During an Interview Conducted by the Asylum Officer in a Language Other Than English (Appendix 119) when the AO places the principal applicant and any dependents who will testify on the asylum claim under oath..

USCIS00004127

**a. Certification Requirements**

The Department of State Foreign Service Institute (FSI) administers language proficiency tests for DOS as well as other government agencies. The FSI administers a speaking test and a written test. The score for each test ranges from 0 (no proficiency) to 5 (functionally native proficiency). More information on the scoring scale is available online at http://www.govtilr.org/. An Asylum Officer who wants to be certified by DOS in a foreign language to conduct asylum interviews in that language is only required to take the speaking test. The Asylum Officer must earn a 3 (general professional proficiency) or higher to be certified to conduct asylum interviews in that foreign language.

**b. Applying for Certification**

Language-certified Asylum Officers, Senior Asylum Officers, and Legal Administrative Specialists are authorized to conduct asylum interviews and serve decisions in a language other than English after the completion of their one-year probationary period. For more detailed information on how to obtain language certification, please visit the Asylum Division's Foreign Language Certification Portal.

To become language certified eligible staff members must take the following steps:

1. The eligible employee should consult the Asylum Division Foreign Language Certification Portal for resources and application instructions.
2. After consulting the Portal, the employee should reach out to their local Non-English Language Coordinator (NELC) to discuss local office procedures.
3. The employee must then complete the Self-Assessment offered by the Interagency Language Roundtable (ILR) to determine eligibility.
4. If the results of the Self-Assessment are satisfactory, the employee, with assistance from the NELC, will complete an SF-182, which is located in the Asylum Language Certification Portal.
5. Once the NELC finalizes the SF-182,and completes a Form 1501 "Purchase Card Transaction Worksheet," they will seek local leadership approval.
6. Once approval is obtained, the NELC will submit both documents to Asylum Management Branch through the Language Certification Portal.
7. After Asylum Management Branch submits application to DOS, DOS will email the employee directly to schedule their test.
8. Within 20 days of the examination, DOS will email the employee and Asylum Management Branch the results.
9. If the employee scores a 3 or above, they are considered language certified. However, if the employee scores below a 3, they are not language certified. Regardless of results, the employee must forward score to the NELC to determine next steps.

An Asylum Officer who earns less than a 3 on the speaking test must generally wait one calendar year before re-taking the test for certification. Asylum Office Directors have discretion to allow an Asylum Officer to take the test more than once in a calendar year.

## 12. Applicants Unable to Testify on their Own Behalf

An asylum applicant may be incapable of testifying on his or her own behalf due to mental incompetence, a physical disability. See Section III.B.6 below for additional guidance on applicants with disabilities. These include individuals who suffer from acute mental or physical disorders, or have suffered an injury, such as a stroke, that makes them unable to communicate.

USCIS00004128

Asylum Office personnel are neither trained nor expected to evaluate an asylum applicant's mental or physical competency and shall not make any determinations to that effect. However, there may be cases in which an applicant manifests behavior that leads Asylum Office personnel to question the applicant's ability to provide competent testimony.

When Asylum Office personnel become concerned that an applicant is not competent to testify, a Supervisory Asylum Officer must be notified and apprised of the reasons for concern. If the Supervisory Asylum Officer believes that there are reasonable grounds to question the competence of the applicant to provide testimony, Asylum Office personnel shall explain the procedures in this section to a representative, family member or guardian accompanying the applicant to the Asylum Office, or to the asylum applicant him or herself, if practicable.

Although the burden of proof is on the applicant to establish his or her eligibility for asylum, a Director may permit another individual to testify on behalf of an applicant who is unable to testify on his or her own behalf as long as certain criteria are met.

### a. Criteria and Required Documentation

For another individual to be allowed to testify on behalf of an applicant, the nature of the applicant's condition must be so severe that it rules out the possibility of him or her testifying on his or her behalf at any time in the near future. Additionally, the applicant must be under the care of a physician, psychiatrist, or psychologist who certifies in a letter that the applicant is mentally or physically incompetent to be interviewed about his or her asylum application in the near future. Only the Asylum Office Director may waive the requirement of documentation if extraordinary circumstances warrant. When provided, documentation must include:

- Length of time the physician, psychiatrist, or psychologist has been treating the applicant.
- Condition from which the applicant suffers, including any type of medication that is prescribed.
- Long term prognosis of the applicant's mental or physical condition.

Usually, an applicant who suffers from post traumatic stress disorder (PTSD) would not be considered unable to testify on his or her own behalf. Individuals who are seeking medical assistance for PTSD or other mental health conditions may request a postponement of an asylum interview. The request should be made in writing to the attention of the Asylum Office Director, who determines whether the request shall be granted and how long the interview shall be postponed.

### b. Testifying on an Applicant's Behalf

The individual testifying on the applicant's behalf cannot be the representative of record. The individual must have first-hand knowledge of the applicant's asylum claim. There is no requirement that the individual be the applicant's relative, only that he or she possesses sufficient knowledge of the applicant's situation in order to sustain the applicant's burden to establish asylum eligibility.

If no one is available to testify on the applicant's behalf, or the above criteria are not satisfied and competent testimony cannot be taken, contact HQASM for guidance on how to proceed.

### 13. Re-interviews of Asylum Applicants

An Asylum Office Director maintains the discretion to have an Asylum Officer re-interview an asylum applicant. The types of case that are normally re-interviewed include (but are not limited to):

USCIS00004129

- An applicant who was interviewed prior to the establishment of the asylum corps in April 1991.
- An applicant who was interviewed by an AO who left the Asylum Office but did not make a decision on the asylum claim prior to departing.
- An applicant who was interviewed by an AO, but the record was not sufficiently developed in order to reach a legally sufficient decision in the case. At the discretion of the Director, either the same AO or another AO interviews the applicant.

If a re-interview occurs, any notes or records of the previous interview remain in the file, on the non-record side. The original assessment may remain in the file, where appropriate, and only at the discretion of the Asylum Office Director, but must be clearly marked "DRAFT – UNOFFICIAL" on each page. In addition, the file should contain a print-out of the Case Status (CSTA) screen in RAPS marked "DRAFT - UNOFFICIAL," which shows any decision that may have been made prior to the re-interview.

Except for ABC cases in which the interview is the first ABC interview and prior to an initial assessment, the AO may develop lines of questioning based upon the record of the initial asylum interview, but must create a new record for the re-interview. If the decision following the re-interview differs from the previous decision, where appropriate and at the Asylum Office Director's discretion, the AO's assessment should briefly explain the basis for the change in decision. See the ABC/NACARA Procedures Manual for more information on adjudicating ABC cases.

### 14.Discovery of Adverse Information After an Asylum Interview

An AO may discover information after an asylum interview but before writing a decision, which adversely impacts upon the asylum claim. A non-exhaustive list of examples includes:

- Country conditions information that contradicts a material aspect of the asylum claim,
- Results of a forensic or other examination reveal that material documents are fraudulent, or
- Review of information in a second A-file of an applicant indicates the applicant may be a national of a different country than the one he or she claimed on the asylum application.

In all cases where adverse information is discovered before or during the interview, the AO provides the applicant with the opportunity to explain any discrepancies or inconsistencies during the course of an interview. If discovery of the adverse information occurs after the interview, the AO apprises the applicant of the information either in a NOID or a Referral Notice, depending on the applicant's status. In compelling cases where testimony was otherwise solid and convincing, an Asylum Office Director maintains the discretion to re-interview an applicant when adverse information is discovered after the asylum interview. However, a re-interview should take place only in extremely exceptional circumstances. See Langlois, Joseph E. Discovery of Fraudulent Documents After the Asylum Interview, Memorandum to Asylum Directors, Supervisory Asylum Officers and Asylum Officers, 27 May 1998, 2p.

#### a. Applicant is Maintaining a Valid Status or Parole is Valid
The applicant is given an opportunity to explain any issues of credibility in a written rebuttal to a NOID. The NOID must clearly outline the adverse information, including identifying documents that were found fraudulent, and explain how it negatively impacts upon the asylum claim.

USCIS00004130

**b. Applicant is Deportable or Removable**

The AO clearly reflects in the Assessment to Refer that the applicant did not have an opportunity to rebut the information during the asylum interview. In addition, the AO outlines the adverse information and how it negatively impacts the asylum claim in the credibility section of the Referral Notice, including identifying documents that were found fraudulent.

For substantive guidance on how to proceed with fraudulent evidence, see AOBTC Basic Training Materials, Fraud in the Context of Asylum Adjudications.

43

USCIS00004131

# II.K. AO CONCLUDES AN ASYLUM INTERVIEW

### 1. I-589 Application

At the conclusion of the interview, the AO:

- Reviews and explains to the applicant any corrections, additions, or changes made to the I-589 and numbers each correction, addition, or change.
- Informs the applicant that by signing the I-589, he or she is affirming/swearing that the information on the application is true and correct. See Weiss, Jeffrey. Form I-589 for the Immigration Court, Memorandum to Asylum Office Directors and Supervisory Asylum Officers, 21 August 1996, 1p.

The applicant and the AO then sign and date the record copy(ies) of the I-589, as dictated by local Asylum Office policy.

### 2. AO Informs the Applicant About the Next Step in the Process

The AO does not inform the applicant of the decision during the course of the interview, or give any hint, suggestion, or any other indication of what the decision will be at the interview's conclusion.

The AO informs the applicant how he or she will be informed of the decision. With the exception of circuit rides, the Asylum Office generally requires an applicant to return to the office to receive the decision. Check with local Asylum Office management to ascertain which cases receive an in-person decision and which cases are served by mail.

#### a. In-Person Service (Personal Service)

The AO gives the applicant a Pick-Up Notice (Appendix 11). Only the principal applicant in the case receives the Pick-Up Notice; the A-numbers of all the dependents are listed on it. If, according to the I-589, the applicant speaks one of the languages into which the Pick-Up Notice has been translated from English (see Appendix 67 for the current list of languages), Asylum Office personnel staple the relevant translated version of the Pick-Up Notice to the English version. The applicant is informed that he or she and all dependents age 14 and over must appear in person to pick up the decision. The AO informs the applicant that while an interpreter is not required at the pick-up appointment, an interpreter is highly recommended so that the applicant will fully understand the documents he or she is receiving and will be able to ask any questions he or she may have. The AO makes the recommendation to bring an interpreter even when the Pick-Up Notice and decision letters have been translated into the applicant's native or proficient language.

The principal applicant must sign the A-file copy of the Pick-Up Notice to evidence his or her receipt of the pick-up requirement. Asylum Office personnel inform the principal applicant that he or she is signing the Pick-Up Notice on behalf of all dependents who are listed on the I-589 and are 14 years old and older. An Asylum Office Director may exercise his or her discretion to require any dependent 14 years of age or older to sign the A-file copy of the Pick-Up Notice, in addition to the principal. It is crucial for the principal applicant to sign the Pick-Up Notice because there are consequences for EAD eligibility for failing to appear on a pick-up date. See Section III.I.3 for more information.

USCIS00004132

Local Asylum Office policy dictates which office employee (e.g. AO or IIO/CR) serves the Pick-up Notice and whether the individual serving the Notice must sign it along with the applicant.

### b. Service by Mail

The AO gives the applicant a Mail-out Notice (Appendix 12).  This informs the applicant that he or she is not required to return to the office to receive a decision.  Only the principal applicant in the case receives the Mail-out Notice; the A-numbers of all the dependents are listed on it.

The principal applicant must sign the A-file copy of the Mail-out Notice to show that he or she was notified of how the decision will be processed.

### c. Dismissing the Applicant

The AO makes sure the applicant clearly understands the next step in the process before dismissing him or her from the office.  After the interview is concluded, the AO escorts the applicant out of the office to the waiting room or exit, making sure that the applicant has not left any belongings in the office.

USCIS00004133

# II.M. AO RESEARCHES A CASE

See RAIO Combined Training Module: Researching and Using Country of Origin Information in RAIO Adjudications, and the ISCPM.

### 1. Asylum Division ECN Page

The Asylum Division ECN page is an online collection of documents produced and collected by HQASM and Asylum Field Offices. Documents in the ECN are organized into pages and include, but are not limited to, office and branch-specific information, caselaw, country conditions information, decision writing templates, forms, policies and procedures, statistics, and training materials. Asylum Office personnel can find information by browsing through the pages or by conducting searches.

The Asylum Division ECN page is currently located at █████████████████████████████████████████

### 2. The RAIO Research Unit

#### *a. The RAIO Research Unit*

The mission of the RAIO Research Unit (RU), as it relates to affirmative asylum adjudications, is to provide AOs with reliable country of origin information (COI) and training, so that AOs can adjudicate asylum applications in a timely and accurate manner. To this end, the RAIO RU maintains libraries of COI resources. Currently, RAIO RU maintains COI resources on its ECN page, Microsoft Teams channel, and elsewhere. The RU ECN page, for example, features Country Pages, where AOs can locate information on topics that frequently arise in adjudications of asylum applications by nationals of a given country, as well as collections of the RU's Query Responses, monthly News Summary Bulletins, and other resources. The searchable collections the RU maintains consist of material generated by governmental and non-governmental agencies, international organizations, human rights advocacy groups, academia, and general news media. The RU also maintains electronic subscriptions to numerous serials and accesses other serials and databases through DHS libraries. The RAIO RU ECN page also includes links to other resources and electronic research tools (e.g., ECOI.net) that AOs should use in conducting their own research. Before contacting the RU, AOs must make an effort to locate the information needed in the resources available in their office, including those that the RU makes available, e.g., through the RU ECN page.

#### *b. Communication with the Research Unit*

AOs should use communication with the RU as a resource to assist them in their adjudications. AOs should contact the RAIO RU, for example, if they (1) are unable to find the information that they are looking for in the resources available to them, (2) wish to consult with the RU about whether or to what extent the information found in a source they have reviewed supports a certain factual conclusion or, (3) need help evaluating the reliability of a source. AOs must copy their SAO and their Training Officers (TOs), or whichever TO[s] their Office may wish to designate for this purpose, on initial communications with the RU for their awareness but permission or concurrence is not required to make an inquiry.

Inquiries to the RU should not generally result in cases being put on hold pending research from the RU.

USCIS00004138

If, after consulting with the RU, an AO believes that a case may need to be put on hold to await RU research, delaying the completion of the case past normal processing times, the AO must:

(1) Establish with the RU how long the research is expected to take.
(2) Estimate, given the RU's expected date for completing the research, by what date the case is likely to be completed.
(3) Request permission from their SAO to place the case on hold until the date when the RU's research is expected to be completed. SAO permission is required before placing cases on hold pending RU research. In deciding whether to place a case on hold, the SAO should determine whether the information requested is outcome determinative.
(4) Notify the RU whether they have received permission to put the case on hold pending RU research.

Initial communications with the RU are, as a general rule, best sent by email to:                            . Communications may also, as appropriate, be directed to an individual RU Researcher and may take place using Teams, teleconference, or any other DHS-approved communication tool. The Research Unit will respond timely to all requests for assistance and will publish all formal query responses generated in response to requests for information on the RAIO RU ECN Page and announce their availability in the monthly News Summary Bulletin. Access to certain query responses may be limited to certain user groups if the query response contains sensitive information.

### 3. The Department of State (DOS)

#### a. Requests for Comments from DOS DRL

In cases where the Asylum Division believes the Department of State, Bureau of Democracy Human Rights and Labor (DOS DRL) may have information specific to the applicant or the applicant's situation, DOS DRL can provide written comments on the case. These requests generally will be made to DRL through HQASM during the HQ Quality Assurance (HQ/QA) review process. When HQASM receives a DOS DRL comment, this will be forwarded to the Asylum Office for consideration in the adjudication.

However, should an AO believe it is appropriate to reach out to DRL earlier in the adjudication process, or the case does not require HQ/QA review and DRL comments would be appropriate, such a request may be sent to DRL by the Asylum Office's Quality Assurance and Training Officer (QA/T) in coordination with HQASM. If a case is sent directly from an Asylum Office to DRL, the QA/T should update the BHRHA ADVISORY REQUESTED/RECEIVED (OPIN screen) in RAPS with the date the I-589 application was sent to DRL for an opinion.

The QA/T should send the request for DRL comments to the person listed on the HQASM Asylum Division Contacts spreadsheet on the Asylum Virtual Library.

The applicant's A-file should be kept at the Asylum Office until DRL's comments are received, at which time the case should be promptly adjudicated and forwarded to HQASM for review, if required. If all other actions of the case are complete but for the pending DRL response, the case may be placed on HOLD in RAPS under code "zz."

USCIS00004139

When a DOS DRL comment letter serves as the basis for a decision, the DOS DRL letter should be referenced in the decision Assessment. Where the decision is a denial, the applicant must be given the opportunity to review and respond to any DOS DRL comments prior to the issuance of the final denial.

For more information regarding HQ/QA review, see Section III.Q.

See Section II.N.2.c below for more information about Notices of Intent to Deny.


### b. Confidentiality Requirements

When information contained in or pertaining to an asylum application is disclosed to a DOS employee, the USCIS or DHS officer must inform the DOS employee of the confidentiality requirements of 8 C.F.R. 208.6. Confidentiality requirements for asylum applications and the Department of State are discussed in more detail in Cooper, Bo. Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information, Memorandum to Jeffery Weiss, Director, Office of International Affairs, 21 June 2001, 7p., and in Langlois, Joseph E. Fact Sheet on Confidentiality, Memorandum to Asylum Office Directors and Deputy Directors, 15 June 2005, 1 p., including the attached fact sheet entitled Federal Regulations Protecting the Confidentiality of Asylum Applicants. See also 8 C.F.R. 208.6(b).


### 4. Fraud Detection and National Security (FDNS) Directorate

The Fraud Detection and National Security (FDNS) Directorate coordinates initiatives with DHS enforcement bureaus, including anti-fraud strategies and processes for referring cases to ICE for criminal investigation and prosecution. For more information on FDNS, please see the Identity and Security Checks Procedures Manual (ISCPM).


### 5. U.S. Embassies and Consulates Overseas

Under certain circumstances, AOs may need to be in touch with US embassies or consulates abroad. This should not be done directly. Requests for assistance or information from a U.S. Embassy or Consulate abroad should be coordinated through the QA/T(s) within the Asylum Office to the HQASM Branch Chief for Quality Assurance/Training at (202) 272-8128.


### 6. Foreign Embassies and Consulates in the U.S.

Under certain (very rare) circumstances, an AO may require information from a foreign embassy or consulate about their regulations or laws (e.g., residency or citizenship laws that bear on the issue of firm resettlement). An AO may contact a foreign embassy or consulate directly under the following conditions:

- The AO has exhausted all country conditions research sources available to him or her, and the relevant information cannot be obtained.
- The AO's supervisor agrees that the information needed is material to the asylum claim and cannot be obtained through any other source.
- The AO will not violate confidentiality provisions of 8 C.F.R. 208.6. See Section III.C, Confidentiality Issues.

USCIS00004140

See also Cooper, Bo. Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information, Memorandum to Jeffrey Weiss, Office of International Affairs, 21 June 2001, 7p., and Langlois, Joseph E. Fact Sheet on Confidentiality, Memorandum to Asylum Office Directors and Deputy Directors, 15 June 2005, 1 p., including the attached fact sheet entitled Federal Regulations Protecting the Confidentiality of Asylum Applicants.

### 7. Homeland Security Investigations Forensics Laboratory (HSI-FL)

The ICE HSI-FL provides forensic examination of documents submitted by various units within DHS. Information about the FL, the services it provides, and policies and procedures for submitting documents is available on the Internet at http://intranet.ice.dhs.gov/sites/hsifl/.

Due to time constraints and HSI-FL's policy of prioritizing the examination of documents pertaining to detained and criminal aliens over cases submitted by an Asylum Office, documents should generally only be submitted to the FL if the AO or SAO believes that the analysis may impact on the outcome of the decision.

### 8. INTERPOL

An Asylum Officer may become aware that there is an INTERPOL notice or warrant relating to a particular asylum applicant. An Asylum Officer may not contact INTERPOL directly. The Asylum FDNS IO should be notified of the INTERPOL notice and will then contact the USCIS liaison to INTERPOL in Washington, DC, to request further information relating to the notice or warrant. See the ISCPM and NaBISCOP for additional information.

### 9. Federal Law Enforcement Agencies

An Asylum Officer may become aware that other federal law enforcement agencies (FLEAs), such as the FBI or DEA, possess information about an asylum applicant. Asylum Officers may not contact FLEAs directly until after consulting with his or her SAO or FDNS IO. Asylum FDNS IOs serve as the principal law enforcement liaison and should facilitate all requests for information to and from federal law enforcement agencies. Asylum Office Directors maintain discretion to establish local procedures for contacting FLEAs in coordination with FDNS. Disclosure of case information to FLEAs is covered in Section III.C, Confidentiality Issues.

USCIS00004141

## II.N. AO PREPARES A DECISION

Once the AO completes the interview, he or she prepares the decision. The AO writes an Assessment or NOID in every interviewed case adjudicated by the Asylum Office. Local office policy dictates whether an individual other than an AO prepares a decision letter, NTA, I-94 card, etc.

This section lists the possible decisions that an AO may reach, and the documents that must be prepared to support that decision. The instructions on which documents to prepare presume that the immigration status of the principal applicant and all dependents are the same.

If a dependent's immigration status is different from the principal applicant's status, the principal applicant may receive different documents than those listed in this section. These are referred to as "Split Decisions." An outline of how to process a split decision may be found in Section III.E.9.

### 1. Applicant Appears Eligible for Asylum

The Asylum Office grants asylum in the exercise of discretion to an applicant who qualifies as a refugee under Section 101(a)(42) of the INA and is not barred from relief under Section 208(a)(2) or 208(b)(2) of the INA. See also 8 C.F.R. 208.14(b).

#### a. Recommended Approval

As of August 25, 2020, USCIS no longer issues recommended approvals.

#### b. Asylum Approval

The Asylum Office issues an asylum approval when results of all required identity and security checks for the principal applicant and all dependent family members are current and complete and allow for an approval.

The following is an outline of the documents and the Form I-589 and RAPS updates associated with an asylum approval. Detailed instructions on how to prepare the documents can be found in Section IV, "How To..." of this manual.

- Assessment to Grant
- Asylum Approval letter (Appendix 17, 49, or 50)
- I-94 card, endorsed with asylum approval stamp (see Section IV.E below) that bears the date of asylum approval, signature, Asylum Office code, and office ID number of the adjudicating officer.
- Asylum and NACARA § 203 Background Identity and Security Checklist (Appendix 1 of the Identity and Security Checks Procedures Manual)
- RAPS – FDEC of G1
- When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference).
- If the claim is being granted based solely on coercive family planning (CFP) policies, place an "X" next to the CFP ground only. For more information on CFP cases, see Section III.B.2.
- I-589 – "FOR BCIS USE ONLY" section. Asylum Office personnel complete the appropriate area(s) of this section, indicating a final approval, date, and Asylum Officer ID number.
- RAPS – GLET for service of decision letter

USCIS00004142

### 2. Applicant Appears Ineligible for Asylum

#### a. Asylum Office Authority to Issue Decisions to Applicants who Appear Ineligible for Asylum

The Asylum Office's authority to issue decisions to individuals who are found ineligible for asylum is defined by regulation. 8 C.F.R. 208.14(c). Because the authority of the Asylum Office varies depending on the individual's status, the type of decision prepared depends on the status of the individual at the time the decision is issued (mailed or personally served), not at the time of decision preparation or interview, if there is a difference.

Asylum Office Directors maintain the discretion to establish the most efficient workflow for the processing of decisions for individuals who appear ineligible for asylum provided that:

- The type of decision is appropriate under the regulations at the time it is issued; and
- In the absence of exceptional circumstances, asylum applications are processed in a manner consistent with established timeliness requirements and without unreasonable delay.

See Section III.N for special procedures governing parolees.

#### b. Referral

The Asylum Office must refer to the Immigration Court for adjudication in removal proceedings an applicant who is ineligible to apply for or be granted asylum and appears inadmissible or deportable at the time the decision is issued. 8 C.F.R. 208.14(c)(1). *See also Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens*, USCIS Policy Memorandum 602-0050.1, 28 June 2018, 11 p.

The following is an outline of the documents associated with a referral. Detailed instructions on how to prepare the documents can be found in Section IV, "How To..." of this manual.

- Assessment to Refer (Appendix 46)
- Form I-213, Record of Deportable/Inadmissible Alien, if required. Check with local Asylum Office management about requirements for preparing Form I-213.
- Form I-862, Notice to Appear (NTA), or Form I-863, Notice of Referral to Immigration Judge
- Referral Notice (Appendices 51, 52, 53, 54 and 55)
- Asylum and NACARA § 203 Background Identity and Security Checklist (Appendix 1 of the Identity and Security Checks Procedures Manual)
- Global decision card, with a deportation code of A1 if an NTA is to be issued, A5 if an I-863 is to be issued.
- When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference). Global allows entry of no nexus if the applicant failed to establish nexus to one of the five protected grounds.
- Global and ECHO to generate an NTA and Form I-213, if required.
- I-589 – "FOR BCIS USE ONLY" section. If the form does not contain a space for a referral, Asylum Office personnel write "referral," the Asylum Officer ID number, and the date of the decision. Update the Global Service card for service of decision letter.

USCIS00004143

### c. Notice of Intent to Deny (NOID)

The Asylum Office issues a denial of asylum to an applicant who is ineligible to apply for or be granted asylum and is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status ("in-status") at the time the decision on the application is issued. Prior to denial, the Asylum Office issues an in-status applicant a NOID (Appendix 45), providing him or her 10 days, plus 6 days for mailing (a total of 16 days), to rebut the reasons for the denial. Any rebuttal is considered prior to making a final decision in the case. An applicant found eligible for asylum after the rebuttal period is processed for approval as indicated above in this section. An applicant found ineligible for asylum is processed as a denial or referral, as described in this section.

Under 8 CFR § 208.11(c), an applicant must be provided the opportunity to review and respond to any Department of State (DOS), Bureau of Democracy, Human Rights and Labor (DRL) comments prior to the issuance of any final decision to deny the application. In accordance with this regulation, if the basis for issuing the NOID is, in part, based on DOS DRL comments, the NOID must cite to the use of the DOS DRL comment letter and note the specific information applied in reaching the adverse determination. A copy of the DOS DRL comment letter should be attached to the NOID for the applicant's reference.

From time to time, Asylum Office personnel will encounter an applicant who nears and reaches the end of his or her period of authorized stay during the processing of the asylum application. As indicated in Section II.N.2, an Asylum Office Director maintains the discretion to establish procedures to ensure that the appropriate decision is prepared based on the applicant's status at the time the decision is issued, without undue delay.

For discussion of extensions of periods of nonimmigrant status, see Section III.G.

The following is an outline of the documents and RAPS updates associated with a NOID. Detailed instructions on how to prepare the documents can be found in Section IV, "How To..." of this manual.

- Notice of Intent to Deny (NOID) (Appendix 45)
- RAPS – "Y" and expiration date entered in VIST
- RAPS – PDEC of D1-D7, deportation code A6.
- When updating the "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference). The RAPS screen allows entry of "NO," for no nexus if applicant failed to establish nexus to one of the five protected grounds.
- I-589 – "FOR BCIS USE ONLY" section. Asylum Office personnel write "NOID," the Asylum Officer ID number, and the date of the decision.
- RAPS – DINT for service of the NOID, RBUT for receipt of any rebuttal.

### d. Denial

After a NOID and rebuttal period, the Asylum Office denies asylum to an applicant who is ineligible to apply for or be granted asylum and is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status or has valid parole at the time the decision on the application is issued. If the applicant lost valid status between the issuance of the NOID and the date of issuance of the final decision, a referral is issued. 8 C.F.R. 208.14(c).

USCIS00004144

The following is an outline of the documents and the Form I-589 and RAPS updates associated with a denial. Detailed instructions on how to prepare the documents can be found in Section IV, "How To..." of this manual.

- Final Denial (Appendices 56, 57, and 58)
- Asylum and NACARA § 203 Background Identity and Security Checklist (Appendix 1 of the Identity and Security Checks Procedures Manual)
- RAPS – "Y" entered in VIST
- RAPS – FDEC of D1-D7, deportation code A6.
- When updating "basis of the claim" section, enter the basis upon which the case is decided, rather than basis claimed by the applicant (if there is a difference). The RAPS screen allows entry of "NO," for no nexus if applicant failed to establish nexus to one of the five protected grounds.
- I-589 – "FOR BCIS USE ONLY" section. If required by local Asylum Office policy, the AO completes the appropriate area(s) of this section, indicating a denial.
- RAPS –DENY for service of decision letter.

USCIS00004145

## II.O. SAO REVIEWS A FILE

### 1. Case Review Checklist

Before a decision letter is served, the SAO reviews each case for procedural and substantive correctness and completeness, which includes the following:

- Applicant and AO signed the I-589 and corrections have been made accurately and clearly.
- Assessment or NOID is clear, concise, complete, and correct.
- AO's notes contain the proper elements as described in the RAIO Combined Training Module: Interviewing - Note Taking.
- Decision letter (e.g., Referral Notice, etc.) is correctly addressed to the applicant and any representative of record, accurately reflects the status of the case, and lists all dependents.
- SAOs must review the cases for completeness and correctness as outlined in this manual and appendices and in the various lesson plans of RAIO and Asylum training materials.
- Address on the documents matches the address in Global.
- Information and dates are correct and consistent throughout (NTA, I-213, assessment, I-589, I-94).
- AO signed the Form I-213, if required.
- NTA allegations/charges and the location of the Immigration Court are correct.
- Any Record of Oath is properly executed.
- Asylum and NACARA § 203 Background Identity and Security Checklist is present and completed in accordance with the decision being issued.
- Each A-file is in neat, record order, with no loose papers or unconsolidated folders attached.
- Global is properly updated.

Copies of the relevant documents are in the dependent's A-file. See Section III.J.5 on record order.

### 2. Signature on Documents

An SAO's signature on a document evidences that he or she reviewed the case in accordance with the instructions in the previous section and concurs in the decision that was made by the AO. After reviewing the asylum decision, the SAO takes the following action:

- Signs or initials the assessment indicating supervisory review.
- Signs the Referral Notice, Asylum Approval letter, NOID, or Final Denial letter.
- Signs and dates each NTA, if required.
- Signs Form I-213, if required.
- Signs and dates the Asylum and NACARA § 203 Background Identity and Security Checklist.

### 3. Standard of Review

It is not the role of the SAO to ensure that the AO decided the case as he or she would have decided it. AOs must be given substantial deference once it has been established that the analysis is legally sufficient. See Melville, Rosemary Langley. Procedures for Supervisory Asylum Officers and Asylum Officers, Memorandum to Asylum Directors, Supervisory Asylum Officers and Asylum Officers, 29 June 1995, 1p. In the event that the SAO disagrees with the AO's decision, he or she discusses the case with the AO. If the SAO and AO are not able to resolve their differences, the SAO elevates the issue to the Director (or Deputy Director) of the Office. The Director may decide, in his or her discretion, to refer the case to the HQASM Quality Assurance Branch (HQASM/QA) for further review.

USCIS00004146

## II.P. ASYLUM OFFICE SERVES THE DECISION ON THE APPLICANT

Once the SAO has reviewed the case, Asylum Office personnel prepare the case for service of the decision on the applicant and representative of record, if any, according to local Asylum Office procedures. An applicant's file must contain copies of any documents served on him or her by the Asylum Office.

USCIS00004147

# II.Q. ASYLUM OFFICE SERVES THE DECISION ON THE APPLICANT

For all in-person service of decisions, local Asylum Office policy dictates whether Asylum Office personnel verify the identity of an applicant and all dependent family members 14 years old and older in CPMS-IVT. See Section II.I.1 of this manual and the Identity and Security Checks Procedures Manual for additional information on CPMS-IVT (forthcoming).

Applicants are called to receive the decision by number, rather than name, in a manner dictated by local policy. See Section II.I.7, AO Calls the Applicant for the Interview.

The principal applicant receives service of the documents for the entire family, except that an NTA must be served on the dependent if he or she is at least 14 years old. Asylum Office personnel may serve an NTA to the principal applicant for any dependent who is less than 14 years old.

Before personally serving a document on an applicant, Asylum Office personnel must ask the applicant to review the document served, particularly the I-94 (if issued), to ensure biographical data is correct (e.g., spelling of the applicant's name and date of birth). See 8 C.F.R. 292.5(a) for information about service upon attorney or representative of record.

A representative of record is entitled to copies of the decision the Asylum Office serves on the applicant, so if the representative does not appear for an in-person service, the Asylum Office must mail him or her copies of the decision.

At the time of service, asylum personnel date stamp the decision letter. If the Asylum Office serves the decision by mail, the date stamp should correspond to the date of actual mailing.

Depending upon the decision that was reached in the case, the applicant receives one (1) of the following sets of documents

### 1. Recommended Approval

As of August 25, 2020, USCIS no longer issues recommended approvals.


### 2. Asylum Approval

Decision documents:

- Original Asylum Approval letter
- Asylum Approval letter translated into the applicant's native or proficient language (see Appendix 67 for the current list of languages), if the applicant speaks one of the languages into which the letter has been translated
- Original I-94 card, for principal applicant and each dependent properly included as a derivative, endorsed with asylum approval stamp (see Section IV.E) that bears the date of asylum approval, signature, Asylum Office code, and office ID number of the adjudicating officer
- Form AR-11, Alien Change of Address

60

USCIS00004148

If the Asylum Office serves the decision in-person, Asylum Office personnel:

- Place the date of service on the Asylum Approval letter.
- Inform the applicant to notify USCIS of any change in address on the AR-11 within 10 days of such change.
- Ask the principal applicant to sign the A-file copy as proof of service.

If the Asylum Office serves the decision by mail, Asylum Office personnel:

- Place the date of service on the Asylum Approval letter.
- Serve the Asylum Approval letter, a translated version of the letter if appropriate, all I-94 cards, and the AR-11 either by regular or certified mail, as dictated by local Asylum Office policy.

For decisions served by mail, Asylum Office personnel must keep in mind the importance of timely service, as asylees may be eligible for social benefits for which they must apply within 30 days of their asylum approval.

For both methods of service (in-person or by mail), no more than two (2) business days after the decision is served, Asylum Office personnel update the Grant Letter Served/Sent (GLET) screen, indicating the date and type of service.

Note: "Date of service" refers to the date that the letter is placed in an envelope and put in the out-going mail.

### 3. Referral

Decision documents:

- Referral Notice
- Referral Notice translated into the applicant's native or proficient language (see Appendix 67 for the current list of languages), if the applicant speaks one of the languages into which the letter has been translated
- NTA -- copy of original NTA that was signed by SAO or one of several original NTAs that were signed by an SAO
- Legal Service List
- EOIR-33, Change of Address Form
- Form AR-11, Alien Change of Address

Each individual 14 years of age and older must receive an NTA, Legal Services List and an EOIR-33 Change of Address Form.

The Immigration Court must receive an NTA with the original signature of an SAO. Local Asylum Office policy dictates whether Asylum Office personnel copy an NTA with the original signature or have an SAO sign multiple NTAs. Whatever policy is instituted, the Asylum Office must ensure that the Immigration Court receives an NTA with an SAO's original signature, otherwise an Immigration Judge may terminate the case.

USCIS00004149

If the Asylum Office serves the decision in-person, Asylum Office personnel:

- Ask each individual at least 14 years of age to sign his or her NTA.
- Ask the principal applicant to sign the NTA for any dependent under the age of 14.
- Place the date of service on the Referral Notice.
- Fully and correctly complete the certificate of service section on the NTA, indicating that the document was personally served.

In serving the decision, Asylum Office personnel inform the applicant:

- Of the date and location of hearing.
- That failure to appear for the hearing can result in the judge's entering a removal order in absentia, which could mean that the applicant could be detained or removed without a further hearing.
- That the applicant is required to notify the USCIS of a change of address on the AR-11 within 10 days of such change and that the applicant is also required to notify the Immigration Court of any change of address on the EOIR-33 within 5 days.

If the Asylum Office serves the decision by mail, Asylum Office personnel:

- Place the date of service on the Referral Notice.
- Fully and correctly complete the certificate of service section on the NTA, indicating the type of mail (certified or regular) that was used to serve the document.
- Serve the referral documents by either regular or certified mail, as dictated by local Asylum Office policy.

Note: "Date of service" refers to the date that the notice is placed in an envelope and put in the out-going mail.

Local Asylum Office policy as to whether NTAs are mailed by regular or certified mail must take into account differing interpretations of "proof of service" by local Immigration Courts. In cases where the applicant fails to appear for the removal hearing, some courts have held that when an NTA has been mailed by certified mail, DHS has a greater burden to establish proof of service before an in absentia order will be entered. See Langlois, Joseph E. Service of Notices to Appear by Mail, Memorandum to Asylum Office Directors, 9 March 1998, 2p.

For both methods of service (in-person by mail), no more than two (2) business days after the decision is served, Asylum Office personnel update the Notice to Appear Served (OSSE) command, indicating the date and type of service of the NTA.

### 4. Notice of Intent to Deny (NOID)

Decision document:

- NOID

The letter provides an applicant a sixteen-day (16) period before a rebuttal is due. The actual time allotted is the ten days to prepare the rebuttal, plus three days on either end (16 days total) for the mail to

USCIS00004150

be delivered. The rebuttal is considered timely if received on the next business day after the 16th day, if the last day of the rebuttal period is a weekend or holiday. See 8 C.F.R. 1.2.

If the Asylum Office serves the decision in-person, Asylum Office personnel:

- Place the date of service on the NOID. This date is when the 16-day period begins even though the decision is not mailed.
- Ask the applicant to sign the file copy as proof of service.
- Inform the applicant of the need to notify USCIS of any change in address.

If the Asylum Office serves the decision by mail, Asylum Office personnel:

- Place the date of service on the NOID, as this begins the 16-day rebuttal period.
- Serve the NOID by either regular or certified mail, as dictated by local Asylum Office policy.

Note: "Date of service" refers to the date that the letter is placed in an envelope and put in the out-going mail.

For both methods of service (in-person or by mail), no more than two (2) business days after the decision is served, Asylum Office personnel update the Record Preliminary Decision Sent (DINT) screen, indicating the type of letter ("N" for NOID) that was served, and the date and type of service.

### 5. Denial

Decision document:

- Final Denial
- Final Denial translated into the applicant's native or proficient language (see Appendix 67 for the current list of languages), if the applicant speaks one of the languages into which the letter has been translated. Asylum Office personnel should use the appropriate version of the translation depending on whether or not the applicant submitted a rebuttal to the NOID.
- AR-11, Alien Change of Address

If the Asylum Office serves the decision in-person, Asylum Office personnel:

- Place the date of service on the Final Denial.
- Ask the applicant to sign the file copy as proof of service.
- Inform the applicant of the need to notify USCIS of any change in address.

If the Asylum Office serves the decision by mail, Asylum Office personnel:

- Place the date of service on the Final Denial.
- Serve the Final Denial, a translated version of the Final Denial if appropriate, and Form AR-11 by either regular or certified mail, as dictated by local Asylum Office policy.

For both methods of service (in-person or by mail), no more than two (2) business days after the decision is served, Asylum Office personnel update the Denial Letter Sent (DENY) screen in RAPS.

USCIS00004151

# II.R. POST-SERVICE PROCESSING

### 1. Recommended Approval

As of August 25, 2020, USCIS no longer issues recommended approvals. However, Asylum Office Directors must establish local procedures for tracking recommended approvals issued prior to August 25, 2020 identifying cases that are ready for final approval, and conducting follow-up on cases when necessary (for example, when an FBI name check turns up results requiring further research).

Asylum Office personnel prepare a recommended approval as a final approval when:

- FBI name checks have been completed for the principal applicant and all dependents, and the results allow for a final approval;
- The Asylum Office only had access to a T-file or a W-file at the time of the interview, and procedures for issuing a final grant on the T-file or W-file have been completed; or
- A dependent appeared to be subject to reinstatement of a final order, and the ICE Special Agent in Charge opted not to reinstate the final order.

See Langlois, Joseph E. Securing Compliance with Fingerprinting Requirements Prior to the Asylum Interview and Amending Procedures for Issuance of Recommended Approvals, Memorandum to All Asylum Office Personnel (Washington, DC: 12 September 2006, revised 4 October 2006).

### 2. Asylum Approval

After an asylum approval is served, Asylum Office personnel must take the following actions:

- Ensure each paper A-file or the electronic records system, as applicable, (for principal and all dependents) contains a copy of the Asylum Approval letter and a scan or photocopy of the entire front side of the executed corresponding I-94 card.

- Collect the top portion of the I-94 card in the local Asylum Office and then ship the top portions of the I-94 cards together on a monthly basis (at a minimum) to the designated U.S. Customs and Border Protection (CBP) contractor for date entry into CBP's I-94 system.

- Transfer the file in RAILS to the National Records Center (NRC) to indicate that the file is no longer in the possession of the Asylum Office.

- Send the paper A-file to the NRC for storage.

### 3. Referral or Case Forwarding

Asylum Office personnel prepare a case for the Executive Office for Immigration Review (EOIR) and the ICE Office of the Principal Legal Advisor (OPLA) so that an immigration court hearing can take place on an appointed date and time in any of the following scenarios: (1) after the Asylum Office serves a referral on an applicant; (2) after the Asylum Office locates a previously issued and unfiled NTA in the A-file; (3) after the Asylum Office determines that an NTA has been filed and docketed with EOIR and that removal proceedings are pending; (4) after an Asylum Office determines that an NTA was filed and docketed with EOIR but the immigration judge (IJ) terminated proceedings due to error(s) in the NTA or for unknown

USCIS00004152

reasons, or PCQS reflects Failure to Prosecute (FTP) in the "IJ Other Comp" field; or (5) after an Asylum Office determines that an NTA was not issued when it should have been during the credible fear process.

### a. EOIR

The Asylum Office prepares a packet to file with the Immigration Court. If the court packet is not properly filed with the court and served on the applicant, the court may reject the case submission or terminate proceedings for failure to prosecute. Such a case may be sent back to the Asylum Office for issuance of a new NTA. Directors should consult with the local USCIS Office of the Chief Counsel and/or ICE OPLA on procedures for handling these types of cases.

As of February 11, 2022, all new court packets must be electronically submitted to the EOIR Courts & Appeals System (ECAS), which is accessed through the DHS Portal. ECAS is an EOIR system that is managed and updated by EOIR on a regular basis. For more information regarding how to properly upload documents into the DHS Portal/ECAS, please review the resources provided by EOIR on their ECAS DHS Resources webpage.

In instances where Asylum Office personnel are unable to upload the court packet into the DHS Portal/ECAS, for example, where an NTA was previously paper filed with the immigration court but is not yet available in the DHS Portal/ECAS, Asylum Office personnel should contact the local immigration court for guidance on how to submit the court packet to the immigration court.

The packet sent to EOIR contains the following documents:

- Form I-589:
    - For referrals, a photocopy of the Form I-589 that contains signatures of the applicant and Asylum Officer and reflects changes made by the Asylum Officer during the interview. EOIR is not given the original Form I-589 with the original signatures unless the Asylum Officer prepared and signed two Forms I-589.
    - For unadjudicated cases, a Form I-589 that contains the applicant's signature, but it will not be signed by an Asylum Officer.
- Copies of all documents in support of the Form I-589. This includes but is not limited to country conditions information and documents submitted at any time in connection with the asylum application.
- NTA, with the original signature of the USCIS officer who signed and dated the document on page 1, if a new NTA is being issued and served.
- Coversheet:
    - For cases where an NTA has not been filed and docketed with EOIR: asylum personnel will create a record in the DHS Portal/ECAS and will include the Case Confirmation worksheet from the DHS Portal/ECAS showing the hearing date, time, location, elapsed days, and clock status as part of the court packet. Weiss, Jeffrey. Form I-589 for the Immigration Court, Memorandum to Asylum Office Directors and Supervisory Asylum Officers, 21 August 1996, 1p.
    - For cases where an NTA has already been filed and docketed with EOIR: asylum personnel will not be able to create a record in the DHS Portal/ECAS. Instead, asylum personnel will manually fill out Appendix 109 ("Coversheet for Cases Forwarded to EOIR Where Application Cannot be Entered Into DHS Portal/ECAS by USCIS").

65

USCIS00004153

### b. ICE Office of the Principal Legal Advisor (OPLA)

*The Asylum Office also prepares the file for the ICE Office of the Principal Legal Advisor (OPLA) by taking the actions described in the bullets below. Asylum Office Directors coordinate with ICE OPLA for procedures to flag persecutor and national security cases for special attention or assignment.*

- *File contents for principal applicant and any dependents:*
  - o *If sending to ICE OPLA after asylum adjudication, ensure the file contains a copy of the NTA, Referral Notice, marked-up Form I-589, copies of all documents in support of the Form I-589, and the appropriate coversheet as described in* AAPM Section II.R.3.a. *above.*
  - o *If sending to ICE OPLA without adjudicating the asylum application, ensure the file contains a copy of the NTA (if a new one was issued and served), Form I-589 with the applicant's signature, copies of all documents in support of the Form I-589, and the appropriate coversheet as described in* AAPM Section II.R.3.a. EOIR *above.*
- *Send the A- or T-files to ICE OPLA that has jurisdiction over the Immigration Court where the hearing will take place.*
- *Transfer the file in the case management system and update RAILS to indicate that the files are no longer in the possession of the Asylum Office.*

### 4. Notice of Intent to Deny (NOID)

Asylum Office Directors establish a procedure for tracking files pending rebuttals to NOIDs to ensure that rebuttals are filed in the file and forwarded to the AO for review and that cases with no rebuttal are processed for a final decision.

After a NOID is served, a final decision may not be made until a rebuttal is received or the rebuttal period expires, whichever occurs first. If the applicant submits a rebuttal, Asylum Office personnel update the Rebuttal Received (RBUT) screen in RAPS. The AO verifies that RAPS has been updated properly with respect to the rebuttal, considers the information, and makes a decision on the case.

### a. Applicant Fails to Submit a Rebuttal or Rebuttal Does not Overcome the Reasons for Denial

The AO finalizes the decision that the applicant is not eligible for asylum status. The type of decision documents the AO prepares depends upon the applicant's immigration status. See Section II.N.2 for guidance on which type of decision is prepared.

### b. Rebuttal Overcomes Reasons for Denial

If the rebuttal overcomes the reasons for denial, and the applicant has established eligibility for asylum, the AO prepares a short memo to the file indicating the reasons for the decision and prepares the case for approval. This memo replaces the need to prepare an Assessment to Grant. See Section II.N.1 for guidance on which type of decision is prepared.

USCIS00004154

# III.   EXPANDED TOPICS

## III.A. ADDRESS CHANGES

### 1. Applicant's Obligation to Notify USCIS of a Change of Address

Aliens must notify USCIS of a change of address on Form AR-11, Alien Change of Address, within 10 days of such change, to the address given on the form. The applicant should also separately notify the Asylum Office if the applicant changes his or her address at any time during the pendency of an affirmative asylum claim. Notice of such change of address to the Asylum Office may take any of the following forms:

- Electronic request after the applicant updates his or her address on www.uscis.gov.
- Submission of an original or photocopied Form AR-11, Alien Change Of Address.
- Written notice in letter form.
- In-person notification to an IIO/CR, documented in writing in the file and signed by the applicant.
- In-person notification to an AO during an asylum interview.

### 2. Recording Change of Address

If the applicant sends the notice of change of address to a USCIS or DHS office other than an Asylum Office, that office forwards the change of address to the Asylum Office that has the physical file. Except as indicated in Section III.A.2(a) below, Change of Address Received on Interview Day, and Section III.A.2.b below, Change of Address Received After the Interview but Before Service of Decision, below, a notice of change of address is processed as follows:

Asylum Office personnel update RAPS with the notice of change of address within two (2) business days of its receipt, and file it in the A-file within ten (10) days of receipt. To update RAPS, Asylum Office personnel:

- Check the Case History (CHIS) and Address History (AHIS) screens to see whether the address change is the most current. If it is not the most current, do not change the address in RAPS and route the correspondence to the file.
- If there is no future interview date, update the new address as indicated on the Address Change (MOVE) screen. Enter the effective date of the new address, which is the date the notice was dated by the applicant. If the applicant did not date the notice, use the date that the Asylum Office received the notice. If the new address falls under the jurisdiction of the same Asylum Office, route the correspondence to the file after updating RAPS, or schedule the applicant for an asylum interview using the Add Case (ADDC) command, depending upon local Asylum Office policy. If the address of the applicant falls under the jurisdiction of a different interview location, RAPS will prompt the user to transfer the case on the Case Transfer (TRAN) screen. Transfer the case in RAPS and, if necessary, transfer the A-file.
- If there is a future interview date and an interview mailer has been sent notifying the applicant of an upcoming interview date, follow the procedures in Section III.A.2.a, Change of Address Received on the Interview Day, starting at the second paragraph.
- If there is a future interview date but no mailer has been sent, cancel the interview (indicating the cancellation was caused by the applicant), update MOVE in RAPS and transfer the case to the Asylum Office having jurisdiction over the applicant's residence.

USCIS00004155

- If the applicant failed to appear for a prior interview, route the change of address to Asylum Office personnel who process no-show applications

### a. Change of Address Received on the Interview Day

An applicant may notify an IIO/CR or an AO of a change of address when he or she appears at the Asylum Office for the interview. If the applicant's new address remains within the jurisdiction of the Asylum Office that issued the Interview Notice, Asylum Office personnel update the Address Change (MOVE) screen in RAPS, using the day of the interview as the effective date of the change. An AO may proceed with the asylum interview.

If the applicant's new address falls under the jurisdiction of another Asylum Office, in most cases the applicant is not interviewed in the Asylum Office that issued the Interview Notice and the case is transferred to the Asylum Office having jurisdiction over the applicant's residence. Asylum Office Directors maintain discretion to establish criteria for determining which interviews will go forward and which will be cancelled for transfer of the file to the new Asylum Office having jurisdiction over the applicant's new residence. If the interview is to be cancelled for transfer to the Asylum Office having jurisdiction over the applicant's new address, Asylum Office personnel take the following steps:

- If the applicant is present, ask the applicant to complete and sign an In-Person Reschedule Request (Appendix 9).
- Cancel the interview using the Remove Case from Schedule (REMC) command indicating the rescheduling is caused by the applicant.
- Utilizing the MOVE screen, type in the new address, transferring the case on the TRAN screen if appropriate.

### b. Change of Address Received After the Interview but Before Service of Decision

Asylum Office personnel give the notice of a change of address to the AO or SAO processing the case, who checks the date the applicant submitted the notice. If the notice was submitted prior to the interview, the case is processed using the address that was verified by the applicant on the I-589 during the asylum interview, provided that address is different from the address on the notice. If the INTERVIEW DATE field does not contain an "N/S" and the CURR OFFICER field is blank, bring it to the attention of a supervisor so that he or she can find out why no action appears to have been taken on the asylum application. If the notice was submitted after the interview, Asylum Office personnel update the Address Change (MOVE) screen.

If the new address falls under the jurisdiction of another Asylum Office, the Asylum Office where the interview was conducted retains jurisdiction over the case. The applicant is still obligated to appear at the Asylum Office if he or she was served a Pick-Up Notice at the time of the interview, although the Asylum Office Director maintains the discretion to cancel the pick-up appointment and mail out the decision. Any documents that were generated with the applicant's old address that have not been served must be regenerated to reflect the new address.

### c. Change of Address Received After Service of a Decision

Asylum Office personnel update RAPS and route the evidence of the change of address to the file.

USCIS00004156

## III.B. CATEGORIES OF CASES

### 1. Children Filing as Principal Asylum Applicants

The Asylum Office Director must bring to the attention of HQASM, without waiting for the case to be ready for QA review, any case of a child under the age of 18 who has applied for asylum as a principal and whose parent or legal guardian[1] has not given express consent for the child to apply for asylum in the United States. Additionally, the Asylum Office Director may bring to the attention of HQASM, without waiting for the case to be ready for QA review, any case of a child who either lacks the capacity to assert his or her own claim, who has a conflict of interest with a parent that impacts the asylum adjudication, or who appears to be in a situation that endangers his or her health or welfare. HQASM will consult with the USCIS Office of Chief Counsel as appropriate and will provide specific guidance on processing the case, if necessary, based on the particular circumstances of each child. The Asylum Office may not issue a final decision in any minor principal applicant case until HQASM/TRAQ has issued a written concurrence. See Section III.B.1.a.x, Headquarters QA Review Required. The Refugees, Asylum, and Parole System (RAPS) indicates that an applicant is a minor principal applicant by displaying "MINOR PRINCIPAL" in boldface at the top of the Case Status (CSTA) screen.

Special guidelines were developed by the INS Office of International Affairs for adjudicating asylum claims filed by individuals under the age of 18 who are applying for asylum independently, rather than as dependents. See Weiss, Jeffrey. Guidelines for Children's Asylum Claims, Memorandum to Asylum Officers, Immigration Officers and Headquarters Coordinators, 10 December 1998, 30p. These guidelines continue to apply to the Asylum Program within USCIS.

AOs must familiarize themselves with these guidelines, as well as with guidance in Error! Reference source not found., AO Conducts an Asylum Interview, on conducting an asylum interview and the applicable RAIO CT training materials, including Children's Claims, Interviewing—Introduction to the Non-Adversarial Interview, and Interviewing—Eliciting Testimony, and the corresponding Asylum Division Supplements. If Asylum Office personnel suspect that a child may have been trafficked into the United States, they should consult Section III.B.14, Trafficking Victims.

#### a. Unaccompanied Alien Children Applying for Asylum

USCIS Asylum Offices have initial jurisdiction[2] over all asylum applications filed by unaccompanied alien children (UACs).[3] UACs can file for asylum with USCIS even if the UAC has been issued a Notice to Appear (NTA). This initial jurisdiction provision applies to all UACs who file for asylum after March 23, 2009, as well as to the asylum claims filed by UACs with pending proceedings in Immigration Court or cases on appeal to the Board of Immigration Appeals (BIA) or on petition for review in federal court as of December 23, 2008.

Absent exceptional circumstances, UACs who are apprehended by U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), or another federal entity must be placed into the custody of the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services (HHS) within 72 hours of being determined to be UACs.[4] Those UACs are generally issued an NTA before an Immigration Judge of the Executive Office for Immigration Review (EOIR) within the U.S. Department of Justice (DOJ) for removal proceedings under section 240 of the Immigration and Nationality Act (INA). During removal proceedings, a UAC may request asylum. ICE provides those UACs in Immigration Court intending to file for asylum with "Instructions for an unaccompanied alien child in

USCIS00004157

immigration court to submit a Form I-589 asylum application to USCIS" (UAC Instruction Sheet (Appendix 93)). The IJ generally continues the case to provide time for the UAC to file the Form I-589 with USCIS and have the asylum claim adjudicated.

Asylum Offices may encounter filings from UACs in a number of different procedural postures:

1. A UAC who has never been in removal proceedings: This UAC may affirmatively file for asylum under standard affirmative procedures.
2. A UAC in removal proceedings: This UAC may apply for asylum with USCIS under the initial jurisdiction provision of the TVPRA.[5]
3. A UAC whose case was referred to Immigration Court after having been affirmatively adjudicated by USCIS: This UAC may not re-file with USCIS, as USCIS already exercised initial jurisdiction in the case.

### i. UACs in Removal Proceedings Filing with USCIS

UACs in removal proceedings must file Form I-589 with the Nebraska Service Center (NSC). The outer envelope of the filing should be addressed with the heading "UAC I-589." In extenuating circumstances where expeditious processing is required, the Director of the local Asylum Office may consent to the UAC filing the Form I-589 directly with the Asylum Office in accordance with the guidance in Section II.B.2, Filing Directly with the Asylum Offices. The Director may consider whether the UAC continues to be in ORR custody as a factor meriting expeditious processing.

UACs must file Form I-589 along with the items set forth in Section II.A.3, What Applicant Must File. In addition, UACs in removal proceedings should file a copy of the UAC Instruction Sheet and, if they were previously determined to be a UAC by CBP or ICE, evidence of that determination (such as evidence that they were in ORR custody).[6]

### ii. Indication in RAPS that the Applicant is a UAC in Removal Proceedings[7]

At the time of receipt of the Form I-589 from a UAC in removal proceedings, the NSC will verify whether the UAC is in removal proceedings. In such cases, the NSC will enter the special group code "PRL" (formerly used for parolees and now used for UACs in removal proceedings) into RAPS. This special group code takes the case off of the automatic scheduler so that the Asylum Office can determine whether special arrangements for the interview need to be arranged. Additionally, a weekly report of all minor principal applicants (RACQPRLD), which differentiate those UACs in removal proceedings (i.e., in the special group PRL) from other minor principal applicants, is available for Asylum Office use on the RAIO Virtual Library at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### iii. Determination as to Whether the Applicant is a UAC

USCIS must determine whether an applicant in removal proceedings is a UAC.[8] In most of these cases another Department of Homeland Security entity, either CBP or ICE, has already made a determination of UAC status after apprehension, as required for the purpose of placing the individual in the appropriate custodial setting.

#### 1. Cases In Which a Determination of UAC Status Has Already Been Made

In those cases in which either CBP or ICE has already made a determination that the applicant is a UAC, and that status determination was still in place on the date the asylum application was filed, Asylum Offices will adopt that determination without another factual inquiry. Unless there was an affirmative act

USCIS00004158

terminating the UAC finding before the applicant filed the initial application for asylum, Asylum Offices will adopt the previous DHS UAC status determination.[9]

Asylum Officers will see evidence of these prior UAC determinations[10] in A-files or in systems on the:

- Form 1-213, Record of Deportable Alien;
- Form 93 (the CBP UAC screening form);
- ORR Initial Placement Form;
- ORR Verification of Release Form; and
- Encounters tab in the ENFORCE Alien Removal Module (EARM).[11]

In these cases the Asylum Officer does not need to question the applicant regarding his or her age and whether he or she is accompanied by a parent or legal guardian to determine UAC status. If CBP or ICE determined that the applicant was a UAC, and, as of the date of initial filing of the asylum application, that UAC status determination was still in place, USCIS will take initial jurisdiction over the case, even if there appears to be evidence that the applicant may have turned 18 years of age or may have reunited with a parent or legal guardian since the CBP or ICE determination.[12]

### 2. Cases In Which a Determination of UAC Status Has Not Already Been Made

In cases in which a determination of UAC status has not already been made, Asylum Officers must determine if the applicant is a UAC.

#### a. Making a UAC Status Determination

Asylum Officers determine whether an applicant is a UAC based on the statutory UAC definition.[13] After determining that an applicant does not have lawful immigration status in the United States, Asylum Officers must make the following additional determinations:

#### Age

The Asylum Officer must confirm that the applicant was under 18 years of age at the time of filing the Form I-589.[14] Where the file includes a Form I-213, the apprehending agent's notation of the date of birth serves to indicate the age that the applicant claimed to be at the time of apprehension. Unless there is clear, contradictory evidence in the file, jurisdiction should not be refused on the basis of age.

#### Unaccompanied Status

The Asylum Officer must also confirm that the applicant was unaccompanied at the time of filing the Form I-589. If the applicant had no parent or legal guardian in the United States who was available to provide care and physical custody, the applicant is unaccompanied. Legal guardianship refers to a formal (legal/judicial) arrangement.[15] A child is unaccompanied even if he or she is in the informal care and physical custody of other adults, including  family members who are not parents or legal guardians of the child. For instance, if a UAC is released from ORR custody to a sponsor who is not a parent or legal guardian, the child continues to be unaccompanied.

#### b. UACs Not In Removal Proceedings

USCIS00004159

Asylum Officers must make a UAC determination for applicants who appear to be UAC, are not in removal proceedings, apply for asylum with USCIS via the affirmative asylum process, and do not have a previous UAC determination from ICE or CBP. The Asylum Officer makes a UAC determination for purposes of determining whether the applicant is subject to the 1- year filing deadline and whether the Asylum Office must notify HHS that it has discovered a UAC. [16] Asylum Officers should examine whether the applicant was a UAC at the time of filing the asylum application for purposes of determining whether the 1-year filing deadline applies [17] and whether the applicant was a UAC at the time of the interview (i.e., when "discovery" takes place) for purposes of notifying HHS. An Asylum Office should notify HHS that it has discovered a UAC by following the steps in Section III.B.1.a.ix, Notifying HHS that USCIS discovered a UAC, below.

*c. UACs In Removal Proceedings*

For applicants in removal proceedings where CBP or ICE has not already made a UAC determination, Asylum Officers need to make UAC determinations for the purpose of determining whether USCIS has jurisdiction over the case. Asylum Officers should examine whether the applicant was a UAC on the date of initial filing of the asylum application for the purpose of determining USCIS jurisdiction. If the Asylum Office is the first federal government entity to make a determination that the individual is a UAC and the individual remains a UAC at the time of the asylum interview, then the Asylum Office should notify HHS that it has discovered a UAC by following the steps in Section III.B.1.a.ix, Notifying HHS that USCIS Discovered a UAC, below. If the Asylum Officer finds that USCIS does not have jurisdiction over the case, the Asylum Officer must draft a memo to file explaining why the applicant was not a UAC at the time of filing, and the case is transferred back to Immigration Court after Headquarters quality assurance review.

**iv. Transfer of File**

An A-file will already exist for UAC asylum applicants with USCIS who are concurrently in removal proceedings. The NSC will create a T-file containing the asylum application and transfer the file to the Asylum Office. Additionally, RAPS will automatically initiate the A-file transfer request from the ICE Office of Chief Counsel to the Asylum Office. ICE may contact the Asylum Office to confirm that the file is being transferred due to the applicant being a UAC.

**v. Scheduling of UAC Interviews**

PRL applicants may be scheduled for interview manually or automatically using the batch scheduler. See Section II.G. Asylum Office Schedules Interview for more information.

**vi. Interview Locations**

Most UACs can be scheduled for interview at an Asylum Office or a pre-existing circuit ride location. Special arrangements may need to be made for certain UACs in ORR custody. In some cases it may be necessary for the Asylum Office to arrange for a new circuit ride location to interview those UACs in ORR facilities not located within an hour of a current interview location. Additionally, while the general preference is for the interview to occur in a USCIS office, those UACs in an ORR secure facility should be interviewed at the secure facility, in order for proper security arrangements to be in place.

**vii. Failure to Appear**

If a represented UAC fails to appear for an asylum interview, follow the guidance in Section III.I, Failure to Appear. If an unrepresented UAC fails to appear for an asylum interview, reschedule once. If the unrepresented UAC fails to appear a second time and does not submit a reasonable excuse, the Asylum Officer should issue a UAC Notice for Failure to Appear (Appendix 90) and transfer the file to ICE OCC.

USCIS00004160

The Asylum Division is able to provide telephonic interpreters for UACs who cannot fulfill the general requirement under 8 C.F.R. § 208.9(g) to provide an interpreter for the asylum interview. The Asylum Office should follow standard procedures for arranging for telephonic interpretation found in Section II.J.4.b, Asylum Office Provision of Contract Interpreter Monitor. If any issues or questions arise, contact the HQASM point of contact for the interpreter contract.

### ix. Notifying HHS that USCIS Discovered a UAC

The TVPRA requires departments and agencies of the federal government to notify HHS within 48 hours of the apprehension or discovery of a UAC.[18] If Asylum Officers encounter an asylum applicant whom they discover to be a UAC, they should inform their office's UAC POC. The UAC POC must send an e-mail to ORR at UACnotification@acf.hhs.gov and copy the HQASM HHS notification inbox at HHSUACNotif.AsylumOps@uscis.dhs.gov. The e-mail should contain as much of the following information as possible:

**Standard subject line:** USCIS Notification to HHS of Discovery of a UAC

**Body:**

Pursuant to section 235(b)(2)(A) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), this e-mail serves as notification to the Department of Health and Human Services that U.S. Citizenship and Immigration Services has discovered the following unaccompanied alien child:

1. Alien number:
2. Name:
3. Date of birth:
4. Country of citizenship:
5. Residence address:
6. Residing with:
7. Information about parents:
8. Information about siblings:
9. Form Represented by:
10. Additional notes:

The TVPRA also requires that federal, state, and local officials notify HHS within 24 hours of the discovery of a person who is under 18 years of age (whether accompanied or not) who may be a victim of a severe form of trafficking in persons.[19] This is so that HHS can provide interim assistance to any such individual. If Asylum Officers encounter an asylum applicant under 18 years of age whom they discover may be a victim of a severe form of trafficking in persons, they should inform their office's UAC POC. The UAC POC

USCIS00004161

must send an e-mail to ORR at ChildTrafficking@acf.hhs.gov or call 202-205-4582. An e-mail should contain as much of the following information as possible:

**Standard subject line:** USCIS Notification to HHS of Discovery of a Person Who is under 18 Years of Age Who May Be a Victim of a Severe Form of Trafficking in Persons

**Body:**

Pursuant to section 107(b)(1)(G) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), this e-mail serves as notification to the Department of Health and Human Services that U.S. Citizenship and Immigration Services has discovered the following person who is under 18 years of age who may be a victim of a severe form of trafficking in persons:

1. Alien number:
2. Name:
3. Date of birth:
4. Country of citizenship:
5. Residence address:
6. Location of exploitation:
7. Suspected form of trafficking:
8. Represented by:
9. USCIS contact information:
10. Additional notes:

An ORR Child Protection Specialist will respond to each notification during regular business hours, Monday through Friday, and will follow up with the reporting official as appropriate. Follow-up will involve facilitating interim and long-term eligibility, where applicable, and providing technical assistance as needed.

### x. Headquarters QA Review Required

Referrals and NOIDs of all juvenile cases in which the principal applicant is less than 18 years old at the time of filing should be sent to HQ for QA review prior to service. [20] In addition, all juvenile cases where it is determined that USCIS does not have jurisdiction should be sent to HQ for review prior to service, regardless of the principal applicant's age at the time of filing. See Section III.Q, Quality Assurance Review, for detailed procedures on how to submit cases to HQASM.

### xi. Handling of Case Upon Entry of Final Decisions

Decision documents:

- Standard Asylum Approval (Appendix 49)
- UAC Decision Notice for Non-Eligibility (Appendix 87)

USCIS00004162

- Non-UAC Notice of Lack of Jurisdiction (Appendix 92)

## Asylum Approval

Where the Asylum Office decides to grant asylum to a UAC in removal proceedings, standard grant procedures in Section II.N.1, Applicant Appears Eligible for Asylum, are followed. Additionally, in cases where RAPS indicates that the applicant is a MINOR PRINCIPAL on the CSTA screen, the AO is required to answer whether or not the applicant was unaccompanied[21] at the time of filing the asylum application in the "UNACCOMPANIED MINOR (Y/N):" field on the Final Decision (FDEC) screen. If required by local procedures, the Asylum Office UAC point of contact (see below) contacts the local ICE Office of Chief Counsel in order to alert the office to the nature of the decision so that ICE can move the Immigration Court to terminate proceedings.

## Applicant Ineligible for Asylum Status

Where the Asylum Office decides that a UAC in removal proceedings is not eligible for a grant of asylum, case processing will depend on the individual's procedural posture before EOIR. The Asylum Office should coordinate with ICE for the transfer of the A-file to ICE. On the Final Decision (FDEC) screen, the AO will refer the case using code I4, REFERRED – INELIGIBLE, and select Deportation Code A6, NO DEPORT, unless the UAC's removal proceedings were terminated without prejudice (see number 3 below). Additionally, in cases where RAPS indicates that the applicant is a MINOR PRINCIPAL on the CSTA screen, the AO is required to answer whether or not the applicant was unaccompanied at the time of filing the asylum application in the "UNACCOMPANIED MINOR (Y/N):" field on the Final Decision (FDEC) screen. The AO drafts an Assessment to Refer and issues the UAC Decision for Non-Eligibility (Appendix 87).

1. Proceedings continued for good cause: If the UAC's removal proceedings are still pending, due to the hearing date having been continued for good cause pending USCIS adjudication of the asylum claim, the Asylum Office will be unable to issue an NTA, as an active NTA already exists. The Asylum Office should proceed in issuing a referral notice but should not issue an NTA.
2. Proceedings administratively closed: If the UAC's removal proceedings are still pending, due to the case having been administratively closed pending USCIS adjudication of the asylum claim, the Asylum Office should proceed in issuing a referral notice but should not issue an NTA.
3. Proceedings terminated: If the UAC's removal proceedings were terminated without prejudice pending adjudication by USCIS of the asylum claim, the Asylum Office should follow standard referral procedures, including issuance of an NTA, as stated in Section II.N.2, Applicant Appears Ineligible for Asylum.

The Asylum Office will not serve a court packet on the Immigration Court for those UACs whom the Asylum Office refers where there is an active NTA (i.e., scenarios #1 and 2 above). Nonetheless, the Asylum Office should prepare the court packet and the A-file as usual. After the file has been transferred to Immigration Court, ICE will serve the court packet on the Immigration Court. Additionally, the Asylum Office should ensure that a copy of the CSTA screen in RAPS is attached to the outside of the A-file before transferring it to ICE in addition to the Asylum Division Cover Sheet for Transfer of A-file for UAC in Removal Proceedings (Appendix 91).[22]

USCIS00004163

The Asylum Office Lacks Jurisdiction (Applicant is not a UAC)

Where the Asylum Office decides that an individual in removal proceedings is not a UAC and USCIS does not have jurisdiction over the asylum application, the AO will administratively close the case on the Admin Close Update (CLOS) screen using code C4, ADMINISTRATIVE CLOSED-IJ JURISDICTION, and select Deportation Code A6, NO DEPORT. The AO will not be prompted to fill in the Unaccompanied Minor field. The AO should not remove the special group code PRL from the case. The AO prepares a memo to the file in place of an assessment and prepares the Non-UAC Notice of Lack of Jurisdiction (Appendix 92).

### xii. UAC Points of Contact for Each Office

Each Asylum Office should designate a UAC point of contact (POC) and a back-up UAC POC. The POC will be responsible for interacting with the local ICE Office of Chief Counsel, local EOIR Immigration Court staff, and ORR staff. The POC may also manage the interview scheduling process for the Asylum Office's UAC cases.

The POC should coordinate with the local ICE Office of Chief Counsel to inform ICE of the UAC's asylum application, to arrange for ICE to forward the A-file to the Asylum Office, and to verify whether the UAC's case is continued, administratively closed, or terminated pending the asylum interview. The POC should also communicate with ICE regarding the Asylum Division's processing of the case and to advise ICE of the need to request a continuance before the immigration judge if case processing is delayed. Following the entry of a decision and if required by local procedures, the Asylum Office UAC POC contacts ICE to alert them to the decision and to arrange for transfer of the file where necessary.

Additionally, the Asylum Office UAC POC may need to coordinate with the Asylum Office Clock Issues POC in order to interact with EOIR to resolve any asylum clock issues that arise.

### xiii. Concurrent Filings

UACs may have concurrent applications and petitions pending with USCIS, such as an I-360 petition for special immigrant juvenile status, an application for T nonimmigrant status, or a petition for U nonimmigrant status. Asylum Officers should check CLAIMS before the interview and ask applicants that appear to be UACs if they have filed any other applications or petitions with USCIS. Refer to Handling Procedural Issues Related to Concurrent Filings by UACs (Appendix 86) for further guidance on how to handle cases with concurrent applications.

### b. Withdrawal Requests

Standard withdrawal procedures in Section III.W, Withdrawal Requests, apply to all children who file as principal asylum applicants.[23] However, if the withdrawing applicant is under the age of 14, the Asylum Officer should collect signatures on the withdrawal form of the applicant and of any parents, legal guardians, other accompanying adults or representatives. If the applicant is in removal proceedings and states that he or she wants to withdraw because he or she is not a UAC, then the Asylum Officer should determine whether USCIS has jurisdiction based on the procedures in Section III.B.1.A.iii, Determination as to Whether the Applicant Is a UAC, instead of accepting the withdrawal. If USCIS does not have jurisdiction over the case, then USCIS does not have the authority to accept the withdrawal. In these cases, the Asylum Officer should draft a memo to file explaining the lack of jurisdiction.

76

USCIS00004164

[1] Legal guardianship refers to a formal (legal/judicial) arrangement. There is no requirement for evidence to demonstrate parental consent. If, however, during the interview the Asylum Officer discovers an issue regarding parental consent, such as that the parent appears to have a conflicting interest with the child or that one parent has deliberately not been made aware that the child is filing for asylum, please alert HQ TRAQ and we will work with OCC to resolve the issue.

[2] See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110-457, section 235(d)(7)(B) (effective March 23, 2009).

[3] As defined at 6 U.S.C. § 279(g)(2), an unaccompanied alien child means:

a child who—

(A) has no lawful immigration status in the United States;
(B) has not attained 18 years of age; and
(C) with respect to whom—

> (i) there is no parent or legal guardian in the United States; or
> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

[4] TVPRA §§ 235(a)(4); 235(b)(3).

[5] A UAC in removal proceedings need not wait until his or her master calendar hearing in immigration court before filing his or her Form I-589 with USCIS. So that the Nebraska Service Center will accept a Form I-589 from an individual in removal proceedings, the UAC must submit proof that he or she was determined to be a UAC with the Form I-589, such as evidence that he or she was in ORR custody as a UAC (either the UAC Initial Placement Referral Form or the ORR Verification of Release Form). The initial jurisdiction provision also applies to UACs who had removal proceedings, or related administrative or Federal appeals, pending on December 23, 2008. HQASM may therefore refer to Asylum Offices some cases in which this issue is raised in litigation before the Board or the Federal courts.

[6] UACs may submit the UAC Initial Placement Referral Form or the ORR Verification of Release Form as evidence that they were in ORR custody. For more information, see Kim, Ted. Updated Service Center Operations Procedure for Accepting Forms I-589 Filed by Unaccompanied Alien Children, Memorandum to the Associate Director of Service Center Operations, 4 June 2013, 2p. plus attachments; Langlois, Joseph E. Statutory Change Affecting Service Center Operations' Procedures for Accepting Forms I-589 Filed by Unaccompanied Alien Children, Memorandum to All USCIS Service Centers, 9 April 2009, 1p. plus attachments.

[7] Langlois, Joseph E. Special Group Code for Unaccompanied Alien Child Defensive Asylum Filings Changed to "PRL," Memorandum to Asylum Office Staff, 2 April 2009, 1p.

[8] For further guidance, see Kim, Ted. Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children, Memorandum to Asylum Office Staff, 28 May 2013, 3p. plus attachments; Langlois, Joseph E. Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children, Memorandum to Asylum Office Staff, 25 March 2009, 7p. plus attachments.

[9] One example of a termination of a UAC finding would be the act of ICE taking an individual out of ORR custody and placing the individual into ICE custody as an adult detainee, either because the individual has turned 18 or it has been determined that the original finding that the individual was under 18 was not correct.

USCIS00004165

[10] These prior UAC determinations may not necessarily use the language "UAC" or "unaccompanied alien child" but could also use language such as "unaccompanied juvenile."

[11] For samples of these documents, see ████████████████████████████████████████████
████.

[12] Generally, an Asylum Office should not expend resources to pursue inquiries into the correctness of the prior DHS determination that the applicant was a UAC.

[13] See 6 U.S.C. § 279(g)(2). See also Langlois, Joseph E. Updated Procedures for Minor Principal Applicant Claims, Including Changes to RAPS, Memorandum to Asylum Office Directors, etc., 14 August 2007, 9 p.

[14] The earliest date of filing can be used, whether it was with EOIR or USCIS.

[15] The Asylum Division has generally interpreted a "formal arrangement" to mean that there must be a court-ordered document, or its equivalent in a foreign legal system, to confer guardianship. If you have specific questions about documents presented, please direct your questions to HQ TRAQ.

[16] Jurisdiction is not at issue in these affirmative asylum cases.

[17] The 1-year filing deadline does not apply to UACs.

[18] TVPRA § 235(b)(2)(A).

[19] TVPA § 107(b)(1)(G); 22 USC 7705(b)91)(G).

[20] Only cases in which the Asylum Division will issue a final decision require Headquarters QA review. Cases in which an applicant failed to appear or withdrew his or her application for asylum do not require Headquarters QA review.

[21] The Asylum Office needs only to determine whether the applicant was unaccompanied at the time of filing, not whether the applicant met the full UAC definition.

[22] The cover sheet is also available on the RAIO Virtual Library at: ████████████████████████████████████████████

[23] HQASM does not generally need to review a withdrawal request before the field grants the request.

## 2. Coercive Family Planning (CFP)

In September 1996, the Illegal Immigration Reform and Responsibility Act (IIRIRA) amended the refugee definition to include persons who have been persecuted in the past or have a well-founded fear of future persecution on the basis of a forced abortion, involuntary sterilization, failure or refusal to undergo such a procedure, or for other resistance to CFP practices. The acronyms "CFP" and "CPC" (coercive population control) are both used within USCIS and are interchangeable.

IIRIRA placed a cap of 1,000 on the number of individuals who were admitted as refugees or approved for asylum status on a claim relating to CFP practices during any fiscal year. Individuals who were found to be eligible for asylum based solely on their resistance to CFP, and whose security checks were complete and allowed for a final grant, were given a conditional grant, pending assignment of a final approval authorization number within the 1,000-per-year cap.

The Real ID Act of 2005, signed on May 11, 2005, lifted the annual numerical limitation on refugee admissions and grants of asylum based on resistance to CFP. Therefore, cases in which the applicant's sole basis of claim is CFP are treated in the same manner as all other asylum cases: those who are found

USCIS00004166

to be eligible for asylum and whose security checks are complete and allow for a final grant are given an asylum approval.[1] See Langlois, Joseph. The Effect of the "Real ID" Act on the Processing of Coercive Population Control (CPC) Cases, Memorandum for All Asylum Office Personnel, 16 June 2005

---

[1] Previously, CFP cases had to await assignment of a final approval authorization number under the 1,000 per-year cap and were given a conditional grant until a number became available. However, since the Real ID Act of 2005 lifted the cap, CFP cases, like all other asylum cases, may receive a final approval as soon as all required security checks are complete and allow for a final grant. Nonetheless, it is important to record the basis of claim in RAPS as CFP, as the Asylum Program is still required to report to Congress on the number of CFP cases granted each year. 3. Credible Fear-Screened Affirmative Asylum Applicants

### 3. Credible Fear-Screened Affirmative Asylum Applicants

An asylum office may encounter an affirmative asylum application from an individual who was already screened through the expedited removal/credible fear process. These individuals may:

1) have been issued a Form I-862, Notice to Appear (NTA), but it has not been filed and docketed[1] with Executive Office for Immigration Review (EOIR) – See *Appendix 106, Scenario 7*;

2) have their NTA filed and docketed with EOIR, but PCQS reflects Failure to Prosecute (FTP) in the "IJ Other Comp" field – See *Appendix 106, Scenario 7*;

3) have been issued Form I-863, Notice of Referral to Immigration Judge, but it was not properly filed and docketed with EOIR for immigration judge (IJ) review of the negative credible fear determination – See *Appendix 106, Scenario 8*;

4) have their negative credible fear determination reviewed by the IJ and the IJ reversed (i.e., "vacated" in PCQS-DOJ-EOIR), but an NTA was not issued and/or filed and docketed with EOIR to initiate INA section 240 removal proceedings – See *Appendix 106, Scenario 12*;

5) have their negative credible fear determination reviewed by the IJ and the IJ concurred (i.e., "sustained" in PCQS-DOJ-EOIR), but the individual has not been removed – See *Appendix 106, Scenario 9*; or

6) have an NTA that was filed and docketed with EOIR so that they are in removal proceedings – See *Appendix 106, Scenario 13*.

For circumstances 1-6 described above the asylum office does not have jurisdiction over the Form I-589. How the case will be processed will depend on which circumstance applies as outlined below.

**Please note:** In instances where an individual received a Credible Fear screening, and the IJ later dismisses or terminates the immigration court proceedings, Asylum personnel should refer to AAPM III.B.16 Previously in Removal Proceedings (PRP) Asylum Applications for guidance related to processing those Forms I-589.

USCIS00004167

To identify whether the noncitizen was previously screened through the expedited removal/credible fear process, the case management system will display a credible fear case record for the A-number if there is a record of that individual's screening through the credible fear process. If a case record exists, asylum office personnel should review the record to determine the outcome and status of the credible fear screening. Personnel should then search for the A-number in PCQS-DOJ-EOIR to determine if:

- an NTA has been filed and docketed with EOIR (look under "EOIR Docketing Date");
- if IJ review occurred after a Form I-863 was filed; or
- if an NTA was filed and docketed with EOIR after an IJ vacated a negative credible fear determination.

### a. Processing Cases for Circumstances (1) through (4) Described Above

If the individual remains in expedited removal because circumstances (1) through (4) described above apply, the asylum office does not have jurisdiction over the Form I-589. If the asylum office encounters such an individual, the asylum office will take one of the following actions, as appropriate:

i. If an NTA was previously issued or should have been issued following IJ review of a negative credible fear determination: Issue a new NTA to the individual and serve the new NTA on, and forward the Form I-589 to, the appropriate immigration court for adjudication (See *AAPM Section III.B.15.b. and d. under Previously Issued NTAs* for further guidance);

**OR**

ii. If USCIS issued a negative credible fear determination but the Form I-863 was not properly filed with EOIR: Re-issue the Form I-863 and the appropriate Form I-869 (Record of Negative Credible Fear Finding and Request for Review by Immigration Judge), prepare the negative credible fear court packet, and refer the negative credible fear determination case to the appropriate immigration court for immigration judge review (See *AAPM Section III.L.6.e. Form I-589 Filed by Individual with Negative Credible Fear Determination and Unfiled Form I-863* for further guidance);

**AND**

iii. Close the Form I-589 in the case management system:

- Select under the Adjudication Tab one of the following Case Events: (1) "Forward to IJ/Clock Running - Close" and then choosing "Previously Unfiled NTA" or "DHS Failed to Prosecute - NTA Refiled" (if PCQS reflects FTP) as the Close Type; or (2) "Admin Close," choosing "No/IJ Jurisdiction" as the Close Type, and adding a comment that the asylum office will not issue an NTA/referral;
- Issue Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)") [select only one option]; and
- Take no further action.

### b. Processing Cases for Circumstance (5) Described Above

If circumstance (5) described above applies, because the IJ concurred with the negative credible fear determination, asylum office personnel will:

USCIS00004168

- Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Admin Close" as the Case Event, choosing "No/IJ Jurisdiction" as the Close Type, and adding a comment that the asylum office will not issue an NTA/referral;
- Issue Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)") using **Option 7** ("If the applicant received a negative credible fear determination and requested IJ review, and the IJ concurred"); and
- Take no further action.

### c. Processing Cases for Circumstance (6) Described Above

Where circumstance (6) described above applies because an NTA was filed and docketed with EOIR, so the noncitizen is in removal proceedings, USCIS does not have jurisdiction over the asylum application. How the case is processed will be determined by when the issue is identified:

- During Intake: If during intake USCIS personnel discover that the NTA was filed and docketed with EOIR at the time of Form I-589 filing, the case will be processed according to the procedures outlined in *AAPM Section III.L.1.a. EOIR Jurisdiction Discovered at the Time of Filing*.
- After Case Intake / Acceptance: If asylum office personnel discover that the NTA was filed and docketed with EOIR after filing and case acceptance, the case will be processed according to the procedures outlined in either:
    - *AAPM Section III.L.1.b.ii. Previously Issued NTA Filed and Docketed with EOIR After USCIS Accepted the Form I-589 but Prior to Asylum Interview or Service of Final Decision or*
    - *AAPM Section III.L.1.b.iii. Previously Issued NTA Filed and Docketed with EOIR Prior to USCIS Accepting the Form I-589*

---

[1] "Docketed" refers to the EOIR Docketed Date, which is when Immigration Court staff enters into EOIR's case management system, CASE or any successor, the EOIR Rec'd Date and charging document information. The EOIR Docketed Date reflects the formal acceptance of a newly filed case onto the court's docket for case scheduling and processing.

### 4. Deceased Applicants – DRAFT

If the Asylum Office discovers, prior to a final decision on an asylum application, that the principal applicant is deceased, Asylum Office personnel treat the asylum application as withdrawn and administratively close the case in RAPS under code C3. The case of a deceased principal applicant should not be deleted from RAPS.

If the case of a deceased principal applicant includes surviving dependents, Asylum Office personnel should follow the instructions in *Section III.E.6.b*, Loss of Derivative Status by Marriage, Divorce, or Death of Principal Applicant, by notifying any dependents of their ineligibility for continued classification as a dependent and by affording the dependent(s) the opportunity to file a new I-589 as a principal applicant.

If the Asylum Office discovers that a dependent is deceased, and is survived by the principal applicant, Asylum Office personnel should print the RAPS CSTA and I-589 screens for the dependent, place copies in both the principal's and dependent's A-files, remove the dependent from the principal's record in RAPS

USCIS00004169

using the MOD REL function (PF9) on the principal's I-589 screen, and place a memo in the principal's and dependent's A-files, explaining that the dependent has been removed from the application because he or she is deceased.

### 5. Deferred Enforced Departure (DED)

Deferred Enforced Departure (DED) grants certain qualified citizens and nationals of designated countries a temporary, discretionary, administrative protection from removal from the United States and eligibility for employment authorization for the period of time in which DED is authorized. The President determines which countries will be designated based upon issues that may include, but are not limited to, ongoing civil strife, environmental disaster, or other extraordinary or temporary conditions. The decision to grant DED is issued as an Executive Order or Presidential Memorandum.     Note: Please see below at *Section III.B.7* for procedures governing GTMO/DED Haitians.


An alien does not need to apply for and be granted DED in order to benefit from its provisions. Although DED status is automatic for qualified citizens and nationals of designated countries, some exceptions exist to eligibility under this program, including persons who have committed certain crimes, persons who are persecutors, and persons who have previously been deported, excluded or removed.

Because the decision to extend DED protection is made by the President, it is not a statutory provision under the Immigration and Nationality Act and as such, it is not considered an immigration "status." DED is not considered to be a valid immigrant, nonimmigrant, or Temporary Protected Status under 8 C.F.R. 208.14(c)(2). Therefore, individuals who are covered by DED and are not eligible for asylum must be referred to the Immigration Judge pursuant to 8 C.F.R. 208.14(c)(1) unless they otherwise have valid status or parole as described in 8 C.F.R. 208.14(c)(2) or (3). DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED. Therefore, Asylum Offices should proceed with referrals of such cases when asylum is not granted. *Langlois, Joseph E.Clarification of Procedures for Processing Applicants Covered by Deferred Enforced Departure (DED) who are Ineligible for Asylum, Memorandum to Asylum Office Directors, et al., 1 November 2001, 2p.*

When referring a person who appears to be covered by DED, include a memorandum to the file addressed to the ICE Office of the Principal Legal Advisor (OPLA) and DRO indicating, "The individual who is the subject of this memorandum may be covered by Deferred Enforced Departure (DED)."

### 6. Disabilities - Physical and Mental

Pursuant to Section 504 of the federal Rehabilitation Act of 1974, "[n]o qualified individual with a disability in the United States shall, by reason of his or her disability, be excluded from the participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by any Executive agency." Each federal agency must promulgate such regulations as are necessary to carry out this provision. The implementing regulations for the Department of Homeland Security are found at 6 C.F.R. 15. Pursuant to 6 C.F.R. 15.60, DHS offices "shall take appropriate steps to effectively communicate with applicants" and "shall furnish appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department." Furthermore, in determining which auxiliary aids are appropriate, "the Department shall give primary consideration to the requests of the individual with a disability." Pub.L. 93-112; 6 C.F.R. 15.30.

USCIS00004170

### a. Hearing-Impaired Applicants

In the case of hearing-impaired asylum applicants, the aforementioned requirements under the Rehabilitation Act mandate that the Asylum Office provide for, and assume the cost of, a sign-language interpreter. See Section II.J.4 above on working with an interpreter.

### b.Mentally Incompetent Applicants

Instructions for dealing with mentally incompetent applicants are codified in various sections of Title 8 Code of Federal Regulations. Although there is no definition of "mentally incompetent," 6 C.F.R. 15.3(d)(ii) defines "mental or psychological disorder" to include "mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities."

8 C.F.R. 103.5a(c)(2)(i) provides that, in the event an inadmissible or deportable alien is confined to a mental institution or hospital, and is unable to understand the charges contained in the Notice to Appear, the NTA is to be served on the person in charge of the institution or hospital. 8 C.F.R. 103.5a(c)(2)(ii) provides that the NTA should also be served on the person with whom the mentally competent alien resides, whether or not the alien is confined to a mental institution or hospital. Wherever possible, DHS must also serve the NTA on a near relative, guardian, committee, or friend.

Mentally incompetent applicants may also be unable to participate in all or part of their asylum interviews. Although 8 C.F.R. 1240.4 relates specifically to removal proceedings before EOIR, the provision gives useful guidance for the conduct of asylum interviews. When it is impracticable for the applicant to be present at his or her hearing because of mental incompetence, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear is permitted to appear on behalf of the respondent. If one of the aforementioned persons cannot reasonably be found or fails or refuses to appear, the custodian of the applicant shall be requested to appear on his or her behalf. Similarly, if an applicant is unable, due to mental incompetence, to appear for, or testify during, his or her asylum interview, an individual, such as a close relative, should be permitted to testify on the applicant's behalf as long as certain criteria are met. See Section II.J.12 for further guidance. If the applicant has an attorney or legal representative, that individual should also appear at the interview, but the attorney or representative should not be permitted to testify on the applicant's behalf. Rather, his or her role should be limited to the provision of a closing statement at the end of the interview, as outlined in Section II.J.5 and in the RAIO Combined Training Module: Interviewing - Introduction to the Non-Adversarial Interview.

When Asylum Office personnel become concerned that an applicant is not competent to testify, a Supervisory Asylum Officer must be notified and apprised of the reasons for concern. If the Supervisory Asylum Officer believes that there are reasonable grounds to question the competence of the applicant to provide testimony, Asylum Office personnel shall explain the procedures in Section II.J.12 above to a representative, family member or guardian accompanying the applicant to the Asylum Office, or to the asylum applicant him or herself, if practicable.

### 7. Expeditious Processing Required

An Asylum Office Director may determine that it is in the best interest of USCIS to process an asylum application more expeditiously than usual because the case contains sensitive issues or there is special interest in the case. Examples include, but are not limited to, applicants who are being placed in witness protection programs, applicants who are providing information of national security concern to other agencies within the Federal Government, and cases in which there is a family member in jeopardy (e.g., spouse or child of an asylum applicant is in danger of harm in the country of claimed persecution).

USCIS00004171

Once the Director determines that the Asylum Office will expedite the processing of an asylum application, the following process occurs:

- The Director, Deputy Director, or Quality Assurance and Training Officer (QA/T) communicates the essential facts of the case to the HQASM Chief of the Training, Research and Quality Branch (TRAQ).
- If the case meets the criteria outlined in Section II.M.3 for requesting comments from DRL, Asylum Office personnel send the request to DRL via the HQASM contact in accordance with the procedures in Section II.M.3.
- If appropriate, HQASM/TRAQ alerts the USCIS Office of Communications.
- An AO interviews the applicant as soon as practicable and prepares an Assessment or NOID. If the case fits into a QA review category, the Asylum Office sends to HQASM/TRAQ the I 589, supporting documentation, Assessment or NOID, and interview notes per existing procedures.
- HQASM/TRAQ responds within three days of receipt. Until then, the Asylum Office places the case on HOLD - HQ in RAPS.

### 8. Legalization/Special Agricultural Workers (SAW)

Certain asylum applicants may have filed applications for adjustment of status pursuant to INA Section 210, the special agricultural workers (SAW) program, and INA Section 245A, the general legalization program, created by the Immigration Reform and Control Act of 1986 (IRCA).

Applicants who filed these special adjustment applications are commonly referred to as Legalization or SAW applicants. Aliens who applied for this benefit were given a 90-93M series A-number.

IRCA contains confidentiality provisions that restrict the use, publication and examination of information furnished pursuant to applications under INA Sections 210 and 245A.

Under the confidentiality provisions, DHS employees may use "information furnished pursuant to an application" for SAW status only (1) to adjudicate the application, or (2) for prosecution for fraud under Section 210(b)(7). They may use information furnished pursuant to an application for legalization under Section 245A only (1) to adjudicate the application, (2) for prosecution for fraud under Section 245A(b)(6), or (3) for preparation of reports to Congress under Section 404 of the Immigration Reform and Control Act, furnishing such information in the same manner and circumstances as census information may be disclosed under 15 U.S.C. INA Section 210(b)(6) and 245A(c)(5).

"Information furnished pursuant to an application" includes information supplied by the alien on the application form, any documentation the alien may submit in support of the application, and information furnished on behalf of the application by any third party. A DHS document, such as an I-94, that is provided by the alien in support of a legalization or SAW application is protected by confidentiality. This means that an AO is prohibited from using any information pertaining to a legalization or SAW case in the adjudication of an asylum claim.

For more information about confidentiality provisions, see GENCOU Opinion 89-73, Utilization of Information from IRCA Records, 7 November 1989,.

Previously, consolidation with a Legalization or SAW file could not take place. In the case of a Legalization/SAW applicant who applied for asylum, the Asylum Office, after receiving a T-file containing the asylum application from the Service Center, had to create a new A-file, with a number different from

USCIS00004172

the applicant's 90M-93M series Legalization/SAW A-number. As of August 2004, this is no longer the case. For additional information, see Part II-14, Section G.3 of the Records Operations Handbook.

The AO who adjudicates the asylum application must not review any materials relating to the Legalization or SAW application that were contained in the 90M-93M series file. These materials can usually be found underneath a red file marker.

### 9. National Security Matters, Including Known or Suspected Terrorists and Human Rights Abusers

For additional guidance on cases involving terrorism or threats to national security, see Section VIII of the Identity and Security Checks Procedures Manual and Aytes, Michael, Scialabba, Lori, and Sposato, Janis. National Security Reporting Requirements, Memorandum for Asylum Office Directors, et al., 16 February 2007, 4p. (plus attachment).

### a. Notification Procedures

An Asylum Office must undertake special notification procedures for asylum applications involving national security matters, as defined in this section. Each office designates a point of contact (POC) for national security matters. If there is reason to believe that an applicant is a national security risk, Asylum Office personnel take the following actions:

- Notify the Asylum Office POC for terrorist and national security issues.
- Within 24 hours of identification of a national security issue, the POC contacts the local Special Agent In Charge (SAC) at the office of Immigration and Customs Enforcement to advise him or her of the case. The SAC may forward the case to the JTTF and/or advise Asylum Office personnel as to how the case will be handled.
- Prior to the issuance of an approval of asylum for any applicant described in this section, obtain concurrence from HQASM/TRAQ in accordance with regular quality assurance submissions to HQ.
- Document all actions taken in the file.

For more detailed guidance on notification procedures for cases involving terrorism or threats to national security, see Section VIII of the Identity and Security Checks Procedures Manual.

While the case is pending resolution of national security matters, Asylum Office personnel place the case on hold in RAPS using code ZZ-Other or code SECO (as appropriate), unless the case has been referred to HQASM, in which case HQ-Headquarters Review is appropriate. Langlois, Joseph E. New RAPS Capablity: Ability to Flag Certain Security or Fraud Related Cases, Memorandum to Asylum Office Directors and Deputy Directors, 30 September 2004, 3p. plus attachment.

### b. Categories of National Security Matters

National security matters fall into the categories described below. The categories are provided only to assist in identification of cases. *See* Williams, Johnny N. Designation of National Security Matters (Washington, DC: 18 December 2002), 7p.

**i. Terrorism-Related Categories:**

- Any individual associated with any of the organizations included in the Foreign Terrorist Organizations List or the Terrorist Exclusion List, both of which are compiled by the Department

85

USCIS00004173

of State and are available at http://www.state.gov/s/ct/, or any individual associated with an undesignated terrorist organization as defined by section 212(a)(3)(B)(vi)(III) of the INA.

- Any individual who admits to having engaged in terrorist activities.
- Any individual who testifies to having been falsely accused of engaging in terrorist activities or of being a member of a terrorist organization.
- Any individual who is suspected of being involved in terrorism, or of being a direct or indirect supporter of a terrorist organization(s).
- Any individual whose actions may fall within the definition of terrorist activities under section 212(a)(3)(B) of the INA.

The definitions of these categories were significantly broadened under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 and the REAL ID Act of 2005. For more details and a summary of the legislation, see Ziegler, James W. New Anti-Terrorism Legislation (Washington, DC: 31 October 2001), 8p., appended to Langlois, Joseph E. Procedures for Contacting HQASM on Terrorist Cases (Washington, DC: 3 January 2002), 2p.; Langlois, Joseph E. Revised Instructions for Processing Asylum Terrorist/Suspected Terrorist Cases (Washington, DC: 26 January 2005), 3p. (plus attachments); Langlois, Joseph E. Updates to Asylum Officer Basic Training Course Lessons as a Result of Amendments to the INA Enacted by the REAL ID Act of May 11, 2005 (Washington, DC: 11 May 2006), 8p.

### ii. Human Rights Abuse-Related Categories:
Human rights abusers and modern-day war criminal cases, inquiries, or allegations, to include activity involving an individual suspected of having ordered or engaged in persecution of others, war crimes, genocide or torture.

For the purpose of these procedures, a human rights abuser of national security interest includes an individual who the Asylum Officer has reasonable grounds to suspect has engaged in (either directly or indirectly), ordered, incited, assisted, or otherwise participated in persecution of others, war crimes, genocide, or torture, and who is either a high-level official or who is a risk to public safety. There does not need to be a nexus between the human rights abuse and one of the five protected grounds in the refugee definition in order for the individual to be a suspected human rights abuser of national security interest. Langlois, Joseph E. Asylum Division. Known or Suspected Human Rights Abusers, Memorandum to Asylum Office Directors, et al., 11 September 2000, 2p.

Pearson, Michael A. Human Rights Abuse Memorandum of Understanding, Memorandum to Regional Directors, et al., 29 September 2000.

### iii.Other National Security-Related Categories:
•Other national security cases involving inquiries or allegations of any of the following: espionage, engaging in illegal acts involving weapons of mass destruction, being an agent or officer of a hostile foreign intelligence service, or engaging in violations of the import and export laws relating to sensitive information or technology. For a listing of examples of what may constitute a national security/terrorist-related threat/concern, please refer to Section 212(a)(3) and 237(a)(4) of the Immigration and Nationality Act. Weiss, Jeffrey L. Processing of Claims Filed by Terrorists or Possible Terrorists, Memorandum to Asylum Office Directors, HQASM Staff, 1 October 1997, 2p. plus attachments.

USCIS00004174

### c. Guidelines for Liaison with Local ICE Personnel
#### i. Arrests in the Asylum Office
A DHS officer may arrest an alien at the time of issuance of an NTA or at any time thereafter. Depending upon the circumstances of a particular case, it may be appropriate for DHS to arrest an individual for reasons related to national security. Whether or not to arrest an alien is within the purview of the local ICE SAC.

If requested, the asylum POC provides to a Special Agent any documentation from the asylum interview indicating that the alien is of national security interest, including a Q&A sworn statement. The POC also reminds the Special Agent of the confidentiality requirements of 8 C.F.R. 208.6, should the Special Agent discuss the case with non-Federal Government officials. See Section III.C, Confidentiality Issues, for more details.

An arrest of an asylum applicant may take place at an Asylum Office. Note, however, that Asylum Office personnel do not have the authority to detain individuals and therefore may not "hold" the alien for a lengthy period of time in anticipation of arrest. If arresting officials do not arrive in a timely manner, Asylum Office personnel may not prevent the alien from leaving the Asylum Office.

Of paramount importance in determining when and where the arrest should take place is safety. If the arrest is to take place in an Asylum Office, the arresting officer should be given some deference as to where and when the arrest should occur in accordance with his or her training to maximize the safety of all involved. However, the Asylum Office Director informs the arresting officer of the Asylum Office's strong interest in avoiding a disturbance that may intimidate other asylum-seekers in the office. Directors are encouraged to provide a discreet area for the arrest to take place.

#### ii. Preparation of Charging Documents
When an arrest is to be made and/or charging documents will be issued in a national security case, ICE personnel and the asylum POC coordinate which party will issue and serve the NTA. Asylum Office personnel consult with USCIS Area Counsel and/or ICE Office of the Principal Legal Advisor (OPLA) to identify the appropriate allegations and charges when issuing the NTA in a national security case. 8 C.F.R. 236.1(b).

If an NTA is served on the applicant and filed with EOIR prior to an adjudication of the asylum application, Asylum Office personnel administratively close the case in RAPS using the "IJ Jurisdiction" code (C4). Otherwise, once the national security issues have been reviewed and resolved and the case cleared for adjudication, Asylum Office personnel complete a decision and update the case in RAPS according to established procedures. Whenever possible, when the decision is made to go forward with an NTA, the Asylum Office should retain responsibility for preparing the NTA, scheduling the EOIR hearing using the ANSIR system, and serving the applicant and EOIR with the NTA packet.

HQASM/TRAQ concurrence is required prior to the issuance of an approval.


### 10. NTA Issuance at Applicant's Request
From time to time applicants may ask that an Asylum Office issue an NTA to them if they have received a final denial from the Asylum Office and subsequently fell out of status. Applicants may also ask an Asylum Office to issue an NTA to their family members who did not apply with the applicant for asylum so

USCIS00004175

that the whole family can be in Immigration Court proceedings together. The request must be made in writing to the appropriate Asylum Office and the Asylum Office has the discretion to deny the request.

In limited and extraordinary circumstances, the Asylum Office may issue an NTA to an applicant who requests one before or after adjudication, in order to seek lawful status or relief from removal with the immigration judge. The request must be made in writing to the appropriate Asylum Office and the Asylum Office retains discretion to deny the request. If the Asylum Office receives a request for an NTA prior to adjudication, the Office will ask the applicant if he or she wants to withdraw the asylum application. If the applicant wants to withdraw, the Office will close the I-589 and issue the NTA pursuant to existing procedures. If the applicant does not want to withdraw, the Office will exercise discretion to deny the request and continue with adjudication. If the Office receives the request for an NTA after interview, the Office will adjudicate the application and, if the application is not granted, issue an NTA in accordance with section II.N of the AAPM. *See Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens,* USCIS Policy Memorandum 602-0050.1, 28 June 2018, 11 p.

Any supervisory immigration officer has the authority to issue an NTA. Supervisory Asylum Officers may issue NTAs at their discretion based on office resources and the evidence of inadmissibility or removability of the requestor. Asylum Office personnel must at least initiate security checks prior to NTA issuance (as required by Yates, William R. Security Check Requirements Preceding Notice to Appear Issuance, Memorandum for Regional Director, et. al., 2 March 2004, 2 p.).

### 11. Special Groups

#### a. ABC/ABR/ABX

Pursuant to a settlement agreement entered into by INS, EOIR, and DOS in American Baptist Churches v. Thornburgh (ABC) 760 F. Supp. 796 (N.D. Cal. 1991), persons identified as ABC class members who have registered for ABC benefits, and filed asylum applications by the qualifying dates are entitled to a de novo asylum adjudication pursuant to the 1990 regulations and special procedures set forth in the settlement. See the ABC-NACARA Procedures Manual about ABC cases.

These applicants and their qualifying relatives may file for Suspension of Deportation/Special Rule Cancellation pursuant to Section 203 of the Nicaraguan and Central American Relief Act (NACARA). The original special group designations for these cases were "ABC" and "ABR." The ABC designation is over-inclusive, and may be present even when the individual is not eligible for ABC benefits. The ABR code is entered when a file review has occurred and the applicant has not been found ineligible for ABC benefits. The special group code "ABX" is used when a case has been removed from the ABC or ABR special group, if evidence surfaces clearly indicating that the individual is not eligible for ABC benefits.

#### b. ABQ/ABN/ABA/ABB/ABZ

As part of its effort to reduce the number of pending asylum cases, the Asylum Division created special group code "ABQ" in 2004 to identify special group ABC/ABR cases, in which the applicant had not yet filed an application for NACARA 203 relief and had not requested employment authorization during the previous three years. Special group code "ABN" was created at the same time to allow asylum offices to identify special group ABQ cases, in which the Asylum Office had received the A-file, for scheduling purposes. Asylum offices have been able to schedule interviews of special group ABQ/ABN cases to determine which applicants are genuinely interested in pursuing their asylum requests. See

USCIS00004176

Langlois, Joseph. Asylum Backlog Reduction Project, Memorandum for Asylum Office Directors and Deputy Directors, 29 January 2004, 5p.

To continue its backlog reduction efforts, the Asylum Division has added special group code "ABA," which identifies special group ABC/ABR cases, in which the applicant has not applied for NACARA 203 relief but has requested employment authorization during the previous three years. Asylum Offices can change the special group designation from ABA to "ABB" to indicate that the A-file is physically present at the office. Asylum offices can change the special group designation from ABA or ABB to "ABZ," if the applicant appears for his or her scheduled asylum interview and indicates an intent to apply for NACARA 203 relief within 60 days.    See Langlois, Joseph. ABA/ABB Asylum Backlog Reduction Project, Memorandum for Asylum Office Directors and Deputy Directors, 2 February 2005, 6p.

### c. DEP

The DEP special group code in RAPS is used only for certain NACARA applications. Asylum Office personnel update a case as "DEP" when an Asylum Office finds a principal applicant ineligible for an ABC interview, but he or she appears eligible to apply for benefits under Section 203 of NACARA based upon the his or her relationship to a parent or spouse who has an asylum application pending with the asylum program and appears eligible to apply under Section 203 of NACARA.

The updating of the case with the DEP code will prevent RAPS from scheduling the applicant for an asylum interview along with other non-special group cases and therefore, gives the applicant an opportunity to apply for benefits under NACARA before being interviewed.

### d. FSB

Certain nationals of Former Soviet Block (FSB) countries who entered the U.S. on or before December 31, 1990, and who filed for asylum on or before December 31, 1991, are also entitled to file for Suspension of Deportation/Special Rule Cancellation pursuant to the Nicaraguan and Central American Relief Act (NACARA). The special group code in RAPS for these cases is "FSB."      See the ABC-NACARA Procedures Manual about FSB cases.

### e. HDD/HGN/HGT/HGX

The Haitian Refugee Immigration Fairness Act (HRIFA), Pub.L. No. 105-277, § 902, 112 Stat. 2681-538, allows certain nationals of Haiti who have been residing in the United States to adjust status to that of lawful permanent resident. This code was used to place potentially eligible asylum applicants' cases on hold to give them time to apply for adjustment of status.

### f. KRD

This code was used to designate cases of Iraqi Kurds who were airlifted to Guam in 1997.

### g. NCG

Section 202 of NACARA allows certain Nicaraguan and Cuban nationals who are physically present in the United States to adjust status to that of lawful permanent resident. This code was used to place potentially eligible asylum applicants' cases on hold to give them time to apply for adjustment of status.

### h. PEN

This code is used to place on hold those asylum cases that also have pending applications to adjust status to that of lawful permanent resident. The cases are placed on hold in order to give the relevant Service Center time to adjudicate the adjustment applications before the Asylum Office processes the asylum applications.

USCIS00004177

## 12. Temporary Protected Status (TPS)

Under Section 244 of the INA, DHS is authorized to grant Temporary Protected Status (TPS) to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon a finding that such states are experiencing ongoing civil strife, environmental disaster, or certain other extraordinary and temporary conditions.

A chart of all states designated for TPS and the effective dates of the designations is available at uscis.gov by clicking on Services and Benefits, then Humanitarian Benefits, then Temporary Protected Status, or by clicking here. Because special group codes prevent cases from being picked up for scheduling, the "TPS" special group code in RAPS has been disabled.

If an applicant has been granted TPS, the Asylum Office considers him or her to be in a valid status for the purposes of processing the asylum application. "TPS" and the expiration date are entered on the VIST screen in RAPS. An applicant who has only applied for but not been granted TPS, however, would not be considered in valid TPS status. In this case, the Asylum Office processes the case depending upon the applicant's immigration status at the time of decision.

## 13. Issues Affecting LGBTI Applicants

The terminology involving gender identity and sexual orientation is continuously evolving. For purposes of this manual, the acronym "LGBTI" is used to refer to individuals who identify as lesbian, gay, bisexual, transgender, intersex, or other diverse gender identities and sexual orientations. In analyzing an applicant's claim for asylum, asylum officers must understand the differences between sex, gender, and sexual orientation.

- Sex: A biological categorization determined by reproductive, anatomical, and genetic characteristics, generally defined as male, female, and intersex.
- Gender: A social construct generally based on the societal roles expected of individuals based primarily on their sex. As a social construct, gender varies from society to society and can change over time.
- Gender Identity: A person's innermost concept of self as male, female, a blend of both, or nonbinary – how people perceive themselves and what they call themselves. One's gender identity may conform with or differ from their sex assigned at birth. This identity is not necessarily visible to others.
- Gender Expression/Presentation: How a person represents or expresses gender identity to themself and others – through appearance, dress, mannerisms, speech patterns, social interactions, name, and other characteristics and behaviors.
- Sexual Orientation: A person's attraction to people of the same or another sex (and sometimes to both/all sexes or to no one). Sexual orientation is distinct from gender identity.

See National Institutes of Health, "Sex, Gender, and Sexuality," available at https://www.nih.gov/nih-style-guide/sex-gender-sexuality#:~:text=Sex%2C%20sexual,%2C%20sex%20hormones%2C%20sex%20characteristics (accessed 4/26/2023).

USCIS00004178

### a. Same-Sex Marriage

In United States v. Windsor, 133 S. Ct. 2675 (June 26, 2013), the Supreme Court held that Section 3 of the Defense of Marriage Act, Pub. L. No. 104-199, § 3(a), 110 Stat. 2419 (codified as amended at 1 U.S.C. § 7 (2000)) (DOMA), which had limited the terms "marriage" and "spouse" to opposite-sex marriages for purposes of all federal laws, was unconstitutional. As a result, USCIS interprets "spouse" in section 208 of the INA to include an applicant's same-sex spouse. USCIS determines the validity of marriages between individuals of the same sex in the same manner as marriages of individuals of the opposite sex.

### b. Transgender Asylum Applicants

"Transgender" is an umbrella term used to describe people whose gender identity and/or gender expression/presentation is different from the sex they were assigned at birth. Individuals who are transgender may use other terms to describe their gender more specifically. The term transgender does not relate to sexual orientation.

Being transgender does not depend upon physical appearance or medical procedures. An individual who is transgender may undertake the process of bringing their gender expression/presentation and/or body into alignment with their gender identity through a process called transitioning. However, not all transgender individuals want to transition, feel safe transitioning, or have the necessary resources or the legal option to transition.

The transition process is complex and can occur over a long period of time. The exact steps involved in transition will vary from person to person. The steps of a transition, also referred to as gender affirming care, can include:

- Social transition: Telling family, friends, and co-workers, using a different name, using different pronouns, dressing differently, etc.
- Legal transition: Changing one's name and/or gender marker on official documents like a driver's license, passport, Social Security record, or in other documentation like bank accounts, etc.
- Medical transition: Hormone replacement therapy and/or one or more surgical procedures.

### i. Transgender Principal Applicants

Asylum applicants may select their gender on the asylum application. Neither the initial selection nor any later change in gender selection requires supporting documentation. Further, the gender selected does not need to match the gender listed on other immigration documents, nor does it need to match other supporting identity documents, such as a birth certificate, a passport, or state identification. Asylum applicants are presumed to be the gender that they claim on the asylum application. Asylum officers need not make any special inquiry into whether an applicant is the gender claimed on the asylum application or a transgender individual. Asylum office personnel must respect the applicant's preferences in relation to pronouns used to refer to the applicant in communication.

An asylum applicant's status as a transgender individual is not considered in evaluating the merits of the asylum claim unless gender identity is raised by the applicant as part of the basis of the asylum claim. However, the asylum officer is required to undertake the usual questioning and requests for documentation to ascertain the applicant's identity. As with any other asylum applicant, the asylum officer should ascertain, through testimony and/or documentation, a transgender asylum applicant's identity, including gender and name at birth. Where the applicant claims a name change, the asylum officer should request evidence that the name change was completed according to the relevant U.S. state or foreign law.

USCIS00004179

Whether an asylum applicant has changed their name legally, security checks that are normally triggered by an individual's name must be conducted on all names used by the applicant.

The asylum officer must be sensitive to the transgender asylum applicant's particular situation, the likelihood that they may have experienced stress and/or trauma surrounding issues of gender identity, and the potential for increased cultural and language barriers to effective communication. See RAIO Combined Training Program Lesson Plan "Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims."

### ii. Dependents of Transgender Principal Applicants

A transgender asylum applicant may include their spouse or children as dependents in an asylum application in accordance with current guidance and regulations without regard to the applicant's gender identity. Similarly, a principal asylum applicant may include a transgender spouse or child as a dependent in their asylum application without regard to the spouse or child's gender identity, in accordance with current guidance and regulations. Guidelines in the previous section for determining identity and gender apply. See Section III.E, Dependents, for specific procedures for dependent asylum applicants.


### 14. Trafficking Victims

The Trafficking Victims Protection Act (TVPA) guarantees certain rights, services, and protections to victims of severe forms of trafficking.

The TVPA defines a victim of a severe form of trafficking as a person subject to:

(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age OR

(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

While Asylum Officers are not responsible for making a determination as to an applicant's status as a victim of trafficking, Asylum Officers can play a key role in the protection of victims and in the prosecution of traffickers by detecting indicators of trafficking during an applicant's testimony and bringing cases of possible trafficking victims to the attention of ICE officials.

If the potential victim is a child filing for asylum as a principal applicant, the Asylum Officer should consult Section III.B.1, Children Filing as Principal Asylum Applicants, for additional guidance.

Each Asylum Office Director must designate a Supervisory Asylum Officer (SAO) as the point of contact (POC) for human trafficking matters for their office. This POC will serve as the principal liaison between the asylum field office and the ICE POC during the trafficking referral process outlined below. In the event that the SAO Trafficking POC is unavailable when a trafficking-related situation arises, all SAOs must be trained and prepared to serve as back-up POCs.

The Asylum Officer must differentiate between a suspected current trafficking situation, where the applicant may be in immediate danger because he or she is a possible or self-declared victim of current trafficking, and a possible or self-declared victim of past trafficking.

USCIS00004180

Asylum Officers encountering possible victims of human trafficking during the course of an asylum adjudication must follow this five step process: 1) detection, 2) notification, 3) referral, 4) information providing, and 5) tracking.

### Step 1- Detection:

In the course of an asylum interview, an AO should be aware of the indicators of human trafficking. For a reminder of possible indicators of trafficking, please consult the RAIO Combined Training Trafficking Lesson Plan.

Once an Asylum Officer suspects that an applicant has been or is currently being trafficked, he or she should ask follow-up questions to elicit more information without alerting the applicant or any individuals accompanying the applicant of the concern.

Facts related to the suspected trafficking should be documented in the interview notes. The AO should specifically annotate whether he or she thinks the applicant is currently a victim of trafficking who may be in imminent danger and/or has been trafficked in the past and is no longer in imminent danger.

If the applicant is a minor, the AO should consult Section III.B.1, Children Filing as Principal Asylum Applicants, to ensure that his or her inquiry is child sensitive and that it includes questions concerning the minor applicant's care and custody situation, as well as whether the parents are aware of and approve of the asylum application.

### Step 2- Notification:

Once the Asylum Officer has identified through line of inquiry indicators that an applicant has been or continues to be a victim of trafficking, the Asylum Officer must alert and discuss the suspicion and indicators of trafficking with the designated SAO POC.

The AO should complete the "Victims of Trafficking Memo to File," located at the end of the RAIO Combined Training Trafficking Lesson Plan, and provide an electronic copy to the SAO POC.

If the potential victim is a minor principal applicant, Asylum Office management must be alerted and the case must be reported to the HQASM QA mailbox. See Section III.B.1, Children Filing as Principal Asylum Applicants. HQASM will instruct on whether the Asylum Office should proceed with drafting an assessment and, if necessary, submitting a QA referral packet or whether the Asylum Office should postpone such action while issues related to the minor's care and custody situation are being addressed.

### Step 3- Referral:

The Asylum SAO POC will determine the timing and method of a referral to ICE in the case of a possible victim of trafficking based on whether he or she believes the applicant is currently being trafficked and faces any imminent danger.

In instances where the AO and SAO POC believe the applicant is currently a victim of trafficking and is possibly in danger, referral to ICE is immediate.

USCIS00004181

1. The SAO POC makes a referral to ICE by phone while the applicant is still in the Asylum Office.
2. The SAO POC relays the indicators of trafficking to the ICE agent and together they form a plan for action.
3. The applicant should not be alerted to the fact that an ICE agent is being called, unless the SAO POC can confirm that the applicant is not in danger and is not accompanied by anyone who poses a risk to the applicant. The timing and method of the ICE response will vary based on the AO's and SAO POC's perception of the imminent risk faced by the applicant. Further, the overall accessibility of ICE units may vary nationwide.
4. The SAO POC must use the following means, in the order listed below, to ensure an immediate verbal referral to an ICE agent in these situations.

   o   Call the individual field office's pre-established ICE POC, the Supervisor of an ICE Human Trafficking and Smuggling Unit, located in the proximity of the Asylum Office.
   o   If the ICE POC is not responsive, call the ICE National Directory (X- Sector) at 1-800-XSector and ask to speak with the supervisor of the Human Trafficking and Smuggling Unit in that city. If X-Sector does not have that information, the SAO POC should request the duty agent in the closest ICE field office.
   o   If the SAO POC is unable to reach an agent through either of these mechanisms, he or she should contact the Trafficking POC at HQASM.

Note: If the potential applicant is a minor, ICE's internal policy dictates that they respond immediately regardless of whether the individual is in a dangerous situation.

In instances where the AO and the SAO POC do not believe that the applicant is currently being trafficked and is not in imminent danger, the referral to ICE will involve the SAO POC sending the local ICE Assistant Special Agent in Charge (ASAC) a copy of the memo to file via email or fax for his or her records.

If the applicant's case has already been investigated by ICE, there would be no need to refer the case, unless the affirmative asylum interview revealed information that raised new or additional concerns.

In addition to notifying ICE, the Trafficking Victims Protection Act (TVPA) requires that federal, state, and local officials notify the Department of Health and Human Services (HHS) within 24 hours of the discovery of a person who is under 18 years of age (whether accompanied or not) who may be a victim of a severe form of trafficking in persons. (TVPA § 107(b)(1)(G); 22 USC 7705(b)91)(G)) This is so that HHS can provide interim assistance to any such individual. If Asylum Officers encounter an asylum applicant under 18 years of age whom they discover may be a victim of a severe form of trafficking in persons, they should inform their office's POC for unaccompanied alien children's issues (UAC POC). The UAC POC must send an e-mail to the HHS Office of Refugee Resettlement (ORR) at ChildTrafficking@acf.hhs.gov or call 202-205-4582. An e-mail should contain as much of the following information as possible:

Standard subject line: USCIS Notification to HHS of Discovery of a Person Who is under 18 Years of Age Who May Be a Victim of a Severe Form of Trafficking in Persons

Body:

Pursuant to section 107(b)(1)(G) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), this e-mail serves as notification to the Department of Health and Human Services

USCIS00004182

that U.S. Citizenship and Immigration Services has discovered the following person who is under 18 years of age who may be a victim of a severe form of trafficking in persons:

1. Alien number:
2. Name:
3. Date of birth:
4. Country of citizenship:
5. Residence address:
6. Location of exploitation:
7. Suspected form of trafficking:
8. Represented by:
9. USCIS contact information:
10. Additional notes:

An ORR Child Protection Specialist will respond to each notification during regular business hours, Monday through Friday, and will follow up with the reporting official as appropriate. Follow-up will involve facilitating interim and long-term eligibility, where applicable, and providing technical assistance as needed.

### Step 4- Providing Information to Possible Victims of Trafficking:

Asylum Officers must provide possible victims of trafficking with the following informational pamphlets. These pamphlets outline the trafficking-specific immigration benefits and the contact information of service providers who assist victims of trafficking.

These pamphlets must only be given to an applicant if the AO and the SAO POC are certain that the applicant is no longer at risk of trafficking and/or that the providing of this information to the applicant (who may be accompanied by persons involved in the trafficking) would not put the applicant in danger.

The AO will provide the applicant with the following:

1) USCIS "Immigration Remedies for Victims of Violence" brochure;
2) DOJ Office of Victims of Crime list of federally funded anti-trafficking non-governmental organizations that operate across the United States;
3) HHS National Human Trafficking Resource Center hotline number (National Directory for all trafficking-related referrals): 1-888-3737-888.

### Step 5- Tracking:

The AO completes the "Victims of Trafficking Memo to File," located at the end of the RAIO Combined Training Trafficking Lesson Plan, places a copy on the right-hand side of the A-file, and provides an electronic copy to the SAO POC.

Once this has been done, the AO processes the asylum case as usual.

USCIS00004183

### a. NTA Filed and Docketed with EOIR

Following a court approved settlement agreement in Mendez Rojas et al., v. Wolf et al., 2:16-cv-01024-RSM (W.D. Wash. Nov. 4, 2020), USCIS will accept a Form I-589 from an individual who is in removal proceedings before an Executive Office for Immigration Review (EOIR) immigration judge, so long as the Form I-589 is filed with USCIS 21 days or fewer after the date their Form I-862, Notice to Appear (NTA), was filed and docketed[1] with EOIR. This time period is defined as the "21-day grace period," and these cases are known as "Grace Period" cases. If the Form I-589 is filed with USCIS 22 days or more after the date when the NTA was filed and docketed with EOIR, USCIS will not accept or adjudicate the Form I-589. The date EOIR docketed the NTA is reflected as the "EOIR Docketing Date" in PCQS-DOJ-EOIR. Although USCIS will accept Grace Period cases, USCIS will not adjudicate them. Instead, USCIS will transfer the Form I-589 in a Grace Period case to the appropriate immigration court for adjudication. See *AAPM Section III.L.1.a. EOIR Jurisdiction Discovered at the Time of Filing* for instructions on transferring the Form I-589 to EOIR.

### b. EOIR Issues a Failure to Prosecute (Appendix 106 – Scenarios 4 and 7)

There may be circumstances where during A-file review the asylum office determines that the individual was previously issued an NTA but PCQS reflects Failure to Prosecute (FTP) in the "IJ Other Comp" field. Failure to Prosecute refers to where DHS has not filed the Notice to Appear with the court by the time of the first hearing. In these circumstances asylum office personnel should complete the following steps to reissue the NTA:

1. Cancel the affirmative asylum interview if the FTP designation in PCQS is discovered prior to the interview date.

2. Search the A-number in PCQS-DOJ-EOIR to identify the proper EOIR court location to forward the Form I-589 and the EOIR court packet and to file the new NTA.

   - In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be forwarded to the Base City found in PCQS-DOJ-EOIR.

   - Asylum personnel may contact the EOIR Hotline for the appropriate court information.

3. Complete the necessary security checks.

4. Generate a new NTA with the date, time, and location of the immigration court hearing.

5. Enter the case into CASE-ISS/DHS Portal and select "Previously Issued/Unfiled NTA – Clock is Running...(D)" as the Clock Status.

6. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.

USCIS00004184

- Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the case. A- and T-files already in the possession of ICE OPLA do not need to be requested.
- Upon receipt of any A- or T-files, combine the files by completing the following:
    - Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
    - Physically remove the T-file barcode and staple it to the inside cover of the A-file.
    - Consolidate the A- and T-files in RAILS.

7. Create the EOIR court packet; fill out, print, and attach the Case Confirmation worksheet from CASE-ISS/DHS Portal; and forward the EOIR court packet with the Case Confirmation worksheet to the appropriate immigration court, including filing the NTA. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing.*

    - Print multiple copies of the Case Confirmation worksheet from the CASE-ISS/DHS Portal, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.

8. Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Forward to IJ/Clock Running - Close" as the Case Event, choosing "Previously Unfiled NTA" as the Close Type, and filling out the "Closed On" date field.

9. Issue the individual the new NTA and Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)").

    - Select Option 2 on the notice informing the applicant that the NTA is being re-issued as a result of a Failure to Prosecute.

10. Send the A- or T-file to U.S. Immigration and Customs Enforcement (ICE) Office of the Principal Legal Advisor (OPLA) and update the file transfer in RAILS as appropriate.


**c. NTA in A-file – Not Filed and Docketed with EOIR** (Appendix 106 – Scenarios 2, 3 and 7)

If during A-file review, the asylum office discovers an NTA and there is no record of a filed and docketed NTA with EOIR in PCQS-DOJ-EOIR, asylum office personnel should refer to *AAPM Section III.L.1.b.i. Previously Issued NTA Not Filed and Docketed with EOIR* for instructions on processing these cases.


**d. IJ Vacated USCIS's Negative Credible Fear Determination, but NTA Not Issued, or NTA Not Filed and Docketed with EOIR** (Appendix 106 – Scenario 12)

There may be circumstances where during review of an A-file and of PCQS-DOJ-EOIR, the asylum office discovers that the individual received a negative credible fear determination and that the IJ then vacated the determination during the credible fear review hearing. Where the IJ vacates negative credible fear determination, DHS should issue Form I-862, Notice to Appear (NTA) to place the noncitizen into removal proceedings. If there is no record that the individual was subsequently issued or served an NTA, or no

USCIS00004185

record in PCQS-DOJ-EOIR that a subsequently issued NTA was filed and docketed with EOIR, asylum office personnel should complete the following steps:

1. If discovered prior to the interview date, cancel the affirmative asylum interview.

2. Search the A-number in PCQS-DOJ-EOIR to identify the proper EOIR court location to forward the Form I-589 and the EOIR court packet and to file the new NTA.

   - In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be forwarded to the Base City found in PCQS-DOJ-EOIR.

   - Asylum personnel may contact the EOIR Hotline for the appropriate court information.

3. Complete the necessary security checks.

4. Generate a new NTA with the date, time, and location of the immigration court hearing.

5. Enter the case into the CASE-ISS/DHS Portal and select "Previously Issued/Unfiled NTA – Clock is Running...(D)" as the Clock Status.

6. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.

   - Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the case. A- and T-files already in the possession of ICE OPLA do not need to be requested.

   - Upon receipt of any A- or T-files, combine the files by completing the following:

     o Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.

     o Physically remove the T-file barcode and staple it to the inside cover of the A-file.

     o Consolidate the A- and T-files in RAILS.

7. Create the EOIR court packet; fill out, print, and attach the Case Confirmation worksheet from the CASE-ISS/DHS Portal; and forward the EOIR court packet with the Case Confirmation worksheet to the appropriate immigration court, including filing the NTA. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing.*

   - Print multiple copies of the Case Confirmation worksheet from the CASE-ISS/DHS Portal, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.

8. Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Forward to IJ/Clock Running - Close" as the Case Event, choosing "Previously Unfiled NTA" as the Close Type, and filling out the "Closed On" date field.

9. Issue the individual the new NTA and Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)"),

USCIS00004186

- Use **Option 3** ("If the applicant received a negative credible fear determination but the IJ vacated the determination and DHS did not issue an NTA or the NTA was not filed and docketed with EOIR").

10. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate.

---

[1] "Docketed" refers to the EOIR Docketed Date, which is when Immigration Court staff enters into EOIR's case management system, CASE or any successor, the EOIR Rec'd Date and charging document information. The EOIR Docketed Date reflects the formal acceptance of a newly filed case onto the court's docket for case scheduling and processing.

### 16. Previously in Removal Proceedings (PRP) Asylum Applications

The term Previously in Removal Proceedings (PRP) refers to asylum applications filed by applicants who were in removal proceedings and whose proceedings were subsequently dismissed or terminated by an immigration judge. Generally, these applications are within the jurisdiction of USCIS since the removal proceedings were dismissed or terminated. PRP cases can be identified through a review of PCQS-DOJ-EOIR or via the EOIR Automated Case Information system. In most circumstances, these cases will have been identified during intake and the special group code "PRP - Previous Removal Proceedings – Dismissed or Terminated" will have been applied to the Global Entry Tab. In other circumstances where an applicant had a pending asylum case in Global at the time of intake of a new asylum application after dismissal or termination of removal proceedings, this new application will be considered supplemental evidence and the case will not be designated as PRP in Global. In addition, some cases will be identified as a "PRP-PRL - Previous Removal Proceedings – UAC" in Global when the applicant would have been designated as a "PRL - UAC in Removal Proceedings" at intake but for the dismissal or termination of the applicant's removal proceedings. If the case was not identified as PRP at intake, Asylum Division staff will identify these cases and may apply the special group code in Global upon review, if applicable.

USCIS will accept the application and assign the earliest filing date associated with a previously filed Form I-589 with USCIS or EOIR before the dismissal or termination of their proceedings. If the applicant did not previously apply for asylum with USCIS or had an application pending with USCIS at the time of dismissal or termination, such as a PRL applicant, the Asylum Office will adjudicate the application following existing procedures. If the applicant previously applied for asylum with USCIS and USCIS referred, transferred, or forwarded the application to EOIR for reasons other than being under the jurisdiction of EOIR, the Asylum Office exercises discretion to issue an NTA. In other words, USCIS will adjudicate a newly filed Form I-589 where the applicant had previously filed an affirmative asylum application with USCIS, but the Asylum Division did not adjudicate the previously filed application because the applicant was under the jurisdiction of EOIR, or because USCIS re-filed a previous NTA that was not properly filed and docketed with EOIR. The process for reviewing and processing PRP cases, including the issuance of a discretionary NTA, is outlined in more detail below.

USCIS00004187

### a. Identifying PRP Cases Using PCQS-DOJ-EOIR

In most instances, PRP cases will be identified during intake and assigned the PRP special group code in Global prior to the Asylum Office receiving the Form I-589. However, Asylum personnel may occasionally discover PRP cases in their pending caseload that do not have the PRP code applied. Asylum personnel can determine if a case falls into the PRP category by searching PQCS-DOJ-EOIR with the A-number associated with the Form I-589. Cases which require the "PRP" special group code will have an IJ Decision outcome in PCQS-DOJ-EOIR of either "Dismissed" or "Terminated" prior to filing their most recent I-589 with USCIS. Once the PRP designation is confirmed, staff will add the PRP special group code in Global to the case unless there is an existing special group code that needs to be retained for litigation reasons or because the existing special group code is prioritized over the PRP code for case type identification.[1] Since Global is only able to accommodate one special group code at a time, if a special group code is replaced, please write in the "scheduling note" comment box on the Entry tab the code previously assigned to the case. The PRP special group code should not be applied to cases where an asylum application was already pending with USCIS at the time of dismissal or termination by EOIR.

### b. Identifying Prior Form I-589 Filings

When determining how to process the PRP case, Asylum personnel should determine if a previous Form I-589 was filed with either USCIS or EOIR. A Form I-589 that was previously filed with USCIS and was completed will have in Global a Grace Period record or an Affirmative record with a linked archived record from the earlier Form I-589. If the application was pending with USCIS at the time of IJ dismissal or termination, the case will not be archived in Global and it will not be assigned a PRP code.

A Form I-589 previously filed with EOIR may have multiple indicators in PCQS-DOJ-EOIR of that EOIR asylum application. Additionally, a copy of any prior application should be in the noncitizen's immigration records. If one or multiple of the following indicators exists in PCQS-DOJ-EOIR, then a previous Form I-589 was filed before EOIR:

1. Information related to the applicant and/or an Asylum EAD Clock is present under the "DOJ EOIR Asylum Clock Status" tab;
2. "Int Asylum Rec'd Date" is listed under the "Asylum Clock Calculator" tab; and/or
3. "ASYLUM" is listed as a type of application for relief under the "Applications" tab.

Please note that the existence of a DEFA record in Global without corresponding evidence in PCQS-DOJ-EOIR is not sufficient evidence of a previously filed Form I-589 before EOIR. As such, asylum personnel should review PCQS-DOJ-EOIR data to determine if a case meets the PRP criteria.

### c. Impact of Prior Form I-589 Filings on Filing Date

If the applicant does not have a prior Form I-589 filing, the filing date associated with the application will be the date it is properly filed with USCIS.

USCIS00004188

If the applicant had a previously filed Form I-589 with USCIS or EOIR, then the applicant will receive the filing date associated with their earliest filed application. The earlier filing date may have been assigned to the case at intake. If the earlier filing date was not assigned to the case in Global at intake, Asylum personnel will have to correct the filing date and reissue a receipt notice reflecting the original Form I-589 filing date. See AAPM Section II.D. Global Case Creation for guidance on correcting Form I-589 filing dates.

### d. Processing PRP Cases after Filing [2]

Forms I-589 filed with USCIS that are identified as PRP or PRP-PRL cases either at the time of intake or while pending with the asylum office will either be fully adjudicated by the asylum office or forwarded to EOIR through the issuance of a discretionary NTA without an interview or adjudication. Which process applies will vary depending upon whether USCIS previously processed a Form I-589 for the applicant as outlined below.

### i.     PRP Cases Not to be Adjudicated by the Asylum Office - Issuing an NTA

Generally, USCIS will not adjudicate the new Form I-589 filed by an applicant who previously was referred, transferred, or forwarded to EOIR by the Asylum Division.  Any cases with archived affirmative asylum records in Global that were referred to EOIR or administratively closed for reasons other than the applicant was in the jurisdiction of EOIR should be processed as follows:

- Close in the case management system using the Forward to IJ/Clock Running – Close and selecting "PRP USCIS Previously Issued NTA" reason;
- Issue a new NTA;
- Issue *AAPM Appendix 120, Notice of Issuance of Discretionary NTA*; and
- Upload the Form I-589 and supporting documents into the DHS Portal.
    - o   In the DHS Portal, select "Previously Issued/Unfiled NTA" from the Asylum Clock Status dropdown menu to ensure the Asylum EAD Clock continues to run.

Please see *AAPM Appendix 106 Adjudication Reference Chart* (Scenario 5 and 6) for more information related to processing cases Terminated or Dismissed by EOIR.

This processing also applies to PRP-PRL designated cases.

### ii.    PRP Cases to be Adjudicated by the Asylum Office

USCIS will adjudicate the Form I-589 filed by individuals with no previous asylum application before USCIS. USCIS will also adjudicate cases where a previous affirmative asylum application was filed with USCIS but were not adjudicated because the applicant was in the jurisdiction of EOIR, or because USCIS re-filed a previous NTA that was not properly docketed:

PRP applications USCIS will adjudicate include:

- A previous Form I-589 was only filed with EOIR.
- USCIS administratively closed a Form I-589 filed with USCIS because the applicant was in the jurisdiction of EOIR.

101

USCIS00004189

- A previous Affirmative record exists in Global, but the case was closed using the "Previous Unfiled NTA" or "Proceedings Terminated – NTA Refiled" codes in Global.
- The Form I-589 was processed in Global Grace and forwarded to EOIR.
  - Asylum personnel can determine if a Grace Period record exists by searching the applicant's A-number in Global and locating a GRACE record.

This processing also applies to PRP-PRL designated cases.

---

[1] PRP should not be added to cases of class members in *J.O.P. v. U.S. Dept. of Homeland Security et al., Civil Action 8:19-cv-01944*, and/or applicants with a pre-existing PRL special group code assigned to their case in Global.

[2] **NOTE:** These procedures do not apply to *Ms. L/MMM* class members. Refer to *Ms. L/MMM* settlement agreement guidance for appropriate procedures.

USCIS00004190

## III.C.  CONFIDENTIALITY ISSUES

Information about and contained in an asylum application or credible/reasonable fear determination is protected from disclosure to third parties without written consent of the applicant or the Secretary of Homeland Security. See 8 C.F.R. 208.6. "Generally, confidentiality of an asylum application is breached when information contained therein or pertaining thereto is disclosed to a third party, and the disclosure is of a nature that allows the third party to link the identity of the applicant to:

1. the fact that the applicant has applied for asylum;
2. specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or
3. facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum."

Cooper, Bo. INS General Counsel. Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information, Memorandum to Jeffrey Weiss, Office of International Affairs. (Washington, DC: 21 June 2001), 7p., and Langlois, Joseph E. Fact Sheet on Confidentiality, Memorandum to Asylum Office Directors and Deputy Directors, 15 June 2005, 1 p., including the attached fact sheet entitled Federal Regulations Protecting the Confidentiality of Asylum Applicants.

### 1. Asylum Interviews

Asylum interviews shall be separate and apart from the public, except at the request of the applicant. Members of the public (applicants, interpreters, attorneys, cleaning crew, and outside visitors) routinely travel through the corridors of an Asylum Office. Therefore, an AO should keep the office door closed during an asylum interview, if the interview is conducted in a publicly traveled area. If a particular need arises when an AO needs to interview with the door open in a publicly traveled area, a request for an exemption must be made to the SAO prior to the interview. 8 C.F.R. 208.9(b).

### 2. Protecting Confidentiality – Written Materials

Photocopying machines, printers, and Asylum Offices may contain policy memoranda, case assessments, I-589 applications and charging documents with identifying information about an asylum applicant. To ensure that all materials related to an application for asylum remain confidential, Asylum Office personnel must ensure that any written materials with identifying information about an asylum applicant are not laying in plain view during an asylum interview. In addition, Asylum Office personnel may not permit asylum applicants, attorneys, and interpreters to wait in areas (e.g., near printers and photocopying machines) where documents that contain identifying information about an applicant are in plain view.

### 3. Access to Asylum Files by Non-DHS Federal Law Enforcement Agencies (FLEAS)

An Asylum Office may disclose information to a non-DHS FLEA if the information requested is needed in connection with a criminal or civil investigation that is already underway, if the Secretary of Homeland Security authorizes disclosure, or if the applicant provides written consent to disclose information from his or her file. Otherwise, any information about an individual applicant may not be disclosed to an agent/officer, even when that individual believes the applicant should be entitled to a benefit because of information/assistance the applicant may have provided. For example, an agent who has received cooperation from an asylum applicant may want to provide information to support the asylum application. The agent may supply the information if he or she is aware that the applicant has applied for

USCIS00004191

asylum, but USCIS may not disclose information about the case or case status, or confirm or deny the fact that the applicant has applied for asylum, unless the applicant consents to the disclosure in writing. 8 C.F.R. 208.6.

Under certain circumstances as prescribed by the Secretary of Homeland Security's memo of April 18, 2007, asylum information may be disclosed to any element of the U.S. Intelligence Community, or any other federal or state agency having a counterterrorism function. See Chertoff, Michael, Secretary of Homeland Security, Disclosure of Asylum-Related Information to U.S. Intelligence and Counterterrorism Agencies, Memorandum to the Deputy Secretary; the Under Secretaries; the General Counsel; Director, USCIS; et al. (Washington, DC: 18 April 2007), 5p.

Asylum Office personnel should not disclose the interest of the law enforcement, intelligence, or counterterrorism agency in a particular application to the asylum applicant and should limit the number of USCIS employees who have knowledge of any such interest to those with a "need to know" basis.

### 4. Disclosure to Third Parties – General

Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by 8 C.F.R. 208.6 or at the discretion of the Secretary of Homeland Security. This includes neither confirming nor denying that a particular individual filed for asylum. Inquiries about the status of an asylum application should not be taken or responded to by telephone except where it is possible to verify the identity of the caller, such as when an attorney/representative can immediately fax a signed G-28. An Asylum Office may accept written status requests signed by the applicant (or the applicant's attorney or representative with a properly completed G-28 on file) by mail or fax. Information shall not be disclosed to third parties except as provided in 8 C.F.R. 208.6.

An Asylum Office may receive inquiries from city and state officials such as probation officers and police personnel about asylum applicants. The receiving party should refer such inquiring parties or requests to the Director or her/his designated official. Pursuant to 8 C.F.R. 208.6, information about an applicant derived from the asylum application alone cannot be disclosed to state and local law enforcement unless the applicant consents or if permitted at the discretion of the Secretary of Homeland Security.

### 5. Testimony of Other Applicants

As discussed in the beginning of this section, the facts contained in an asylum application and the testimony given by an asylum applicant in support of his or her claim are protected by the confidentiality provisions in 8 C.F.R. 208.6. The confidentiality protections also extend to the Asylum Officer's assessment of the applicant's claim, in that it contains the essential facts in support of the applicant's asylum application. The purpose of the assessment is to document the reasoning of the decision and the facts upon which it is based for internal review, not to explain the decision to the public. Nevertheless, the Asylum Officer's assessment of the claim may be disclosed to the applicant in response to a FOIA request, or through other means. Therefore, it is important that the assessment not contain confidential information related to the asylum application of a third party, thus risking the violation of the third party applicant's right to confidentiality if the assessment is released. This does not preclude an Asylum Officer from considering relevant testimony of another asylum applicant in making a determination of asylum eligibility. Until further training materials on this issue have been developed, in cases where the Asylum Office Director and Deputy Director concur that information in one asylum application clearly contradicts the information in another asylum application and that information would change the outcome of an adjudication that would otherwise be an approval, the Asylum Office should contact HQASM-Operations

USCIS00004192

for further guidance. Confidentiality may be broken by the applicants themselves, and therefore waived. For example, if two or more family members were present when the testimony was given, the confidentiality of that testimony has been broken as to the applicants who were present. Similarly, if a copy of a family member's asylum application is submitted in support of the other's asylum application, the confidentiality of the copied asylum application has been broken as to those family members.

USCIS00004193

## III.D. DEPARTING THE U.S. BEFORE A FINAL DECISION

USCIS presumes that an applicant has abandoned their asylum application if either of the following occurs:

- The applicant departs the United States without first obtaining advance parole, or, for Temporary Protected Status (TPS) recipients, an approved Form I-512T, Authorization for Travel by a Noncitizen to the United States (sometimes referred to as MTINA TPS travel authorization)[1]; or
- The applicant departs the United States pursuant to advance parole, or, for TPS recipients, an approved Form I-512T, Authorization for Travel by a Noncitizen to the United States, and returns to the country of claimed persecution

An applicant can overcome the presumption of abandonment by a preponderance of evidence indicating that they did not abandon the asylum application if the applicant establishes certain facts. *See* 8 C.F.R. 208.8. Appearance at the asylum office by an applicant, generally, is substantial evidence of not abandoning the asylum application. *See the* Asylum Supplement of the RAIO Combined Training Module: Refugee Definition. The asylum officer should also consider the following factors:

- Length, purpose, and duration of the departure
- Whether the applicant engaged in any activities while outside the United States that would be inconsistent with asylum eligibility
- Whether the applicant has returned or is attempting to return to the United States

Where an applicant has returned to the country of claimed persecution, an asylum office determines whether the applicant has overcome the presumption of having abandoned the asylum application on a case-by-case basis, considering the factors listed above as well as whether there were compelling reasons for the applicant to return to the country of feared persecution.

Even if the presumption of abandonment is overcome, an applicant's return to the country of feared persecution, depending on the circumstances, may have a bearing on the applicant's ability to establish a well-founded fear of persecution. *See* RAIO Combined Training Module: Well-Founded Fear.

USCIS lacks jurisdiction to grant asylum to an applicant who is not in the United States. However, the asylum office may be called upon to give input into a decision on whether to allow the re-entry of an asylum applicant into the United States, necessitating an evaluation of the case using the above factors.

### 1. Discovering DEPARTURE FROM U.S. before an Asylum Interview

When an asylum office becomes aware of evidence of an applicant's departure from the United States before an asylum interview has been scheduled, asylum office personnel should immediately schedule the applicant for an interview. The application should be administratively closed immediately for abandonment if:

USCIS00004194

- There is no evidence that the applicant obtained advance parole, or, for TPS recipients, an approved Form I-512T, Authorization for Travel by a Noncitizen to the United States, prior to leaving the United States,
- The applicant fails to appear for the interview, and
- The Asylum Office Director is satisfied that the applicant is no longer in the United States pursuant to 8 C.F.R. 208.8.

The asylum office should enter the administrative closure due to abandonment/departure from the United States into the asylum case management system. If the asylum application is closed for abandonment, the asylum office issues the applicant a Notice of Dismissal – Abandonment of Asylum Application (Appendix 65). The asylum office does not refer the asylum application to immigration court.

If the Asylum Office Director believes the noncitizen may still be in the United States, the asylum office follows the instructions in Section III.I, Failure to Appear.

If the applicant appears at the interview, follow instructions in Section III.D.2, Discovering Departure from the U.S. During an Asylum Interview.

### 2. Discovering Departure from the U.S. During an Asylum Interview

When the applicant appears for an asylum interview and discloses that they left the United States between filing and the interview, the asylum officer determines whether the applicant has overcome the presumption of abandonment considering the factors above. Appearance at the asylum office by an applicant, generally, is substantial evidence of not abandoning the asylum application. The asylum officer requests a copy of any advance parole document (Form I-512L), or, for TPS recipients, an approved Form I-512T, Authorization for Travel by a Noncitizen to the United States, issued by DHS to the applicant. The asylum officer should also question the applicant about any departures from the United States to determine whether the departure bears on the applicant's eligibility for asylum.

### 3. Discovering Departure from the U.S. After an Asylum Interview

An asylum office may become aware of evidence that an applicant departed the United States after the asylum interview but before a final decision. The asylum office should administratively close the application for abandonment if:

- There is no evidence that the applicant obtained advance parole, or, for TPS recipients, an approved Form I-512T, Authorization for Travel by a Noncitizen to the United States, prior to leaving the United States, and
- The Asylum Office Director is satisfied that the individual is no longer in the United States pursuant to 8 C.F.R. 208.8.

The asylum office should enter the administrative closure due to abandonment/departure from the United States into the asylum case management system. If the asylum application is closed for abandonment, the asylum office issues the applicant a Notice of Dismissal – Abandonment of Asylum Application (Appendix 65). The asylum office does not refer the asylum application to immigration court.

USCIS00004195

¹ Beginning July 1, 2022, USCIS started issuing a new travel authorization document to Temporary Protected Status (TPS) beneficiaries: Form I-512T, Authorization for Travel by a Noncitizen to the United States. USCIS no longer issues advance parole documents as evidence of prior consent to a TPS beneficiary's travel outside the United States.

USCIS00004196

## III.E. DEPENDENTS

1. Adding a Dependent After Principal Applicant's Initial Filing

A principal applicant may add to his or her asylum application a spouse or child under age 21, who is in the United States and not under the jurisdiction of EOIR, at the time of filing or at any time prior to the rendering of a final decision by the Asylum Office, regardless of whether the new dependent previously filed for asylum as a separate principal applicant or never submitted an asylum application. An individual who was issued a Notice of Intent to Deny (NOID) or a Final Denial may be added as a dependent on a spouse's or parent's asylum application. A spouse or child may be added to a principal's asylum application even after the issuance of a NOID to the principal applicant. The addition of a dependent in the case management system will automatically initiate the scheduling of a biometrics collection appointment and initiate other security checks. Asylum Office personnel must conduct all required security checks for any dependents added after the principal applicant's initial filing. 8 C.F.R. 208.21.

"Final Decision" in this context refers to a Final Denial, Referral (with Form I-862, Notice to Appear (NTA), filed with the Immigration Court), or Final Approval.

If a request to add a dependent is received after the issuance of a final approval to the principal applicant, Asylum Office personnel provide the principal applicant with information about the filing of a Form I-730, Asylee/Refugee Relative Petition, which can be found at www.uscis.gov/i-730.

The burden of proof is on the principal applicant to establish the claimed relationship with the prospective dependent. Details regarding the types of documentation that may be used to establish the principal applicant-dependent relationship in cases pending before USCIS are discussed in 8 C.F.R. 204.2(a)(1)(i)(B), (a)(2), (d)(2) and (d)(4).

a. Dependent Did NOT Previously File an Asylum Application

i. Adding a dependent before the interview

The principal applicant files with the Service Center[1] or the local Asylum Office a packet that includes:

- One (1) copy of their Form I-589 that includes the dependent's information.
  - At a minimum, an applicant is permitted to submit copies of only pages 1, 2, 3 (including Supplement A to Form I-589, if submitted with the principal applicant's Form I-589), and 9 of the principal applicant's Form I-589 in lieu of the entire Form I-589 and supplemental documentation.
- One (1) photograph of the dependent(s) that the principal applicant wants to add, stapled on page 9 of the dependent's copy of the Form I-589.
- One (1) copy of evidence of relationship.
- Brief statement that the principal applicant wishes to add a dependent to their Form I-589.

Until a case has been scheduled for an interview, Service Centers may add or remove a dependent to the parent's or spouse's application in the case management system. The Service Center adds the dependent to the parent's or spouse's application in the case management system and forwards the file to the Asylum Office. The Asylum Office may add or remove a dependent to the parent's or spouse's application in the case management system if filed locally. Following the instructions in *AAPM Section II.C.2.a. Form I-589 Filed Directly with the Asylum Vetting Center,* local Asylum Office personnel create a file for the dependent.

USCIS00004197

ii. Adding a dependent at the time of the interview

A principal applicant may add a dependent to his or her asylum application at the time of the asylum interview, as long as the dependent appears with the principal applicant. To add a dependent who is present at the interview, the principal applicant submits to the AO the same packet described in the previous section.

Following instructions in *AAPM Section II.C.2.a. Form I-589 Filed Directly with the Asylum Vetting Center*, local Asylum Office personnel create a file for the dependent. Asylum Office personnel add the dependent to the principal applicant's case in the case management system. The AO meets and interviews the dependent according to instructions in *AAPM Section II.J.3. AO Conducts An Asylum Interview, Dependents*.

If the prospective dependent does not appear with the principal applicant at the interview, the AO:

- Completes the interview with the principal applicant.
- Completes Form I-72 or office equivalent, which instructs the principal applicant to bring the prospective dependent to the office on a day before the pick-up date if the interview takes place at the Asylum Office, or before the AO leaves the circuit ride city if the interview takes place away from the Asylum Office (or when the next circuit ride is scheduled if this occurs on the last day of the circuit ride).
- Provides the principal applicant with the original form and places a copy on the right-hand side of the A-file.
- Places the principal applicant's case on "Awaiting Documentation" hold in the case management system. This will result in an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock.

If the dependent appears on the appointed date and time, the AO follows instructions in *AAPM Section III.E.1.a.iii. Adding a dependent after the interview*, removes the case from hold in the case management system, and processes the family's decision.

If the individual fails to appear on the appointed date, Asylum Office personnel:

- Do not add the individual as a dependent on the principal applicant's application.
- Write a memo to the principal applicant's file, with a copy in the dependent's file, if any, that states the prospective dependent failed to appear for the appointment.
- Remove the case from hold in the case management system.
- Process the asylum application of the principal applicant for pick-up or mail-out. .

iii. Adding a dependent after the interview

A principal applicant may submit materials to add a dependent to the Asylum Office that is adjudicating his or her application. Neither the Service Center nor the Asylum Office will add an individual as a dependent if the case management system indicates the Asylum Office already issued a final decision to the principal applicant. Should this occur, the Service Center or the Asylum Office returns the packet to the principal applicant and issues them Appendix 110 ("Denial of Request to Add Dependent to Form I-589") informing them that USCIS cannot add the dependent because a final decision was issued.

Requests Received by the Asylum Office

If the Asylum Office receives a request to add a dependent either before the pick-up date, or while the case is pending if the decision will be mailed, Asylum Office personnel take the following action:

USCIS00004198

- Place the principal's case on "Awaiting Documentation" hold in the case management system.
- Send to the principal applicant Appendix 13 ("Response to Request to Add Dependent to Asylum Application"), which schedules both the principal applicant and the dependent for an appointment with an AO. This appointment may be scheduled for the same date as the pick-up appointment if resources permit the completion of all necessary follow-up processing prior to service of the decision on that date.

Asylum Office personnel follow procedures in *AAPM Section III.E.1.a.ii. Adding a dependent at the time of the interview* for processing guidelines depending upon whether the individual appears or fails to appear at the appointment.

b. Dependent Previously Filed an Asylum Application as a Principal Applicant

There is no statutory or regulatory bar to an individual being both a principal applicant and a dependent. An individual who filed an asylum application may wish to withdraw his or her application as a principal applicant and become a dependent on a spouse's or parent's asylum application. The choice to withdraw as a principal applicant or to pursue an application as both a principal applicant and a dependent is the individual's and the principal applicant's, who agrees to include the individual as a dependent. If an individual wants to withdraw his or her asylum application as a principal applicant and become a dependent, the following procedures apply. For procedures on individuals pursuing an asylum application as both a principal applicant and a dependent, see *AAPM Section III.E.3. Simultaneous Filing as a Principal Applicant and a Dependent*.

i. Request to add a dependent received before the asylum interview

The Service Center will not add an individual as a dependent if the case management system indicates that the individual is currently a principal applicant. Should this occur, the Service Center sends a notice to the individual to submit his or her application to the local asylum office that has jurisdiction over the Form I-589.

Upon receipt of the packet, Asylum Office personnel make reasonable efforts to schedule the interview of the parent or spouse of the individual who wants to be added as a dependent and the dependent who filed a separate Form I-589 on the same date and time by having them added to the schedule manually. Asylum Office personnel also make reasonable efforts to assign both individuals to the same AO for interview. If that is not possible, then the same SAO reviews both decisions.

ii. Adding a dependent at the time of the interview

A principal applicant may request to add a dependent to his or her asylum application at the time of the asylum interview. The AO explains to the principal applicant and prospective dependent, if present, that it is possible to be a principal applicant and dependent simultaneously. If the choice is made to pursue both applications simultaneously, Asylum Office personnel follow guidance contained at *AAPM Section III.E.3. Simultaneous Filing as a Principal Applicant and a Dependent*. If the prospective dependent no longer wants to pursue an application as a principal applicant, the AO may grant the request to withdraw the principal application and add the dependent at the interview as long as the dependent is present. The individual who wants to be added as a dependent provides to the AO a signed statement that he or she wishes to withdraw his or her asylum application (see Appendix 43 ("Declaration of Intent to Withdraw Asylum Application")). The principal applicant provides to the AO a signed statement that he or she wishes to add a dependent to his or her asylum application.

Asylum Office personnel locate the dependent's file. The AO completes the section on the Form I-589 that pertains to information about a spouse or child, so the principal applicant does not need to submit a new

USCIS00004199

copy of his or her Form I-589. If the file contains one (1) photograph of the individual, he or she does not need to submit a new one. The principal applicant must submit three (3) copies of evidence of relationship. The AO interviews the dependent according to instructions in *AAPM Section II.J.3. AO Conducts An Asylum Interview, Dependents*.

Asylum Office personnel transfer the spouse's or child's information from their own asylum application to the dependent section of the principal applicant's application in the case management system.

If the prospective dependent who filed a separate Form I-589 did not appear at the time of the principal's interview, the principal applicant may be given a brief extension of time to bring his or her prospective dependent and the required materials to add the prospective dependent. If the prospective dependent does not appear, the AO completes the principal applicant's case without adding the prospective dependent.

iii. Adding a dependent after an interview

A principal applicant may submit materials to add a dependent to the Asylum Office that is adjudicating his or her application. Neither the Service Center nor the Asylum Office will add an individual as a dependent if the case management system indicates the Asylum Office already issued a Final Approval, Final Denial, or Referral to the principal applicant. Should a request to add a dependent arrive after the final decision has been issued, the Service Center or the Asylum Office returns the packet to the principal applicant with Appendix 110 ("Denial of Request to Add Dependent to Form I-589"), informing him or her that USCIS cannot add the dependent because a final decision was issued.

(a) Requests Received by the Service Center

If the request to add a dependent is filed with the Service Center after the interview has been scheduled, the Service Center will reject the application and instruct the individual to contact the local asylum office with jurisdiction over their case. The Service Center will not add an individual as a dependent if the case management system indicates that the individual is currently a principal applicant.

(b) Requests Received by the Asylum Office

If the Asylum Office receives a request to add a dependent either before the pick-up date, or while the case is pending if the decision will be mailed, Asylum Office personnel take the following action:

- Place the principal's case on "Awaiting Documentation" hold in the case management system.
- Send to the principal applicant Appendix 13 ("Response to Request to Add Dependent to the Asylum Application"), which schedules both the principal applicant and the dependent for an appointment with an AO. This appointment may be scheduled for the same date as the pick-up appointment if resources permit the completion of all necessary follow-up processing prior to service of the decision on that date.

Asylum Office personnel follow procedures in *AAPM Section III.E.1.a.ii. Adding a dependent at the time of the interview* for processing guidelines depending upon whether the individual appears or fails to appear at the appointment.

If the dependent does not appear, the Asylum Office schedules the dependent for an interview based on the Form I-589 he or she filed as a principal applicant. This interview should take place during the next scheduled circuit ride. Because the individual wants to be considered as both a principal applicant and a dependent, the AO delays serving the decision on the spouse's or parent's Form I-589 pending the interview and decision on the dependent's separately filed Form I-589. See *AAPM Section*

USCIS00004200

*III.E.3. Simultaneous Filing as a Principal Applicant and a Dependent* below. Asylum Office personnel place the principal applicant's case on "Awaiting Documentation" hold until the dependent is interviewed.

---

[1] Once a case is scheduled for an interview, only a local Asylum Office can add a dependent.

## 2. Family Members Filing as Separate Principal Applicants

There is no requirement that a family must submit an asylum application as a family. A husband and wife or a mother and daughter may each submit separate asylum applications as principal applicants. Each individual is entitled to an interview on his or her application and confidentiality protections as outlined in *AAPM Section III.C. Confidentiality Issues*.

To the extent practicable, Asylum Office personnel should schedule family members on the same day and with the same AO. Asylum Office personnel will not always know in advance that multiple family members have filed principal asylum applications. However, this may come to an AO's attention after interviewing a family member. The AO should notify an SAO so that Asylum Office personnel can attempt to have all family members interviewed by the same AO or at least to have the same SAO review all the decisions.

## 3. Simultaneous Filing as a Principal Applicant and a Dependent

There is no statutory or regulatory bar to an individual being both a principal asylum applicant and an asylum dependent applicant at the same time. An individual may pursue an asylum application as a principal applicant and as a dependent on a parent's or spouse's asylum application. If an applicant expresses a desire to proceed both as a principal applicant on one application and as a dependent on another qualifying immediate family member's principal application, Asylum Office personnel take the following actions:

- Confirm with all applicants involved that they wish to proceed as principals, that one or all wish to proceed as dependents, and that the principal applicant(s) wish to include the dependent(s) on their case(s).
- Locate and obtain any paper A-files and access any digital records.
- If an individual who is currently included on a Form I-589 as a dependent subsequently files a Form I-589 as a principal applicant, the subsequent principal filing will be assigned the same filing date in Global as the first filing they were included on as a dependent.
- If an interview has not yet been conducted, Asylum Office personnel schedule all individuals in the same family grouping for interviews in the case management system on the same date, whenever possible. The same AO should be assigned all the cases where possible.
- If an interview has already been conducted or is underway, but the individual who wishes to proceed as both a dependent and a principal has not been scheduled for an interview as a principal applicant, Asylum Office personnel schedule them for an interview as soon as possible. The same AO who conducted the previous interview should be assigned to interview the family member(s) whenever possible. If that is not possible, then the same SAO should review all decisions.
- No decision is to be rendered in any individual case of a family group involving simultaneous filers until all principal applicants are interviewed.

USCIS00004201

Depending on the decision contemplated in each case, Asylum Office personnel take the following steps:

**a. All Applicants Eligible for Approval**

- Prepare final approvals for each member of the family group who filed as a principal applicant.
- Principal applicants who are also dependents on another family member's case that is also being approved should be removed from that case as a dependent prior to finalizing the approval decision in the case management system, so they only receive a single asylum approval decision and that decision will be as a principal applicant.
- Serve decisions on each applicant as a principal applicant.

**b. All Applicants Referred or Denied**

- Prepare referral or final denial materials, as appropriate, for each member of the family group who filed as a principal applicant.
- Individuals who are both principal applicants on their own application and dependents on another family member's case should remain as dependents in the case management system and listed on the principal's decision (i.e., referral or final denial) as a dependent. However, where a case is referred to immigration court, the noncitizen receives only one NTA and will be referred together with their family unit.
- Serve decisions on each applicant as a principal applicant

**c. All Applicants Require Notices of Intent to Deny**

- Prepare Notices of Intent to Deny for each member of the family group who filed as a principal applicant.
- Individuals who are both principal applicants on their own application and dependents on another family member's case should remain as dependents in the case management system and listed on the principal's NOID as a dependent.
- Serve NOIDs on each applicant as a principal applicant.
- Delay adjudication of all final decisions until all rebuttal periods have expired and final decisions can be processed simultaneously. Final decisions are processed as indicated in AAPM III.E.3.b above.

**d. One Applicant Eligible for Approval, Other(s) Not Eligible**

A principal applicant whose application merits approval may wish to add to their filing a dependent who is ineligible for asylum as a principal applicant but who is eligible to be included as a dependent and approved on the principal's application. In this circumstance, asylum office personnel inform the prospective dependent that they are ineligible for an asylum approval as a principal applicant. If the prospective dependent who is ineligible as a principal applicant would like to be added to the eligible principal applicant's application, the eligible principal applicant must provide the request to include the new dependent in writing. The new dependent is not required to withdraw the asylum application that they filed as a principal applicant; however, the Asylum Office must make a final decision on that application as well.

If the principal applicant who merits asylum approval is eligible to add a dependent to their application:

114

USCIS00004202

- Update the case management system to add the dependent(s) to the principal applicant's application.
- Ensure all interview and security check requirements are complete for all case members.
- Prepare final approvals for the family group.
- If the newly added dependent does not indicate in writing the withdrawal of their application as a principal applicant for the purpose of becoming a dependent, the newly added dependent remains a principal applicant on their own asylum application and the decision on their application as a principal applicant is then processed. The applicant is treated as in-status because they are being approved for asylum as a dependent. Therefore, complete a NOID, and if the reasons for denial are not overcome, a Final Denial.

If the principal applicant whose application merits asylum approval is not eligible to add the other applicant as a dependent (for example, where the child merits asylum approval but the parent does not), each applicant is processed as a principal applicant only.

### 4. Dependent's Failure to Appear at Asylum Interview

If a dependent included in a principal applicant's initial Form I-589 filing fails to appear for the asylum interview, the AO proceeds with the interview and takes the following action:

- Completes Form I-72 or office equivalent, which instructs the principal applicant to bring any missing dependent family members to the office or circuit ride location on a specific date and at a specific time. The principal applicant must bring the dependent at the earliest possible time. If the AO issues a Pick-up Notice, the appointment may be scheduled for the same date as the pick-up appointment if resources permit the completion of all necessary follow-up processing prior to service of the decision on that date.
- Provides the principal applicant with the original form and places a copy on the right-hand side of the A-file.
- Informs the principal applicant that failure to present the missing dependent will result in the dependent's removal from the application for asylum and possible referral to the Immigration Court, if dependent is not in lawful status.
- Places the principal applicant's case on "Awaiting Documentation" Hold in the case management system. This will stop the EAD clock until the applicant presents the requested dependent.

#### a. Dependent Fails to Appear on Appointed Date and Time

If the prospective dependent fails to appear on the date indicated on Form I-72 or office equivalent, Asylum Office personnel:

- Remove the dependent from the case management system.
- Place a memo in the A-file of the dependent with a copy in the principal applicant's A-file that states the dependent was removed because he or she failed to appear for an asylum interview.
- Physically separate the dependent's A-file from the principal applicant's A-file.
- Process the dependent's A-file in accordance with the status of the dependent and standards of prosecutorial discretion, as exercised by the Asylum Office Director (e.g., place the dependent into removal proceedings, forward the file to the component needing to take action on the file, etc.).
- Remove the principal applicant's case from hold in the case management system and process the case.

USCIS00004203

Meissner, Doris. Exercising Prosecutorial Discretion, Memorandum to Regional Directors, et al., 17 November 2000, 13p.

### b. Dependent Appears on Appointed Date and Time

Once the dependent appears, the AO:

- Verifies the dependent's identity, including verifying identity in CPMS-IVT, and his or her relationship to the principal applicant.
- Ensures the dependent falls under USCIS jurisdiction.
- Ascertains whether any mandatory bars apply.
- Reviews any biographical data on the Form I-589 that may have been incomplete due to the dependent's absence at the asylum interview.
- Removes the case from hold in the case management system.
- Processes the family's decision.

### 5. Child Status Protection Act – DRAFT

The Child Status Protection Act (CSPA) amended Section 208(b)(3)(B) of the INA with respect to the definition of "child" for asylum applicants as follows:

"(B) CONTINUED CLASSIFICATION OF CERTAIN ALIENS AS CHILDREN. An unmarried child who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and Section 209(b)(3), if the alien attained 21 years of age after such application was filed but while it was pending."

As a result, unmarried children who turn 21 years of age after an asylum application was filed but prior to adjudication are still considered eligible for derivative asylum status and may remain as dependents on the asylum application. The relevant date to consider in determining whether a dependent who has turned 21 still qualifies as a child for the purposes of eligibility for derivative status is the date on which his or her parent filed an asylum application, at which time the dependent must have been under 21. There is no requirement that the child have been included as a dependent on the application, but the child must have been under 21 on the date the application was filed. Langlois, Joseph E. H.R. 1209 – Child Status Protection Act, Memorandum for Asylum Office Directors, et. al., 7 August 2002, 2p.; Yates, William R. The Child Status Protection Act – Children of Asylees and Refugees, Memorandum for Regional Directors, Service Center Directors, District Directors, 17 August 2004, 4p.

"Filing date" is defined as the date USCIS or INS received an application. See 8 C.F.R. 103.2(a)(7). The filing date is recorded in the case management system. In the event there is a conflict between the date in the case management system and the receipt date stamped on the application, the earlier date is used for CSPA purposes.

Pursuant to section 8 of the CSPA, the provisions of the CSPA are not retroactive. Therefore, the CSPA benefits applicants for asylum and asylee adjustment who aged out on or after August 6, 2002, the date of enactment of the CSPA.

In general, a derivative is eligible for continued classification as a child if one of the following conditions is met:

USCIS00004204

- The parent's application for refugee/asylum status was pending on or filed after August 6, 2002, and the derivative was under the age of 21 at the time of filing; or
- The Form I-730 from which the derivative is benefiting was pending on August 6, 2002, and the derivative was under the age of 21 at the time the Form I-730 was filed; or
- The parent's application for refugee/asylum status or the Form I-730 was filed prior to August 6, 2002, and the derivative turned 21 years of age on or after August 6, 2002.

The USCIS Office of Chief Counsel has advised that, as long as the asylee adjustment application was pending as of August 6, 2002, a derivative child asylee over age 21 should be permitted to adjust without filing for asylum as a principal with a request for a nunc pro tunc approval, as discussed below.

### 6. Loss of Derivative Status After Initial Filing but Before Final Decision

A dependent loses his or her eligibility to be included as a dependent on a parent's or spouse's application, if at least one (1) of the following occurs:

- Spouse or child withdraws his or her asylum application;
- Child marries;
- Spouse divorces principal applicant; or
- Principal applicant dies.

### a. Loss of Derivative Status by Dependent Withdrawal

A dependent may withdraw his or her asylum application at any time prior to the issuance of a final decision, as described in this manual, *AAPM Section III.W. Withdrawal Requests*. Depending upon the dependent's immigration status, the Asylum Office may place him or her into deportation or removal proceedings before an Immigration Judge. No charging documents are issued if the dependent is withdrawing for the purpose of pursuing his or her own application as a principal applicant. Weiss, Jeffrey L., Dependents' Requests to Withdraw, Memorandum to Asylum Directors, et. al., 11 March 1997, 2p. If an individual who is currently included on a Form I-589 as a dependent subsequently files a Form I-589 as a principal applicant, the subsequent filing will be handled under the earlier filing date for scheduling purposes.

The dependent must request withdrawal in writing, with a copy placed in both the principal and dependent's files. If there is insufficient information in the file to sustain an NTA, Asylum Office personnel request a signed written statement from the dependent including date, place, and manner of entry, or copies of documentation providing sufficient basis to sustain an NTA.

If the dependent requests withdrawal in order to be placed into removal proceedings, Asylum Office personnel take the following actions:

- Place in dependent's A-file a printout of dependent's relevant information from the case management system.
- Remove the dependent from the principal applicant's application in the case management system.
- Enter the dependent as a principal in the case management system.
- Administratively close the dependent's case in the case management system.
- Issue the dependent a charging document.

### b. Loss of Derivative Status by Marriage, Divorce, or Death of Principal Applicant

USCIS00004205

A spouse or child who becomes ineligible for derivative status cannot remain a dependent on a parent's or spouse's asylum application and must file an application as a principal applicant in order to pursue asylum. See ADOTP Training Materials, One-Year Filing Deadline. If an individual who is currently included on a Form I-589 as a dependent subsequently files a Form I-589 as a principal applicant because he or she lost derivative status by marriage, divorce, or death of the principal applicant, the subsequent filing will be handled under the later/current filing date for scheduling purposes.

If the dependent files a Form I-589 as a principal applicant, the loss of derivative status qualifies as a changed circumstance for the purposes of determining whether he or she is subject to the one-year filing deadline, so long as the asylum application was filed within a reasonable time after becoming aware of the loss of derivative status. See 8 C.F.R. 208.4(a)(4).

i. Notifying the principal applicant and dependent of ineligibility for derivative status

When USCIS becomes aware that a dependent is no longer entitled to derivative status, the Asylum Office notifies the principal applicant (unless deceased) and the dependent of the dependent's ineligibility for derivative status.

If an AO discovers during an asylum interview that a dependent is no longer entitled to derivative status, the AO verbally notifies the principal applicant that the dependent cannot remain on the asylum application and issues the appropriate letter (Appendices 14, 15, 16). The letter is served on the principal applicant at the interview, copied for the files, and copied to the dependent by mail or in person, if he or she is present. If the dependent is not present, the AO confirms whether the principal applicant is still in contact with the dependent and whether the dependent resides at the same address as the principal applicant. If the dependent is not present at the Asylum Office and no longer resides at the same address, the AO obtains the dependent's current address from the principal applicant (if known), and mails the letter, with an accompanying Form I-589 packet, including a legal service provider list. If the principal applicant does not know the dependent's current address or the dependent continues to reside with the principal applicant, the AO mails the packet to the dependent's last known address.

If USCIS discovers an individual's ineligibility for derivative status outside of an asylum interview, the Asylum Office sends the appropriate letter regarding the removal of the dependent ((Appendices 14, 15, 16), with an accompanying Form I-589 packet to the principal applicant. The Asylum Office also sends a copy of the letter and a Form I-589 packet to the dependent and representative of record, if any, even if the principal applicant and dependent live at the same address. If the loss of derivative status results from the death of a principal applicant, Asylum Office personnel send the letter and a Form I-589 packet only to the dependent and any representative of record.

ii. Updating the case management system to reflect loss of derivative status

Asylum Office personnel should delete the dependent from the principal applicant's Entry tab in the case management system to reflect the loss of derivative status. Asylum Office personnel can also opt to make the dependent a principal applicant under their name in the principal applicant's Entry tab in the case management system.

### 7. Loss of Derivative Status After Asylum Approval but Before Adjustment of Status

In order to derive lawful permanent resident status from a principal applicant who was granted asylum status, a derivative asylee must continue to meet the definition of a spouse or child of an asylee at the time USCIS adjudicates the adjustment application. If the derivative asylee no longer meets the definition of spouse or child of an asylee, he or she may not adjust his or her status to that of a lawful permanent resident. Although an individual may lose his or her ability to adjust status as a derivative asylee meeting the definition of "spouse" or "child" of an asylee, once asylum status is granted, an individual does not

USCIS00004206

lose asylee status even if a principal/dependent relationship ends, unless USCIS or EOIR formally terminates asylum. The Asylum Division accepts new Forms I-589 from these former dependents as principal applicants under special procedures whereby they request a grant of asylum nunc pro tunc in order to create an avenue for individuals who have been recognized as asylees to adjust status. The definition of "child" is found at INA § 101(b). The definition was affected by the Child Status Protection Act (CSPA). For more information on the CSPA, see *AAPM Section III.E.5. Child Status Protection Act – DRAFT* above.

The processing of a former dependent's Form I-589 does not vary depending upon how the individual lost derivative status (i.e., naturalization of principal applicant, marriage, or divorce). These procedures apply to all dependents who are no longer eligible for derivative status regardless of whether they were granted asylum status by an Asylum Office or Immigration Judge or entered the United States as an asylee pursuant to the approval of a Form I-730, Refugee/Asylee Relative Petition.

### a. Filing a Form I-589 and Interview with an AO

The dependent who lost derivative asylum status files a Form I-589 with ZGA. If an Asylum Office did not grant asylum status, the individual's A-file should contain an IJ order granting asylum to the individual (either as an individual or as a member of a family unit) or an approved Form I-730. At the time of the interview, the individual should present positive identification and evidence of his or her asylee status, such as an endorsed I-94 card.

ZGA personnel locate the former dependent's A-file and perform the necessary case management system updates and changes to make the dependent a principal applicant in the system. This may include adding the case to the case management system if the individual received asylee status from an IJ or pursuant to an approved Form I-730. The approval of a Form I-730 does not confer asylee status unless and until the beneficiary is present in the United States.

If the former dependent received asylee status pursuant to a Form I-730, the filing date entered in the case management system will be the date the dependent entered the United States, or the date of the grant of the Form I-730, whichever is later.

If an Asylum Office granted the dependent derivative status, the individual can be made a principal applicant on their own case by selecting this option by their name on the principal applicant's Entry tab in the case management system. If the former dependent now lives in the jurisdiction of an Asylum Office other than that which made the prior decision in the case, ZGA personnel coordinate with the owning office to transfer the case to that office.

An AO conducts an interview with the former dependent to verify the individual's identity and ensure that he or she is physically present in the United States. The AO must also ascertain that the individual is not under the jurisdiction of the Immigration Court and that no mandatory bars to asylum eligibility, with the exception of the firm resettlement bar and the third country transit bar, apply. Unless circumstances in the next section are present, a former dependent does not need to independently establish his or her eligibility for asylum, so an AO does not review the asylum claim at the time of the interview.

### b. Discretion to Interview on the Merits of an Asylum Claim

There is a presumption that the individual who lost derivative status is eligible for a grant of asylum on his or her own; however, an Asylum Office Director has the discretion to interview an individual on the merits of the asylum claim if he or she believes the individual may not be entitled to a grant of asylum as a principal applicant. Examples include but are not limited to:

USCIS00004207

- An individual who is a national of country different from the principal applicant and who does not appear to have a fear of harm in that country (e.g., a national of France or Canada).
- An individual who never lived with the principal applicant.
- An individual whose spouse or parent appears to have derived asylum through fraud but that spouse's or parent's asylum status has not been terminated.

At the direction of the Asylum Office Director, the AO conducts a full interview on the merits, according to procedures outlined in *AAPM Section II.J. AO Conducts An Asylum Interview*, to determine the individual's eligibility for asylum status. In the case of an individual who has an adverse history that does not meet the requirements of a mandatory bar, the AO must explore and balance the positive and negative discretionary factors. These factors are weighed and, if the negative factors outweigh the positive factors, asylum may be denied as a matter of discretion.

### c. Granting Asylum Nunc Pro Tunc

An Asylum Office may grant asylum nunc pro tunc to a date in the past. This date depends upon whether the individual was granted asylum as a dependent on a Form I-589 that was filed with either USCIS, INS, or EOIR, or entered the United States or was granted derivative asylee status pursuant to an approved Form I-730. "Nunc pro tunc" is Latin for "now for then." Granting asylum nunc pro tunc means that the derivative is granted asylum as a principal back to the date of the principal applicant's original grant date or the derivative's date of entry into the United States (see below).

- If USCIS, INS, or EOIR granted the individual derivative asylum status, the Asylum Office grants asylum nunc pro tunc to the date of the principal applicant's asylum approval (which should also be the date of the individual's original asylum approval as a dependent).
- If the individual entered the United States pursuant to an approved Form I-730, the Asylum Office grants asylum nunc pro tunc to the date of the individual's entry into the United States.
- If the individual obtained derivative asylee status pursuant to an approved Form I-730 while in the United States, the Asylum Office grants asylum nunc pro tunc to the date of the approval of the Form I-730.

All required background identity and security checks must be current and complete and allow for approval prior to any asylum approval, including a nunc pro tunc asylum approval. Asylum Office personnel follow instructions in the Identity and Security Checks Procedures Manual for completing and documenting background identity and security checks. Upon receipt of the results of the background identity and security checks, the Asylum Office follows the instructions below, depending upon the type of response that is received.

If the results allow for an approval and the results have not expired, Asylum Office personnel:

- Document all background identity and security checks in the file.
- Prepare Appendix 17 ("Asylum Approval – Nunc Pro Tunc") and an accompanying I-94 card.
- Grant asylum in the case management system.
- Serve the documents and prepare the case for post-service processing according to the instructions for approvals in *AAPM Section II.R. Post-Service Processing.*
- Return the A-file to the Service Center handling the Form I-485 application. The A-file should contain a memorandum including the specific officer and address to which to return the A-file. If there is no memorandum in the A-file, Asylum Office personnel can return the A-file to the officer at the Service Center who handles nunc pro tunc cases.

USCIS00004208

If the results allow for an approval but the results have expired, Asylum Office personnel follow instructions in the Identity and Security Checks Procedures Manual on obtaining updated identity and security checks.

If the results do not allow for an approval and Asylum Office personnel determine that the case must be referred to Immigration Court (because Asylum Office personnel determine that they must terminate derivative asylee status), follow instructions in *AAPM Section III.V. Termination of an Asylum Approval*. If Asylum Office personnel intend to refer a nunc pro tunc case to Immigration Court, Asylum Office personnel must contact the relevant Service Center so that the Service Center is aware of the referral of the case to Immigration Court and can advise of any additional procedures required for handling the Form I-485 application.

If Asylum Office personnel determine that they cannot grant the nunc pro tunc application but that they need not terminate derivative asylee status, Asylum Office personnel return the A-file to the relevant Service Center for continued adjudication of the Form I-485 application.

If the derivative asylee filed a nunc pro tunc application prior to filing a Form I-485 application in anticipation of aging out, Asylum Office personnel return the A-file to the National Records Center after completion of nunc pro tunc processing so that the relevant Service Center can request the file once the derivative asylee files the Form I-485 application.

d. Individual is Ineligible for a Grant of Asylum Nunc Pro Tunc

If the former dependent is ineligible for an approval of asylum nunc pro tunc as a principal applicant due to a criminal record or mandatory bar, the AO:

- Follows any applicable procedures in this manual related to the mandatory bar.
- Prepares a NOID, because as an asylee, he or she is considered to be in a valid status.
- If USCIS or INS granted the former dependent's asylee status and the evidence that makes the dependent ineligible for a final approval constitutes a ground for termination under 8 C.F.R. 208.24, the AO initiates termination of the former dependent's asylee status as described in *AAPM Section III.V. Termination of an Asylum Approval* and issues a Notice of Intent to Terminate Asylum Status (NOIT). See below for guidance on initiating termination of asylum if EOIR granted the former dependent's asylee status.
- Notifies the appropriate ICE office according to local practice that termination of asylum proceedings have been instituted against the dependent. The notification includes the applicant's criminal convictions, name, date of birth, A-number, and current address, where applicable, and a note explaining that either the Asylum Office will provide notification that asylum has been terminated and an NTA is being issued or that an NTA is being issued for litigation of the termination question before an IJ. The AO documents the notification and response in the file.

If EOIR granted the former dependent's asylee status and the evidence that makes the dependent ineligible for a final approval constitutes a ground for termination under 8 C.F.R. 208.24, the Asylum Office does not have jurisdiction to terminate the asylee status. The Asylum Office Director maintains discretion to coordinate with the local ICE Office of the Principal Legal Advisor (OPLA) to request and assist in the preparation of a DHS Motion to Reopen before the Immigration Judge after the completion of Asylum Office action in the former dependent's case.

If the individual is found eligible for asylum status as a principal applicant after the NOID rebuttal period, the Asylum Office follows the instructions in *AAPM Section III.E.7.c. Granting Asylum Nunc Pro Tunc*. If the

USCIS00004209

Asylum Office had also issued a NOIT, the Asylum Office issues Appendix 41 ("Notice of Continuation of Asylum Status").

If the individual fails to present a rebuttal, or fails to present evidence to overcome the reasons for denial, an AO prepares Appendix 18 ("Denial of Asylum Status as a Principal Applicant"). Asylum Office personnel serve the letter according to the instructions for denials, except that if there is a concurrent termination proceeding, the denial letter is held and served under the same cover as the termination notice.

If the Asylum Office issued the NOIT, the Asylum Office completes the termination interview and termination according to *AAPM Section III.V. Termination of an Asylum Approval*, with the exception of the case management system entries.

The case management system is updated as follows:

- For denials as a principal applicant without termination of the derivative asylee status, the case management system should reflect the appropriate Denial Reason and Bar to Applying for Asylum, if applicable, on the Decision Card. Asylum Office personnel should not generate charging documents and should ensure that the COA field in CIS2 continues to reflect the valid derivative asylum status.
- For denials as a principal applicant with concurrent termination of the derivative asylee status, the case management system should reflect the appropriate Referral/Denial Reason and Bar to Applying for Asylum, if applicable, on the Decision Card. Asylum Office personnel follow guidance below in *AAPM Section III.V.8. Asylum Office Terminates Asylum Status* in preparing charging documents. Asylum Office personnel with CIS2 access update the COA field with "ASR" (Asylum Status Revoked) in CIS2 to show that asylum status was terminated.

e. Dependents with Spouses or Children

A derivative asylee applying for a grant of asylum as a principal nunc pro tunc may include any qualifying dependents in his or her application. If the applicant is granted asylum nunc pro tunc and the dependents are in the United States, the dependents will also receive grants of asylum as derivative asylees. A dependent's grant date will be the actual date that the nunc pro tunc grant is issued, not the backdated date that the principal nunc pro tunc applicant receives. If the applicant is granted asylum nunc pro tunc and the dependents are outside of the United States, the applicant may petition for the dependents on a Form I-730, Refugee/Asylee Relative Petition.

### 8. Effect of Principal Applicant's Administrative Closure on a Dependent's Claim

If a principal applicant is under the jurisdiction of the Immigration Court, or had a prior order reinstated by ICE or CBP, the Asylum Office will not adjudicate the Form I-589. This outcome also affects the derivative asylum application of any dependent, even if the dependent is not under the jurisdiction of the Immigration Court or subject to a prior order. The dependent may submit a Form I-589 as a principal applicant to pursue asylum in the U.S., as long as USCIS has jurisdiction to adjudicate their asylum application. Principles of prosecutorial discretion, as exercised by the Asylum Office Director, apply in determining whether to place into removal proceedings a dependent who is not maintaining lawful immigrant, nonimmigrant, or Temporary Protected Status. Meissner, Doris, Exercising Prosecutorial Discretion, Memorandum to Regional Directors, et al., 17 November 2000, 13p. For further details regarding applicants under the jurisdiction of the Immigration Court, see *AAPM Section III.E.12. Previously Issued NTAs and Dependents* below.

USCIS00004210

### 9. "Split Decisions"

A "split decision" occurs when the Asylum Office is unable to issue the same type of documents to each individual in a family unit because one (1) of the following scenarios applies:

- The principal applicant's immigration status is different from a dependent's immigration status and the principal applicant is ineligible for an asylum approval.
- The principal applicant is eligible for asylum but a dependent is subject to a bar described in 8 C.F.R. 208.21(a).
- The principal applicant is eligible for asylum but the dependent fails to follow requirements for identity and security checks, including biometrics collection, CPMS-IVT verification, and providing any required court records.

See *AAPM Section III.N. Parolees Ineligible for Asylum* on dependents who are parolees, when the principal applicant is not a parolee.

This section provides guidance on how to process "split decisions." A Quick Reference Table, including instructions for case management system updates, for split decisions is provided in Appendix 61.

#### a. Approvals

If a principal applicant is found eligible for asylum, but the dependent is subject to a bar described in 8 C.F.R. 208.21(a), then the dependent cannot be granted asylum. A dependent also cannot be granted asylum if he or she is under the jurisdiction of EOIR or failed to follow requirements for identity checks. The AO must issue to the principal applicant Appendix 19 ("Denial of Derivative Asylum Status"). This letter must include the A-number of the principal applicant and the A-number of the dependent who is being denied derivative asylum status, but not the A-numbers of any other dependents included in the asylum application. An Asylum Office Director has prosecutorial discretion to place a dependent before the Immigration Court if the dependent is deportable or removable. Among the factors to be considered are 1) the likelihood the Immigration Court that would have jurisdiction over the removal proceedings would accept the charging documents as sufficient to institute proceedings, 2) the age of the dependent(s), 3) whether the dependent has an application upon which he or she would be able to seek relief in front of the Immigration Judge, 4) whether the dependent has a criminal record, and 5) office resources.

#### b. Referrals

This section applies to cases where the principal applicant is referred to the Immigration Court, either because he or she is ineligible for asylum status or ineligible to apply for asylum, but the dependent cannot be referred along with the principal applicant because of the dependent's status.

i. Dependent is in a valid status or parole is not terminated

The AO uses the standard Referral Notice; however, the name and A-number of the dependent is not included on the Notice. The AO also inserts the following paragraph:

"Because your [spouse/child], [Name], [A-number], who was listed on your asylum application as a dependent, does not appear deportable or removable, we are not placing [him or her] in Immigration Court proceedings along with you."

Since the dependent is not included in the decision and is not being referred to the Immigration Judge, prior to recording the referral of the principal applicant and any out-of-status dependents in the case management system, the Asylum Officer prints relevant biographical information, historical actions of the

USCIS00004211

case, and any relevant adjudication actions from the case management system, places the printouts on the non-record side of the dependent's and the principal applicant's A-files, then removes the in-status dependent from the principal applicant's case in the case management system.

ii. Dependent is under the jurisdiction of EOIR

See *AAPM Section III.E.12. Previously Issued NTAs and Dependents* below.


### c. Final Denial

This section applies to a principal applicant who is being issued a Final Denial letter because he or she is in a valid status.

i. Dependent is removable or parole is to be terminated

If the principal applicant is in valid status but the dependent is removable or parole will be terminated, the AO issues to the principal applicant the standard Final Denial letter, with the A-number of the dependent listed on the letter. See *AAPM Section III.N.3. Dependents Who Are Parolees* for guidance in such cases. An Asylum Office Director has prosecutorial discretion to place a dependent before the Immigration Court if the dependent is deportable or removable. Among the factors to be considered are 1) the likelihood the Immigration Court that would have jurisdiction over the removal proceedings would accept the charging documents as sufficient to institute proceedings, 2) the age of the dependent(s), 3) whether the dependent has an application upon which he or she would be able to seek relief in front of the Immigration Judge, 4) whether the dependent has a criminal record, and 5) office resources. If there are serious concerns for considering the dependent a danger to the community based on criminal convictions or a threat to the security of the U.S. (e.g., terrorist activity), the Director should exercise discretion to place the dependent in removal proceedings.

ii. Dependent in a valid status or parole is not and will not be terminated

A principal applicant who was paroled to apply for asylum but is found ineligible for asylum is issued Appendix 58 ("Final Denial – Parole"). If the dependent is in a valid status or maintains valid parole, the name and A-number of the dependent are not included on the Final Denial letter. The AO also inserts the following paragraph:

"Because your [spouse/child], [Name], [A-number], who was listed on your asylum application as a dependent, does not appear deportable or removable, we are not placing [him or her] in Immigration Court proceedings along with you."


### 10. Dependent Subject to Reinstatement or FARO

If a dependent appears to be subject to reinstatement of a prior removal, deportation, or exclusion order or to issuance of a final administrative removal order (FARO), Asylum Office personnel coordinate with ICE Enforcement and Removal Operations (ERO) for a determination of whether the order will be reinstated or issued. For guidance on coordinating with ICE ERO, refer to procedures in *AAPM Section III.S. Reinstatement of a Prior Order* pursuant to INA § 241(a)(5) and Final Administrative Removal Orders (FARO) pursuant to INA § 238(b).

If ICE ERO reinstates the prior order or issues the FARO, Asylum Office personnel remove the dependent from the principal applicant's application and issue Appendix 19 ("Denial of Derivative Asylum Status") along with the applicable decision letter to the principal applicant.

USCIS00004212

### 11. Dependent Subject to Mandatory Bar to Asylum

Most mandatory bars to a grant of asylum apply independently to any spouse or child who is included in an asylum applicant's request for asylum. 8 C.F.R. 208.21(a) (referring to INA § 208(b)(2)(A)(i)-(v) for applications filed on or after April 1, 1997, or under 8 C.F.R. 208.13(c)(2)(i)(A), (C), (D), (E), or (F) for applications filed before April 1, 1997). The mandatory bars that apply independently to dependents are persecution of others, conviction of a particularly serious crime, commission of a serious nonpolitical crime, security risk, and terrorist – all bars other than firm resettlement and third country transit. In some instances, a principal applicant may be granted asylum and a dependent denied or referred because he or she is subject to a mandatory bar.

When an Asylum Office learns that a mandatory bar applies to a dependent, the Asylum Officer interviews the dependent in sworn statement/Q&A format. See *AAPM Section II.J.9. Note-Taking by the AO During an Asylum Interview*; RAIO Combined Training Module: Interviewing - Note Taking. If the evidence indicates that a ground for mandatory denial or referral exists, then the applicant has the burden of proving by a preponderance of the evidence that the ground does not apply. For substantive information on the application of mandatory bars, see Asylum Officer Basic Training Materials: Mandatory Bars to Asylum and Discretion.

If, after the interview, the Asylum Officer determines that the dependent is subject to a mandatory bar, the Asylum Officer:

- Writes a memorandum to the principal applicant's file (with a copy to the dependent file) outlining the evidence that indicates a bar applies to the dependent.
- Follows procedures in *AAPM Section III.B.9. National Security Matters, Including Known or Suspected Terrorists and Human Rights Abusers*, where applicable.
- Notifies via memorandum the appropriate ICE office according to local practice of name, date of birth, A-number, current address, and relevant convictions of dependent subject to a bar due to criminal activity.
- Processes the case:
  Ø as a "split decision" in accordance with *AAPM Section III.E.9.a. Approvals*, above, if the principal applicant is eligible for an asylum approval;
  Ø as a referral in accordance with *AAPM Section II.N.2.b. Referral*, above, if the principal applicant is being referred to the IJ;
  Ø as a NOID or final denial in accordance with *AAPM Section II.N.2.c. Notice of Intent to Deny (NOID)* or *AAPM Section II.N.2.d. Denial*, above, if the principal applicant is not eligible for asylum, but maintains a lawful status.

Follows any local procedures requiring coordination with USCIS Office of Chief Counsel or ICE Office of the Principal Legal Advisor.

### 12. Previously Issued NTAs and Dependents

In certain scenarios, USCIS will discover prior to adjudication that an applicant and/or dependent was issued a Form I-862, Notice to Appear (NTA), that has not been filed and docketed with EOIR (i.e., "unfiled" NTA), or an NTA that was filed with EOIR and docketed by EOIR after the principal applicant filed their Form I-589 with USCIS. Asylum personnel will be responsible for taking the appropriate actions in these cases to properly close out the principal applicant's and any dependent applications and A-files, and either forward or transfer the Form I-589 to EOIR. For more information related to unfiled NTAs, NTAs

USCIS00004213

"filed and docketed" with EOIR, and the process of forwarding or transferring cases from USCIS to EOIR, please review *AAPM Section III.B.15. Previously Issued NTAs* and *AAPM Section III.L. Jurisdiction*.

**i. Principal does not have a previously issued and unfiled NTA and the dependent has a previously issued and unfiled NTA**

If the principal applicant does not have a previously issued and unfiled NTA, USCIS will take jurisdiction over the dependent with an unfiled NTA. If USCIS determines that the principal applicant should be referred to the immigration court, the dependent will also be issued a new NTA and included in the referral. If the principal applicant is maintaining legal status and is issued a final denial, the dependent will be issued a new NTA and referred to the immigration court. If USCIS determines that the principal applicant should be granted asylum, the dependent should also receive the same decision.

**ii. Principal does not have a previously issued and unfiled NTA and the dependent has a filed and docketed NTA with the immigration court**

If the principal applicant does not have a previously issued and unfiled NTA, but a dependent has a filed and docketed NTA with the immigration court, USCIS will reject the inclusion of the dependent on the Form I-589 and issue Appendix 110 ("Denial of Request to Add Dependent to Form I-589").

If the dependent's NTA is filed and docketed *after* USCIS has accepted the principal's Form I-589 but prior to adjudication, Asylum personnel will remove the dependent from the principal applicant's application in the case management system by editing the dependent card in the principal applicant's Entry tab, issue Appendix 19 ("Denial of Derivative Asylum Status"), and continue with the adjudication of the principal applicant's application, including any other dependent(s).

**iii. Principal applicant has a previously issued and unfiled NTA and the dependent does not**

If a principal applicant's previously issued and unfiled NTA is discovered prior to adjudication, Asylum personnel are responsible for administratively closing the principal applicant's application in the case management system, issuing the principal applicant a new NTA, forwarding the A-file to ICE OPLA, filing the new NTA, and forwarding the EOIR court packet to the immigration court. Asylum personnel should determine if each dependent on the case is maintaining legal status, and if not, issue each dependent an NTA, include them when forwarding the principal applicant's case to the immigration cfourt, and file their NTAs with the immigration court. If a dependent is currently in legal status, they should not be issued an NTA and should not be included when forwarding the principal applicant's case to the immigration court. See *AAPM Section III.L.1.b.i. Previously Issued NTA Not Filed and Docketed with EOIR* for re-issuing and filing an NTA and forwarding the EOIR court packet to the immigration court with Form I-589 filing date recorded.

In instances where Asylum personnel are issuing a new NTA to the principal applicant and applicable dependent(s), Asylum personnel should create a lead record for the principal applicant in CASE-ISS/DHS Portal and add each dependent issued an NTA as a rider. A printout of CASE-ISS/DHS Portal Case Confirmation worksheet should be included with the EOIR court packet.

If a dependent is in a valid status or maintains valid parole, the name and A-number of the dependent are not included on Appendix 107 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Transfer of Form I-589 to EOIR (Non-Expedited Removal)") or Appendix 108 ("Notice of Forwarding of Form I-589 to

USCIS00004214

EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)"). Asylum personnel should also insert the following paragraph in the letter:

"Because your [spouse/child], [Name], [A-number], who was listed on your asylum application as a dependent, does not appear deportable or removable, we are not placing [him or her] in Immigration Court proceedings along with you."

### iv. Principal applicant and dependent both have previously issued and unfiled NTAs in their A-files

If during the course of A-file review, an asylum officer discovers an unfiled NTA for a principal applicant and any dependent(s) prior to adjudication, Asylum personnel are responsible for administratively closing the principal applicant's application in the case management system, issuing the principal applicant and dependents new NTAs, forwarding their A-files to ICE OPLA, forwarding the EOIR court packet to the immigration court, and filing the new NTAs. See *AAPM Section III.L.1.b.i. Previously Issued NTA Not Filed and Docketed with EOIR* for re-issuing and filing an NTA and forwarding the EOIR court packet to the immigration court with Form I-589 filing date recorded.

In instances where Asylum personnel are issuing a new NTA to the principal applicant and applicable dependent(s), Asylum personnel should create a lead record for the principal applicant in CASE-ISS/DHS Portal and add each dependent issued an NTA as a rider. A printout of the CASE-ISS/DHS Portal Case Confirmation worksheet should be included with the EOIR court packet.

### v. Principal applicant has a previously issued and unfiled NTA and dependent has a filed and docketed NTA with the immigration court

If during the course of A-file review, Asylum personnel discover that a dependent has a filed and docketed NTA with the immigration court, and the principal applicant has a previously issued and unfiled NTA, Asylum personnel will remove the dependent in question from the principal applicant's application in the case management system by editing the dependent information under the principal applicant's Entry tab and will issue Appendix 19 ("Denial of Derivative Asylum Status").

In regards to the unfiled NTA in the principal applicant's A-file, Asylum personnel should follow *AAPM Section III.L.1.b.i. Previously Issued NTA Not Filed and Docketed with EOIR* for re-issuing and filing an NTA and forwarding the EOIR court packet to the immigration court with the Form I-589 filing date recorded.

In instances where Asylum personnel are issuing a new NTA to the principal applicant and any other applicable dependent(s) (i.e., dependents with previously issued and unfiled NTAs), Asylum personnel should create a lead record for the principal applicant in the CASE-ISS/DHS Portal and add each dependent issued an NTA as a rider. A printout of the CASE-ISS/DHS Portal Case Confirmation worksheet should be included with the EOIR court packet and each A-file. Furthermore, for all dependents who already have a filed and docketed NTA with the immigration court, Asylum personnel will list their names, A-numbers, and the immigration court location with jurisdiction over their removal proceedings on the CASE-ISS/DHS Portal Case Confirmation worksheet for the principal applicant to inform the immigration court that the affiliated derivatives have already been placed in removal proceedings; a copy of this worksheet will be placed in the principal applicant's A-file as well.

### vi. Principal applicant has a filed and docketed NTA with EOIR for 21 days or fewer before the date of filing the Form I-589 with USCIS and the dependent has no previously issued NTA

If USCIS personnel determines that a principal applicant has an NTA that was filed and docketed with the immigration court 21 days or fewer before the date of filing their Form I-589 with USCIS, they will transfer

127

USCIS00004215

the case to the immigration court by following the procedures in *AAPM Section III.L.1.a. EOIR Jurisdiction Discovered at the Time of Filing*. This is known as a "Grace Period" Case. In this circumstance, USCIS personnel should determine the immigration status of each dependent, and for those not in legal status, issue them an NTA, forward any A-files or T-files to ICE OPLA, include the dependents who are being issued an NTA in the transfer to the immigration court with the principal applicant's case, and file the dependent's NTA.

In instances where the Asylum Division is transferring the Form I-589 to the immigration court after the court has already received and docketed the principal applicant's NTA, USCIS personnel will be unable to update the CASE-ISS/DHS Portal and include new dependents that previously were not in removal proceedings. Instead, USCIS personnel intending to send any dependents' information along with the principal applicant's case should include on the "Transfer Cover Letter" printed for the EOIR court packet the names, A-numbers, and immigration court location with jurisdiction over their removal proceedings.

In instances where dependents maintain legal status, they will not be included in the principal applicant's case transfer to the immigration court, and USCIS personnel should not include those dependents' information when transferring the case to the immigration court on the "Transfer Cover Letter". The transfer notice generated automatically will inform the applicant that any dependents who are maintaining legal status are not being transferred.

**vii. Principal applicant has a filed and docketed NTA with EOIR for 21 days or fewer before the date of filing the Form I-589 with USCIS and dependent has a previously issued and unfiled NTA**

If USCIS personnel determine that a principal applicant has an NTA that was filed and docketed with the immigration court 21 days or fewer before the date of filing their Form I-589 with USCIS, they will transfer the case to the immigration court by following the procedures in *AAPM Section III.L.1.a. EOIR Jurisdiction Discovered at the Time of Filing* for Grace Period cases. In addition, USCIS personnel will determine the immigration status of each dependent, issue a new NTA for each dependent on the case that is not maintaining legal status, and include the dependents in the transfer of the principal applicant's case to the immigration court.

In instances where the Asylum Division is transferring the Form I-589 to the immigration court after the court has already received and docketed the principal applicant's NTA, USCIS personnel will be unable to update the CASE-ISS/DHS Portal and include new dependents that previously were not in removal proceedings. Instead, USCIS personnel intending to send any dependents' information along with the principal applicant's case should include on the "Transfer Cover Letter" printed for the EOIR court packet the names, A-numbers, and immigration court location with jurisdiction over their removal proceedings.

**viii. Principal applicant and dependent have filed and docketed NTAs with EOIR for 21 days or fewer before the date of filing the Form I-589 with USCIS**

If USCIS personnel determine that a principal applicant has an NTA that was filed and docketed with the immigration court 21 days or fewer before the date of filing their Form I-589 with USCIS, they will transfer the case to the immigration court by following the procedures in *AAPM Section III.L.1.a. EOIR Jurisdiction Discovered at the Time of Filing* for Grace Period cases. While USCIS personnel will transfer to the immigration court the principal applicant's case if it falls within the grace period timeframe, USCIS personnel will not transfer any dependents whose NTAs have been filed and docketed with the immigration court. However, for such dependents who already have an NTA that was filed and docketed with the immigration court, USCIS personnel will list their names, A-numbers, and the immigration court location with jurisdiction over their removal proceedings on the principal applicant's "Transfer Cover Letter" to inform the immigration court that the affiliated derivatives have already been placed in removal proceedings; a copy of this cover letter will be placed in the principal applicant's A-file as well. In addition,

USCIS00004216

in such scenarios, USCIS personnel will remove the dependent in question from the principal applicant's application and notify the principal applicant that the dependent is not included in the transfer of the application to the immigration court.

**ix. Principal applicant files Form I-589 with USCIS and includes dependents; however, the principal has an NTA that was filed and docketed with EOIR 22 days or more before the Form I-589 filing date**

If individuals apply affirmatively but have NTAs that have been filed and docketed with the immigration court for 22 days or more before their Form I-589 filing date, USCIS personnel will issue the principal applicant the "Form I-589 Rejection Notice," which will include all dependents on their application

### 13. Polygamous Marriages and Impact on Ability to Qualify as a Dependent

For a spouse to qualify as a dependent on an asylum application, the principal applicant's marriage to a dependent spouse must be valid under the law of the jurisdiction where it was celebrated to be recognized for immigration purposes. However, polygamous marriages are not recognized as a matter of United States federal public policy, even if recognized in the place of celebration.

If a principal applicant (PA) or their purported dependent spouse was married to someone else prior to their joint marriage, they must show that all of their previous marriages were terminated *before* their marriage to one another took place. Documents that show termination of marriages, such as death certificates and divorce decrees, must be legal and verifiable in the country that issued them, and divorces must be final.

In the context of polygamous marriages that are valid in the place of celebration, only the marriage to the first spouse is legally recognized for immigration purposes. If the PA wishes to add a subsequent spouse as a dependent on their asylum application, the PA will need to divorce the first spouse and then remarry the spouse of choice. For example, if a PA is a husband in a polygamous relationship who would like to include his first wife as a dependent on his asylum application, he may do so without divorcing any subsequent wives because only the first marriage is viewed as legal and valid under U.S. law. However, he may not include any subsequent wives as dependents on his asylum application if he had married those wives prior to divorcing the first wife because those marriages would not be recognized as legal or valid for immigration purposes. If the PA subsequently divorces his first wife, he still may not include his second wife whom he married prior to the divorce from the first wife as a dependent on his asylum application as the second marriage is not considered valid for immigration purposes because the PA was married to his first wife at the time the second marriage took place. If the PA were to remarry following the termination of the marriage to the first wife, the subsequent wife could be included as a dependent spouse as this marriage would now be considered legal and valid for immigration purposes.

USCIS00004217

# III.F.  EMPLOYMENT AUTHORIZATION DOCUMENT (EAD)

### 1. Pre-reform Cases

Asylum interviews shall be separate and apart from the public, except at the request of the applicant. Members of the public (applicants, interpreters, attorneys, cleaning crew, and outside visitors) routinely travel through the corridors of an Asylum Office. Therefore, an AO should keep the office door closed during an asylum interview, if the interview is conducted in a publicly traveled area. If a particular need arises when an AO needs to interview with the door open in a publicly traveled area, a request for an exemption must be made to the SAO prior to the interview. 8 C.F.R. 208.9(b).

### 2. Reform Cases INA § 208(d)(2)

8 C.F.R. 208.7

Asylum reform was designed to separate the issuance of an Employment Authorization Document (EAD) from the submission of an asylum application. After January 4, 1995, an applicant could not apply for an EAD until an asylum application had been pending for 150 days or the applicant had received a recommended approval or final approval of asylum. USCIS has 30 days from receipt to adjudicate the EAD application and could not issue an EAD until the asylum application had been pending for 180 days or more.

This 180-day period is referred to as the 180-day Asylum EAD Clock. Both the asylum program and EOIR have a target number of days to adjudicate an asylum application within the 180-day Asylum EAD Clock .

#### a. Asylum Program Time Frame

To sustain the timeliness goals of asylum reform, it was the aim of the Asylum Division to adjudicate referrals of asylum applications filed on or after January 4, 1995 and pending within the jurisdiction of a local Asylum Office within 60 days from the date a complete application was filed with USCIS. This "60-day referral clock" was counted from the date USCIS accepted the application as complete (i.e. filing date) until the Asylum Office served an NTA on the applicant as evidenced by the updating of the service card in Global, less any stoppages of the clock due to delays requested or caused by the applicant. See AOBTC Lesson Plan, Corps Values and Goals.

#### b. EOIR Time Frame

Once an Asylum Office refers an application to the Immigration Court, the court has the remainder of the 180 days to adjudicate the asylum application before the applicant may be granted employment authorization. An applicant granted asylum is authorized to work incident to status, regardless of whether the grant took place prior to 180 days from filing.

### 3. 180-Day Asylum EAD Clock

Section 208(d)(2) of the INA provides that, unless the applicant is otherwise eligible for employment authorization, employment authorization cannot be granted on the basis of a pending asylum application prior to 180 days after the date the asylum application was properly filed. The 180-day Asylum EAD Clock runs unless the applicant's actions cause a delay in the processing of the application.

Global indicates whether there are any applicant-caused delays and whether they have been remedied.

USCIS00004218

Actions by the applicant that are considered applicant-caused delays include, but are not limited to:

- A request to transfer a case to a new asylum office or interview location, including when the transfer is based on a change of address;
- A request to reschedule an interview for a later date;
- Failure to appear at an interview or biometrics appointment;
- Failure to provide a competent interpreter at an interview (if required);
- A request to provide additional evidence at or after an interview;
- The submission of large volumes of evidence immediately before an interview that requires a reschedule; and
- Failure to receive and acknowledge an asylum decision in person (if required).

If the Asylum Office denies the asylum application, the 180-day Asylum EAD Clock stops. The 180-day Asylum EAD Clock remains stopped, even if the applicant is subsequently placed into removal proceedings.

If an asylum application is denied by USCIS before a decision on an initial or renewal application for employment authorization, the application for employment authorization will be denied.

For a list of Global actions which affect the 180-Day Asylum EAD Clock , please refer to the Impact of Global Actions on the 180-Day Asylum EAD Clock (Appendix 20).


#### 4. Employment Authorization of Asylees

Asylees are authorized to work in the United States incident to asylum status. In order to work in the United States, every prospective employee must show to a prospective employer certain documentation as proof of employment authorization. That proof may consist of, among other things, an unrestricted social security card and a state-issued driver's license. It may also consist of an unexpired EAD issued by USCIS. USCIS issues EADs to individuals granted asylum by USCIS or EOIR.

For a list of all documents that can be accepted by an employer as proof of employment authorization, consult Form I-9, Employment Eligibility Verification, available on the USCIS web site at http://www.uscis.gov/files/form/i-9.pdf.

Asylum Office personnel trigger the production and issuance of EADs for asylees granted by USCIS updating the service card in Global. Once activated, the automated process produces and issues the EAD to the asylee by mail in 7 to 10 days. For further guidance, see Langlois, Joseph E. Final Procedures for the Automated Generation of I-766 EADs, Memorandum to All Asylum Office Personnel, 20 April 2007, 2 p., including attached procedures.

USCIS00004219

## III.G.  EXTENSIONS OF NONIMMIGRANT STAY

An applicant may submit an application to the Service Center to extend his or her period of nonimmigrant stay on either Form I-539 or Form I-129 (depending upon the type nonimmigrant status).  This application can be made either before or after submission of an I-589.

8 C.F.R. 208.14(c)(1) requires the issuance of charging documents to an alien who appears deportable, excludable, or removable and is ineligible for a grant of asylum.  Therefore, an Asylum Office must refer to the Immigration Court applicants who are found ineligible for asylum status and whose periods of nonimmigrant stay have expired, regardless of whether the applicants have applications to extend their authorized periods of nonimmigrant stay pending with USCIS.  This referral should occur even if the applicant submitted the application to extend his or her period of authorized stay timely (before the nonimmigrant stay expired) and the applicant did not otherwise violate the terms of his or her status.

The fact that an applicant has applied for an extension of nonimmigrant stay does not prevent DHS from placing the individual in proceedings before the Immigration Court.  Therefore, AOs treat such individuals as out-of-status when their authorized periods of stay have lapsed for purposes of scheduling a pick-up and processing a referral rather than a denial, if the applicant is ineligible for asylum.  It is recommended that Asylum Office personnel check CLAIMS before concluding that an extension has not been granted, as the request to extend may have been approved by USCIS, but the applicant has not yet received notice.

USCIS00004220

# III.H. EXTENSIONS TO SUBMIT DOCUMENTATION

### 1. Requested by Applicant at Conclusion of Interview

If the applicant requests additional time to submit evidence after an asylum interview, or if the applicant failed to submit the required certified translations of documents or evidence of relationship to dependents included in the application, the AO may, in his or her discretion, grant a brief extension of time after consultation with an SAO. The SAO determines the length of the extension, taking into consideration the type of documentation the applicant wishes to submit. When appropriate, the SAO takes into account any extensions granted to the applicant in submitting documentation for purposes of measuring the AO's timeliness in completing the case. The AO issues either a Pick-up Notice or Mail-out Notice according to instructions by the SAO.

If the applicant is granted an extension, the AO completes a Form I-72 or office equivalent, listing the documents the applicant must submit. The AO gives the original to the applicant as a receipt and places a copy on the right-hand side of the file.

The AO informs the applicant that his or her request to submit additional evidence or the granting of additional time to obtain required documentation will create an applicant-caused delay as it pertains to the 180-Day Asylum EAD Clock . To properly note the applicant-caused delay, Asylum Office personnel place the case on "Awaiting Documentation" hold in the case management system until the applicant submits the documents. When the documents are submitted, the AO removes the case from hold to resolve the delay. The AO reviews and considers timely submitted documentation in preparing his or her decision.

If the applicant fails to submit the documents by the requisite date, the AO removes the case from hold and processes the decision.

### 2. Requested by AO at Conclusion of Interview

The AO may request that an applicant submit additional, reasonably available corroborating documentation as evidence in support of the asylum claim. Because of time constraints a request for documents should only be made when both the AO and SAO determine that the documentation impacts upon the decision.

The SAO determines the length of time the applicant is given to submit the requested materials, taking into consideration the type of documentation USCIS is requesting. The AO issues either a Pick-up Notice or Mail-out Notice according to instructions by the SAO.

The AO completes a Form I-72 or office equivalent, listing the documents to be submitted by the applicant. The AO gives the original to the applicant as a receipt, and places a copy on the right-hand side of the A-file. Form Required: I-72 or office equivalent

Because credible testimony may be sufficient to sustain a burden of proof and the AO is requesting the submission of documents that the asylum applicant might not have foreseen necessary, the AO does NOT place the case on hold in the case management system.

USCIS00004221

### 3. Requested by Applicant after Service of NOID

The AO has discretion to grant a reasonable extension of time, generally no more than 30 days, to an applicant or representative who requests an extension to prepare a rebuttal. A request for an extension should only be denied if repetitive or abusive. The AO must send written notification to both the principal applicant and the representative, if any, if a request for an extension is denied. If the request for an extension is granted pursuant to a telephonic request, the AO must document the file with the amount of time that was granted and the expiration date. The case management system is updated to show an applicant-caused delay during the extension, using the "Awaiting Documentation" hold.

USCIS00004222

## III.I.  FAILURE TO APPEAR

| Reviewed, No Substantive Changes since 8/2020 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections: 1,2,3,4 |

An applicant's failure to appear at an asylum interview may result in the referral or dismissal of the application, or waiver of the right to an asylum interview. If an applicant demonstrates that he or she was unable to appear at the appointment due to "exceptional circumstances", the Asylum Office must excuse the failure to appear. (See 8 C.F.R. 208.10(b)(1).) If the applicant lacked proper notice of the interview location, date, and time, the Asylum Office must excuse the failure to appear. In cases where the Asylum Office dismissed the asylum application (for in status applicants), the Asylum Office shall reopen the asylum application. In cases where the Asylum Office referred the applicant for removal proceedings, the Asylum Office may take jurisdiction over the case and reopen the asylum application where an immigration judge has granted a request to dismiss proceedings.

As a matter of Asylum Office policy, the failure to appear may also be excused if, within 45 days after the missed interview, the applicant demonstrates "good cause" for failing to appear. In all cases, a request to reschedule an interview or a missed interview is considered an applicant-caused delay, as it pertains to the applicant's eligibility for an Employment Authorization Document (EAD). (See 8 C.F.R. 208.7(a)(1)(iv).) Asylum applicants may file a Form I-765, Application for Employment Authorization, based on a pending asylum application 150 days after they filed their asylum application and are not eligible to receive an EAD until their asylum application has been pending for at least another 30 days, for a total of 180 days. 8 CFR 208.7(a)(1). The 180-day Asylum EAD Clock does not include any delays requested or caused by the applicant while their asylum application is pending with USCIS and/or EOIR. (See Section III.F, Employment Authorization Document.) Asylum Office personnel must update the interview outcome in the case management system within one (1) working day to reflect that an applicant failed to appear for a scheduled interview. After a failure to appear is recorded in the case management system the 180-Day Asylum EAD Clock remains stopped until either the asylum office excuses the failure to appear (according to the above-mentioned standards, which may include for good cause if the excuse is received within 45 days of the missed appointment or for exceptional circumstances or improper notice regardless of when the excuse is received) and reschedules the interview or sends the applicant a "Determination Demonstrating Exceptional Circumstances," or, if referred to the immigration court, the applicant appears for their master calendar hearing before the immigration judge.

After an applicant misses a scheduled interview, and provided that the Asylum Office has not received an excuse or a request to reschedule from the applicant or representative, Asylum Office personnel must mail the Failure to Appear Warning (*Appendix 74*) to the applicant and representative, if any, and retain a copy for the record. The warning letter should be mailed when the no show interview outcome is entered into the case management system. This warning letter describes the effect of the failure to appear on EAD eligibility and lists procedural steps the applicant must take to establish exceptional circumstances for failing to appear for the interview before the expiration of the 45-day period. The letter also describes the effect of failing to respond to the warning letter within the 45-day period.  A copy of any documents

USCIS00004223

generated and provided to the applicant and representative, if any, in this section should be interfiled appropriately in the A-file.

### 1. Asylum Interview – Applicant Submits Excuse Prior to Interview Date

For reschedule requests received within a reasonable period prior to the interview date, Asylum Offices should strive to complete the request and provide notice as soon as practicable and before the scheduled interview date.

### 2. Asylum Interview – Applicant Submits Excuse on or After Interview Date

As a matter of Asylum Division policy, the Asylum Office will not issue a decision and/or referral until 45 days have passed after the first missed interview date in order to give the applicant time to submit an excuse. An applicant's excuse for a failure to appear at an asylum interview within the 45-day period will be considered a request to reschedule an asylum interview and evaluated under a good cause standard. The excuse may include a change of address that transfers jurisdiction to another Asylum Office.

#### a. Excuse Submitted before Issuance of Referral (for Applicants without Valid Status) or Dismissal (for Applicants in Valid Status)

The Asylum Office treats any written excuse received before the issuance of a referral or dismissal (if the applicant is in valid status) as a request to reschedule the interview. If a request to reschedule an interview is made on or up to 45 days after the interview date, or if the interview has already been rescheduled on one (1) occasion, the applicant must establish that the request for a rescheduling is due to good cause. Prior to determining whether the request to reschedule is due to good cause, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

Reschedule requests received after the interview date and prior to the issuance of a charging document or dismissal decision should be answered within a reasonable time period and as soon as practicable.

- Denying a request to reschedule. If the Asylum Office denies a request to reschedule, either received in person or by mail, it must issue a Denial of Interview Reschedule Request (Appendix 73).
- Granting a request to reschedule. If the Asylum Office honors a request received in-person, it should complete an In-Person Reschedule Request form (*Appendix 9*) and provide a copy to the applicant and representative, if any. If the Asylum Office honors a request received by mail, the Asylum Office should produce and mail as soon as practicable an Interview Cancellation Notice and Interview Reschedule Notice (as described below).

#### i. Determining Lack of Proper Notice

The Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice. An Asylum Office must reschedule an asylum interview if the Interview Notice was not mailed to the most current address provided by the applicant and received by USCIS prior to issuance of the

USCIS00004224

Interview Notice, regardless of how many times the applicant may have previously requested a rescheduling of an interview.

The Asylum Office will confirm proper notice promptly upon an applicant's failure to appear for the interview. If notice was improper, the Asylum Office should promptly reschedule the interview and update the case management system to ensure that a delay is not attributed to the applicant. Additionally, the Asylum Office will institute local procedures to appropriately re-confirm that proper notice was given just prior to issuing the Referral Notice for Failure to Appear (Appendix 68) or Dismissal of Asylum Application – Failure to Appear (Appendix 31).

The Asylum Office will reschedule an interview after a failure to appear caused by USCIS due to lack of proper notice if one of the following scenarios applies:

- The file does not contain a copy of the applicant's Interview Notice.
- The file contains a properly executed Form G-28, but the case management system is not updated to include the representative's correct information
- USCIS received notification of a change of address prior to the issuance of the Interview Notice, but failed to update the case management system before the Interview Notice was issued.
- The address in the case management system is not correct in that an apartment number is missing or the street is misspelled, etc.
- The Interview Notice is unreadable.

To reschedule a case:

- Update the case management system to reflect the failure to appear as a reschedule request by USCIS;
- Update attorney and address information as needed; and
- Schedule the applicant for an interview.

A rescheduling caused by USCIS is not counted against the applicant when determining whether any future request to reschedule meets the good cause or exceptional circumstances requirement. In addition, a delay caused by USCIS will not result in an applicant-caused delay that would impact the adjudication of an EAD application.

If the case has already been closed in the case management system, Asylum Office personnel will reopen and prioritize the reschedule of the case for interview. Exceptions to the prioritization of rescheduled interviews require approval by the Director or Deputy Director of the Asylum Office.

ii. Evaluating "Good Cause"

Good cause means a "reasonable excuse for being unable to appear for an asylum interview." What may be a reasonable excuse for one applicant may not be reasonable when looking at the circumstances of another applicant. Therefore, it is extremely important to review the excuses and requests for a rescheduling on a case-by-case basis before determining whether the request to reschedule will be honored. This good cause standard does not apply if the rescheduling was caused by the Asylum Office, such as lack of notice.

USCIS00004225

If the applicant establishes good cause and the Asylum Office honors the request to reschedule, Asylum Office personnel update the case management system, indicating the cancellation is at the request of the applicant. The case management system will schedule a new interview and generate an Interview Reschedule Notice according to the automatic scheduling priorities. Because the reschedule request was approved, the case management system will resolve the applicant-caused delay created when the applicant failed to appear on the date the request was approved.

If the applicant does not establish good cause for a request to reschedule made after the interview date but before 45 days has passed, the Asylum Office will issue a Denial of Interview Reschedule Request (Appendix 73) prior to issuing Referral Notice for Failure to Appear (Appendix 68) or Dismissal of Asylum Application – Failure to Appear (Appendix 31) on Day 46. Make the following the change on the Denial of Interview Reschedule Request (Appendix 73):

- Delete the following language: "You must appear for your scheduled interview at the Asylum Office listed above."


### b. Excuse Submitted on or after day 46 / Issuance of a Referral and Charging Document (for Applicants without Valid Status)

Once 46 days have passed after an applicant's failure to appear for an interview, the Asylum Office will issue a Referral Notice for Failure to Appear (*Appendix 68*) and the charging document to the appropriate parties on day 46. The Referral Notice for Failure to Appear is generated once the failure to appear is recorded in the case management system. Once the Asylum Office serves a charging document on the applicant and with the immigration court, the Asylum Office loses jurisdiction over the asylum application. The missed interview will result in an applicant-caused delay impacting the applicant's eligibility for an EAD.

If an applicant is placed in immigration court proceedings, the applicant is still eligible to submit a response for the failure to appear for their asylum interview with USCIS and have the applicant-caused delay resolved if he or she: (1) establishes exceptional circumstances; and (2) follows procedures to seek termination of immigration court proceedings to return jurisdiction to the Asylum Office. USCIS must excuse the failure to appear if USCIS did not provide proper notice. USCIS must excuse the failure to appear if the applicant demonstrates that the failure to appear was due to exceptional circumstances and must accept jurisdiction if the immigration court proceedings are terminated.

#### i. Determining Lack Of Proper Notice

Upon review, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

If the Asylum Office finds lack of proper notice after referring the case to the immigration court, the Asylum Office Director coordinates with USCIS Local Counsel and/or ICE OCC (Office of Chief Counsel) so that a DHS request for dismissal of proceedings can be submitted. The Asylum Office cannot reopen the asylum application until notification that removal proceedings have been dismissed is received. Once such notification and the A-file are received, Asylum Office personnel must reopen the case in the case management system and prioritize the rescheduling of an interview. Exceptions to the prioritization of rescheduled interviews require approval by the Director or Deputy Director of the Asylum Office. The case management system will automatically place the applicant in the appropriate priority category for

USCIS00004226

interview scheduling purposes. This will resolve the applicant-caused delay as it pertains to the 180-day Asylum EAD Clock.

### ii. Examining "Exceptional Circumstances"

Exceptional circumstances is defined in INA Section 240(e)(1) as "circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien." Exceptional circumstances are not limited to the express examples provided at INA Section 240(e)(1). Adjudicating individuals should examine the totality of the circumstances to determine if the applicant has demonstrated exceptional circumstances. In certain cases, the ineffective assistance of counsel may constitute exceptional circumstances excusing the failure to appear. The Asylum Division's "One Year Filing Deadline" Lesson Plan, section V.B.2.d describes how to determine ineffective assistance of counsel.

If the applicant wishes to establish exceptional circumstances for failure to appear, he or she must notify the Asylum Office in writing and should do so as soon as possible after receiving the Referral Notice for Failure to Appear (*Appendix 68*). The Asylum Office will examine whether the notification was made within a reasonable period of time after the date the Referral Notice for Failure to Appear (*Appendix 68*) was issued and the relationship between the "exceptional circumstance" and the time it took for the applicant to notify the Asylum Office of his or her request. The Asylum Office should not consider a request to establish exceptional circumstances after an immigration judge has made a determination on the merits.

In order to establish that exceptional circumstances exist for failing to appear, the applicant must take the following steps:

- The applicant must submit a written explanation describing in detail the exceptional circumstances which caused his or her failure to appear for the interview.
- In addition to the written explanation, the applicant must include supporting documentary evidence for exceptional circumstances, if available. These documents may include, but are not limited to, police reports, medical records, and birth/death certificates.
- Any document that is not in English must be accompanied by a full English language translation, along with a certification by the translator that it is complete and accurate, and that he or she is competent to translate from the relevant foreign language into English.

Upon receipt of the written explanation, Asylum Office personnel will create a T-file for the written explanation and supporting documents. Next, Asylum Office personnel will enter the receipt date in the case management system.

The adjudicating individual will examine the written explanation and supporting documents, if any, to determine if the applicant has established exceptional circumstances for failure to appear at the asylum interview. The adjudicating individual may request additional documentation, if warranted. In addition, the Asylum Office Director, Deputy Director, or designee has the discretion to require that applicants appear in person to establish exceptional circumstances if the documentary evidence is not sufficient. In order to request additional documentation or that the individual appear for an interview, the Asylum Office will issue a Request for Additional Information ("Exceptional Circumstances") (Appendix 75) to the applicant and representative, if any. If the applicant fails to appear at the "exceptional circumstances" interview or fails to submit the requested information, the adjudicating individual will make the "exceptional circumstances" determination based on existing documentation. The adjudicating individual will use the

USCIS00004227

[Determination of Exceptional Circumstances Worksheet (Appendix 69)](#) to document the determination. The worksheet is generated using the Enterprise Collaboration Network (ECN) Exceptional Circumstances Determination site. A Supervisory Asylum Officer will review the worksheet and sign in the appropriate location upon concurrence. The worksheet, written request, supporting documents, [Request for Additional Information ("Exceptional Circumstances") (Appendix 75)](#), and interview notes, if any, will be interfiled in the T-file.

The applicant's representative, if any, may attend the interview provided a G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, is on file. The applicant may not be interviewed on the merits of his or her asylum claim.

The Asylum Office must make the determination on the exceptional circumstances within ten (10) business days of the receipt of the written explanation, unless additional information is requested, or an exceptional circumstances interview is scheduled. The Asylum Office will also attempt to make the exceptional circumstances determination prior to the date of the next immigration court hearing, if possible. Upon making a determination, Asylum Office personnel will enter whether exceptional circumstances were established and the date upon which the determination was made in the case management system.

Upon making a determination, the Asylum Office will issue a Determination of Failure to Demonstrate "Exceptional Circumstances" (*Appendix 70*) or a Determination Demonstrating "Exceptional Circumstances" (*Appendix 71*) to the applicant and representative of record, if any.

Per locally developed procedures, the Asylum Office will contact the appropriate ICE OCC point-of-contact and notify them that the applicant established exceptional circumstances. The Asylum Office will transfer the T-file to the File Control Office to be combined with the A-file.

If the Asylum Office determines that the applicant has not established exceptional circumstances and issues a Determination of Failure to Demonstrate "Exceptional Circumstances" (*Appendix 70*), the Asylum Office will transfer the T-file to the File Control Office to be combined with the A-file.

### iii. Immigration Court Proceedings

The applicant is required to attend all hearings with the immigration court. If the Asylum Office issues a Determination Demonstrating "Exceptional Circumstances" (*Appendix 71*), the applicant may contact the ICE OCC, either in advance of his or her next hearing, or at his or her next hearing, and provide them with a copy of the Determination Demonstrating "Exceptional Circumstances" (*Appendix 71*) stating that the applicant demonstrated exceptional circumstances for missing his or her asylum interview. Contact information for the ICE OCCs is available on the ICE webpage, at www.ice.gov/contact/opla. The applicant may then request that the ICE OCC exercise prosecutorial discretion to join in a motion to dismiss removal proceedings. The decision whether to join in the request is a matter within ICE's discretion and is decided on a case-by-case basis. USCIS Asylum Offices cannot provide any assurances that all such requests will be granted.

If the ICE OCC does not join in the motion to dismiss, the applicant may file his or her own motion to dismiss with the Immigration Court, or the applicant may make the request orally at a hearing with an immigration judge. The decision to grant the applicant's motion to dismiss rests with the immigration judge whether or not the ICE OCC joins in the motion.

USCIS00004228

If the immigration judge grants the motion to dismiss removal proceedings, the Asylum Office will reopen the asylum application, take jurisdiction over the applicant's case, and reschedule the applicant for an interview. Once removal proceedings have been dismissed, an applicant may expedite the rescheduling of the asylum interview with the Asylum Office by mailing, emailing, or faxing a copy of the immigration judge's decision order dismissing removal proceedings to the Asylum Office. If the immigration judge denies the applicant's request to dismiss proceedings, jurisdiction over the asylum application remains with the immigration court.

### iv. Post-Decision Processing

Once the immigration judge terminates removal proceedings, per locally developed procedures, ICE OCC will notify the local Asylum Office point of contact and send the A-file back to the Asylum Office for interview scheduling. As noted above, to expedite the rescheduling of the asylum interview, the applicant is also advised to provide a copy of the immigration judge's order dismissing removal proceedings to the Asylum Office. Upon receipt of the immigration judge's order, the Asylum Office will request the A-file. Once the A-file is received, the Asylum Office will reopen the case in the case management system and place the applicant in the appropriate priority category for interview scheduling purposes. Exceptions to the prioritization of rescheduled interviews require approval by the Director or Deputy Director of the Asylum Office. With regards to employment authorization, in cases in which the Asylum Office determined that exceptional circumstances were established, the applicant-caused delay is resolved on the date the asylum office sent the Determination Demonstrating "Exceptional Circumstances" (Appendix 71) to the applicant, even if the IJ did not terminate court proceedings and transfer jurisdiction to USCIS.


### c. Excuse Submitted on or after day 46 / Issuance of Dismissal (for Applicants in Valid Status)

The Asylum Office will administratively close the application and issue a dismissal letter to an applicant that maintains valid immigration status on day 46 when no excuse has been submitted prior to the expiration of the 45-day period. The application will be reopened at the request of either the Asylum Office or the applicant in cases where at least one (1) of the following scenarios applies:

- USCIS made an error in closing the case, e.g., lack of proper notice exists.
- The applicant writes a letter to the Asylum Office asking to reopen his or her asylum application and establishes exceptional circumstances.

### i. Determining Lack Of Proper Notice

Upon review, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

### ii. Applicant Asks for Re-Opening After Issuance of Dismissal of Asylum Application – Failure to Appear

If the applicant requests in writing that the Asylum Office reopen his or her case on or after 46 days since the missed interview, the adjudicating individual should examine the letter for exceptional circumstances and complete the Determination of "Exceptional Circumstances" Worksheet (Appendix 69). See Section III.I.2.b.ii, Examining "Exceptional Circumstances," for specific guidance on this process. Upon making a determination, Asylum Office personnel will enter whether exceptional circumstances were established and the date upon which the determination was made in the case management system. If the adjudicating individual does not find that the applicant established exceptional circumstances, then the adjudicating individual will issue a Determination of Failure to Demonstrate "Exceptional Circumstances"

USCIS00004229

[In-Status] (Appendix 77). If the applicant is no longer in valid status, the adjudicating individual should issue a charging document and Determination of Failure to Demonstrate "Exceptional Circumstances" (Appendix 70) with the following changes:

- In paragraph 3, delete the sentence: "Therefore, your asylum interview cannot be rescheduled with the Asylum Office."
- Replace the deleted sentence with, "Because you are no longer in valid immigration status, your asylum application has been referred to an immigration judge for adjudication in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review. Attached is a charging document with the location, date and time of your hearing before the immigration judge."

If the adjudicating individual finds exceptional circumstances, he or she should issue a Determination Demonstrating "Exceptional Circumstances" [In-Status] (Appendix 76). These notices are generated in the case management system. Then, the case will be reopened and scheduled for interview based upon appropriate priority category for interview scheduling purposes. Exceptions to the prioritization of rescheduled interviews require approval by the Director or Deputy Director of the Asylum Office. With regard to employment authorization, the applicant-caused delay is resolved on the date the asylum office sent the Determination Demonstrating "Exceptional Circumstances" (*Appendix 71*) to the applicant.

### 3. Asylum Interview – Applicant Fails to Submit Excuse

As a matter of Asylum Division policy, the Asylum Office will not issue a decision and/or referral until 45 days have passed after the first missed interview date in order to give the applicant time to submit an excuse. An applicant may fail to submit an explanation for his or her non-appearance at an asylum interview. Before an assumption is made that the applicant chose not to proceed with his or her asylum request, Asylum Office personnel must determine whether the applicant's failure to appear was caused by the applicant or by USCIS (e.g., due to lack of proper notice).

An Asylum Office must reschedule an asylum interview if the Interview Notice was not mailed to the most current address provided by the applicant and received by USCIS prior to issuance of the Interview Notice.

The Asylum Office will confirm proper notice promptly upon an applicant's failure to appear for the interview.

#### a. Caused by USCIS (Lack of Proper Notice)

Upon review, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

If notice was improper, USCIS will promptly reschedule the case for interview in the case management system. A delay caused by USCIS will not result in an applicant-caused delay that would impact the applicant's eligibility for an EAD. Moreover, the Asylum Office will institute local procedures to appropriately re-confirm proper notice just prior to issuing the Referral Notice for Failure to Appear (Appendix 68) or Dismissal of Asylum Application – Failure to Appear (Appendix 31) and Delay Notice (Appendix 78).

USCIS00004230

### b. Caused by the Applicant

A failure to appear may be deemed caused by the applicant if all of the following are present:

- The file contains a copy of the applicant's Interview Notice.
- If the file contains a properly executed Form G-28, the case management system is updated to include the representative's correct information and code.
- The address in the case management system at the time of interview scheduling was the most current as provided by the applicant at the time.
- The address on the applicant's Interview Notice matches the address in the case management system at the time of interview scheduling and does not contain a missing apartment number or misspelling of a street name, etc.
- The Interview Notice is readable.

### i. Applicant is deportable or removable

If the file contains sufficient evidence of an applicant's deportability or removability, the Asylum Office refers the application to the immigration court. Asylum Office personnel:

- Update the case management system, indicating that the application is referred for failing to appear for the interview.
- Prepare the case as a referral.
- Issue the Referral Notice for Failure to Appear (Appendix 68) and Delay Notice (Appendix 78).

### ii. Applicant is in a valid status or the file does not contain sufficient evidence of inadmissibility or deportability in pre-reform cases

The Asylum Office administratively closes the application according to the following instructions:

- Update the case management system indicating that the application is referred for failure to appear for the interview.
- Issue to the principal applicant a Dismissal of Asylum Application – Failure to Appear (*Appendix 31*) letter.
- Local Asylum Office policy dictates whether the Asylum Office retains the file or sends it to the NRC.

Asylum applications filed prior to January 4, 1995, could not be used by themselves to establish alienage and deportability for the purpose of issuing charging documents. Review Section III.O.2.c, Evidence of Deportability/Removability, prior to issuing a charging document in a pre-reform case in order to ensure it is not rejected by the immigration judge.

### iii. Applicant is a parolee

If the applicant who failed to appear was paroled, Asylum Office personnel take the following actions:

- Update the case management system indicating that the application is closed for failure to appear or referred (if not in valid status).
- Review the appropriate part of *Section III.N, Parolees Ineligible for Asylum,* to determine whether parole remains valid, whether charging documents will be issued, and, if so, what type.
- If parole remains valid, process the case in accordance with Section III.N.2.d.i.

USCIS00004231

- If parole is being terminated, make the following changes on the Referral Notice for Failure to Appear (Appendix 68).
  - o Delete the following language: "Your asylum request is therefore referred to an immigration judge for adjudication in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review."
  - o Replace the deleted sentence with: "Enclosed please find a Notice to Appear (Form I-862), which constitutes written notice of termination of your parole status [8 C.F.R. 212.5(d)(2)(i)] and places you under removal proceedings."
- If parole is being terminated and an NTA is issued, include a Delay Notice (Appendix 78) with the referral notice.

If an applicant requests to reschedule on or after 46 days from the missed interview, the applicant must establish exceptional circumstances before the interview is rescheduled and the applicant-caused delay is resolved.

### 4. Failure to Appear at a Pick-up Appointment

If a principal applicant or dependent 14 years old or older fails to pick up the decision after being given a Pick-up Notice, Asylum Office personnel will update the case management system for each individual on the case who fails to appear. In the case of a referral, the failure to appear will constitute an applicant caused delay for the purposes of EAD eligibility and the 180-day Asylum EAD Clock will remain stopped until the applicant appears in court. The decision letter, charging document, and the Failure to Appear to Pick-Up Your Asylum Decision (Appendix 72) are mailed together to the applicant, in the case of a referral.

USCIS00004232

## III.J. FILE MANAGEMENT

| Reviewed, No Substantive Changes since Nov. 2021 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: 1,2,3,4 | Sections: |

Asylum Office personnel enter all A-files, T-files, and W-files into NFTS when the Asylum Office receives them from another location or office personnel create them within the records section.

### 1. Multiple A-Numbers

During the processing of a case, an AO may discover that the applicant has more than one A-number. The AO must request the additional files(s). The additional file(s) may contain information previously not available to the AO that helps to establish the applicant's alienage and deportability, or his or her eligibility to file an affirmative asylum application. The file(s) may also contain information that pertains to the asylum claim.

The AO may refer to information contained in most other files pertaining to the applicant and develop lines of questioning during the asylum interview based on that information, if relevant. This information may be used in credibility determinations if it is material to the asylum claim. However, an AO is prohibited from using any information pertaining to a legalization or SAW case in the adjudication of an asylum claim. See section III.B.8 above.

#### a. Consolidating Multiple A-files

If at least two A-files exist for one applicant, USCIS consolidates the A-files. Local Asylum Office policy dictates who is responsible for file consolidation. Prior to consolidating the A-files, a thorough review must be made to clearly establish that they refer to the same person. Any doubt should be resolved in favor of not consolidating the A-files.

When file consolidation results in a new primary A-number different than the RAPS records, Asylum Office personnel follow instructions in the next section to reflect the consolidation in RAPS. For guidance on consolidating A-files, including required CIS updates, see Records Operations Handbook, Part II-14 (File Consolidation, Mergers and Unconsolidations), Available on the USCIS Intranet at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

After consolidating A-files, the individual who performed the file consolidations sends the applicant the Notice of File Consolidation letter (Appendix 21).

#### b. Recording File Consolidation in RAPS

RAPS allows users to change the A-number of an applicant when consolidation of multiple A-files results in a new primary A-number for an applicant, and view the history of A-number changes associated with an A-number. This functionality is available only when the survivor A-number is not already in RAPS.

If both records being consolidated exist in RAPS, Asylum Office personnel:

USCIS00004233

- Print all pages of the CHIS and CSTA screens of the secondary A-number and file them on the non-record side of the primary A-file.
- Delete the secondary record from RAPS using DELC.
- Update the information of the primary record in RAPS to reflect any information learned from the additional records, if necessary.

If the primary A-number is not in RAPS and the A-number in RAPS has been consolidated and no longer exists as a primary A-number, Asylum Office personnel follow the instructions below regarding the CHAN command.

### i. CHAN

The Change an A-number (CHAN) command is used to change the A-number associated with a record in RAPS. Access to the CHAN command is limited to the users who have registered with the Office of Information Resources Management (IRM) for access to the Delete Case (DELC) function (generally two per office).

An authorized user desiring to change the A-number of an applicant should enter the command CHAN and the old (also known as "subordinate" or "consolidated") A-number on the command line of RAPS. The CHAN screen will show the current A-number ("Old A-number"), the applicant's name, date of birth, sex, nationality, current case status, date of filing, case control office, an indicator of whether there is an I-881 on file, and whether there is a special group code applied to the case. The user will be prompted to enter the new A-number ("New A-Number"). Press enter after typing in the number. The user will then be prompted to answer yes or no ("Y/N") to the question, "Do you wish to Change the Existing A-number to the New (Y/N)?" Enter the applicable response and press ENTER.

When two A-files have been consolidated, the Case History (CHIS) screen of the new A-number will display two actions: "A-Number Changed (New)" and "A-Number Changed (Old)", each with the corresponding A-number on the left. The case history of the new A-number will contain all the case history of the old A-number. The old A-number is automatically deleted as an independent record in RAPS. The history of the change in A-numbers is also available to be viewed in the A-Number Change History (ANCH) screen of either A-number, as discussed in the next section.

### ii. ANCH

The A-Number Change History (ANCH) permits users to view prior or subsequent A-number(s) for a particular A-number. Users may notice a longer than usual pause while RAPS searches the database when this command is entered. The result screen shows the secondary A-number ("Old A-number"), the new primary/survivor A-number ("New A-number"), the date the change was made in RAPS ("Change DT") and the user ID associated with the action. The user will be prompted to enter "P" to view prior A-number

Example: A-file 88-888-888 is consolidated into A-file 77-777-777. Therefore, in RAPS, A-number 88-888-888 was changed to A-number 77-777-777. If "P" (for "prior") is entered in the ANCH screen for A77-777-777, the result will display A88-888-888 as the old A-number, and A77-777-777 as the new A-number. If "S" (for "subsequent") is entered in the ANCH screen for A77-777-777, no history will display, since A77-777-777 has not been changed to another A-number.

Even though A88-888-888 has been deleted as a case in RAPS, the A-number change history is still viewable by using the ANCH command. In the case discussed above, if "S" is entered in the ANCH screen for A88-888-888, the result screen will display A88-888-888 as the old A-number, and A77-777-777 as the

USCIS00004234

new A-number. If "P" is entered, no history will be displayed unless other A-numbers were previously consolidated into A88-888-888.

### c. Adjudicating a Claim when the Asylum Office has not Received the Multiple A-file(s)

An AO may make a decision on the asylum claim based upon the information available to him or her when the multiple A-files cannot be obtained within the normal case processing time, subject to the guidance in this section.

A determination to place a case on hold and wait for an A-file must be made in consultation with the SAO, as it may impact on how the case will be processed (Pick-up vs. Mail-out). As a general rule, the processing of an asylum application should not be upheld pending receipt of the other A-files that pertain to an applicant, except:

- when a legally correct and sufficient decision cannot be made without looking at the applicant's other A-file(s), OR
- when the applicant is eligible for asylum. An Asylum Office may not issue an Asylum Approval until all A-files are consolidated. If, however, 90 days have passed since the initial attempt to obtain the A-file(s), follow procedures in Section III.J.4.a or Section III.J.4.b.

### 2. Requesting Copies of A-Files from the Law Enforcement Support Center (LESC) – DRAFT

In order to request an A-file from the Law Enforcement Support Center (LESC), Asylum Office personnel send an e-mail to LSC.Records@dhs.gov with the following information:

- Alien Registration Number (A#)
- Requestor name and telephone number
- Reason for the request
- Official mailing address
- DHL account number

If the subject of the A-file is in custody, the LESC will ship the file to the Asylum Office. If the subject of the A-file is not in custody and there is no record relating to the subject in the National Crime Information Center (NCIC), the LESC will ship the file to the Asylum Office.

If the subject of the A-file is not in custody and there is a record relating to the subject in the National Crime Information Center (NCIC), the LESC will not release the A-file, but Asylum Office personnel can request an electronic copy. Such requests for electronic copies of A-files at the LESC must be coordinated through the Eastern Forms Center (EFC).

After first making a request to the LESC to determine whether the LESC can transfer the A-file, designated Asylum Office personnel e-mail Form FC-076, A-File Scanning Request, to the EFC at the e-mail address provided on the form. If the Asylum Office is requesting copies of more than one A-file, Asylum Office personnel should list the A-files in priority order.

Upon receipt of Form FC-076, EFC personnel at the LESC facility will scan the A-file in its entirety and save it as two Adobe Acrobat pdf files, one pdf file for the left side of the A-file and one pdf file for the right

USCIS00004235

side of the A-file. The EFC personnel will then copy the pdf files to a compact disc and forward the compact disc to the requesting office. The EFC will send an e-mail to the requesting office as notification that the compact disc is en route.

When the Asylum Office receives compact discs from the EFC, Asylum Office personnel respond to the original e-mail from the EFC to acknowledge receipt. Asylum Office personnel print paper copies of the pdf files on the compact discs and add them to the T-file. Asylum Office personnel also keep the compact disc in the T-file.

### 3. Work Folders ("W-files")

A W-file is an "in-house" folder created in the absence of both an A-file and a T-file. A work folder contains non-record copies of correspondence or other materials. Under no circumstances should a W-file leave the office in which it was created. If the A-file is not located, and it becomes necessary to send the file out of the office for further processing, the W-file must be converted into a T-file.

### 4. Temporary Files ("T-files")

The Service Center will generate a T-file whenever a review of the various DHS databases indicates an applicant has a pre-existing A-number. In addition, any DHS office may create a T-file when it becomes necessary for the office to take action on a case in the absence of the A-file. For further guidance on creating and using T-Files, see Records Operations Handbook (ROH), Part II-04, Available on the USCIS Intranet at http://ors.uscis.dhs.gov/roh/. Part II-04 of the ROH also provides instructions on joining T-files to A-files (referred to as a "merger").

If an AO must use a T-file during the adjudication of an asylum claim, the Asylum/NACARA 203 Processing Sheet for T-Files (Appendix 62) is completed. Asylum Office personnel immediately order the A-file in CIS, and place a copy of the 9504 screen on the right-hand side of the T-file. DACS, NAILS, and EOIR (PF11 on the 9101 screen in CIS) must be checked prior to the interview. In addition, Asylum Office personnel must make an effort to obtain the A-file and document the efforts on the processing sheet. This effort includes calling the office that possesses the A-file.     Williams, Johnny N. Responsibilities of Adjudicators, Memorandum to Regional Directors, et al., 13 November 2002, 2p.

If any records check is positive, Asylum Office personnel follow existing procedures to obtain and resolve the cause for the positive records check. The resolution of the hits must be documented in writing before adjudication on a T-file, preferably attached to the processing sheet.

### a. Interviewing an Applicant When the Asylum Office Cannot Locate an A-file or T-file

If the Asylum Office cannot locate an A-file or T-file, or has not received the file from another USCIS or DHS office, the interview may proceed only if the AO is able to obtain a copy of the applicant's I-589 from the applicant or another USCIS or DHS office with the file. If the I-589 is received, a T-file is created to store the applicant's records until the A-file is located or received.

If an I-589 is not available, the Asylum Office reschedules the interview using the Remove Case from Schedule (REMC) command, indicating the rescheduling is at the fault of "INS". Asylum Office personnel make a concerted effort to locate the file. If, upon the applicant's return, the Asylum Office still cannot locate the file, the applicant may be asked to submit a new application directly to the Asylum Office for further processing. An asylum interview may not be conducted unless the AO has at least a copy of the I-589.

USCIS00004236

### b. Adjudicating an Application on a T-file

An Asylum Office may issue a Referral, NOID, or Final Denial on a T-file or administratively close a case unless there are reasonable grounds for believing information in the A-file would materially impact the decision. A determination to wait for an A-file must be made in consultation with the SAO, as it may impact on how the case will be processed (Pick-up vs. Mail-out). If a decision is made on a T-file because the A-file could not be located or obtained after established procedures were followed, this must be documented on the Asylum and NACARA § 203 Background Identity and Security Checklist (Appendix 1 of the Identity and Security Checks Procedures Manual), which is reviewed and signed by an SAO prior to decision issuance. When any background check has a positive result (i.e., a confirmed or possible matching record exists), adjudication on a T-file cannot proceed until the Asylum Office Director or Deputy Director has reviewed and concurred in the decision. This authority may not be delegated.

An Asylum Office may NOT issue an Asylum Approval on a T-file, except as indicated below, this section.

### i. CIS Indicates Another DHS Office has the A-file

By the time the Asylum Office is ready to issue a final decision, the Asylum Office, at a minimum, must have ordered the A-file in CIS and called the office that possesses it. There are several reasons why an A-file may not be sent to the Asylum Office, and they are usually recorded in CIS on the 9504 screen:

- M – The A-file is missing and the office is doing a special search.
- I – The A-file was transferred to the office that requested it (REQUEST FCO field); however, either that office did not receive it or confirm it into CIS as having been received, so it is still "in transit" according to the system.
- A – An application for another benefit is in process so the office cannot release the A-file.
- D – The A-file is under docket control, so the applicant was or is currently in the DACS system.
- F – The A-file was found, but not sent. A reason could be that it is needed in the office for something other than the processing of an application.
- P – The A-file is currently being used by ICE Investigations
- N – The A-file was not found in the location according to the office's file control system. It is temporarily lost.

If 90 days have passed since the Asylum Office made its initial attempt to obtain the A-file and the office holding the file cannot release it, Asylum Office personnel add to the Asylum/NACARA 203 Processing Sheet For T-Files: "Initial attempt" refers to the date in CIS when the A-file was requested, or when the first contact was made to the office holding the A-file in order to obtain the A-file, whichever is earlier.

- A brief explanation that the Asylum Office is issuing an Asylum Approval because 90 days have passed since an initial attempt was made to obtain the file.
- A brief outline of the information from CIS that explains why the A-file was not transferred to the Asylum Office.
- A brief outline of the attempts that were made to obtain the A-file, referencing any documents in the T-file that evidence steps taken to obtain the A-file.

In addition, Asylum Office personnel update the A-file Receipt Confirmation (AFIL) screen, indicating that the office made a diligent search for the file.

An SAO signs the memo to ensure the Asylum Office took proper and complete steps to obtain the A-file. Asylum Office personnel then prepare the case as an Approval. If any security check has a hit of

USCIS00004237

information pertaining to the applicant, the Director or Deputy Director must concur in the decision on the Asylum and NACARA § 203 Background Identity and Security Checklist.

### ii. CIS Indicates the Asylum Office has the A-file

In some cases, CIS may indicate that an A-file is within the Asylum Office; however, the A-file is not in its proper NFTS location, or NFTS indicates that the A-file was sent to another office but CIS was not updated.

(a)A-file not in its NFTS location

The records supervisor must perform a diligent search of the Asylum Office in order to locate the A-file, and record in the T-file all of the attempts to locate the A-file.

If 90 days have passed since Asylum Office personnel performed the initial diligent search, the office performs another diligent search. If the A-file still cannot be found, Asylum Office personnel include on the T-file processing sheet the following information:

- Brief explanation that the Asylum Office is issuing an Asylum Approval because 90 days have passed and the A-file cannot be located.
- Brief outline of information from CIS that shows the A-file has been designated as Missing "M."
- Brief outline of the attempts that were made to locate the A-file.

An SAO signs the memo to ensure the Asylum Office took proper and complete steps to obtain the A-file. Asylum Office personnel then prepare the case as an Approval. For further guidance on missing and lost A-files, see Records Operations Handbook (ROH), Part II-22, Available on the USCIS Intranet at ▮▮▮▮▮▮▮▮▮▮

(b)A-file sent to another office but CIS was not updated

NFTS may indicate that an A-file was sent to another office; however, CIS was not updated to show the new office location. Asylum Office personnel must:

- Update CIS to show the correct A-file location.
- Request the A-file in CIS.

Follow the instructions in Section III.J.4.b.ii(a) above if the Asylum Office does not receive the A-file within the 90-day period, and the case is ready for an Asylum Approval.

### 5. Record Order

Prior to submitting the file for the next step in processing, all staff members are responsible for ensuring that the file is maintained in record order. Note: the electronic records system for an online filed Form I-589 does not follow a record order or always include the same documents as a paper A-file. Record order is as follows (listed from top to bottom):

ASYLUM DIVISION A-FILE RECORD ORDER

| Record Side (left hand side) | Non-Record Side (right hand side) |
|---|---|
| •Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative (if any)<br>•CASE-ISS/DHS Portal cover sheet (if referral) or other applicable EOIR coversheet | • Asylum and NACARA § 203 Background Identity and Security Checklist, with required screen prints |

USCIS00004238

| | |
|---|---|
| •NTA<br>•Scan or photocopy of the entire front side of the executed I-94 card showing asylum approval (if issued)<br>•Decision Letter (e.g., Referral, Asylum Approval, etc.)<br>•Rebuttal to NOID (if any)<br>•Assessment or NOID*<br>•Bureau of Democracy, Labor and [Human] Rights ("DRL") Response from the Department of State (if any)<br>•Pick-Up Notice/Mail-out Notice<br>•Record of Applicant and Interpreter Oaths<br>•Waiver of Presence of Representative (if any)<br>•Interview Notices (in reverse chronological order)<br>•Acknowledgement of Receipt<br>•Change of Address notification, including Form AR-11 (if any)<br>•FD-258 Fingerprint Card (if any)<br>•Sworn statement taken at interview (if any)<br>•Form I-589, Application for Asylum and for Withholding of Removal (w/ photo(s) attached)<br>•Applicant-specific documentation submitted by applicant in support of I-589<br>•General country conditions documentation submitted by applicant in support of I-589<br>•Form G-325A, Biographic Information, submitted with asylum application (if any)<br>•Advance Parole document (if any)<br>•Form I-765, Application for Employment Authorization<br>•Additional copies of I-589 packet | • Memos to file (if any, in chronological order)<br>• I-213 (if required)<br>• AO's interview notes<br>• Non-record Correspondence (in reverse chronological order)<br>• Service Center Checklist and database checks conducted by Service Center<br>• Miscellaneous I-797 (if any, in reverse chronological order)<br><br><br>* It is not necessary to place a copy of a principal applicant's assessment or NOID in a dependent's file. However, the file must contain copies of the decision letter (e.g., Referral Notice) if the dependent's A-number is listed on it. |

USCIS00004239

## III.K.  IDENTITY AND SECURITY CHECKS

For guidance on background identity and security checks, with the exception of the information contained in this section, please refer to the Identity and Security Checks Procedures Manual. The manual contains guidance on all required security checks, and the appendices to the manual contain all document templates used in the completion of those checks.

### 1. Failure to Follow Requirements for Identity Check Procedures

The procedures in this section govern the processing of the asylum application of an individual who has failed to follow requirements for fingerprint processing and other identity check procedures. Langlois, Joseph E. Procedures for Applicants Who Fail to Comply with Fingerprint Processing Requirements, Memorandum to Asylum Office Directors, et al., 20 August 2002, 8 p.

8 C.F.R. 208.10

An applicant fails to comply with identity check procedures if he or she fails without good cause to:

- for applications filed before June 15, 2004, appear for an appointment for fingerprinting at an Application Support Center (ASC)
- for applications filed on or after June 15, 2004, appear for an appointment for biometrics collection, including enrollment in CPMS-IVT (formerly US-VISIT), and, for applicants age 12 years, 9 months and older, submission of 10-print fingerprint records at an ASC.
- complete a sworn statement regarding his or her criminal history, if required.
- submit requested documentation such as final disposition of an arrest from an Identity History Summary (formerly RAP sheet) or a required "no record" statement within 60 days from the date of the request.

All applicants, regardless of age, are required to submit press prints, a digital signature, and a full-frontal photograph for biometrics collection.

Failure to comply with identity check procedures may result in dismissal of the asylum application or a waiver of the right to an adjudication before an Asylum Officer (referral to EOIR). The standard referral letter contains a box to check for failing to follow requirements for fingerprint processing. If an applicant fails to appear at an ASC for biometrics collection, the Asylum Division may automatically stop (toll) the 180-day employment authorization KLOK.  For more detail on biometrics collection, see Section VI of the Identity and Security Checks Procedures Manual.  See also Appendix 20, Impact of Global Actions on the 180-Day Asylum EAD Clock. 8 C.F.R. 208.10

### a. Excusing a Failure to Comply with Identity Check Procedures

Asylum Office Directors have discretion to excuse a failure to comply with identity check procedures if the applicant demonstrates good cause.  Good cause is decided on a case-by-case basis by taking into account the individual circumstances of the applicant. In order to establish good cause, the applicant must present evidence that the applicant or dependent could not have reasonably attended the ASC appointment at the scheduled date and time.

USCIS00004240

A failure to comply with identity check procedures must be excused if the applicant demonstrates that the failure was the result of exceptional circumstances or the notice was not mailed to the applicant's current address and the address had been provided to the Asylum Division prior to the date the notice was mailed. 8 C.F.R. 208.10. In other words, Asylum Office Directors have discretion to excuse the failure to appear for reasons meeting the lower, "good cause" standard, but must excuse the failure both for reasons meeting the higher, "exceptional circumstances" standard and for improper notice as described in 8 C.F.R. 208.10. Exceptional circumstances are established by showing circumstances no less compelling than serious illness of the applicant or serious illness or death of the applicant's spouse, child, or parent. See Section 240(e)(1) of the Immigration and Nationality Act (INA).

Asylum Office Directors may exercise discretion to excuse a failure to comply with identity check procedures for good cause until jurisdiction passes to EOIR with the filing of a charging document. If the applicant establishes either exceptional circumstances or improper notice (e.g., a timely address change notice was discovered in the wrong file) and the applicant has already been placed in proceedings before EOIR, Asylum Office Directors must coordinate with the ICE Office of the Principal Legal Advisor (OPLA) for a motion to terminate EOIR proceedings and reopen the case before the Asylum Office. If EOIR has already decided the case and denied asylum, the Asylum Office Director discusses with the local branch of ICE OPLA whether a Motion to Reopen or to Reconsider would be appropriate. If assistance is needed in resolving such cases, contact HQASM.

Asylum Office Directors should contact HQASM for procedures for excusing a dependent's failure to comply with identity check procedures where the derivative asylum application was dismissed for such failure and the former dependent demonstrates either exceptional circumstances or improper notice under 8 C.F.R. 208.10 after the final approval was issued to the principal applicant.

### b. Notice to the Applicant
**i. Notifying the Applicant of a Request for Documents or Appointment for Sworn Statement**
Asylum Office personnel issue requests for final court dispositions and appointments for sworn statements under the following circumstances and with the following documents:

- Applicant with a criminal record: If the Asylum Office does not have a mechanism in place to obtain official final disposition records (such as coordination with ICE District Investigations), the Asylum Office mails a Request for Final Court Disposition(s) (Appendix 23) letter to the principal applicant, which gives him or her 60 days to submit the required documentation. All correspondence discussed in this section that is directed to a dependent separate from the principal should be addressed to the dependent alone and copied under separate cover to the principal applicant.

- Applicant with rejected or waived fingerprints: If the FBI has rejected an individual's fingerprints on two separate occasions or a fingerprint requirement has been waived, the individual must swear/affirm that he or she does not have a criminal record through the completion of a sworn statement. In addition he or she must provide a "no record" statement from the police department in each U.S. locality where he or she has resided during the last five years, and provide the final disposition of any arrest. Asylum Office personnel issue to the applicant a Appointment for Sworn Statement/Request for Evidence (Rejection of Fingerprints) (Appendix 24) letter (rejected prints) or an Appointment for Sworn Statement/Request for Evidence (Waiver of Fingerprints) (Appendix 25).

USCIS00004241

- Applicant 75 years of age or older: An applicant aged 75 and older must swear/affirm that he or she does not have a criminal record through the completion of a sworn statement. If the applicant must be called in to complete the sworn statement, Asylum Office personnel issue the applicant an Appointment for Sworn Statement/Request for Evidence (Waiver of Fingerprints) (Appendix 25).

If the applicant fails without good cause to provide the requested documentation or respond to the request for a sworn statement by 60 days after the issuance of one of these letters to the applicant at the last address he or she provided, Asylum Office personnel process the case in accordance with procedures in Section III.K.1.d, below.

### c. Verification of Compliance with Biometrics Collection Requirements
Prior to or at the time an applicant appears for his or her scheduled asylum interview, Asylum Office personnel should verify whether the principal applicant and each dependent have complied with biometrics collection requirements, i.e., that the principal applicant and all dependents have had their fingerprints, a photograph, and a signature taken at an ASC. If the evidence indicates that the principal applicant and all dependents have complied with biometrics requirements, the asylum interview should proceed as usual. However, if the principal applicant or any dependent has not had biometrics collected, the asylum interview should be rescheduled, along with the biometrics collection appointments of those who have not been to the ASC, in accordance with the guidance set forth in Section II.I.2 above, Asylum Office Verifies that Applicant Complied with Biometrics Collection Requirements.

### d. Cancellation of the Recommended Approval and Dismissal or Referral of the Asylum Application
An applicant who has failed to comply with identity check procedures without good cause or exceptional circumstances will not receive an asylum interview, as explained in Section II.I.2 above, Asylum Office Verifies that Applicant Complied with Biometrics Collection Requirements. The guidance below applies to recommended approvals for failure to comply with identity check procedures issued before promulgation of the procedures in Section II.I.2.

### i. Principal Applicant Failed to Comply with Identity Check Procedures
If the recommended approval of the principal applicant is cancelled and the asylum application dismissed or referred for failure to comply with identity check procedures, the actions taken in the case apply to any dependents in the case as well, regardless of whether dependents complied with identity check procedures. Asylum Office personnel:

- Prepare the Cancellation of Recommended Approval and Referral (Failure to Follow Identity Check Procedures) (Appendix 26) or Cancellation of Recommended Approval and Dismissal (Failure to Follow Identity Check Procedures) (Appendix 27) letter addressed to the principal and all dependents, depending on whether or not the applicant is maintaining lawful status.
- Update RAPS as follows:
  - On the DINT screen, enter "C" and the A-numbers of the principal and all dependents to record the issuance of the cancellation of recommended approval letter.
  - Remove the PDEC of GR using the CORR screen for the principal and all dependents.
  - On the FDEC screen, update principal and dependents as follows:

USCIS00004242

| Status | Decision Code | Deport Code |
|---|---|---|
| Out-of-Status | I7 | A1 (NTA), or

A5 (I-863), if applicable |
| In-Status | D7 | A6 |

- Serve the applicant by mail and follow regular procedures for post-service processing in Section II.R, Post Service Processing, above.

**ii. Principal Complied with Identity Check Procedures, but Dependent Failed to Comply**
These procedures apply when the principal applicant complied with identity check procedures, but one or more dependents failed to comply.  Asylum Office personnel:

- Prepare the Cancellation of Recommended Approval and Referral (Failure to Follow Identity Check Procedures) (Appendix 26) or Cancellation of Recommended Approval and Dismissal (Failure to Follow Identity Check Procedures) (Appendix 27) letter addressed to the dependent, depending on whether or not the dependent is maintaining lawful status.
- Prepare the final asylum approval of the principal applicant and all eligible dependents for issuance at the same time as the cancellation letter for the dependent who failed to comply with identity check procedures.
- Update RAPS as follows:
- On the DINT screen, enter "C" and the dependent's A-number to record the issuance of the cancellation of recommended approval letter.
- Remove the PDEC of GR on the CORR screen for the dependent who failed to comply.
- Enter an FDEC of G1 for the principal and all eligible dependents, and D7 (regardless of status) for the dependent whose application is being dismissed.  The deportation code for the dismissed dependent is A6 (no deportation) if he or she is in-status.  If out-of-status, enter A1 if an NTA will be issued or A5 if a Notice of Referral to Immigration Judge (Form I-863) will be issued.
- Serve the applicant by mail and follow regular procedures for post-service processing as described in Section II.R, Post Service Processing, above.

USCIS00004243

## III.L. JURISDICTION

### 1. USCIS Jurisdiction

*a.* **EOIR Jurisdiction Discovered at the Time of Filing** [1]

**i. Jurisdiction Determined at the Service Center** [2]

Upon case receipt, the Service Center checks PCQS-DOJ-EOIR to determine if USCIS should accept the Form I-589. The Service Center accepts a Form I-589 filed by an individual in removal proceedings if the Form I-589 was filed 21 days or fewer after the date the Form I-862, Notice to Appear (NTA), was filed and docketed [3] with the Executive Office for Immigration Review (EOIR). This time period is defined as the "21-day grace period," and these cases are known as "Grace Period" cases. The date EOIR docketed the NTA is reflected as the "EOIR Docketing Date" in PCQS-DOJ-EOIR.

To determine whether the Form I-589 was filed and docketed during the 21-day grace period, the Service Center calculates the number of days elapsed between the "EOIR Docketing Date" in PCQS-DOJ-EOIR and the date stamped received on the Form I-589. The Service Center will create a T-file to contain the Form I-589. The Service Center enters these applications into the case management system as "Grace Period" cases. Once the case is in the case management system, the individual receives an auto-generated receipt notice (Grace Period Receipt Notice). The case management system also checks PCQS-DOJ-EOIR for relevant data, including Base City, Hearing Location, and Hearing Address.

The Service Center then sends the Grace Period cases to the Asylum Vetting Center (ZGA) for further action. Upon receipt of a Grace Period case, ZGA personnel should complete the following steps:

1. Ensure the case is entered into "Grace Period" in the case management system.
2. Search the A-number in PCQS-DOJ-EOIR to ensure that the EOIR court location pulled by the case management system is correct, including Base City, Hearing Location, and Hearing Address.
    1. In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be transferred to the Base City found in PCQS-DOJ-EOIR.
    2. ZGA personnel may contact the EOIR Hotline for the appropriate court information.
3. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.
    1. Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the Grace Period case. A- and T-files already in the possession of ICE OPLA do not need to be requested.
    2. Upon receipt of any A- or T-files, combine the files by completing the following:
        1. Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
        2. Physically remove the T-file barcode and staple it to the inside cover of the A-file.
        3. Consolidate the A- and T-files in RAILS.

USCIS00004244

4. Execute the transfer to EOIR from the Adjudication tab in the case management system, ensuring that the appropriate EOIR court location is displayed. The individual receives an automatically generated notice that their case was transferred to the EOIR immigration court.
5. Create the EOIR court packet. Click on the "Create Transfer Cover Letter" button in the case management system, review the information on the Transfer Cover Letter for accuracy, print it, place it on top of one of the original Forms I-589 and supporting documents, and transfer the EOIR court packet with the Transfer Cover Letter to the appropriate immigration court. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing.*
    1. Print multiple copies of the Transfer Cover Letter, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.
6. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate.

Note that USCIS cannot enter information into CASE-ISS/DHS Portal at this stage because the NTA has already been filed and docketed with EOIR. Upon receipt, EOIR personnel will update CASE-ISS/DHS Portal with the information on the Transfer Cover Letter generated through the case management system.

If the Service Center determines that a Form I-589 was filed 22 days or more after the date the NTA was filed and docketed with EOIR, the Service Center will either reject the filing and issue the "Form I-589 Rejection Notice" or process the filing as a defensive asylum application (DEFA), as appropriate.

## ii. Jurisdiction Determined at the Asylum Vetting Center (ZGA)

If an individual files a Form I-589 directly with ZGA, ZGA personnel should review the "EOIR Docketing Date" in PCQS-DOJ-EOIR to determine if an NTA has been filed and docketed with EOIR and, if so, if the individual filed their Form I-589 with USCIS 21 days or fewer after the date the NTA was filed and docketed with EOIR ("21-day grace period"). To determine whether the Form I-589 was filed and docketed during the 21-day grace period, ZGA personnel will calculate the number of days elapsed between the "EOIR Docketing Date" in PCQS-DOJ-EOIR and the date stamped received on the Form I-589.

If the Form I-589 was filed 21 days or fewer after the EOIR Docketing Date,[4] ZGA personnel should complete the following steps:

1. Enter the case into the case management system as a "Grace Period" case.
2. Search the A-number in PCQS-DOJ-EOIR and enter the EOIR court location information into the case management system, including Base City, Hearing Location, and Hearing Address.
    1. In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be transferred to the Base City found in PCQS-DOJ-EOIR.
    2. ZGA personnel may contact the EOIR Hotline for the appropriate court information.
3. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.
    1. Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of

USCIS00004245

receipt of the Grace Period case. A- and T-files already in the possession of ICE OPLA do not need to be requested.

2. Upon receipt of any A- or T-files, combine the files by completing the following:
    1. Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
    2. Physically remove the T-file barcode and staple it to the inside cover of the A-file.
    3. Consolidate the A- and T-files in RAILS.

4. Execute the transfer to EOIR from the Adjudication tab in the case management system, ensuring that the appropriate EOIR court location is displayed. The individual receives an automatically generated notice that their case was transferred to the EOIR immigration court.

5. Create the EOIR court packet. Click on the "Create Transfer Cover Letter" button in the case management system, review the information on the Transfer Cover Letter for accuracy, print it, place it on top of one of the original Forms I-589 and supporting documents, and transfer the EOIR court packet with the Transfer Cover Letter to the appropriate immigration court. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing.*
    1. Print multiple copies of the Transfer Cover Letter, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.

6. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate.

If the Form I-589 was filed 22 days or more after the EOIR Docketing Date,[5] ZGA personnel should complete the following steps:

1. Do not accept the Form I-589 and do not enter the case into the case management system.
2. Issue the ZGA specific rejection notice.

---

[1] If an NTA was filed and docketed with EOIR, USCIS may have jurisdiction over a Form I-589 filed with USCIS pursuant to the TVPRA if the applicant was a UAC at the time of first filing a Form I-589 (with EOIR or USCIS). See *AAPM Section III.B.1. Children Filing as Principal Asylum Applicants* for further guidance.

[2] See scenario 10(a)-(b) in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[3] "Docketed" refers to the EOIR Docketed Date, which is when Immigration Court staff enters into EOIR's case management system, CASE or any successor, the EOIR Rec'd Date and charging document information. The EOIR Docketed Date reflects the formal acceptance of a newly filed case onto the court's docket for case scheduling and processing.

[4] See scenario 10(c) in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[5] See scenario 10(d) in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

---

b. ***Previously Issued NTA Discovered Prior to Asylum Interview or Service of Final Decision***

The asylum office will cancel the affirmative asylum interview or decision service if asylum office personnel identify a previously issued NTA prior to the interview date or decision service, respectively. Asylum office personnel should review PCQS-DOJ-EOIR prior to the interview date and again prior to decision service to

USCIS00004246

determine if an NTA has been filed and docketed with EOIR such that the individual is in removal proceedings.

**i. Previously Issued NTA Not Filed and Docketed with EOIR**

If during A-file review the asylum office discovers an NTA and there is no record of a filed and docketed NTA with EOIR in PCQS-DOJ-EOIR, asylum office personnel should complete the following steps:[1]

1. Cancel the affirmative asylum interview if the unfiled NTA is discovered prior to the interview date.
2. Search the A-number in PCQS-DOJ-EOIR to identify the proper EOIR court location to forward the Form I-589 and the EOIR court packet and to file the new NTA.
   1. In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be forwarded to the Base City found in PCQS-DOJ-EOIR.
   2. Asylum personnel may contact the EOIR Hotline for the appropriate court information.
3. Complete the necessary security checks.
4. Generate a new NTA with the date, time, and location of the immigration court hearing.
5. Enter the case into CASE-ISS/DHS Portal and select "Previously Issued/Unfiled NTA – Clock is Running...(D)" as the Clock Status.
6. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.
   1. Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the case. A- and T-files already in the possession of ICE OPLA do not need to be requested.
   2. Upon receipt of any A- or T-files, combine the files by completing the following:
      1. Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
      2. Physically remove the T-file barcode and staple it to the inside cover of the A-file.
      3. Consolidate the A- and T-files in RAILS.
7. Create the EOIR court packet; fill out, print, and attach the Case Confirmation worksheet from CASE-ISS/DHS Portal; and forward the EOIR court packet with the Case Confirmation worksheet to the appropriate immigration court, including filing the NTA. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing*.
   1. Print multiple copies of the Case Confirmation worksheet from CASE-ISS/DHS Portal, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.
8. Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Forward to IJ/Clock Running - Close" as the Case Event, choosing "Previously Unfiled NTA" as the Close Type, and filling out the "Closed On" date field.
9. Issue the individual the new NTA and the appropriate Notice informing them that the asylum office will not conduct their asylum interview:

USCIS00004247

1. Issue Appendix 107 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Transfer of Form I-589 to EOIR (Non-Expedited Removal)"), if the individual was not previously issued a Form I-860, OR
2. Issue Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)"), if the individual was previously issued a Form I-860.

10. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate.

**ii. Previously Issued NTA Filed and Docketed with EOIR After USCIS Accepted the Form I-589 but Prior to Asylum Interview or Service of Final Decision**

If prior to the interview date or prior to decision service the asylum office discovers that an NTA was filed and docketed with EOIR after an individual filed a Form I-589 with USCIS, the asylum office personnel should complete the following steps:[2]

1. Cancel the affirmative asylum interview if this circumstance is discovered prior to the interview date.
2. Search the A-number in PCQS-DOJ-EOIR to identify the proper EOIR court location to forward the Form I-589 and the EOIR court packet.
    1. In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be forwarded to the Base City found in PCQS-DOJ-EOIR.
    2. Asylum personnel may contact the EOIR Hotline for the appropriate court information.
3. Complete necessary security checks
4. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.
    1. Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the case. A- and T-files already in the possession of ICE OPLA do not need to be requested.
    2. Upon receipt of any A- or T-files, combine the files by completing the following:
        1. Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
        2. Physically remove the T-file barcode and staple it to the inside cover of the A-file.
        3. Consolidate the A- and T-files in RAILS.
5. Create the EOIR court packet; fill out, print, and attach Appendix 109 ("Coversheet for Cases Forwarded to EOIR Where Application Cannot Be Entered Into CASE-ISS/DHS Portal by USCIS"); and forward the EOIR court packet with Appendix 109 to the appropriate immigration court. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing*.
6. The case will already be entered into CASE-ISS/DHS Portal.
7. Print multiple copies of the filled out Appendix 109, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.

USCIS00004248

8. Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Forward to IJ/Clock Running - Close" as the Case Event, choosing "Previously Unfiled NTA" as the Close Type, and filling out the "Closed On" date field.
9. Issue the individual Appendix 107 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Transfer of Form I-589 to EOIR (Non-Expedited Removal)") informing them that the asylum office will not conduct their asylum interview.
10. Use **Option 3** ("If the applicant submitted a Form I-589 to USCIS and their NTA was filed and docketed with EOIR after USCIS receipted the Form I-589, but prior to adjudicating the Form I-589").
11. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate.

### iii. Previously Issued NTA Filed and Docketed with EOIR Prior to USCIS Accepting the Form I-589

#### a. Previously Issued NTA Filed and Docketed with EOIR for 21 Days or Fewer Prior to USCIS Accepting the Form I-589 [3]

If prior to the interview date or prior to decision service the asylum office encounters a case that was accepted by USCIS but the Form I-589 was received 21 days or fewer after the EOIR Docketing Date (i.e., a missed "Grace Period" case), asylum office personnel should take the following steps:

1. Cancel the affirmative asylum interview if this circumstance is discovered prior to the interview date.
2. Search the A-number in PCQS-DOJ-EOIR to identify the proper EOIR court location to forward the Form I-589 and the EOIR court packet.
   1. In PCQS-DOJ-EOIR, the proper court location is identified as the "Base City" in the Summary, IJ Decisions, Event Dates & Decisions/Adjournments, Hearing Schedule, and Proceeding tabs. If there are multiple court locations listed, the proper court location is the most recent Base City. In some instances, the individual's address in the case management system will not correspond to the jurisdiction of the Base City identified in PCQS-DOJ-EOIR. In this instance, the case should be forwarded to the Base City found in PCQS-DOJ-EOIR.
   2. Asylum personnel may contact the EOIR Hotline for the appropriate court information.
3. Complete the necessary security checks.
4. Gather all necessary documentation for the court, including the Form I-589 and supporting documents, and any existing A- and T-files.
   1. Search the A-number in RAILS to identify and locate any existing T-files. Any A- or T-files not already located with U.S. Immigration and Customs Enforcement's Office of the Principal Legal Advisor (ICE OPLA) should be requested in RAILS within 48 hours of receipt of the Grace Period case. A- and T-files already in the possession of ICE OPLA do not need to be requested.
   2. Upon receipt of any A- or T-files, combine the files by completing the following:
      1. Remove all documentation from the left and right side of the T-file, place it underneath the documentation on the corresponding side of the A-file, and place Appendix 62 ("Asylum/NACARA 203 Processing Sheet for T-files") between the A- and T-file documentation.
      2. Physically remove the T-file barcode and staple it to the inside cover of the A-file.
      3. Consolidate the A- and T-files in RAILS.

USCIS00004249

5. Create the EOIR court packet; fill out, print, and attach Appendix 109 ("Coversheet for Cases Forwarded to EOIR Where Application Cannot Be Entered Into CASE-ISS/DHS Portal by USCIS"); and forward the EOIR court packet with Appendix 109 to the appropriate immigration court. For more information regarding EOIR court packets, see *AAPM Section II.R. Post-Service Processing.*
   1. The case will already be entered into CASE-ISS/DHS Portal.
   2. Print multiple copies of the filled out Appendix 109, one for the EOIR court packet, one for the principal applicant's A-file, and one for each dependent A-file that is also being sent to the court.
6. Close the I-589 in the case management system by selecting under the Adjudication Tab "Forward to IJ/Clock Running - Close" as the Case Event, choosing "Previously Unfiled NTA" as the Close Type, and filling out the "Closed On" date field.
7. Issue the individual Appendix 107 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Transfer of Form I-589 to EOIR (Non-Expedited Removal)") informing them that the asylum office will not conduct their asylum interview.
   1. Use **Option 2** ("If the asylum office encounters a previously issued NTA that was filed and docketed with EOIR 21 days or fewer prior to USCIS accepting the Form I-589").
8. Send the A- or T-file to ICE OPLA, and update the file transfer in RAILS as appropriate

## b. Previously Issued NTA Filed and Docketed with EOIR for 22 Days or More Prior to USCIS Accepting the Form I-589 [4]

If prior to the interview date or prior to decision service the asylum office encounters a case that was accepted by USCIS but the Form I-589 was received 22 days or more after the EOIR Docketing Date, asylum office personnel should take the following steps:

1. If the A-file is not at the asylum office, order and wait for the A-file. If ICE does not release the A-file, a T-file may be created.
2. Cancel the affirmative asylum interview if this circumstance is discovered prior to the interview date.
3. Close the case in the case management system using the "No/IJ Jurisdiction" code.
4. Notify the individual that the asylum office does not have jurisdiction over their Form I-589 and that their Form I-589 will be closed. Explain this to the individual in person if he or she is in the office, and in all cases issue the individual Appendix 59 ("Notice of Lack of Jurisdiction (Non-Transfer/Non-Forward)").

### 2. Asylum Office Geographical Jurisdiction

There are eight (8) Asylum Offices in the United States: Arlington, Chicago, Houston, Los Angeles (Anaheim, CA), Miami, Newark (Lyndhurst, NJ), New York (Rosedale, NY), and San Francisco. Each Asylum Office has jurisdiction over all affirmative asylum applications filed by asylum applicants who reside within its geographical territory except for aliens described in the previous section as being under the exclusive jurisdiction of EOIR or aliens not entitled to proceedings under section 240 of the INA (see Section III.L.3 below). *See* 8 C.F.R. 100.4(f) for a list of Asylum Offices and their jurisdictions.

#### a. *Residence of Applicant*

8 C.F.R. 208.4(b)(1) requires an applicant to file an I-589 with the Service Center servicing the Asylum Office having jurisdiction over the applicant's place of residence. "Residence" is defined in section 101(a)(33) of the INA as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent."

USCIS00004250

A college student, for example, may move to another state during his or her summer vacation and submit an I-589. Although the individual may intend to return to college, which is located outside of the Asylum Office's jurisdiction, the student is, nevertheless, entitled to file for asylum with the Asylum Office having jurisdiction over his or her place of residence during the summer vacation.

An Asylum Office Director may, in his or her discretion, adjudicate an application for a college student when his or her permanent home address falls within the jurisdiction of the office, or make a similar accommodation for a migrant worker who frequently moves between jurisdictions.

There are instances when an Asylum Office may believe that an applicant does not live at an address he or she provides at an asylum interview. The address may be known to Asylum Office personnel as one that is linked to the location of a "boilerplate" asylum application preparer, or a "drop box." In these instances, an Asylum Office Director may exercise discretion to request proof that the applicant lives within the jurisdiction of the Asylum Office in order to determine whether the office has jurisdiction over the applicant. Any inquiries into or requests for proof of residence must be reasonable in light of the specific circumstances of the applicant including, but not limited to, language and cultural barriers, the availability or lack of family or financial resources, and the availability or inability to obtain documentation in the applicant's name.

Indicators that an applicant may not reside in the jurisdiction of the Asylum Office may arise before, during, or after the asylum interview.

If the Asylum Office requires evidence of an applicant's residence, the AO or SAO:

- Depending on the procedural stage of the case, cancels or terminates the interview.
- If the interview has already begun, explains to all parties (applicant, interpreter, representative) the reason for terminating the interview.
- Completes a Request for Evidence to Establish Residence letter (Appendix 38), providing the original to the applicant and maintaining a copy in the file.
- Places the case on hold in the case management system for awaiting documentation. This will result in an applicant-caused delay as it pertains to the 180-day Asylum EAD Clock.

Check with local Asylum Office management about whether an AO must consult with an SAO or the Director before requesting evidence of an applicant's residence.

If the applicant submits evidence that establishes his or her residence within the jurisdiction of the Asylum Office, Asylum Office personnel remove the case from hold, and reschedule the asylum interview in Global, indicating the rescheduling is at the fault of the applicant. The case can then be set for interview in accordance with regular scheduling priorities.

If the evidence submitted by the applicant or available in the file establishes the applicant's residence in the jurisdiction of another Asylum Office, Asylum Office personnel update Global and transfer the file to the office having jurisdiction.

If the applicant fails to submit evidence, or the evidence does not reasonably establish that the applicant lives within the jurisdiction of the Asylum Office, the Asylum Office conducts an asylum interview, exploring all factors that impact on the exercise of discretion. See RAIO Combined Training Module - Discretion. After an interview, the applicant's asylum application may be referred as a matter of discretion if the negative factor (the applicant's failure to be forthcoming about his or her residence in the United

USCIS00004251

States) outweighs the positive factors in the case.    The reason for the referral on the Referral Notice is explained in the "Other reason for referral section" as follows:

"On [date], USCIS requested proof of your residence in accordance with 8 C.F.R. 103.2(b). You failed to submit evidence or the evidence you submitted was insufficient to establish your residence in the jurisdiction of this or any other Asylum Office. Because evidence indicates you were not forthcoming about your place of residence in the United States and provided false information on your asylum application, your asylum application is being referred to the Immigration Court, as a matter of discretion, using the address you provided on the asylum application and where you received notice of your asylum interview, which was conducted on [date]."

### 3. Aliens Not Entitled to Proceedings under Section 240 of the INA

Certain categories of aliens enumerated in 8 C.F.R. 208.2(c)(1) are entitled to only limited Immigration Judge hearings for consideration of asylum and withholding or deferral of removal applications only. The six so-called "asylum-only" categories are applicants who applied for asylum after April 1, 1997 and are:

- Crewmembers;
- Stowaways who pass the credible fear standard;
- Applicants for admission under the Visa Waiver Permanent Program (VWP) (in the inspections context);
- VWP overstays;
- Aliens ordered removed under INA Section 235(c) (security and related grounds); and,
- Nonimmigrants admitted pursuant to INA 101(a)(15)(S) (witnesses and informants).

Please note that the VWP was preceded by the Visa Waiver Pilot Program (VWPP), which ended in 2000. Applicants who were admitted under the VWPP are processed in the same manner as applicants admitted under the VWP.

The asylum program does not take jurisdiction to consider affirmative asylum applications from members of these six categories. The regulations currently direct such individuals not under the jurisdiction of EOIR to file their asylum applications directly with the District Director, who will issue an I-863 and forward the asylum application to the Immigration Court. 8 C.F.R. 208.4(b)(5). The USCIS District Director's authority to accept I-589s in these circumstances has been delegated to Asylum Office Directors. *See* Aguirre, Eduardo. Delegation to Asylum Office Directors of District Director Authority and Discretion to Issue Form I-863, Notice of Referral to Immigration Judge, to Certain Asylum Applicants, Memorandum to Regional Directors, Asylum Office Directors, et al., 26 July 2004, 2p.

When the Asylum Office encounters an application from a member of one of the six "asylum-only" categories, the Asylum Office issues the I-863 and forwards the I-863 and asylum application to the appropriate Immigration Court.When encountering such a case, Asylum Office personnel take the following actions

- If the interview has not yet taken place, cancel or suspend the interview.

164

USCIS00004252

- Copy any documents that evidence the applicant's status and place them in the file.
- Print any IBIS SQ94 screens that show the applicant's entry into the U.S. and place them in the file.

See the IBIS SOP and Section IV of the Identity and Security Checks Procedures Manual for guidance on conducting SQ94 queries in IBIS.

If the applicant was ordered removed under INA Section 235(c) or admitted pursuant to INA Section 101(a)(15)(S), contact HQASM Operations for further guidance before proceeding. For other "asylum-only" category cases, depending on local Asylum Office policy, either issue a Pick-up Notice to the applicant, or serve the necessary documents on the applicant while he or she is still in the Asylum Office. In either case, Asylum Office personnel:

- Prepare a Referral Notice, and at "Other Reasons for Referral," write: "You are an alien [insert applicable language from 8 C.F.R. 208.2(c)(1)(i)-(vi), e.g. "crewmember who has been refused permission to land under Section 252"] and filed an asylum application on or after April 1, 1997. USCIS does not have jurisdiction over your case and only an Immigration Judge may hear your claim. Your Form I-589, Application for Asylum and for Withholding of Removal, will be forwarded to the Immigration Judge." For individuals who entered under the Visa Waiver Program using fraudulent documents write: "You are an alien who was admitted to the United States pursuant to the Visa Waiver Program under section 217 of the Act using fraudulent documents and filed an asylum application on or after April 1, 1997. USCIS does not have jurisdiction over your case and only an Immigration Judge may hear your claim. Your Form I-589, Application for Asylum and for Withholding of Removal, will be forwarded to the Immigration Judge."
- Prepare a Form I-863, Notice of Referral to Immigration Judge, placing a checkmark in the box next to item 3 and in the appropriate box indicating the category of case.
- Prepare a Form I-213, if required.
- Copy the I-589 for the Immigration Judge.
- Administratively close the asylum application on the Close Case (CLOS) screen, indicating the reason for closure as "IJ Jurisdiction" (C4), placing a "Y" in the "Send to IJ" field.

The following guidance, specific to certain of the above categories, is provided to clarify when the above procedures apply.

### a. Crewmembers

#### i. Crewmembers who applied for asylum on or after 4/1/97

An Asylum Office does not take jurisdiction to adjudicate an asylum claim filed on or after April 1, 1997 by a crewmember, as defined in the INA. 8 C.F.R. 208.2(c)(1)(i) As used in the INA, the term crewmember only pertains to an alien who last arrived in the U.S. on a vessel in the capacity of a working crewman and:

- is applying for a landing permit;
- was inspected and refused admission; or
- was inspected and admitted as a D-1 or D-2 nonimmigrant.

An alien who arrived in any other manner is not considered a crewmember for INA purposes, even though the alien may possess a D nonimmigrant visa or be regularly employed as a crewmember. For example, a person regularly employed as a crewman but who was last admitted as a B-2 tourist or a C-1 alien in transit to a vessel, or who arrived without inspection, would not be classified as a crewmember for INA

USCIS00004253

purposes. In such a case, the Asylum Office may take jurisdiction to adjudicate the application (provided the applicant in not under the jurisdiction of EOIR).

A crewmember who last arrived in a working capacity on a vessel, was inspected and paroled (e.g. for medical treatment), and is still maintaining parole status is processed for asylum purposes as any other parolee. See Section III.N. However, if parole status has expired or been terminated, the alien reverts to an applicant for a landing permit and the guidance in this section applies.

### ii. Crewmembers who applied for asylum prior to 4/1/97

The Asylum Office takes jurisdiction over asylum claims filed by crewmembers prior to April 1, 1997. If the crewmember is found ineligible for asylum and is not maintaining lawful immigrant, nonimmigrant or Temporary Protected Status, Asylum Office personnel process the crewmember's application as a regular referral, issuing an I-862 (NTA). 8 C.F.R. 208.2(b).

### b. Stowaways

An arriving alien who has been identified by inspections as a stowaway is not entitled to make an affirmative asylum application or to removal proceedings pursuant to INA Section 240. See INA Section 235(a)(2), 235(b)(1). Stowaways are interviewed by Asylum Officers for credible fear. 8 C.F.R. 208.30. For procedures relating to stowaways, refer to the Credible Fear Procedures Manual. If inspections identified the applicant as a stowaway, but the applicant absconded before the credible fear process could be completed, and the applicant later files an I-589 with USCIS, the Asylum Office interviews the applicant for credible fear and issues an I-863 as follows: 1) for asylum-only proceedings if credible fear is found; or 2) for IJ review if a negative credible fear decision is made and the alien requests review. If no credible fear is found, and the applicant does not request IJ review, Asylum Office personnel refer the stowaway to local ICE Detention and Removal (DRO) for removal from the U.S. For more detailed guidance on processing true stowaways, see Procedures Manual - Credible Fear Process. 8 C.F.R. 208.2(c)(1)(ii).

An applicant who testifies that he or she traveled to the United States by concealing him or herself on a ship, but jumped ship or otherwise absconded without being identified by DHS as a stowaway is not processed as a stowaway. The Asylum Office accepts affirmative asylum applications from these individuals and treats them as having entered without inspection (EWI).

### c. Visa Waiver Program (VWP) Applicants.
*See* 8 C.F.R. 208.2(c)(1)(iii), (iv)

The Asylum Office does not take jurisdiction to adjudicate the asylum application of a principal applicant who was admitted under the VWP unless:

- The applicant was inspected and properly admitted under the Visa Waiver Program (VWP) and
- The I-589 was filed before the expiration of the 90-day period of authorized stay under the VWP.

-OR-

- The application was filed before April 1, 1997, regardless of when the 90-day period of admission expired.

-OR-

166

USCIS00004254

- The applicant is an unaccompanied alien child (UAC). Section 235(d)(7)(B) of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) provides that USCIS has initial jurisdiction over all UACs seeking asylum, including all UACs who entered under the Visa Waiver Program, regardless of filing date. *See* Section III.B.1.a above, Unaccompanied Alien Children Applying for Asylum.

The evidence required to support a finding of proper admission under the VWPP is discussed in the next section. For the purposes of these procedures, proper admission does not include admission by fraud. For example, if the asylum applicant filed his or her I-589 after April 1, 1997 and before the expiration of his or her 90-day period of admission under the VWPP, but was admitted through the use of fraudulent documents, the Asylum Office does not have jurisdiction to adjudicate the I-589. If the Asylum Office does not have jurisdiction over the application, Asylum Office personnel follow procedures in Section III.L.3 above, Aliens Not Entitled to Proceedings under Section 240 of the INA.

When the Asylum Office takes jurisdiction to adjudicate an asylum application pursuant to the above procedure, the Asylum Office retains jurisdiction to complete adjudication of the case, even if the 90-day period of admission expires before the Asylum Office completes processing of the case. The application is processed identically to other asylum applications for interview and decision, except that for referrals, an I-863 Notice of Referral to Immigration Judge is prepared instead of an NTA. In RAPS, the deportation code is A5. The status at entry to be input in RAPS on the I-589 screen is "WB – Visitor Without Visa 90 Da [sic]."

### i. Evidence of Admission Under the VWP

An applicant must produce evidence of his or her admission (whether bona fide or male fide) to the U.S. under the VWP for the Asylum Office to process the case using the procedures in this section relating to applicants admitted under the VWP. When an applicant has been admitted as a VWP visitor, these procedures apply regardless of whether the applicant gained admission properly and lawfully or by falsely claiming to be a national of a VWP-designated country (including presentation of a counterfeit or impostor passport from such country).

The fact that an applicant cannot establish entry as a VWP applicant does not necessarily mean that he or she failed in the burden of proof as to entry for purposes of the one-year filing deadline, because manner of entry is not necessarily determinative of date of entry. AOs should consult the one-year filing deadline lesson plan for standard of proof issues.

If the applicant claims admission under the VWP (either with genuine or fraudulent or fraudulently obtained documents), he or she must present a passport or signed I-94W card evidencing the admission, or the Asylum Officer must confirm the applicant's admission under the VWP in IBIS or another DHS system containing entry information. An applicant's credible testimony or sworn statement will ordinarily not suffice for the Asylum Office to treat the applicant as having been admitted as a VWP visitor, but Asylum Office Directors maintain the discretion to permit the filing of I-863s based on sworn statements alone if it is determined, in coordination with USCIS Area Counsel or ICE Office of the Principal Legal Advisor (OPLA), that proceedings will not be terminated. Forms I-94W for VWP visitors bear the notation "WB" for business visitors and "WT" for visitors for pleasure.

If an applicant's claim of admission under the VWP cannot be substantiated as described above, the Asylum Office does not consider the applicant as having been admitted under the VWP, and the

USCIS00004255

procedures in this section do not apply. The manner of entry for the applicant is recorded as "unknown" on the I-589 screen in RAPS, and the AO proceeds with the interview and adjudication of the claim. If such an applicant is to be referred to the Immigration Judge, Asylum Office personnel issue an NTA (not an I-863) containing an NVD1 or NVD2 charge, depending on local office policy.

If the applicant is able to establish his or her admission into the U.S. under the VWP, even through the use of a fraudulent passport, Asylum Office personnel determine jurisdiction and process the case according to the guidance contained in this section.

**ii. Dependents Admitted under the VWP**
The Asylum Office takes jurisdiction over a dependent who entered the U.S. as a VWP visitor when taking jurisdiction over the principal applicant, regardless of when the application was filed or whether the 90-day period of authorized stay has expired. The dependent's status at entry in RAPS is "WB."

A dependent who entered as a VWP visitor who is being referred to the Immigration Judge should receive an I-863 instead of an NTA, even if the principal applicant is receiving an NTA. When preparing the referral letter for the principal, Asylum Office personnel insert the following language in the "Other" section of the referral letter:

"Your dependent, (name, A#), was admitted to the U.S. as a Visa Waiver Program (VWP) visitor under Section 217 of the Immigration and Nationality Act, and has remained longer than authorized. A VWP visitor is entitled to only limited Immigration Judge proceedings to review his or her claim for asylum. Therefore, he or she is being issued a Form I-863 for such a proceeding in accordance with 8 C.F.R. 208.2(c)(1) and 217.4(b)."

The deportation code in RAPS is "A5."

**iii. Applicant Paroled into U.S. During Visa Waiver Pilot Program (VWPP) Contingency Plan**
Applicants from VWP-designated countries who were paroled into the U.S. during the interim period between the expiration of the Visa Waiver Pilot Program and the enactment of the Visa Waiver Permanent Program Act (May 1, 2000 – October 30, 2000) are processed as parolees. See Section III.N, Parolees, in this manual. See Langlois, Joseph E. Asylum Division. Visa Waiver Pilot Program (VWPP) Contingency Plan Guidance, (Washington, DC: 10 May 2000), 1p. A visitor paroled under the contingency plan should have a passport and Form I-94W with the word "admitted" crossed out and the word "paroled" written in its place. The paroled code for these cases was "CP." See 8 C.F.R. 217.2(a) for the list of designated countries.

**iv. Guam Visa Waiver Program**
The Asylum Office has jurisdiction to adjudicate asylum applications filed by applicants admitted to Guam pursuant to the Guam Visa Waiver Program (GVWP). The application is processed identically to other asylum applications for interview and decision, except that for referrals, an I-863 Notice of Referral to Immigration Judge is prepared instead of an NTA. In RAPS, the deportation code is A5. *See* INA Section 212(l); *see also* 8 C.F.R. 212.1(e).

### 4. Federal Court Jurisdiction
For the purpose of applying appropriate law, the AO must ascertain the federal court jurisdiction applicable to the alien's place of residence. The AO determines jurisdiction by the address of the applicant's residence, regardless of the address of the Asylum Office or the location of the interview.

USCIS00004256

### 5. Applicants for Admission at Land Border Ports of Entry

An applicant for admission at a land border port of entry is ineligible to make an affirmative application for asylum. See INA Section 208(a)(1). Applicants for admission at land border ports of entry generally will be placed in expedited removal proceedings and referred for a credible fear interview pursuant to 8 C.F.R. 208.30. For guidance relating to credible fear determinations in the context of expedited removal, refer to the Credible Fear Procedures Manual – Credible Fear Process. See Cronin, Michael D. Aliens Seeking Asylum at Land Border Ports-of-Entry, Memorandum to Michael A. Pearson, INS Office of Field Operations, 29 January 2002, 3p.

Applicants seeking asylum at a land border port of entry may also be subject to the U.S.-Canada Safe Third Country Agreement, if they are arriving from Canada. See Section III.P.4 for additional information on this agreement.

The RAPS special group code "BOR," which was formerly used to designate the case of an applicant who was in Mexico or Canada awaiting an affirmative asylum interview has been disabled from future use in a case with a filing date on or after January 29, 2002.

### 6. Form I-589 Filed by Individual in Expedited Removal

Individuals are in expedited removal if they have received a Form I-860, Notice and Order of Expedited Removal, that remains outstanding.[5] If the individual is in expedited removal, USCIS does not have jurisdiction over that individual's Form I-589, even if the individual is paroled out of immigration detention, and therefore USCIS will not adjudicate that individual's Form I-589, with the exception of Forms I-589 filed by certain *Ms. L* class members and *M.M.M.* agreed class members subject to the *Ms. L/M.M.M./Dora Settlement Agreement*.[6]

#### a. Form I-589 Filed by Individual Not Previously Screened for Credible Fear

Asylum offices should review ICE's Enforce Alien Removal Module (EARM) or PCQS-ENFORCE by searching the A-number to determine if an individual who filed a Form I-589 is in expedited removal. If the individual was issued a Form I-860, asylum offices should review the "EOIR Docketing Date" in PCQS-DOJ-EOIR to determine if EOIR personnel documented the filing of an NTA by DHS personnel in EOIR's electronic case management system. Asylum offices also should review the case management system APSO section to determine whether a credible fear screening was conducted in relation to the instant Form I-860.

If PCQS-DOJ-EOIR indicates that the NTA was already filed and docketed with EOIR, then the individual is no longer in expedited removal and is in INA section 240 removal proceedings, as the expedited removal order terminates when an NTA is properly filed with EOIR. See *AAPM Section III.L.1. USCIS Jurisdiction* for further guidance.

If PCQS-DOJ-EOIR does not indicate that an NTA was filed and docketed with EOIR and the case management system APSO section does not indicate that a credible fear screening was conducted in relation to the Form I-860,[7] asylum office personnel should take the following steps:

- Close the Form I-589 in the case management system by selecting under the Adjudication Tab "Admin Close" as the Case Event, choosing "No/IJ Jurisdiction" as the Close Type, and filling out the "Closed On" date field. Additionally, officers should add a comment that the asylum office will not issue an NTA/referral

USCIS00004257

- Write a memorandum to file that explains why the affirmative case was closed and that the individual will be processed for credible fear. Place the memorandum on the right-side of the A-file.
- Issue Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)") to the individual.
  - o Use **Option 4** ("If the applicant was never issued an NTA and the asylum office has the required DHS forms for credible fear processing") OR **Option 5** ("If the applicant was never issued an NTA and the asylum office does not have the required DHS forms for credible fear processing").
  - o Follow guidance in *CFPM Section IV.N. Non-Detained Aliens* to process the individual for credible fear

### *b. Form I-589 Filed by Individual Previously Screened for Credible Fear* [8]

Similarly, the asylum office does not have jurisdiction to adjudicate a Form I-589 if the individual was referred for a credible fear screening and was issued an NTA, but the NTA was either not filed and docketed with EOIR, or the NTA was filed and docketed but removal proceedings were terminated by the immigration judge due to error(s) in the NTA or PCQS reflects Failure to Prosecute (FTP) in the "IJ Other Comp" field. These individuals are also still in expedited removal. For further guidance, see *AAPM Section III.B.3. Credible Fear-Screened Affirmative Asylum Applicants*.

### *c. Form I-589 Filed by Individual in Expedited Removal Who Is Also Issued an NTA* [9]

USCIS does not have jurisdiction over a Form I-589 filed by an individual in expedited removal who was also issued an NTA. If PCQS-DOJ-EOIR does not indicate that the NTA was filed and docketed with EOIR, the asylum office will re-issue and file the NTA with EOIR. [10] For further guidance, see *AAPM Section III.L.1.b.i. Previously Issued NTA Not Filed and Docketed with EOIR*.

If PCQS-DOJ-EOIR indicates the NTA was already filed and docketed with EOIR, then the expedited removal order was terminated when the NTA was properly filed with EOIR, and the individual is no longer in expedited removal and is in INA section 240 removal proceedings. See *AAPM Section III.L.1, USCIS Jurisdiction* for further guidance.

The asylum office has jurisdiction over a Form I-589 filed by an individual who was issued a Form I-860 and an NTA that was filed and docketed with EOIR if the Immigration Judge subsequently terminates or dismisses the INA section 240 removal proceedings. See AAPM III.B.16 Previously in Removal Proceedings (PRP) Asylum Applications for more information related to processing Previously in Removal Proceeding (PRP) cases.

USCIS will adjudicate the Form I-589 following normal adjudication procedures for affirmative asylum cases, unless AAPM III.B.16 Previously in Removal Proceedings (PRP) Asylum Applications indicates otherwise. Prior to adjudication, asylum officers will consider whether an individual appears to fall within the class member definitions in the final settlement agreement in *Mendez Rojas et al. v. Wolf et al.*, 2:16-cv-01024-RSM (W.D. Wash. Nov. 4, 2020). If an individual is a *Mendez Rojas* class member, both USCIS and EOIR must treat pending and newly filed Forms I-589s as timely filed for purposes of the one-year filing deadline, provided the Form I-589 was filed on or before April 22, 2022. Therefore, in these cases, asylum

USCIS00004258

officers should review PCQS-DOJ-EOIR and the A-file for evidence of class membership. Once class membership is verified, asylum officers should include the following language in their assessment under the OYFD section:

> "Under U.S. law, an asylum seeker generally must file an asylum application within one year of their last arrival in the United States, or the application may be denied. Pursuant to the final settlement agreement in *Mendez Rojas et al. v. Wolf et al.*, 2:16-cv-01024-RSM (W.D. Wash. Nov. 4, 2020), USCIS has agreed to treat pending and newly filed asylum applications by certain asylum applicants as timely filed for purposes of the one-year filing deadline. In order to benefit from this final settlement agreement, the applicant must meet the following *Mendez Rojas* class definition. The applicant is a member of Class A.I, as defined by the court order. DHS records indicate that the applicant was apprehended by CBP on [date]. Although DHS filed the Notice to Appear with the Executive Office for Immigration Review to commence removal proceedings under INA § 240, the immigration judge terminated or dismissed those removal proceedings. DHS did not provide notice to the applicant of the one-year filing deadline for asylum applications. The applicant filed the asylum application on [date], more than one year after their last arrival. However, since the applicant is a member of Class A.I, USCIS will find that their asylum application was timely filed."

In instances where PCQS reflects Failure to Prosecute (FTP) in the "IJ Other Comp" field, USCIS will not adjudicate the asylum application and will instead accept the Form I-589, re-issue and file the NTA with EOIR, and forward the case to the appropriate immigration court for adjudication.[11] For further guidance, see *AAPM Section III.B.15.b. NTA Filed but EOIR Issues Failure to Prosecute Decision*.

### d. Form I-589 Filed After NTA EOIR Docketing Date[12]

If an individual who was issued a Form I-860 and later an NTA which is filed and docketed with EOIR subsequently files a Form I-589 with USCIS, see *AAPM Section III.L.1. USCIS Jurisdiction* for further guidance.

### e. Form I-589 Filed by Individual with Negative Credible Fear Determination and Unfiled Form I-863[13]

If a Form I-589 is submitted by an individual who received a negative credible fear determination and requested immigration judge review, but the Form I-863, Notice of Referral to Immigration Judge, and Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge, were not properly filed with EOIR, USCIS will re-issue the Form I-863 and Form I-869, prepare the negative credible fear court packet, and refer the negative credible fear determination case to the appropriate immigration court for immigration judge review. For further guidance, see *CFPM Section III.J. Serving the Determination on the Alien* and *CFPM Section III.K. Post-Service Processing*.

In addition, USCIS will administratively close the Form I-589 in the case management system by selecting "No/IJ Jurisdiction" and issue Appendix 108 ("Notice of Forwarding of Form I-589 to EOIR OR Notice of Dismissal of Form I-589 (Expedited Removal)") using **Option 6** ("If the applicant received a negative credible fear determination and requested IJ review, but IJ review did not occur"). For further information, see *AAPM Section III.B.3. Credible Fear-Screened Affirmative Asylum Applicants*.

### f. Form I-589 Filed by Individual with Negative Credible Fear Determination that Immigration Judge Vacated. NTA Not Issued or Not Filed and Docketed with EOIR[14]

If a Form I-589 is submitted by an individual who received a negative credible fear determination that an immigration judge vacated, but the NTA was either not issued or not filed and docketed with EOIR, USCIS will issue a new NTA, prepare the EOIR court packet, and forward the case to the appropriate immigration

USCIS00004259

court. For further guidance, see *AAPM Section III.B.15.d. IJ Vacated USCIS's Negative Credible Fear Determination, but NTA Not Issued, or NTA Not Filed and Docketed with EOIR.*

---

[1] See scenarios 2, 3, and 7 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[2] See scenario 11 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[3] See scenario 13(a) in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[4] See scenario 13(b) in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[5] A Form I-860 is outstanding and an individual, therefore, remains in expedited removal if (1) an NTA was issued subsequent to a Form I-860, but the NTA was not properly filed and docketed with EOIR; (2) the individual was referred to an immigration judge for review of a negative credible fear determination, but the immigration judge's review has not occurred; or (3) the Form I-860 is final but has not been executed.

[6] *Ms. L* class members and *M.M.M.* agreed class members may have a Form I-860 that remains outstanding. "If a *Ms. L* class member or *M.M.M.* agreed class member was released from DHS or ORR custody, is not currently in Section 240 removal proceedings, and is not subject to a final removal order, that individual can affirmatively apply for asylum before U.S. Citizenship and Immigration Services (USCIS), USCIS will adjudicate such an application regardless of whether an unfiled NTA exists[.]" "Plan to Address the Asylum Claims of Class-Member Parents and Children Who Are Physically Present in the United States" (*Ms. L/M.M.M./Dora* Settlement Agreement), *Ms. L v. ICE*, No. 18-cv-428 (S.D. Cal. filed Feb. 26, 2018) (incorporating the putative class members of *Dora v. Sessions*, No. 18-cv-1938 (D.D.C. filed Aug. 17, 2018)).

[7] See scenario 1 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[8] See scenario 7 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[9] These procedures do not apply to *Ms. L* class members or *Dora* plaintiffs. Those individuals may apply affirmatively with USCIS as long as they are not currently in INA section 240 removal proceedings and are not subject to a final removal order.

[10] See scenario 2, 7 and 12 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[11] See scenario 4 and 7 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[12] See scenarios 10 and 13 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[13] See scenarios 8 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

[14] See scenarios 12 in Appendix 106 ("Form I-589 Adjudication Reference Chart") for additional guidance.

USCIS00004260

## III.M.  MOTIONS TO REOPEN AND RECONSIDER

There are two types of motions that an applicant may submit to an asylum office following a final decision in their case: (1) motions to reopen and (2) motions to reconsider. The differences between a motion to reopen and a motion to reconsider, how an applicant submits them, and how the asylum office processes them are outlined in this section.

### 1. Types of Motions

#### a. Motion to Reopen [1]
A motion to reopen must state new facts that materially impact the applicant's case and must be supported by affidavits or other documentary evidence.

#### b. Motion to Reconsider
A motion to reconsider must establish that the decision was based on an incorrect application of law or policy and must be supported by relevant authorities or precedential case law. The motion must also establish that the decision was incorrect based on the evidence of record at the time of the initial decision. New facts or new documentary evidence will not be considered in a motion to reconsider.

### 2. Asylum Office Processing of a Motion

The applicant or their representative of record submits their motion directly to the asylum office. No form, including the Form I-290B, Notice of Appeal or Motion, or filing fee is required for either type of motion. The applicant or their representative of record must submit any motion within 30 days of the decision that the motion seeks to reopen or reconsider, or within 33 days if USCIS mailed the decision to the applicant. [2] However, failure to file a motion before this period expires may be excused in the discretion of the asylum office director where it is demonstrated that the delay was reasonable and beyond the control of the applicant. [3]  Either a principal or a dependent may file a motion to reopen or reconsider.

### 3. Jurisdiction [4]

Jurisdiction over a motion to reopen or reconsider rests with the director of the asylum office with jurisdiction over the applicant's place of residence, even if that office did not issue the decision that the applicant seeks to reopen or reconsider.

An asylum office director, or their designee, should only consider a motion to reopen or reconsider for a case that has received a final denial from an asylum office. Because referred cases have not received a final decision, they are not entitled to reopening or reconsideration. [5] However, an asylum office director may seek to terminate removal proceedings stemming from a Notice to Appear (NTA) that was issued by the asylum office and served on the immigration court if the director believes an egregious error may have been committed. If the asylum office director elects to pursue termination of the removal proceedings due to the commission of an egregious error, they should coordinate their efforts with the Asylum Headquarters Operation Branch. Terminating removal proceedings under these circumstances must be coordinated with the USCIS Office of the Chief Counsel and/or the ICE Office of the Principal Legal Advisor (OPLA).

USCIS00004261

When the asylum office receives a motion, asylum office personnel with a Supervisor role or higher should update Global by choosing the Motion to Reopen case event on the Adjudication tab and completing the resulting card with the date the motion was received and whether it was a motion to reopen or reconsider. The case log and case state will update to indicate that a motion was received.

### 4. Denying or Dismissing a Motion

An asylum office director may deny a motion if the motion does not meet the qualifications outlined in *AAPM Section III.M.1.a Motion to Reopen* or *III.M.1.b. Motion to Reconsider.* Similarly, the asylum office director may dismiss the motion if the motion was not filed timely as outlined in *AAPM Section III.M.2 Asylum Office Processing of a Motion*. When the asylum office director denies or dismisses a motion that does not meet applicable requirements, asylum office personnel prepare and issue to the applicant and any representative of record a written notice of denial or dismissal. The written notice indicates that the denial or dismissal is based upon either not meeting applicable requirements to support the motion to reopen or reconsider or a failure to file timely. Asylum office personnel also update the Motion to Reopen card on the Adjudication tab in Global as outlined below to indicate that the motion was not approved. An update reflecting this decision will appear on the case log, and the case state will revert to the original case state at the time of service.

#### a. Final Denials of Asylum

For cases where the Asylum Division had issued a final denial of asylum, if an applicant falls out of valid immigration status or parole prior to the denial or dismissal of a motion to reopen or reconsider, the asylum office director can exercise discretion to place a noncitizen who is not in valid immigration status or parole into removal proceedings. For reform cases, the 180-Day EAD Clock is stopped upon entry of a final denial in Global. Issuance of an NTA after a final denial will have no effect on the stopped clock. The clock will start anew if the applicant files a new asylum application in removal proceedings.

If an applicant is maintaining valid immigration status or parole, the applicant may submit a new asylum application to USCIS following a final denial of asylum and/or the denial or dismissal of a motion to reopen or reconsider. That new asylum application would be subject to the same prohibitions on filing as any other newly filed asylum application.

#### b. Referred Cases

Motions to reopen or reconsider should not be approved for asylum referrals unless such approval was authorized by the Asylum Headquarters Operations Branch. However, asylum office personnel should use the Motion to Reopen case event in Global to note that a motion was received from an individual who was referred and select "No" under the "Approved?" header. This will ensure the record retains the motion to reopen request and subsequent motion denial for future reference. Both the initial Motion to Reopen card and the update indicating that the motion was not approved should be added on the same day to avoid impacts to the applicant's employment authorization eligibility.

When the asylum office denies or dismisses a motion to reopen or reconsider for a case that was previously referred, the asylum applicant continues to pursue their application in removal proceedings. No action in Global should be taken after the denial or dismissal of a motion in a case that was previously referred unless directed by Asylum Headquarters.

USCIS00004262

### 5. Granting a Motion

The asylum office must grant the motion and reopen the case for review and re-adjudication if the applicant 1. met the stated time period requirements outlined above and 2. provided new facts that would materially impact the adjudication of the asylum claim (motion to reopen) or provided evidence that the original decision was based on an incorrect application of law or policy (motion to reconsider).

How the asylum office processes a case following the granting of the motion will vary, depending upon what adjudicative actions are needed. The asylum office director or their designee determines whether the applicant will receive another interview or whether the case will be processed solely on the existing evidence in the record. Asylum office personnel notify the applicant and any representative of record in writing that the asylum office granted the motion. Asylum office personnel should update the Motion to Reopen card in the Adjudication tab in Global, indicating that the motion was approved. An update reflecting this decision will appear on the case log and in the case state.

When asylum office personnel are ready to render a decision on the underlying asylum application after approving a motion, they must either add and complete an MTR Decision card on the Adjudication tab in Global if the case does not require reinterview, or they must schedule the case for a re-interview manually through the Schedules tab if a reinterview is required. Manually scheduling the case for a re-interview will remove the option to complete the MTR Decision card, and the case will be processed in Global as a standard case from that point forward.

#### a. Asylum Office Upholds the Original Decision without Reinterview

If the asylum office upholds the original decision in the case, asylum office personnel issue to the applicant and their representative of record, if any, the decision and prepare the case for service. If the case does not require reinterview, the decision must be recorded on the MTR Decision card in the Adjudication tab in Global by choosing the decision outcome "Deny" and filling in the rest of the required data in the card. Users with the role of Officer and above may generate the MTR Decision card. Upon saving, the case log and case state will update to indicate that the original decision was upheld. As of November 2023, Global does not have the ability to record whether supervisory review was conducted after entry of the MTR Decision card; therefore, asylum offices must ensure that supervisory review of the new decision is conducted and properly documented outside of Global. To finalize the new decision on the case, asylum office personnel must enter and complete a Service card in the Adjudication tab in Global, documenting service of the new decision..

#### b. Asylum Office Overturns the Original Decision without Re-interview

If the asylum office overturns the original decision, asylum office personnel prepare the case as an approval and update the MTR Decision card in Global to record a decision outcome of "Grant" if the case does not require reinterview. The case log and case state will update to record that the original decision has been overturned and the case has been granted. Supervisory review must be completed but cannot be documented in Global; therefore, asylum offices must ensure that supervisory review of the decision to grant is properly documented outside of Global. Once the case is served and the service is recorded in Global, Global will generate a request for an asylee Employment Authorization Document (EAD) for the applicant.

#### c. Asylum Office Determines Re-interview is Required

If a case requires a reinterview, asylum office personnel should manually schedule the re-interview after approving the Motion to Reopen card in Global. Asylum office personnel should ensure that the MTR Decision card is not added to the case. If the case has been scheduled for a re-interview, the MTR

USCIS00004263

Decision card will not be available as the MTR Decision card will not be used for cases requiring re-interview. Once the case is scheduled for interview, asylum office personnel should process the case in Global as though it was a standard adjudication, including documenting the decision, supervisory review, and service.

---

[1] Please contact Asylum Headquarters for guidance if you receive a motion to reopen from a Ms. L. Settlement Class member.

[2] If an asylum decision is served by mail, three days are automatically added to the stated 30-day period. See 8 C.F.R. § 103.8(b).

[3] This 30 or 33-day timeframe does not apply to Ms. L. Settlement Class members seeking to reopen a Form I-589 that was previously referred or forwarded to EOIR or denied. Please contact Asylum Headquarters with questions related to motions to reopen from Ms. L. Settlement Class members.

[4] Motions to reopen from Ms. L. Settlement Class members cannot be denied. Please contact Asylum Headquarters for guidance if you receive a motion to reopen from a Ms. L. Settlement Class member.

[5] This limitation does not apply to Ms. L. Settlement Class members who may request reopening of a Form I-589 that was previously referred or forwarded to EOIR. Please contact Asylum Headquarters with questions related to motions to reopen from Ms. L. Settlement Class members.

USCIS00004264

## III.N.  PAROLEES INELIGIBLE FOR ASYLUM

A parolee is an applicant for admission who may be inadmissible to the United States but has been allowed to enter or remain in the United States for a temporary period. The U.S. Department of Homeland Security (DHS) may parole a noncitizen into the United States under certain conditions for a specific purpose. See INA § 212(d)(5)(A). Parole is neither a lawful admission nor a determination of admissibility. See INA §§ 212(d)(5)(A), 101(a)(13)(A).

If an applicant filed for asylum before or after receiving parole, the asylum officer should first determine if USCIS has jurisdiction to adjudicate the asylum application. USCIS may not have jurisdiction over the paroled noncitizen's asylum application if the noncitizen is in expedited removal proceedings, is in immigration court proceedings (i.e., has a filed and docketed[1] Notice to Appear (NTA) with the immigration court), or there is an unfiled NTA.[2] Please review AAPM Section III.L. Jurisdiction for instructions related to processing applications that fall into these scenarios.

If, after determining that USCIS has jurisdiction to adjudicate the application, the parolee is found eligible for asylum and merits asylum as a matter of discretion, the case should be prepared as an approval. Please refer to AAPM Section II.N.1., Applicant Appears Eligible for Asylum.

This section outlines the processing procedures for parolees who are found ineligible for asylum after a determination that USCIS has jurisdiction to adjudicate their asylum application. For additional background information, see Langlois, Joseph E. Asylum Division. Processing Parole Cases, Memorandum to Asylum Office Directors, 21 September 1998.

### 1.  Applicants in a Current Period of Parole at Time of Adjudication

The asylum office must issue a denial when an applicant is determined to be ineligible for asylum and is in a current period of parole. See 8 C.F.R. 208.14(c)(3). However, asylum offices have the discretion to terminate parole through the service of a charging document (NTA) on the parolee, under certain circumstances. *See* 8 C.F.R. 212.5(e)(2)(i). Until the NTA is served, the applicant remains a parolee, so a denial must be issued. Once the NTA is served on the applicant, parole is terminated. *See id.*

The asylum office should terminate parole through issuance of an NTA when the record clearly indicates that the sole purpose of parole was to allow the applicant to apply for asylum and that purpose has been accomplished through the adjudication of the asylum application.

#### a. Applicants with Parole Granted for the Sole Purpose of Applying for Asylum

If an applicant is initially found ineligible for asylum, was paroled for the sole purpose of applying for asylum, and the parole is not expired or terminated at the time of preliminary decision, asylum office personnel:

- Prepare a NOID. Please follow the procedures in AAPM Section II.N.2.c., Notice of Intent to Deny.

- If the applicant's rebuttal overcomes the reasons for denial, asylum office personnel prepare the case as an approval. Please follow the procedures outlined in AAPM Section II.N.1. Applicant Appears Eligible for Asylum.

- If the applicant's rebuttal does not overcome the reasons for denial, or the applicant fails to

USCIS00004265

submit a rebuttal, asylum office personnel continue with the next steps.

If parole is not expired or terminated at the time of the final decision, asylum office personnel:

- Prepare a Final Denial – Parole letter explaining that the enclosed NTA constitutes written notice of termination of the applicant's parole (Appendix 58) and a Notice to Appear (NTA).
- When preparing the NTA, use the charge PRL1 to charge as an intending immigrant or PRL2 for nonimmigrants. PRL1 should be sufficient for most cases, but PRL2 may be appropriate on occasion. Consult with USCIS Office of the Chief Counsel for the appropriate charges.

### b. Applicants with Parole Granted for Other Reasons

If an applicant is found initially ineligible for asylum, was paroled for a purpose other than to apply for asylum, and parole is not expired or terminated at the time of preliminary decision, asylum office personnel:

- Prepare a NOID. Please follow the procedures in AAPM Section II.N.2.c., Notice of Intent to Deny.
- If the applicant's rebuttal overcomes the reasons for denial, asylum office personnel prepare the case as an approval. Please follow the procedures in AAPM Section II.N.1., Applicant Appears Eligible for Asylum.
- If the applicant's rebuttal does not overcome the reasons for denial, or the applicant fails to submit a rebuttal, asylum office personnel continue with the next steps.
- If parole is not expired or terminated at the time of the final decision, asylum office personnel:
- Prepare a Standard Final Denial letter that does not refer to termination of parole using Appendix 56 or Appendix 57.
- Do not prepare an NTA.

### 2. Applicants Whose Parole is Expired or Terminated at Time of Final Decision

The guidance in this section applies to the below categories of noncitizens who are found ineligible for a grant of asylum, their parole is terminated or expired at the time of final decision, and there is no other legal basis for the applicant to remain in the United States:

- applicants paroled pursuant to an advance authorization of parole issued prior to departing the United States,
- applicants paroled prior to April 1, 1997,
- and applicants paroled on or after April 1, 1997 (not pursuant to advance parole).

Applicants in the first two categories (paroled pursuant to an advance authorization of parole issued prior to departing the United States or paroled prior to April 1, 1997) are subject to INA § 240 removal proceedings when they are not eligible for a grant of asylum, their parole is terminated or expired, and they have no other legal basis to remain in the United States.

Applicants who were paroled into the United States on or after April 1, 1997, without advance authorization for parole issued prior to departing the United States, may be subject to the credible fear

USCIS00004266

screening process under 8 CFR § 235.3(b) when parole is terminated or expired under 8 CFR § 208.14(c)(4)(ii). However, asylum office personnel do not conduct a credible fear screening regardless of whether the applicant is in expedited removal proceedings for applicants whose parole is expired or terminated. Where the noncitizen is ineligible for asylum and does not have any other legal basis to remain in the United States, asylum office personnel refer the affirmative asylum application to an immigration judge in accordance with 8 CFR § 208.14(c)(1) as USCIS retains discretion to issue a Notice to Appear for individuals who may be subject to the credible fear process. 8 CFR § 208.30(b).

### a. Confirm Whether Re-Parole Request is Pending with USCIS

If an applicant is ineligible for asylum and their parole is expired or terminated at the time of decision issuance (regardless of the purpose for which parole was authorized), asylum office personnel should verify with the applicant whether they applied for re-parole and also check in CLAIMS 3 and ELIS2 to see if there is a pending Form I-131, Application for Travel Document, filed for the purpose of requesting re-parole (a new period of parole in the United States).

If there is no pending re-parole request, see Section b. Applicants Without Any Re-Parole Requests.

If a re-parole request is pending, see Section c. Applicants With a Pending Re-Parole Request, below.

### b. Applicants Without Any Re-Parole Requests

If no re-parole request is pending at the time of the final decision, as confirmed by checking CLAIMS 3 and ELIS2, asylum office personnel process the case as a referral and issue an NTA.

When preparing the NTA for an applicant ineligible for asylum whose parole is expired or terminated, use the charge PRL1 to charge as an intending immigrant or PRL2 for nonimmigrants. PRL1 should be sufficient for most cases, but PRL2 may be appropriate on occasion. Consult with USCIS Office of the Chief Counsel for the appropriate charges. Please also refer to AAPM Section II.N.2. Applicant Appears Ineligible for Asylum.

This guidance does not apply to a crewmember who last arrived in a working capacity on a vessel, was paroled in, and the parole has expired or been terminated. In that instance, the crewmember reverts to an applicant for a landing permit. Please see AAPM Section III.L.3.a.i., Aliens Not Entitled to Proceedings Under Section 240 of the INA for guidance.

### c. Applicants with a Pending Re-Parole Request

If the applicant is ineligible for asylum and there is a pending re-parole request with USCIS as confirmed by checking CLAIMS 3 and ELIS2, the asylum office contacts the office adjudicating the re-parole request to determine a resolution. Note: For questions related to contact information of specific USCIS offices with pending re-parole requests, please route them through the asylum office chain of command to the HQ Operations Branch for coordination.

When contacting the USCIS office adjudicating the re-parole request:

- Indicate that the asylum office will suspend processing of the asylum application for 30 days from the date of the notification to allow the adjudicating office to process the re-parole request.
- Indicate that after 30 days the asylum office will move forward with adjudicating the asylum application if the office adjudicating the re-parole request has not responded or asked for an extension.

179

USCIS00004267

- Use the hold code "Parole Expired – Pending Re-Parole Request" in Global Affirmative to put the asylum application on hold while waiting for the adjudicating office to process the pending re-parole request. Note: This hold code does not impact the 180-day Asylum Employment Authorization Document (EAD) Clock.

If the USCIS office adjudicating the re-parole request does not wish to expedite the pending Form I-131 and/or they do not respond within 30 days, the asylum office may process the case as a referral and issue the NTA as outlined above. Note: Case-specific circumstances may warrant additional follow-up with the USCIS office adjudicating the re-parole request prior to issuing the referral and NTA.

### 3. Dependents Who Are Parolees

There are instances when the dependent is a parolee, but the principal applicant was not paroled into the United States. If the asylum office is referring the principal applicant to the Immigration Court, the following special procedures must occur for the dependent who was paroled.

#### *a. Dependent's Parole is Expired or Terminated, or the Asylum Office is Terminating Parole*

If the dependent's parole is expired or terminated, no special procedures apply, and the dependent is referred to the Immigration Court along with the principal applicant.

If the dependent was paroled for the sole purpose of applying for asylum and the asylum office is terminating parole, asylum office personnel refer the dependent to the Immigration Court along with the principal applicant. Asylum office personnel issue the standard Referral Notice (Appendix 51) as follows:

- Ensure the name and A-number of the dependent whose parole is being terminated by the asylum office is included in the Referral Notice.
- Include the below language directly before the paragraph on employment authorization, or directly before the closing salutation for applications filed before January 4, 1995:
  - "The attached Notice to Appear (Form I-862) for your [spouse/child], [Name], [A-number], constitutes written notice of termination of [their] parole pursuant to 8 C.F.R. 212.5(e)(2)(i)."

Generally, the asylum office will not terminate the parole of a dependent except where the sole purpose for the parole was to allow the dependent to apply for asylum, and this purpose has been fulfilled. See AAPM Section

III.N.4.b below for handling cases where the dependent's parole is not expired or terminated.

#### *b. Parole is Not Expired or Terminated and the Asylum Office is Not Terminating Parole*

If the dependent was paroled for reasons other than to apply for asylum and that parole is not expired or terminated, the asylum office normally does not terminate parole. If the dependent's parole is not expired or terminated, but the principal is being referred to Immigration Court, asylum office personnel issues the standard Referral Notice (Appendix 51) as follows:

USCIS00004268

- Do not include the name and A-number of the dependent who is a current parolee on the Referral Notice.
- Include the below language directly before the paragraph on employment authorization, or directly before the closing salutation for applications filed before January 4, 1995:
  - Because your [spouse/child], [Name], [A-number], who was listed on your asylum application as a dependent, does not appear removable, we are not placing them in Immigration Court proceedings along with you.".

---

[1] "Docketed" refers to the EOIR Docketed Date, which is when Immigration Court staff enters into EOIR's case management system, CASE or any successor, the EOIR Rec'd Date and charging document information. The EOIR Docketed Date reflects the formal acceptance of a newly filed case onto the court's docket for case scheduling and processing.

[2] Pursuant to the Settlement Agreement in *Ms. L. v. ICE*, 18-cv-00428 (S.D. Cal. 2018) (approved Dec. 11, 2023), USCIS must take jurisdiction over an affirmative Form I-589 filed by a *Ms. L.* Settlement Class member notwithstanding the existence of an unfiled NTA, if USCIS otherwise has jurisdiction over the Form I-589. *Ms. L.* Settlement Class members in pending expedited removal (ER) or reinstatement proceedings, or with a final ER/reinstated order, must have their ER/reinstatement proceedings cancelled, or their final ER/reinstated order rescinded, by DHS prior to filing an affirmative asylum application with USCIS or requesting that USCIS reopen a prior asylum application under the terms of the Settlement Agreement. *Ms. L.* Settlement Class members in pending INA § 240 proceedings before EOIR, or with a final removal order, must have their INA § 240 proceedings dismissed or terminated (or reopened/remanded and dismissed/terminated) by an Immigration Judge. Procedures for processing cases under the Ms. L settlement agreement will be separately provided and should be processed according to the terms of the settlement agreement and those procedures.

USCIS00004269

# III.O. PRE-REFORM VS. REFORM APPLICATION PROCESSES

The term pre-reform applies to applications filed prior to January 4, 1995. January 4, 1995, is the date that reform regulations took effect following a Presidential mandate to streamline the affirmative asylum process. The term reform applies to applications filed on or after January 4, 1995.

The main differences between a pre-reform application and a reform application relate to an applicant's ability to obtain employment authorization, and DHS's ability to use an I-589 to establish alienage and deportability. First, applicants who filed for asylum prior to reform were not required to wait 150 days before filing a request for employment authorization. Second, some charging documents issued by an Asylum Office based upon information gleaned from an I-589 were rejected by Immigration Judges because they have generally taken the position that charging documents based solely on an asylum application filed prior to January 4, 1995, are insufficient. For all other purposes, the processing of pre-reform and reform applications is the same. See Section III.F of this manual for more information on employment authorization.

### 1. Overview of Processing Procedures – Pre-Reform vs. Reform

Prior to asylum reform, AOs either approved or denied asylum applications; they did not refer applications to the Immigration Court.

If an applicant was not eligible for an approval of asylum, an AO issued a NOID, regardless of the applicant's immigration status. The applicant was then given thirty (30) days to offer evidence in rebuttal to the reasons stated in the NOID. If the AO's decision did not change after a rebuttal was considered, or if no rebuttal was received, a Final Denial letter and charging documents were issued to any alien who was deportable or excludable. The applicant could then submit a new asylum application before the Immigration Judge. Applicants in valid immigrant, nonimmigrant, parole status, or temporary protected status were not placed in deportation or exclusion proceedings and were issued only the Final Denial letter.

Under reform, after an interview has taken place, an AO finds an applicant: (1) eligible for an approval of asylum; or (2) ineligible for an approval of asylum. If an applicant in category (2) appears deportable or removable, the Asylum Office provides him or her a Referral Notice, indicating the reason(s) for the referral, and initiates removal proceedings by scheduling a hearing in Immigration Court and issuing an NTA. A referral is not a final decision in the case, and an Immigration Judge will hear the applicant's claim anew. An applicant in category (2) who is in-status receives a Final Denial letter without an accompanying NTA at the time the final decision is rendered.

### 2. Applications Interviewed before January 4, 1995 but Still Pending a Final Decision

There may be still be a small number of asylum applications pending for applicants who were interviewed prior to January 4, 1995, but whose applications are still pending a final decision. If the Asylum Office marked the case with a special group code, then the reason for its pending status may result from an HQASM policy that suspended final adjudication of the I-589. If a special group code is not present, Asylum Office personnel process the case for a final decision according to the following instructions:

USCIS00004270

### a. Applicants Eligible for Asylum Status

If the applicant is eligible for asylum status, the Asylum Office prepares the case for an approval. In some cases, an additional interview may be required, and all security checks must be complete and current before issuing the approval.

### b. Applicants Ineligible for Asylum Status

An applicant who was interviewed prior to reform may have an expectation that his or her case will be processed according to procedures in place at the time of interview. However, because current regulations only give an AO the authority to deny asylum to an applicant who is in-status, a Final Denial cannot be issued to an applicant who is deportable or removable. Because the applicant's prior interview occurred over 10 years ago, the Asylum Office should re-interview the applicant and process the case per regular reform procedures. Different rules are in place for ABC applicants. See ABC-NACARA Procedures Manual for more information.

### c. Evidence of Deportability/Removability

If required by the Executive Office for Immigration Review in the jurisdiction of the Asylum Office, Asylum Office personnel may have to obtain evidence of deportability or removability from documents other than the pre-reform I-589, particularly in the case of a no-show. Examples of possible sources of evidence are:

| Entered Without Inspection | Admitted to the U.S. |
|---|---|
| • I-765 applications in the file | • IBIS SQ94 data |
| • CLAIMS data | • I-94 and/or passport, when available |
| • I-213 (completed by an office other than asylum) | • I-765 applications in file |
| | • CLAIMS |

In addition to the above supporting evidence, the Asylum Office may be required to prepare an I-213, even if not normally required with the referral of a reform case. An I-213 can be prepared with the RAPS Forms Generation Module on the OSCG/OSCP screens.

USCIS00004271

# III.P. PROHIBITONS ON FILING AN ASYLUM APPLICATION

Certain aliens are not eligible to apply for asylum; however, only an AO or an IJ can make this determination after an interview has been conducted. Therefore, the Service Center and the Asylum Office accept asylum applications without regard to whether a prohibition on filing may apply. *See* Langlois, Joseph E. Procedures for Implementing the One-Year Filing Deadline and Processing Cases Previously Denied by EOIR, Memorandum to Asylum Office Directors, et al., 4 January 2002, 14p. *See also* 8 C.F.R. 208.4.

### 1. Categories of Aliens who May not Apply for Asylum

The categories of aliens who are prohibited from filing for asylum are listed below. These prohibitions only apply to an applicant who applies for asylum on or after April 1, 1997:

- Any alien who has not filed an application for asylum within one year of last arrival in the U.S., unless the alien establishes changed circumstances that materially affect his or her eligibility for asylum or extraordinary circumstances directly related to the delay in filing.
- Any alien who previously has been denied asylum as a principal applicant by an Immigration Judge or the BIA (EOIR), unless the alien establishes the existence of changed circumstances that materially affect the applicant's eligibility for asylum. If the applicant was a dependent on a prior I-589 that was denied by the IJ or the BIA, the prohibition on filing does not apply. 8 C.F.R. 208.14(f)
- Any alien who may be removed to a "safe third country" pursuant to a bilateral or multilateral agreement. As discussed in Section III.P.4 below, the U.S. and Canada currently have an agreement, which restricts access to the asylum system of a partner country for aliens arriving from the other partner country in certain circumstances.

Background information and procedural guidance relating to the prohibitions against filing an asylum application are outlined below.

### 2. One-Year Filing Deadline

Any asylum applicant who applied for asylum on or after April 1, 1998 (or April 16, 1998, for those applying with USCIS), must establish that he or she filed for asylum within one year from the date of last arrival in the U.S. or establish that he or she is eligible for an exception to the one-year filing requirement based on changed circumstances that materially affect the applicant's eligibility for asylum or extraordinary circumstances directly related to the delay in filing the application. An application with a filing date on or before April 15, 1998, is not subject to the one-year filing deadline as implemented by the Asylum Division. Although April 1, 1998, is the effective date provided by regulation for those who arrived before April 1, 1997, the INS extended an administrative 14-day grace period for applications filed with the INS. This 14-day period only applies to those applications filed in the first 15 days of April 1998. INA §§ 208(a)(2)(B), (D) and 8 C.F.R. 208.4(a)(2), (4).

Only an Asylum Officer, IJ, or the BIA is authorized to make the determination of whether the applicant established an exception to the one-year filing deadline. An asylum interview is the method USCIS uses

USCIS00004272

to determine an applicant's eligibility to apply. Therefore, asylum applications are accepted for filing regardless of whether the applicant filed timely.

### a. Calculating the One-Year Period and Determining the Filing Date

The methods for calculating the one-year period within which the applicant was required to file and determining the filing date and substantive guidance for the adjudication of cases affected by the one-year filing deadline are contained in the AOBTC Lesson Plan One-Year Filing Deadline.

### b. Interview

Regardless of the filing date of an application, Asylum Officers are to give all applicants an asylum interview. This includes pre-interview familiarization with general country conditions and post-interview research of specific country conditions relevant to the applicant's situation, where applicable.

### c. Analysis and Assessment

#### i. Applicant Established an Exception to the One-Year Filing Deadline

When an applicant has established an exception to the one-year filing deadline, Asylum Officers must include a brief analysis of the one-year filing deadline issue in the assessment to grant or refer. The analysis should include the changed and/or extraordinary circumstances established and a finding that the applicant filed within a reasonable time given the circumstances. If the exception(s) established are based on country conditions, country reports must be cited.

#### ii. Applicant Did Not Establish an Exception to the One-Year Filing Deadline

Referral of an application based on the one-year filing deadline is mandatory for applicants who meet all of the following criteria:

- The I-589 was filed on or after April 16, 1998.

AND

- The applicant has not established by "clear and convincing" evidence that he or she filed an application for asylum within one year of his or her last arrival by establishing either:

1) clear and convincing evidence that the date of last arrival is within the applicable 1-year period or
2) clear and convincing evidence that the applicant was outside the United States during the year immediately preceding the filing date.

AND

- No changed circumstances or extraordinary circumstances apply, or if any do apply, the application was not filed within a reasonable period of time given those circumstances.

### (a) Assessment Requirements

When a case is referred to the IJ based on the one-year filing deadline, officers are not required to include in the referral assessment a full account of the material facts of the applicant's claim, nor must they discuss whether an applicant has established past persecution or has a well-founded fear. The assessment must include all of the following information:

USCIS00004273

- brief biographical information about the applicant such as age, gender, country(ies) of birth and citizenship; date, place, and manner of last arrival including date status expired, if applicable; and the date the I-589 was filed
- identification of the protected characteristic(s) (race, religion, nationality, political opinion, or membership in a particular social group) relevant to the applicant's claim and a brief statement of the harm feared (e.g., "Applicant fears she will be persecuted by the FARC on account of her political opinion.")
- a statement and supporting analysis of the finding that the applicant was found ineligible for an exception based on changed circumstances relating to country conditions because: 1) there was no change in country conditions, 2) the change occurred before April 1, 1997, 3) the change did not materially affect the applicant's asylum eligibility, or 4) the I-589 was not filed within a reasonable time after the change, considering delayed awareness if applicable. This finding and analysis must be supported by a specific description, with citations, of country conditions pertinent to the protected characteristic(s) relevant to the applicant's claim, if any. The time period covered by the description and citations is determined on a case-by-case basis, and may depend on whether a change in country conditions has been asserted by the applicant. Generally, the relevant country conditions would be the period beginning approximately 24 months before the date of filing and ending on the date of the decision in the case.

Note: There may be exceptions to these requirements. If the information is unavailable, the assessment must contain an explanation of the reasons why a required item is not included. For example, if the Asylum Officer found that the applicant's country of citizenship was not established, or the applicant has not established a protected characteristic, the Asylum Officer should explain his or her finding.


Note: There may be cases in which country conditions are not relevant to the determination of changed circumstances because a change in country conditions would not materially affect the applicant's eligibility for asylum (e.g., where the applicant has not established a nexus between the feared harm and a protected characteristic, the applicant is subject to a mandatory bar, and/or claims no fear of returning to his or her country of origin.)

In such a case, no description or citation of country conditions information is required to support the finding of no changed circumstance materially affecting the applicant's asylum eligibility. The Asylum Officer should include in the assessment the statement, "Any change in country conditions would not materially affect the applicant's eligibility for asylum because (the applicant has not established a protected characteristic, entered the U.S. solely for economic reasons, etc.)" and an explanation of the reasons for the finding. A finding that country conditions are not relevant would not be appropriate merely because the Asylum Officer would have found the applicant ineligible for asylum. This finding should be reserved for cases such as those where the applicant clearly has no protected characteristic, no fear, or is clearly subject to a mandatory bar.

- a statement demonstrating that other possible changed and extraordinary circumstances relating to the applicant's case were examined, but the applicant was found ineligible for an exception based on those circumstances and why (for example, the circumstances are not deemed extraordinary, or the changed circumstances did not materially affect the applicant's asylum eligibility), OR, if the applicant was found ineligible for an exception based on an unreasonable

USCIS00004274

delay in filing after changed or extraordinary circumstances, a thorough analysis of why the Asylum Office found the delay in filing to be unreasonable given those circumstances.

### (b) Country Conditions Citations

Except as indicated above, an assessment to refer based on the one-year filing deadline must reflect that the officer reviewed country conditions to confirm that there has been no change that materially affects the applicant's eligibility for asylum. When country conditions are relevant to the applicant's asylum eligibility, the assessment must contain at least two country conditions citations to support a finding that the applicant has not established an exception based on changed circumstances. The time period covered by the citations is determined on a case-by-case basis, but generally must cover the period beginning 24 months preceding the filing date, and ending on the date of the decision. It is preferable that the two citations are from different sources, however they may be from the same issuing organization or agency if another source cannot be found. These guidelines have been developed as a minimum safeguard to document that, where required, country conditions have been examined for changed circumstances before an application is referred. Certain cases may require a broader review of country conditions or citations to more than two sources. For further guidance on using and citing appropriate country conditions, see AOBTC Lesson Plan, Country Conditions Research and the Resource Information Center (RIC).

Although the burden of proof is on the applicant to establish the exception, Asylum Officers must consult country conditions information relevant to the applicant's claim, where appropriate, to determine whether there are changed country conditions that materially affect the applicant's eligibility for asylum. For more discussion about the "cooperative" role of the Asylum Officer and the applicant's burden of proof, see AOBTC Lesson Plan, One-Year Filing Deadline.

### d. Date of Entry (DOE) in Global

The date of entry is recorded in Global according to whether the applicant met their burden of proof. Regardless of the claimed manner of entry, whenever the applicant has failed to meet the burden of proof with respect to their last arrival date, no date shall be entered into the DOE (Date of Entry) field on the Entry Tab. When the field is left blank, the words "UNKNOWN DOE" will automatically be printed on the NTA. Asylum Officers must address any credibility issues relating to the date of entry in the assessment. For guidance on the applicant's burden of proof and determining the appropriate standards of proof required for entry dates, see ADOTC Lesson Plan One-Year Filing Deadline and Asylum Eligibility Part IV – Burden of Proof and RAIO CT Lesson Plan Evidence.

### e. Preparing the Decision

#### i. Applicant Established an Exception

Asylum Office personnel process the approval, referral, and denial of the application of an applicant who established an exception to the one-year filing deadline in accordance with regular decision procedures. See Section II.N, AO Prepares the Decision.

#### ii. Applicant Did Not Establish an Exception

Asylum Office personnel process a referral based solely on the one-year filing deadline in accordance with regular referral procedures, except for the entry of the FDEC decision code and the issuance of the referral letter. The decision code for a one-year filing deadline referral is I5. The referral letter specific to one-year filing deadline referrals is Appendix 54, Referral – 1-Year Deadline.

187

USCIS00004275

### f. Issuing and Processing Notices of Evidence of Untimely Filing and Optional Waiver of Asylum Interview for Certain Untimely Filed Asylum Applications

Asylum Office Directors have the discretion to issue Notices of Untimely Filing to applicants who, according to the information provided on the Form I-589 and in existing records in Global, are eligible to be offered a waiver of the required asylum interview. Applicants and attorneys may not self-select to waive the asylum interview requirement nor draft their own interview waivers.

#### i. Eligibility for an Interview Waiver Offer

Where the applicant's date of last entry to the United States on the application and the date of filing of the Form I-589 in Global indicate that more than ten years have passed between the claimed date of entry and the current calendar date, the Asylum Division may issue the applicant a Notice of Untimely Filing and Optional Waiver of Asylum Interview. Likewise, notices may be issued to applicants who did not claim any date of last entry and the application has been pending longer than 90 days in Global.

Eligible cases may be identified by the Untimely Filed Backlog (UFB) special group code in Global and also have both the Untimely Filing DOE 10+ Years (UFT) and UFB Start Date fields populated on the Entry Tab in Global. Global will automatically apply these codes based upon the relevant data elements and case processing times. The case must also be in an appropriate state, such that the case is otherwise ready for interview. Notices should not be issued to applicants who have not complied with ASC biometrics requirements nor to applicants who are not removable due to being in a legal status that allows them to remain in the U.S.

#### ii. Issuance and Processing of Notices of Untimely Filing and Interview Waivers

Notices of Untimely Filing are generated manually from the Adjudication Tab in Global. Once generated, notices are mailed directly from the centralized printing service and inform the applicant that their application for asylum appears on its face to be prohibited due to the one-year filing deadline. An applicant issued such a notice is offered the opportunity to affirmatively waive (in writing) the requirement for an asylum interview regarding the one-year filing deadline found at 8 CFR § 208.4(a) by signing page 2 of the waiver and returning it to the asylum office.

Applicants are afforded 45 days to respond to the Notice in either the affirmative or negative. The date and response type must be recorded in Global. If no response is received within 45 days, Global will automatically indicate that the Notice was declined on day 46.

#### (a). Interview Waiver Offer Accepted

If properly signed by the applicant (the signature of an applicant's representative, attorney, or other individual is not accepted in lieu of the applicant's for waiver purposes) and returned to the asylum office timely, no asylum interview will be conducted. The date the waiver was returned will be entered in Global and the case will be processed as a one-year filing deadline referral.

The applicant will be referred to the Immigration Court based upon the prohibition against filing more than one year after the last arrival to the U.S. No other legal determinations or case outcomes are allowed for cases that are adjudicated without an asylum interview. The asylum officer will complete the Template Waiver Assessment to Refer (Appendix 114). The asylum officer and staff will perform the required security checks and complete the BISC per the Security Checks for Referrals Pursuant to a Waived Interview guidance. Asylum staff will serve the User-Modified Referral Notice - 1 Year Deadline

USCIS00004276

(Appendix 115) and Notices to Appear on the applicant, any removeable dependents, the attorney of record, and the EOIR per standard asylum processes.

### (b). Interview Waiver Offer Declined or No Response Received

If the applicant declined the waiver offer or failed to respond to the waiver within 45 days, Global will assign the Untimely Filed Interview ("UFI") special group code to the case indicating that the applicant did not waive the interview requirement. The case will be scheduled for an interview in a manner consistent with case completion goals and published Asylum Division guidelines and priorities. All standard asylum interview and adjudication procedures will be followed consistent with the governing RAIO and Asylum Lesson Plans and the AAPM..

### 3. Previous Denial of Asylum by EOIR

#### a. Receiving the I-589

An applicant who was previously denied asylum by an IJ or the BIA (EOIR) may file his or her I-589 with a Service Center or with an Asylum Office directly. An application that has been filed with a Service Center should be forwarded to the Asylum Office having jurisdiction over the applicant's address for input into RAPS. For further guidance on cases previously denied asylum by EOIR, see Langlois, Joseph E. Procedures for Implementing the One-Year Filing Deadline and Processing Cases Previously Denied by EOIR, Memorandum to Asylum Office Directors, et al., 4 January 2002, 14p.

On the same day of receipt, an I-589 initially filed at an Asylum Office is date-stamped and brought to the attention of an SAO or QA/T, depending on local policy. See Section II.C.2, I-589 Filed Directly with the Asylum Office. The SAO or QA/T determines whether the I-589 fits into one of the categories for which direct filing is permitted. After the SAO or QA/T determines that the applicant is permitted to file directly with the Asylum Office because of a prior denial by EOIR, Asylum Office personnel review it to ensure completeness. An incomplete application should be returned to the applicant with a written explanation of what is missing and instructions to re-submit the application.

When a complete I-589 has been received, Asylum Office personnel check the applicant's personal information against CIS, DACS and RAPS for duplicate A-files. Asylum Office personnel locate and order the applicant's A-file(s), and create a T-file pending receipt. If there is a prior record of the applicant in RAPS, Asylum Office personnel take the following actions on the same day the application was received:

#### i. Applicant was a Principal on the Prior Application

- Print both pages of the CSTA screen containing the information about the previous asylum application. Place the printouts on the right-hand side of the file.
- Delete the information from the previous asylum application from RAPS using the Reset Interview (REIN) command. Delete the filing date of the previous application using the CORR screen, and enter the new filing date.
- Update biographical and entry information on the I589 screen, if applicable.
- If the Asylum Office that accepts the application is not the same office that adjudicated the previous application, the Asylum Office that has the new application must contact the Asylum Office that adjudicated the previous application to request that it update RAPS as indicated

USCIS00004277

above, and update the MOVE and TRAN screens to transfer the case to the Asylum Office with jurisdiction over the new application.

### ii. Applicant was a Dependent on the Prior Application

- Print all pages of the CSTA and CHIS screens and place on the right-hand side of the file.
- Create a new record of the applicant in RAPS as a principal, using the New Case (NEWC) command, in conjunction with the Reset Interview (REIN) command. Delete the filing date of the previous application using the CORR screen, and enter the new filing date.
- Update the biographical and entry information on the I589 screen, if applicable.
- If the Asylum Office that accepts the application is not the same office that adjudicated the previous application, the Asylum Office that has the new application must contact the Asylum Office that adjudicated the previous application to request that it update RAPS as indicated above, and update the MOVE and TRAN screens to transfer the case to the Asylum Office with jurisdiction over the new application.

### b. Eligibility to Apply

An individual who was previously denied asylum as a principal applicant by an IJ or the BIA (EOIR) may not file a new application for asylum on or after April 1, 1997, unless there are changed circumstances which materially affect the applicant's asylum eligibility. INA Section 208(a)(2)(C), (D); 8 C.F.R. 208.4(a)(3), (4). If the applicant was a dependent on a prior I-589 that was denied by the IJ, the prohibition on filing does not apply. 8 C.F.R. 208.14(f)

A prior denial of asylum by an Asylum Officer does not invoke the prohibition on filing a new asylum application. 8 C.F.R. 208.4(a)(3). An Asylum Office may consider a new affirmative asylum application from an applicant who was previously denied asylum by an Asylum Officer as long as the applicant remains within the jurisdiction of the Asylum Division pursuant to 8 C.F.R. 208.2. New asylum applications filed by applicants previously denied asylum by an Asylum Officer are adjudicated according to regular procedures except that:

- Guidelines regarding case assignment discussed below in this section should be followed whenever practicable; and
- Substantial deference should be accorded to prior determinations made by an Asylum Officer regarding previously established facts, including credibility findings, unless clear error is present.

### c. Jurisdiction

In most cases in which an applicant is denied asylum by an IJ or the BIA, the Asylum Division does not have jurisdiction over a subsequently filed application, because necessarily a charging document had been served on the applicant and filed with EOIR, which then retains exclusive jurisdiction under 8 C.F.R. 208.2. However, if the applicant left the United States after being denied asylum by EOIR and then returned, the Asylum Division may have jurisdiction to consider an affirmative asylum application filed by that applicant in the following instances:

- applicant was removed from or departed the United States under an order of removal, deportation or exclusion, and subsequently made a legal entry

USCIS00004278

- applicant departed the United States after the expiration of a voluntary departure period, thus becoming subject to a deportation or removal order, and subsequently made legal entry
- applicant departed the United States before the expiration of a voluntary departure period, and subsequently made a legal or illegal entry.

These procedures do not apply to applicants who entered the United States illegally after having been removed, deported, excluded or after having left the United States while under an order of removal, deportation, or exclusion, and are therefore appear to be subject to reinstatement of the prior order, unless ICE has specifically declined to reinstate the order in a particular case. INA Section 241(a)(5); 8 C.F.R. 241.8. For procedures governing applicants who may be subject to reinstatement of a prior removal order, see Section III.S, Reinstatement of a Prior Order.

Examples:

1. A second A-file is discovered for an applicant. Upon examination of that file, Asylum Office personnel note that it contains a 1995 Immigration Judge order denying asylum and ordering deportation. No appeal was filed. The asylum applicant was lawfully admitted in June 2001 on a B-2 visa, and subsequently filed an affirmative asylum application. The Asylum Office has jurisdiction to consider the new affirmative asylum application because the applicant made a legal entry after departing under the deportation order.

2. During pre-interview preparation, the Asylum Officer discovers a 1989 Immigration Judge order denying asylum and granting voluntary departure. The file contains a record verifying the applicant's timely voluntary departure. The applicant crossed the border illegally into the United States in August, 2001 and applied for asylum. The Asylum Office has jurisdiction to consider the new affirmative asylum application even though the applicant made an illegal entry because the applicant re-entered the U.S. after timely complying with the voluntary departure order.

3. The Asylum Officer discovers through the FBI clearance process that the applicant was denied asylum in 1997 and ordered removed. The applicant claims never to have left the United States, and there is no evidence of departure and subsequent entry. The Asylum Office does not have jurisdiction to consider the new affirmative asylum application because the applicant has not departed and re-entered the U.S. The applicant's asylum application remains under the exclusive jurisdiction of EOIR.

4. A review of the EOIR screen shows that the applicant was previously denied asylum by an Immigration Judge and was granted voluntary departure. The applicant filed an appeal with the Board of Immigration Appeals, which was dismissed some time later. She departed the U.S. after the expiration of the voluntary departure period, and thus became subject to a removal order. She was admitted to the U.S. in April 2001 with a passport she acknowledges is fraudulent. The Asylum Office does not have jurisdiction to consider the new affirmative application because the applicant left the United States under a removal order and the applicant's subsequent entry was not lawful. The applicant may be subject to reinstatement.

### d. Case Assignment

If the applicant is applying for the second time in the same Asylum Office that issued the prior adverse decision, Asylum Office personnel will make a reasonable attempt to assign the case to the same officer who made the original decision. This is to promote consistency with prior factual determinations and discourage forum shopping through the submission of another asylum application in the absence of

USCIS00004279

changed circumstances. If the same Asylum Officer is unavailable, the case should be assigned to an officer supervised by the same SAO who signed off on the original decision. If the original AO and SAO are unavailable, the case may be randomly assigned according to regular office procedures.

### e. Interview

In order to determine whether there are changed circumstances that materially affect the applicant's eligibility for asylum, the Asylum Officer interviews the applicant and reviews the record regarding the previous application (including any findings made by EOIR that may be in the file) for a thorough understanding of the basis for the applicant's claim. The focus of the interview reflects the procedural stage of the case in that the Asylum Officer is determining whether there has been a change in circumstances after the decision on the original application, and is not entertaining an appeal of the decision made by EOIR. The Asylum Officer need not re-visit the details of the original asylum claim, unless it is necessary to the determination of asylum eligibility once the applicant has established changed circumstances. Findings of fact made by EOIR, including credibility determinations, must be upheld and cannot be reconsidered. The application of law to the applicant's original case also must be upheld, unless the applicant establishes changed law material to his or her eligibility for asylum. Therefore, the interview focuses on whether any changed circumstances have occurred after the applicant was denied asylum by EOIR that may materially affect the applicant's eligibility for asylum, and any information needed to make an asylum eligibility determination if changed circumstances are established.

### f. Determination and Assessment

Asylum Officers determine whether there are changed circumstances using the same guidance outlined in the AOBTC Basic Training Materials Lesson Plans, One-Year Filing Deadline and Mandatory Bars to Asylum and Discretion. The entire file, including the prior application, supporting evidence, and previous assessment or decision is reviewed prior to making a determination in the case.

### i. Applicant Established Changed Circumstances that Materially Affect Asylum Eligibility

If the applicant established changed circumstances that materially affect his or her eligibility for asylum, the Asylum Officer makes a determination of asylum eligibility based on the merits of the claim, keeping in mind that factual determinations made by EOIR may not be reconsidered, and legal determinations must be upheld except to the extent that there has been a change in the law. Regardless of whether the application is denied, referred or approved, the assessment (or NOID, if applicable) will contain (in addition to the information specified in the applicable decision template):

- a brief statement that the applicant was previously denied asylum by EOIR,
- an explanation of the changed circumstances established,
- how the changed circumstances materially affect the applicant's asylum eligibility,
- an analysis of the merits of the claim in light of the changed circumstances.

Where the established changed circumstances relate to country conditions, the Asylum Officer must cite to country conditions reports to support the finding.

### ii. Applicant Did Not Establish Changed Circumstances that Materially Affect Asylum Eligibility

If the applicant did not establish changed circumstances that materially affect his or her eligibility for asylum, the application will be referred or denied based on the prohibition on filing for asylum after a prior denial by EOIR. Asylum Officers are not required to include in the assessment or NOID a full account of all material facts or an analysis of the applicant's asylum claim. The assessment or NOID must include:

USCIS00004280

- brief biographical information about the applicant such as age, gender, country(ies) of birth and citizenship; date, place, and manner of last arrival including date status expired, if applicable; and the date the I-589 was filed.
- identification of the protected characteristic(s) (race, religion, nationality, political opinion, or membership in a particular social group) relevant to the applicant's claim and a brief statement of the harm feared (e.g., "Applicant fears he will be persecuted by the LTTE on account of his political opinion.").
- a statement of any circumstances that were considered in the determination of whether the prohibition against filing for asylum applies.
- a statement and an explanation of the finding that there were no changed circumstances, OR, if the applicant established the existence of changed circumstances, why the circumstances were not found to materially affect his or her asylum eligibility.
- Where country conditions are relevant to the determinations of changed circumstances, the assessment must contain a minimum of two country conditions citations supporting the finding that the applicant failed to establish a change in country conditions or that any change in country conditions materially affects the applicant's asylum eligibility. It is preferable that the two citations be from different sources, however they may be from the same issuing organization or agency if another source cannot be found.
- If country conditions information is not relevant to the determination of changed circumstances because it would not materially affect the applicant's asylum eligibility, the AO includes in the assessment the statement, "Any change in country conditions would not materially affect the applicant's eligibility for asylum because (the applicant has not established a protected characteristic, is subject to a mandatory bar, etc.)" and an explanation of the reasons for the finding of no protected characteristic, the bar, or other reason country conditions would not materially affect the applicant's asylum eligibility.

### g. HQASM/TRAQ Review

HQASM/TRAQ will review and provide feedback on each case involving a prior denial by EOIR before the decision is issued, regardless of whether the case is approved, referred, or a NOID issued. Asylum Office personnel should scan the case documents and e-mail them to the "ASYLUM QA – AFFIRMATIVE" mailbox. If the materials cannot be scanned to a file size of less than 9MB, Asylum Office personnel send them to HQASM/TRAQ via DHL at 20 Massachusetts Ave., NW, Suite 3300, Washington, D.C. 20529. Asylum Office personnel should alert HQASM/TRAQ in advance of any case sent via DHL.

### h. Preparing the Decision

Asylum Office personnel process the approval, referral, and denial of the application of an applicant who established changed circumstances materially affecting his or her eligibility for asylum after a prior denial by EOIR in accordance with regular decision procedures. See Section II.N, AO Prepares the Decision.

Asylum Office personnel process a referral or denial based solely on a prior denial by EOIR in accordance with regular decision procedures, except for the PDEC or FDEC decision codes: I6 for out-of-status (FDEC), or D6 for in-status cases (PDEC and FDEC). The referral letter for prior denial cases is Appendix 55, Referral – Prior Denial.

### 4. U.S.-Canada Safe Third Country Agreement – DRAFT

Effective December 29, 2004, the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry provides for the return of certain categories of asylum seekers arriving in one partner country from

USCIS00004281

the other partner country. The Agreement allocates responsibility for two types of asylum claims: those made at land border ports-of-entry along the U.S.-Canada border, and those made in transit by aliens being removed through one country by the other. An asylum seeker attempting to make a claim at a land border port-of-entry or upon removal while in transit will be required to return to the other country and make his or her claim there. For asylum seekers arriving at a land border port-of-entry, the Agreement provides certain important exceptions that may permit them to seek protection in the U.S. instead of Canada. For example, there is an exception for persons who have a spouse, parent, child, sibling, grandparent, aunt, uncle, niece, or nephew ("anchor relative") in the country where they are seeking asylum, so long as that anchor relative has lawful status other than visitor status, or is 18 years or older and has a pending asylum claim in that country. There is also an exception for unaccompanied minors. A report concerning the U.S.-Canadian Agreement is available on the USCIS website by clicking on Services and Benefits, then Humanitarian Benefits, then Asylum.

The Federal Register Notice implementing the agreement (69 FR 228) is available at http://a257.g.akamaitech.net/7/257/2422/06jun20041800/edocket.access.gpo.gov/2004/04-26239.htm.

Please note that asylum seekers who are subject to the provisions of the Agreement, and who demonstrate an exception to the Agreement, will in most cases be subject to expedited removal and will not be permitted to apply affirmatively for asylum. For additional information on this process, see the draft AOBTC Lesson Plan, Safe Third Country Threshold Screening.

USCIS00004282

# III.Q. QUALITY ASSURANCE REVIEW

| Reviewed, No Substantive Changes since 2007 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections: |

There are two entities involved in quality assurance issues within the asylum program; (1) HQASM/TRAQ; (2) the QA/T at the local Asylum Office.

### 1. HQASM/TRAQ

The nature of certain cases requires the Asylum Office to notify HQASM/TRAQ before a decision may be issued to an applicant.

### a. Quality Assurance Referral Sheet

The Quality Assurance Referral Sheet (Referral Sheet) lists the types of cases that must be sent to HQASM/TRAQ. All cases on the Referral Sheet require a written response from HQASM/TRAQ before the Asylum Office may serve the decision on the applicant. Because HQASM/TRAQ may periodically change the types of cases it lists on the Referral Sheet, the QA/T is responsible for maintaining copies of the current Referral Sheet. June 2022 Quality Assurance Referral Sheet.

Cases submitted to HQASM/TRAQ for review include cases involving terrorism or suspected terrorism, some persecutors, and cases that are likely to be publicized. For guidance on handling terrorism/suspected terrorism cases, see Section VIII of the Identity and Security Checks Procedures Manual. See alsoAytes, Michael, Revised Guidance on the Adjudication of Cases involving Terrorist-Related Inadmissibility Grounds and Amendment to the Hold Policy for such Cases, Memorandum to Field Leadership, Feb. 13, 2009, 3p.; Aytes, Michael, Additional Guidance on Issues Concerning the Vetting and Adjudication of Cases Involving National Security Concerns, Memorandum to Field Leadership, Feb. 6, 2009, 9p.; Aytes, Michael, Instruction to Discontinue Use of Worksheets for Documenting and Tracking Cases With National Security Concerns, Memorandum to Field Leadership, Sept. 16, 2008, 2p.; Scharfen, Jonathan, R., Policy for Vetting and Adjudicating Cases with National Security Concerns, Memorandum for Field Leadership, April 10, 2008, 7p. and Langlois, Joseph, Issuance of Revised Section of the Identity and Security Checks Procedures Manual Regarding Vetting and Adjudicating Cases with National Security Concerns, Memorandum to All Asylum Office Personnel, May 14, 2008, 4p. (plus attachments).

### b. Submission of Quality Assurance Referral Packet to HQASM/TRAQ

The QA/T coordinates all submissions to HQASM/TRAQ and maintains a log to track them in order to follow up with HQASM/TRAQ. The QA/T should consult with HQASM/TRAQ prior to submitting any case for which the pick-up date has not be cancelled. If it is agreed that the case will be reviewed before the pick-up date, the pick-up date should be clearly noted on the Referral Sheet.

To submit a case to HQASM/TRAQ, each Asylum Office must prepare a "Quality Assurance Referral Packet" to include the documents in the order listed below:

- Completed Quality Assurance Referral Sheet

USCIS00004283

- Copy of the current Material Support Exemption Worksheet, if applicable
- Copy of the Assessment or NOID
- Copy of all I-589s filed by the applicant
- Legible copy of the interview notes
- Copy of any relevant supporting documentation (e.g., affidavit, arrest warrant, passport)

The Asylum Office should not include copies of generalized country conditions materials; however, if the AO relies on a specific article that is not readily available, a copy should be included with the supporting documentation in the packet.

Local Asylum Office policy dictates who is responsible for assembling the packet.

Before sending the packet to HQASM/TRAQ, either the QA/T or an SAO removes any decision entered into RAPS by the AO and places the case on HOLD – HQ in RAPS. Asylum Office personnel should scan the case documents and e-mail them to the "ASYLUM QA – AFFIRMATIVE" mailbox. If the materials cannot be scanned to a file size of less than 9MB, Asylum Office personnel send them to HQASM/TRAQ via DHL at 20 Massachusetts Ave., NW, Suite 3300, Washington, D.C. 20529. Asylum Office personnel should alert HQASM/TRAQ in advance of any case sent via DHL. Upon receipt of the complete package, HQASM/TRAQ will place the case on HOLD – HQ in RAPS. HQASM/TRAQ personnel will remove the case from HOLD-HQ when quality assurance review is complete and the case is returned to the Asylum Office for action.

### c. Comments from HQASM/TRAQ

Neither the QA Referral Sheet nor any comments from HQASM/TRAQ remain part of the A-file. The QA/T collects and maintains the response and the accompanying Assessment/NOID (including a rewrite) for the purpose of identifying issues that may need analysis and discussion during weekly Asylum Office trainings.

### 2. QA/T at the Local Asylum Office

Each Asylum Office has at least one (1) QA/T position. This position was created to facilitate local quality assurance, liaise with HQASM/TRAQ, and to conduct trainings. Additional responsibilities may be placed upon a QA/T depending upon the needs of the Asylum Office as determined by the Director or Deputy Director. See Langlois, Joseph E. The Role of the Quality Assurance & Training Coordinator, Memorandum to Asylum Office Directors and QA/Ts, 17 December 1998, 11p.

USCIS00004284

# III.R.  RAPS REPORTS

## 1.Types of RAPS Reports

The Asylum Division produced RAPS reports until November 1, 2018.

### a. Officer Casebook (RACCAS01)

The Officer Casebook is a weekly report that assists SAOs and AOs in monitoring individual AO caseloads.  The report shows cases assigned to an AO and their status within the asylum adjudication process.  SAOs and AOs must routinely review the Casebook to ensure its accuracy, paying particular attention to Part I of the Casebook, which shows cases that have been interviewed and are still pending a decision by the AO.  If a case appears on the report for which the AO does not believe he or she is responsible, the AO must investigate the case and discuss it with the Supervisory Asylum Officer, and report the same to the Security Officer (SO) and Computer Security Officer (CSO).

### i. Part I – Cases Pending Initial Write-up

Part I lists the A-numbers of cases that were interviewed by an individual AO, but have no decision entered in RAPS.

### ii. Part II – Referrals Pending OSSE

Part II lists the A-numbers of cases that have an FDEC entered, but charging documents have not been served on the applicant and OSSE has not been updated in RAPS.

### iii. Part III – PDEC Denials Pending FDEC or DENY

Part III lists the A-numbers of cases with PDECs of D1-D7, but without a final decision entered.  When a NOID has been issued, the number of days since the service of the NOID is listed (using the date of DINT in RAPS).  Part III also included cases with an FDEC of D1-D7 (final denial), but no denial letter has been served and/or the DENY screen has not been updated.

### iv.Part IV – PDEC Grants Pending FDEC or GLET

Part IV lists the A-numbers of:

- cases with PDECs of GR or GC, but without a final decision,
- cases with FDECs of G1, but the grant letter has not been served and/or the GLET screen has not been updated.

### b. Officer Activity Report (RACFIN00)

This is a biweekly report that lists all cases interviewed, closed, or given a preliminary or final decision by an AO during the reporting period.  AOs attach this report to their biweekly Asylum Officer Accuracy, Productivity and Timeliness Worksheet, in connection with Part III: Calculating Timeliness.

### c. Cases with PDEC "GR" and All FD-258 Ready (RACGRL00)

As of August 25, 2020, USCIS no longer issues recommended approvals.

### d. Fingerprint IDENT and 2nd Reject (RACFBI02)

This is a weekly report that lists all cases where the results of the FBI fingerprint check for an applicant is IDENT, or the fingerprints have been rejected twice by FBI as unclassifiable.  This report allows an Asylum Office to identify which cases need follow-up processing in accordance with the Identity and Security Checks Procedures Manual.

USCIS00004285

### e. No-Show Cases Open 15-Days or More (RACNSH00)

This is a weekly report that lists all cases where at least 15 days have passed since the Asylum Office marked the case with an "N/S" in the INTERVEW DATE field on the CSTA screen, and are still pending a decision. Asylum Office personnel use this report to process "no-show" cases according to the procedures on failure to appear in Section III.I.

### f. IBIS Responses Requiring Reconciliation (RACIBISH)

This is a daily report that lists applicants who may be the subject of records in the Inter-Agency Border Inspection System (IBIS). Asylum Office personnel perform an on-line query of IBIS and a file review, if necessary, for each individual on the list to determine if the individual in IBIS and the individual in RAPS are the same person. Whatever the outcome of the query, Asylum Office personnel update the results in RAPS using the Records Check Update (RCDS) screen in order to confirm the review of the IBIS hit flag. Until this step is completed, no decision on the case can be updated in RAPS. After the migration of the National Automated Immigration Lookout System (NAILS) into IBIS, this report replaced the NAILS Record Check Hit Report (RACINNA2), which used to identify cases with lookout hits via a RAPS/NAILS interface. For additional information on RACIBISH see the Identity and Security Checks Procedures Manual

### g. DACS Record Check Hit Report (RACINDA2)

This is a daily report that lists applicants who may be the subject of records in DACS. Asylum Office personnel perform an on-line query of DACS and a file review, if necessary, for each individual on the list to determine if the individual in DACS and the individual in RAPS are the same person. Whatever the outcome of the query, Asylum Office personnel must update the results in RAPS using the Records Check Update (RCDS) screen in order to confirm the review of the DACS hit flag. Until this step is completed, no decision on the case can be updated in RAPS.        For additional information on RACINDA2 see the Identity and Security Checks Procedures Manual.

### h. Name Change Report (RACNCG00)

RAPS generates a weekly report in each Asylum Office with the A-numbers of files that were updated using the NCHG command. Asylum Office Directors establish local policy to ensure that all name changes are compared to CIS and when appropriate, CIS is updated by Asylum Office personnel with special update access to CIS. The "ALIASES" field in CIS should also be updated if appropriate.

### i. DHS-IDENT Watchlist Reports

The Asylum Division accesses DHS-IDENT biometric Watchlist data through CPMS-IVT, and has three weekly RAPS-generated Watchlist hit reports for distribution to all Asylum Offices.

The reports are as follows:

### i. Watchlist Hits Requiring Reconciliation: Cases Pending Decision Service

The cases listed in this section have Watchlist hits that have not been reconciled in RCDS and have not been updated in RAPS with a GLET, DENY, OSSE, or CLOS (CLOS and OSSE update in the case of closed cases requiring NTA issuance).

### ii. Reconciled Watchlist (RW) Hits: Cases Pending Decision Service

The cases listed in this section have been reconciled in RCDS and have not been updated in RAPS with a GLET, DENY, OSSE, or CLOS (CLOS and OSSE update in the case of closed cases requiring NTA issuance).

USCIS00004286

**iii. Watchlist Hits Requiring Reconciliation: Granted, Denied and Closed Cases**

The cases listed in this section have Watchlist hits that have not been reconciled in RCDS and have been updated in RAPS with a GLET, DENY, or CLOS (excluding C4 "IJ Jurisdiction" closures and all closed cases with NTA issuance).

Prior to the rollout of CPMS-IVT, the Asylum Division used US-VISIT in order to track and resolve Watchlist hits. US-VISIT had been the replacement for a legacy system known as IDENT-Asylum. At the time of that replacement, all historical IDENT-Asylum biometric data were uploaded into US-VISIT in order to match the biometrics of asylum and NACARA 203 applicants previously enrolled into IDENT-Asylum ("historical records") with any and all information contained in US-VISIT. The compiled results were then uploaded into RAPS. Once RAPS contained accurate US-VISIT information on all applicants previously enrolled into IDENT-Asylum, as well as those enrolled directly into US-VISIT after the ASC began sending fingerprint records to US-VISIT, the Asylum Division created three new Watchlist hit reports, which are described above.

## 2. Security Procedures for RAPS Reports

Each Asylum Office has a Security Officer (SO) and a Computer Security Officer (CSO). Both individuals are responsible for examining the Officer Casebooks for abnormalities and investigating any perceived anomaly, such as an update of a case in RAPS showing the officer ID of an AO no longer employed by the Asylum Office. See Langlois, Joseph E. Office Security Procedures, Memorandum to Asylum Offices, 16 April 1999, 2p. Every anomaly is to be investigated, with the results of investigations documented by the SO, and periodically reported in writing to the Director.

AOs are responsible for ensuring the accuracy of both their Officer Casebook and their Officer Activity Report. An AO must investigate any case that appears on either report that he or she believes is incorrectly assigned, and must report the same to the SAO, SO and the CSO. SAOs should also review the reports for each AO he or she supervises. Abnormalities are to be reported to the SO and CSO for investigation.

## 3. Global Reports

As of November 1, 2018, the Asylum Division transitioned to Global and began producing reports using SMART and Tableau. For more information contact Asylum IDEA.

USCIS00004287

# III.S.  REINSTATEMENT OF A PRIOR ORDER PURSUANT TO SECTION 241(a)(5) OF THE INA AND FINAL ADMINISTRATIVE REMOVAL ORDERS (FARO) PURSUANT TO SECTION 238(b) OF THE INA

### 1.  Reinstatement of a Prior Order pursuant to INA §241(a)(5)

If an applicant returns to the United States illegally after having been removed from the United States, or after having departed voluntarily while under an order of removal, deportation, or exclusion, the individual is subject to reinstatement of the prior order. This does not include an individual who is granted voluntary departure and leaves the United States before expiration of the voluntary departure period. An individual whose prior order of removal, deportation, or exclusion is reinstated is not eligible to apply for relief from removal under the INA, including asylum, but may seek withholding of removal under section 241(b)(3) of the INA and withholding or deferral of removal under regulations that implement Article 3 of the Convention Against Torture in immigration cases.

A grant of withholding or deferral of removal is not relief since the individual still has a removal order and that order may still be executed by removing him or her to a third country.

An individual subject to reinstatement of a previous removal order may be eligible for relief under the Legal Immigration Family Equity Act (LIFE Act). Section 1505(c) of the LIFE Act Amendments, Title XV of H.R. 5666, enacted by reference in Consolidated Appropriations Act for FY 2001, Public Law 106-554 (Dec. 21, 2000), provides that an individual who is otherwise eligible for relief under section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA) shall not be barred from applying for such relief by operation of section 241(a)(5) of the INA (reinstatement). This means that a NACARA § 203 applicant or a potential NACARA § 203 applicant who was deported, excluded, or removed from the United States or who otherwise left the United States while under a final order and then reentered the United States illegally, and who had that prior order reinstated, may still apply for and, if eligible for the benefit, be granted relief under NACARA § 203. See Michael Pearson, Implementation of Amendment to the Legal Immigration Family Equity Act (LIFE) Regarding Applicability of INA Section 241(a)(5) (Reinstatement) to NACARA 203 Beneficiaries, Policy Memorandum (Washington, DC: 23 February 2001).

**Whether a prior order will be reinstated is under the purview of CBP or ICE.**

**a. Determining Whether an Applicant is Subject to Reinstatement of a Prior Order**

Often, the Asylum Office becomes aware that an applicant may be subject to reinstatement of a prior order when it receives a positive FBI response or when reviewing the results of a DHS-IDENT Encounter Search accessed through CPMS-IVT. An AO may also discover this information at the time of the interview, or shortly thereafter, when the Asylum Office receives an A-file after an interview has been conducted on a T-file.

When Asylum Office personnel determine that the applicant may be subject to reinstatement of a prior order, the Asylum Office should contact the ICE Enforcement and Removal Operations (ERO) office with jurisdiction over the applicant's place of residence to determine whether the

USCIS00004288

office will reinstate the prior order. The processing of the asylum application stops until the Asylum Office is notified that ICE has reinstated the prior order.

When contacting ICE, Asylum Office personnel should scan and e-mail the documentation in the A-file that indicates the applicant may be subject to reinstatement of a prior order. The e-mail should state that the Asylum Office will suspend processing of the asylum application for 60 days from the date of the notification to allow ICE to reinstate the prior order and that after 60 days the Asylum Office will move forward with adjudicating the asylum application if ICE has not reinstated the prior order. The Asylum Office should use the hold code "Reinstatement" in Global to put the asylum application on hold while waiting for ICE to reinstate. This hold code does not impact the 180-day Asylum Employment Authorization Document (EAD) Clock.

Asylum Office personnel may use the following sample e-mail when contacting ICE:

The [X] Asylum Office has encountered an asylum applicant who appears to be subject to reinstatement of a prior order. Attached please find [fill in form numbers and names of attached documents]. Please inform us if you need additional documents. Please inform us if you plan to reinstate the prior order. The [X] Asylum Office will put adjudication of this asylum application on hold for 60 days from the date of this notification in order for you to reinstate the prior order. If you do not reinstate the prior order during this 60-day period we will continue to adjudicate the asylum application once the 60 days have passed. Please note that [this individual is eligible for employment authorization] OR [this individual will be eligible for employment authorization once the asylum application has been pending for 180 days].

If the Asylum Office discovers that the applicant may be subject to reinstatement of a prior order at the time of the interview, local procedures dictate whether there is immediate follow-up with the local ICE ERO office. The AO may serve a Mail-Out Notice (Appendix 12) on the applicant if a Pick-Up Notice (Appendix 11) would normally be required. If the applicant has already been served the Pick-Up Notice and the information is discovered a sufficient period of time before the pick-up date, Asylum Office personnel should send the applicant a Notice of Change in Decision Service from Pick-Up to Mail-Out (Appendix 33). Otherwise, if ICE has not reinstated the prior order, Asylum Office personnel should inform the applicant that his or her decision is not ready for service at the time he or she appears on the pick-up date.

### b. Asylum Office Action When a Prior Order is Reinstated

Once the prior order has been reinstated by DHS, the applicant is not permitted to apply for asylum or other relief from removal under the INA. The applicant may be eligible, through the reasonable fear screening process, to apply for withholding under Section 241(b)(3) of the INA and withholding or deferral of removal under the regulations that implement Article 3 of the Convention Against Torture in immigration cases.

After a DHS Officer serves Form I-871, *Notice of Intent/Decision to Reinstate Prior Order*, on an applicant or the Asylum Office discovers an unexecuted Form I-871 in the A-file, the Asylum Office administratively closes the asylum application on the CLOS screen in RAPS using close code "CO-Reinstatement" regardless of whether a "reasonable fear" interview will be conducted. Asylum Offices should not accept an affirmatively filed Form I-589 if the office is aware of an unexecuted Form I-871.

USCIS00004289

If an Asylum Office receives an affirmatively filed Form I-589 from an individual whose prior order has been reinstated, the Asylum Office may treat the case as a reasonable fear referral if the Asylum Office has all the required DHS forms (Form I-871 and prior order of removal) for the individual prior to conducting the reasonable fear interview. The Asylum Office should notify ICE that the Asylum Office has all the required forms for the individual and will treat the case as a reasonable fear referral, or, if the Asylum Office does not have all the required forms for the individual, the individual must contact ICE if he or she wishes ICE to make a proper reasonable fear referral. The Asylum Office also should continue to follow all guidance in the Reasonable Fear Procedures Manual.

i. Cases with no decision, cases with a decision other than Recommended Approval, and Recommended Approvals for which the Recommended Approval Letter has not been issued

When the Asylum Office has a copy of Form I-871, Asylum Office personnel:

- Administratively close the case in RAPS. The reason for the closure is "Reinstatement" (CO). Indicate that an NTA/referral will NOT be issued to the applicant (Place "N" in the "Send to IJ" field).

- Prepare a Memo to File (No Jurisdiction for I-589-Reinstatement) (Appendix 95).

- Prepare a Notice of Lack of Jurisdiction (Reinstatement of a Prior Order) (Appendix 96).

- Serve the letter by either regular or certified mail, depending upon local Asylum Office policy.

- Follow guidance in the Reasonable Fear Procedures Manual.

ii. Recommended Approval Letter has been issued

When the Asylum Office has a copy of Form I-871, Asylum Office personnel:

- Administratively close the case in RAPS. The reason for the closure is "Reinstatement" (CO). Indicate that an NTA/referral will NOT be issued to the applicant. (Place "N" in the "Send to IJ" field.)

- Prepare a Memo to File (No Jurisdiction for I-589-Reinstatement) (Appendix 95).

- Prepare a Cancellation of Recommended Approval (Reinstatement of a Prior Order) (Appendix 28).

- Prepare a Notice of Lack of Jurisdiction (Reinstatement of a Prior Order) (Appendix 96).

- Serve the letter by either regular or certified mail, depending upon local Asylum Office policy.

- Follow guidance in the Reasonable Fear Procedures Manual.

USCIS00004290

## 2. Final Administrative Removal Order (FARO) pursuant to INA §238(b)

Under certain circumstances, DHS may issue an order of removal if DHS determines that a person is deportable under section 237(a)(2)(A)(iii) of the INA (convicted by final judgment of an aggravated felony after having been admitted to the United States). A person against whom DHS issues a final administrative removal order is not eligible for relief from removal under the INA, including asylum, but may be eligible through the reasonable fear screening process to seek withholding of removal under section 241(b)(3) of the INA and withholding or deferral of removal under regulations implementing Article 3 of the Convention Against Torture in immigration cases. A grant of withholding or deferral of removal is not considered relief since the individual still has a removal order that may be executed by removal to a third country.

After a DHS Officer serves Form I-851A, *Final Administrative Removal Order,* on an applicant or the Asylum Office discovers an unexecuted Form I-851A in the A-file, the Asylum Office administratively closes the asylum application on the CLOS screen in RAPS using close code "CF-Admin Rmvl Agg Felon" regardless of whether a reasonable fear interview will be conducted. Asylum Offices should not accept an affirmatively filed Form I-589 if the office is aware of an unexecuted Form I-851A.

If an Asylum Office receives an affirmatively filed Form I-589 from an individual subject to a FARO, the Asylum Office may treat the case as a reasonable fear referral if the asylum office has the required DHS form (Form I-851) for the individual prior to conducting the reasonable fear interview. The Asylum Office should notify ICE that the Asylum Office has the required form for the individual and will treat the case as a reasonable fear referral, or, if the Asylum Office does not have the required form, the individual must contact ICE if he or she wishes ICE to make a proper reasonable fear referral. The Asylum Office also should continue to follow all guidance in the Reasonable Fear Procedures Manual.

### a. Cases with no decision, cases with a decision other than Recommended Approval, and Recommended Approvals for which the Recommended Approval Letter has not been issued

When the Asylum Office has a copy of Form I-851, Asylum Office personnel:

- Administratively close the case in RAPS. The reason for the closure is "Admin Rmvl Agg Felon" (CF). Indicate that an NTA/referral will NOT be issued to the applicant. (Place "N" in the "Send to IJ" field.)

- Prepare a Memo to File (No Jurisdiction for I-589-FARO) (Appendix 97).

- Prepare a Notice of Lack of Jurisdiction (FARO) (Appendix 98).

- Serve the letter by either regular or certified mail, depending upon local Asylum Office policy.

- Follow guidance in the Reasonable Fear Procedures Manual.

### b. Recommended Approval Letter has been issued

When the Asylum Office has a copy of Form I-851, Asylum Office personnel:

- Administratively close the case in RAPS. The reason for the closure is "Admin Rmvl Agg Felon" (CF). Indicate that an NTA/referral will NOT be issued to the applicant. (Place "N" in the "Send to IJ" field.)

USCIS00004291

- Prepare a Memo to File (No Jurisdiction for I-589-FARO) (Appendix 97).

- Prepare a Cancellation of Recommended Approval (FARO) (Appendix 99).

- Prepare a Notice of Lack of Jurisdiction (FARO) (Appendix 98).

- Serve the letter by either regular or certified mail, depending upon local Asylum Office policy.

- Follow guidance in the Reasonable Fear Procedures Manual.

USCIS00004292

## III.T.  RESCHEDULE REQUESTS

All requests to reschedule must be made by the applicant in writing to the Asylum Office by mail, email, or fax or completing an In-Person Reschedule Request (Appendix 9) at the Asylum Office. Asylum Office staff will not honor a request to reschedule received telephonically. If a telephonic request is received, Asylum Office personnel notify the caller of the requirement to make the request in writing by mail, email, fax, or in-person, that the request must be signed by the applicant and/or representative and include the reason for the request and any associated evidence, and that the written request must be received as soon as possible before the interview date. However, as stated below, the Asylum Office will continue to accept requests for rescheduling on or up to 45 days after the missed interview date.

For reschedule requests received within a reasonable period prior to the interview date, Asylum Offices should strive to complete the request and provide notice as soon as practicable and before the scheduled interview date. Reschedule requests received after the interview date and prior to the issuance of a charging document or dismissal decision should be completed within a reasonable time period and as soon as practicable.

- Granting a request to reschedule. If the Asylum Office honors a request received in-person, it should complete an In-Person Reschedule Request form (Appendix 9) and provide a copy to the applicant and representative, if any. If the Asylum Office honors a request received by mail, the Asylum Office should produce and mail as soon as practicable an Interview Cancellation Notice and Interview Reschedule Notice (as described below).
- Denying a request to reschedule. If the Asylum Office denies a request to reschedule, either received in person or by mail, it must issue a Denial of Asylum Interview Reschedule Request (Appendix 73).

If the applicant does not establish good cause for a request to reschedule made before the interview date, the Asylum Office will issue a Denial of Interview Reschedule Request (Appendix 73). Make the following change on the Denial of Interview Reschedule Request (Appendix 73):

- Delete the following language: [Because you failed to appear for your asylum interview and you did not establish good cause for your request to reschedule, your asylum application will either be referred to an immigration judge for adjudication in removal proceedings before the U.S. Department of Justice, Executive Office for Immigration Review (EOIR) (if you are not in lawful immigration status), or your asylum application will be administratively closed and dismissed (if you are in lawful immigration status)] after 45 days from the date of the missed interview.]

A copy of any documents generated and mailed to the applicant and representative, if any, in this section should be interfiled appropriately in the A-file.

### 1. Requests to Reschedule Interview

As a matter of Asylum Division policy, the Asylum Office reschedules an interview if it is the applicant's first request for a rescheduling, and the request is received prior to the interview date.

USCIS00004293

If a request to reschedule an interview is made on or up to 45 days after the interview date, or if the interview has already been rescheduled on one (1) occasion, the applicant must establish that the request for a rescheduling is due to "good cause." Prior to determining if the applicant established good cause, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

If the request to reschedule is made on or after 46 days after the interview and after a charging document or dismissal by the Asylum Office has been issued, the applicant must establish "exceptional circumstances" for failure to appear. Prior to determining if the applicant established exceptional circumstances, the Asylum Office must determine whether the applicant's failure to appear was caused by lack of proper notice.

### a. Evaluating a Reschedule Request

Good cause may be defined as a "reasonable excuse for being unable to appear for an asylum interview." What may be a reasonable excuse for one applicant may not be reasonable when looking at the circumstances of another applicant. Therefore, it is extremely important to review the excuses and requests for a rescheduling on a case-by-case basis before determining whether the request to reschedule will be honored.

The good cause standard does not apply if the rescheduling was done due to a procedural fault by the Asylum Office, such as lack of notice.

If the applicant establishes good cause and the Asylum Office honors the request to reschedule, Asylum Office personnel update the case management system, indicating the cancellation is at the request of the applicant. The case management system will schedule a new interview and generate an Interview Reschedule Notice according to the automatic scheduling priorities. If the applicant made the reschedule request prior to the interview, the case management system will create an applicant-caused delay as it pertains to 180-Day Asylum Employment Authorization Document (EAD) Clock for EAD adjudication. This delay will be resolved when the applicant appears for their rescheduled interview. If the applicant made the request after failing to appear for their interview, the applicant-caused delay resulting from their failure to appear would be resolved on the date the asylum office approved the reschedule request. For more information, see AAPM Section III.F. Employment Authorization Document (EAD).

### b. Abuse of Rescheduling Policy

Local Asylum Office policy dictates how each office will handle multiple requests for rescheduling when it appears that the applicant is either causing undue delay of the interview, or abusing the office's rescheduling policy. If Asylum Office personnel determine that USCIS will not honor a future excuse and request for a rescheduling of the asylum interview, the Asylum Office should use the Grant of a Reschedule Request of an Asylum Interview (Appendix 32) letter. In accordance with Appendix 32, the Asylum Office will not grant future reschedule requests after the Grant of a Reschedule Request of an Asylum Interview (Appendix 32) letter is mailed unless the applicant establishes "exceptional circumstances" for a request.

206

USCIS00004294

In addition, the In-Person Reschedule Request (Appendix 9) form contains a line at the top of the page where an Asylum Office can record how many times the case has been rescheduled. Each Asylum Office may determine whether to use this section of the form or delete it.

### 2. Reschedules Due to Interpreter Problems

There may be instances where an AO may terminate or cancel an interview and reschedule it for a later date with SAO approval because a particular interpreter is abusing his/her role.

### 3. Reschedules Due to Asylum Office Geographical Jurisdiction

There may be instances when an Asylum Office believes that an applicant does not live at an address he or she provides at an asylum interview and the Asylum Office Director exercises discretion to request proof that the applicant lives within the jurisdiction of the Asylum Office. The Asylum Office may cancel or terminate the interview and reschedule it for a later date.

### 4. Applicant Requests to Reschedule Pick-up Date

If an applicant informs an AO that he or she cannot appear on the date and time indicated on the Pick-up Notice, the AO informs the applicant of the consequences of his or her failure to appear to pick up the decision (i.e., if the applicant is to be referred, the applicant-caused delay as it pertains to the 180-Day Asylum EAD eligibility, and whether it is resolved is at the discretion of the IJ). If the applicant has special circumstances, he or she may be given a pick-up date that is not within the usual timeframe of decision service if the following criteria are met:

- The applicant presents a reasonable excuse why he or she is unable to appear on the date and time given to other applicants interviewed that day.
- The SAO concurs in the decision to give the applicant a special pick-up date, unless local office procedures require concurrence from the Director or Deputy Director.

If the AO gives the applicant a special pick-up date, it must be prior to either the regularly scheduled pick-up date or a date that will ensure that the Asylum Office complies with its "60-day referral clock."

If Asylum Office personnel entered the pick-up date in the case management system prior to the interview and that date was changed by the AO and SAO at the time of the interview, the date previously-entered into the case management system will need to be removed (at the fault of the applicant) and a new date entered. Entering the new pick-up date will ensure that the applicant-caused delay will be resolved when the applicant appears at the new pick-up appointment.

If Asylum Office personnel need to change who is at fault for cancelling the pick-up, personnel must contact the HQASM to have the applicant-caused delay resolved.

### 5. Canceling a Pick-up Date at the Fault of USCIS

Once the Asylum Office issues a Pick-up Notice, Asylum Office personnel must serve the decision on the appointed date and time. An Asylum Office cannot cancel a pick-up date except in rare circumstances. Local office policy dictates who has the authority to determine that rare circumstances exist in order to cancel pick-up dates.

If the Asylum Office must cancel a pick-up date, the applicant must be notified in advance, if possible. If there is sufficient time before the applicant is scheduled to appear at the Asylum Office, Asylum Office personnel send the applicant a Notice of Change in Decision Service from Pick-up to Mail-out (Appendix 33). A copy of the Notice remains in the applicant's file. Asylum Office personnel also remove the pick-up

USCIS00004295

date in the case management system. Personnel should ensure that the pick-up date is not listed at the fault of the applicant, or it will create an erroneous applicant-caused delay. If an applicant-caused delay is erroneously created, Asylum Office personnel must contact the HQASM to have the delay resolved.

USCIS00004296

# III.U.  RESCISSION OF AN ASYLUM APPROVAL

There may be instances when an Asylum Office learns that an applicant was either under the jurisdiction of EOIR or outside of the U.S. at the time of the asylum approval.  However, lack of jurisdiction over an asylum application is not grounds for termination under 8 C.F.R. 208.24.  When the Asylum Office did not have jurisdiction to hear the claim, the Asylum Office must move to reconsider the asylum approval pursuant to 8 C.F.R. 103.5(a)(5)(ii) in order to pursue rescission of asylum status.

### 1.  Issue Motion to Reconsider

If the Asylum Office did not have jurisdiction over the asylum application at the time of approval, the Asylum Office sends the asylee a Motion to Reconsider (Appendices 35 or 36) letter, pursuant to 8 C.F.R. 103.5(a)(5)(ii).  Asylum Office personnel use the letter that corresponds to the reason for rescission, which is either that the applicant was in proceedings before EOIR or was outside of the U.S. at the time of the final approval.  If the applicant was under the jurisdiction of EOIR with another A-number, Asylum Office personnel consolidate the A-files and the A-numbers.  Asylum Office personnel attach to the Motion to Reconsider any unclassified documents that were relied upon to determine that USCIS did not have jurisdiction over the asylum application at the time of the final approval.

If the Asylum Office did not have jurisdiction over a derivative application, but did have jurisdiction over the principal's application, Asylum Office personnel should direct the letter to the dependent with a copy sent to the principal applicant.  The clause at the end of the first paragraph, "as well as the grant of asylum to any dependent included in your asylum application," should be deleted.

When issuing the Motion to Reconsider, Asylum Office personnel enter the date that USCIS initiated the Motion to Reconsider in the MTR INITIATED BY USCIS – DATE field on the Motion to Reopen or Reconsider (MTRC) screen.  An update indicating "MTR ISSUED FOR CASE BY USCIS" will appear on the Case History (CHIS) screen.

### 2. Wait 45 days or until response is received, whichever comes first

The asylee is given 45 days from the date of the motion (30 days + 15 days for receiving and reviewing the mail) to respond to the Motion to Reconsider.

If the Asylum Office receives a response to the Motion to Reconsider, Asylum Office personnel enter a Y in the REBUTTAL/WAIVER RECVD field and the date that the Asylum Office received the response in the IF YES, DATE RECVD field on the Motion to Reopen or Reconsider (MTRC) screen.  An update indicating "REBUTTAL/WAIVER RECEIVED" will appear on the Case History (CHIS) screen.

If the Asylum Office does not receive a response to the Motion to Reconsider, Asylum Office personnel enter an N in the REBUTTAL/WAIVER RECVD field on the MTRC screen.

### 3. Review response, if any, and issue letter affirming or rescinding grant

If the asylee submits a timely response to the motion, and it rebuts the reasons provided for the proposed rescission, Asylum Office personnel send the asylee an Affirmation of Asylum Grant After Motion to Reconsider (Appendix 37) affirming the asylum grant.  Asylum Office personnel also update the DECISION and DECISION DATE fields on the Motion to Reopen or Reconsider (MTRC) screen, using the decision code C1 – ASYLUM GRANT AFFIRMED.  An update indicating "ASYLUM GRANT AFFIRMED BY USCIS" will appear on the Case History (CHIS) screen.

USCIS00004297

If the Asylum Office does not receive a timely response or the response fails to overcome the reasons to rescind, Asylum Office personnel take the actions described below to rescind the asylum grant.

If there are derivative asylees who obtained asylee status through an I-730, their status must also be rescinded. They may be added to the applicant's case in RAPS prior to these actions using the I730 command.

### a. Rescission based on EOIR jurisdiction

Asylum Office personnel take the following actions to rescind an asylum grant based on EOIR jurisdiction:

- Send the former asylee a Notice of Rescission of Asylum Grant (Appendix 36), notifying him or her that the grant of asylum has been rescinded. If the asylee received asylum as a derivative, remove the sentence "the grant of asylum to any dependent included in your asylum application is also rescinded" from the rescission notice.
- Take the following steps in RAPS in this order:
- Enter the decision code C2 – ASYLUM GRANT RESCINDED in the DECISION field and the date of the decision in the DECISION DATE field on the MTRC screen. This will automatically delete the final grant decision. An update indicating "ASYLUM GRANT RESCINDED BY USCIS" will appear on the CHIS screen.
- Administratively close the asylum application. The reason for the closure is "IJ JURISDICTION" (C4). Indicate that an NTA/referral will NOT be issued to the applicant. (Place an "N" in the "Send to IJ" section.)
- Transfer the file to the ICE Office of the Principal Legal Advisor (OPLA) if the former asylee is currently in proceedings or to ICE Investigations or DRO (depending upon local procedures) if the former asylee has a final order.

### b. Rescission based on applicant's lack of physical presence in U.S.

If it is determined that the applicant was not in the United States at the time of the asylum approval, USCIS lacked jurisdiction to approve asylum, and the prior grant of asylum must be rescinded. However, the actions to take after rescission will depend on whether the applicant received advance parole or not, whether the applicant traveled back to the country of feared persecution, and whether the absence from the United States affects the applicant's substantive claim. There may be some circumstances in which the applicant will be required to file a new I-589, but, in other cases, it may be appropriate to grant the I-589 again, with a new approval date. Until final guidance is provided on these rare cases, please contact the HQASM Operations team for guidance if you intend to rescind a grant of asylum based on an applicant's absence from the U.S. at the time of approval. HQASM Operations will provide instruction for the language to incorporate in the Notice of Rescission of Asylum Grant (Appendix 37), based on the particular circumstances of the case, as well as further actions to take on the applicant's case.

### c. Rescission grounds apply only to dependent

If the rescission grounds apply only to a dependent, only the asylee status of the dependent is rescinded. Asylum Office personnel follow the steps outlined in Sections III.W.a and III.W.b in order to rescind a dependent's asylee status. The CURRENT STATUS field on the Case Status (CSTA) screen for the principal will indicate "Prin Granted, Dep Rescinded" if only the dependent's asylee status is rescinded. An update indicating "DEPN GRANT RESCINDED BY USCIS" will appear on the CHIS screen.

USCIS00004298

# III.V.  TERMINATION OF AN ASYLUM APPROVAL

| Reviewed, No Substantive Changes since 2007 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections:1,2,3,4,5,6,7,8,9,10,11,12,13 |



### 1. Overview of Termination Proceedings

#### a. Grounds for Termination of Asylum Status

The Asylum Office initiates a proceeding to terminate asylum status granted by USCIS when prima facie evidence indicates that at least one (1) of the following circumstances is present:

##### 1) Any Filing Date: Fraud Ground

There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted.

##### 2) Applications Filed on or after April 1, 1997

As to an application filed **on or after April 1, 1997**, one or more of the conditions described in Section 208(c)(2) of the INA exist, summarized below:

- the alien no longer meets the definition of a refugee due to a fundamental change in circumstances;
- the alien is a persecutor, danger to the security of the U.S., described in terrorist grounds of inadmissibility, or firmly resettled in another country; or the alien was convicted of a particularly serious crime or there are serious reasons to believe the alien committed a serious nonpolitical crime outside the U.S.;
- the alien may be removed pursuant to a safe third country agreement;
- the alien voluntarily re-availed him- or herself of the protection of the country of feared persecution by returning to such country with the reasonable possibility of obtaining or having obtained permanent resident status with the same rights and obligations of other permanent residents of the country;
- the alien has acquired a new nationality and enjoys the protection of that country.

##### 3) Applications Filed before April 1, 1997

As to an application filed **before April 1, 1997**,
- the alien no longer has a well-founded fear of persecution due to a change of country conditions in the alien's country of nationality or last habitual residence, or

USCIS00004299

- the alien has committed any act that would have been grounds for a mandatory denial of asylum under 8 C.F.R. 208.13(c)(2), summarized below:
  - the alien was convicted of a particularly serious crime;
  - the alien was firmly resettled in another country;
  - the alien is a danger to national security;
  - the alien has been convicted of an aggravated felony;
  - the alien ordered, incited, assisted, or otherwise participated in persecution of others on account of one or more of the five protected grounds;
  - the alien is involved in terrorist activities as described in INA Section 212(a)(3)(B)(i)(I) [engaged in], (II) [reasonably likely to engage in after entry], and (III) [incited with an intent to cause death or serious bodily harm], unless there are no reasonable ground to believe the asylee is a danger to national security

### b. Asylum Office Jurisdiction and Who May be Subject to Termination
#### 1) Jurisdiction: USCIS or EOIR

Termination proceedings can only be initiated after an Asylum Approval has been issued. The Asylum Office may terminate asylum status granted by USCIS, as long as the Asylee has not yet adjusted to LPR status. If the individual has adjusted to LPR status, the asylum office may not initiate termination proceedings as the individual is no longer considered an Asylee. *See Robleto-Pastora v. Holder, 591 F3d 1051 (9th Cir. 2009).* The Asylum Office does not have jurisdiction to terminate asylum granted by EOIR, but EOIR may terminate the asylum status of an Asylee that was granted by USCIS. If the Asylum Office receives a request to take action to terminate asylum that was granted by EOIR, the Asylum Office refers the requester to USCIS Area Counsel or the ICE Office of the Principal Legal Advisor (OPLA).

#### 2) Choice of Procedure for Terminating Asylum Granted by USCIS

When USCIS initiates termination proceedings, it may do so by initiating and conducting termination proceedings at the Asylum Office pursuant to guidance in this manual, or USCIS may elect to issue an NTA concurrently with a Notice of Intent to Terminate Asylum Status by EOIR (Appendix 43) to vest the Immigration Court with jurisdiction over the termination proceedings. See 8 C.F.R. 208.24(f).

#### 3) Asylum Office with Jurisdiction over the Termination Proceedings

The Asylum Office that handles issues related to the termination of asylum status, including conducting termination proceedings, if any, is the Asylum Office with jurisdiction over the asylee's place of residence (or, if detained, place of detention). The Asylum Office that conducts termination proceedings may update the REVO screen regardless of whether that office issued the asylum grant.

#### 4) Termination of Derivative Asylum Status

The Asylum Office may terminate the asylum status of any derivative asylee who has not yet adjusted to LPR status. The Asylum Office may terminate derivative asylum status whether it was gained at the same time of the original asylum grant to the principal, or through the approval of an I-730, Refugee/Asylee Relative Petition. The Asylum Office may terminate the asylum status of a derivative asylee whose asylum status was granted by USCIS, even if the Principal Asylee/I-730 petitioner was granted asylum by EOIR, if there is an independent ground to terminate the derivative.

#### i. Termination of Derivative with Principal

USCIS00004300

Termination of asylum status for the principal asylee results in termination of any derivative status, if the derivative asylee has not yet adjusted to LPR status. The termination does not preclude the former derivative from applying for asylum or withholding of removal on his or her own. If any derivative has already adjusted to LPR status, that derivative will not be listed on the NOIT or included in the termination proceedings.

### ii. Termination of Derivative Only, without the Principal

When grounds for termination apply to a derivative alone, the derivative asylum status is terminated without effect on the principal asylee's status, and documents discussed in this section are issued to the derivative asylee alone.

### 5) Cases Granted Asylum Status by USCIS that have Adjusted to LPR Status and Present Adverse Information

Although the Asylum Office may not terminate the asylum status of an individual that has adjusted to LPR status, if the adverse information constitutes inadmissibility, the case may be subject to Post-Adjustment Eligibility Review (PAER). See additional program guidance on PAER..


### c. Standards of Proof Relevant to Termination Proceedings
#### 1) Standard for NOIT Issuance

Before asylum may be terminated, the Asylum Office issues a Notice of Intent to Terminate (NOIT) to the asylee. The NOIT must list the ground(s) for the intended termination and must include a summary of the evidence supporting the ground(s). To issue a NOIT, the Asylum Office must have information establishing a prima facie case supporting termination.

#### 2) Standard for Termination of Asylum Status

In order to terminate asylee status, USCIS has the burden of establishing one or more of the termination grounds in 8 C.F.R. 208.24 by a preponderance of the evidence. In other words, to begin termination proceedings through the issuance of a NOIT, the Asylum Office must have information that, on its face, indicates that asylum termination may be appropriate, but need not have the higher level of evidence required to terminate asylee status.

#### 3) Sufficiency of Evidence

After the issuance of the NOIT, the disclosure of other facts and circumstances in the termination interview may cause the Asylum Office to find that there is insufficient evidence to meet the preponderance of the evidence standard required to terminate asylee status. For more discussion regarding standards of proof, see RAIO Combined Training Course: *Evidence*.


### 2. Asylum Office Processing of a Motion

#### a. Identification of Pending Benefits

Every case subject to review for termination or PAER must be checked in appropriate systems to identify any additional pending immigration benefits with other USCIS offices that would be affected by a termination of asylum status. This includes checking pending benefits for principal asylees as well as any derivative asylees that would be subject to termination proceedings. The Asylum Office will, at minimum, identify any pending I-730 petitions, I-485, and N-400 applications.

USCIS00004301

### b. Notification to Other USCIS Offices

If the asylum office identifies a pending I-730, I-485, or N-400, the Asylum Office must inform the USCIS office with jurisdiction over the pending benefit that the case is subject to termination proceedings or PAER. This should be done as soon as possible after the Asylum Office identifies the pending benefit. The Asylum Office must send a follow up message to the USCIS office(s) with pending applications/petitions after a decision has been made by the Asylum Office. Asylum Offices can find points of contact and contact instructions on the current version of the instruction sheet: "*Notifying Service Centers and Field Offices about a Termination or PAER Action*".

### c. Timely Handling of Cases with Pending I-485 Applications

In the case that a principal asylee has a pending I-485 application, the Asylum Office will either 1) complete initial review and issue a NOIT or, 2) if the Asylum Office determines that it will not issue a NOIT, return the file for continued adjudication of the I-485 within 180 days of the Asylum Office's receipt of the A file for termination review. The Asylum Office will adhere to this timeframe unless there are compelling circumstances.

### 3. Sources of Adverse Information

### a. Overseas Source

A DHS overseas office, a DOS embassy or consulate, or other entity operating overseas may receive or generate information related to an asylum claim that relates to asylum eligibility, and may indicate that a termination ground is applicable or PAER is appropriate. For termination and PAER purposes, adverse information from overseas is limited to information that the overseas source proactively identified without an initial request for the information from DHS. An Asylum Office should not take action on adverse information received directly from an overseas DOS consular or overseas DHS immigration officer before submitting it to HQASM for review. DHS and DOS have established a protocol requiring that any adverse information supplied by a DOS consular officer be directed to HQASM for review. If the source of the adverse information is a DHS office overseas, the adverse information must also be forwarded to HQASM for review. Asylum Office personnel refer to HQASM any inquiries or information received by the Asylum Office directly from an overseas source. The Asylum Office should not take further action before receiving written instructions from HQASM.

#### 1) HQASM receipt and review of adverse information

When HQASM receives adverse information from either the DOS or an overseas DHS office, HQASM personnel will review the case as per HQASM procedures.

If HQASM determines that the adverse information is not related to a termination ground for asylum (because, for example, the alleged fraud is wholly unrelated to the asylee's asylum claim), HQASM forwards the adverse information from an overseas source to HQ RAIO FDNS when appropriate.

#### 2) Transmittal of adverse information to the Asylum Office

#### i. Termination Cases – Transmittal from HQASM

If HQASM determines that the adverse information establishes a prima facie case for termination and, therefore, warrants a termination interview, HQASM prepares a memorandum to the Asylum Office Director having jurisdiction over the individual's place of residence requesting that the Asylum Office issue a Notice of Intent to Terminate Asylum Status (NOIT) or other appropriate action.

The memo to an Asylum Office Director does not recommend that asylum status be terminated. The transmittal memo provides a brief outline of the information and merely concludes that there is sufficient

USCIS00004302

adverse information to warrant NOIT issuance and to conduct a termination interview, where all the facts of the case can be more fully developed and evaluated by an AO. HQ will indicate in the transmittal memorandum what information can be disclosed from the overseas referral. HQASM attaches the transmittal memo to the A-file for shipment to the appropriate Asylum Office Director for further action.

### ii. PAER Cases – Transmittal from HQASM

For cases in which the former asylee has already adjusted to LPR status, HQASM will review the adverse information and if it appears to have prima facie evidence of fraud or another inadmissibility ground, HQASM will forward the case to the appropriate Asylum Office with a transmittal memo requesting PAER, when appropriate. For adverse information indicating other actionable inadmissibilities, the asylum office will forward the case to the appropriate USCIS office. HQASM attaches the transmittal memo to the A-file for shipment to the appropriate Asylum Office Director for further action.

### iii. Asylum Office Receipt of Case

After the Asylum Office Director receives the A-file and memo from HQASM, the Asylum Office Director will forward the file/file information to the SAO responsible for termination and the FDNS IO. After receipt of the A file, the Asylum Office will determine whether or not the case is subject to Asylum Office review, and if it is subject to Asylum Office review, the Asylum Office will determine whether the case requires termination review or PAER. At this point, Asylum Office staff must update RAPS and apply either the Termination Review (TM) or Post-Adjustment Eligibility Review/PAER (PR) hold code. These hold codes should be applied to record at the earliest point possible after the file is received by the Asylum Office. The SAO responsible for termination and the FDNS IO will coordinate file handling and information sharing on the case.

### b. Domestic Source – Asylee in the U.S.
#### 1) Asylum Office Receipt of Case

An Asylum Office may receive from within DHS or another domestic source outside DHS adverse information that indicates that an individual's asylum status should be terminated or subject to PAER. After receipt of the A file, the Asylum Office will determine whether or not the case is subject to Asylum Office review, and if it is subject to Asylum Office review, the Asylum Office will determine whether the case requires termination review or PAER. At this point, Asylum Office staff must update RAPS and apply either the Termination Review (TM) or Post-Adjustment Eligibility Review/PAER (PR) hold code. These hold codes should be applied to record at the earliest point possible after the file is received by the Asylum Office. The Asylum Office Director, or designee, should review any adverse information received and institute termination proceedings when it establishes a prima facie case in support of termination based on one or more of the grounds provided in 8 C.F.R. 208.24. The Asylum Office Director will share the adverse information and file/file information with the FDNS IO.

#### 2) HQASM Role and Review

Unless HQASM received the information and therefore brought it to the attention of the Asylum Office, HQASM need not act as an intermediary between the Asylum Office and the entity providing the information. HQASM also does not need to review the NOIT or a recommendation to terminate or continue the individual's asylum status, unless the case  otherwise falls within one of the categories for HQASM/QA review, when requested in a particular case, or if the case involves classified information, as discussed below.

USCIS00004303

### c. Domestic Source – Asylee Applying for Admission at a Port of Entry

An Asylum Office may receive a request from another DHS component to issue a NOIT to an asylee who is seeking re-admission to the U.S. The Asylum Office may only issue the NOIT if there is evidence establishing a prima facie case in support of termination..

#### 4. Notifying Asylee of USCIS's Intent to Terminate Asylum Status

### a. Who to Include on the NOIT
#### 1) When Principal Asylee is Subject to Termination

The NOIT will be addressed and issued to the principal asylee, if the principal asylee is subject to termination. In this case, any derivative asylees that have not yet adjusted will be included on the NOIT of the principal.

#### 2) When Derivative Asylee is Subject to Termination

If it is a derivative asylee that is subject to termination, and not the principal asylee, only the derivative asylee will be included on the NOIT.

#### 3)    Updating RAPS to include Derivatives

If a dependent entered the U.S. pursuant to an I-730 that was granted based upon the principal's asylum approval, the AO updates the I-730 Data Entry (I730) screen in RAPS. This adds the dependent to the principal's asylum claim.

### b. What to Include in the NOIT

Prior to the termination of a grant of asylum, the Asylum Office notifies the individual of USCIS's intent to terminate asylum status through the issuance of a Notice of Intent to Terminate (NOIT). The NOIT template used depends on whether the termination proceedings will be conducted by the Asylum Office or EOIR. Circumstances under which a USCIS asylum grant may be terminated by EOIR are discussed below. In either case, the NOIT notifies the asylee of the grounds for termination, including the specific regulation for each ground, and includes a brief summary of the unclassified supporting evidence that constitutes grounds for termination. The Asylum Office must include at least one evidentiary statement to support each termination ground presented on the NOIT. The Asylum Office does not attach reports, case documents, or any other documentary evidence to the NOIT, but may summarize statements or findings from such documents as part of the evidentiary statement.

Generally, the Asylum Office may disclose to the asylee unclassified evidence constituting or supporting grounds for termination, including a brief description of information from unclassified materials from the Department of State or other government agencies. If there is a question as to what may be disclosed to the asylee in notifying him or her of the grounds for termination, HQASM should be contacted

### c. Issuing the NOIT and Recording Issuance
#### 1) Classified Information

In some cases, the adverse information from either an overseas or domestic source that constitutes grounds for termination will include classified terrorist or criminal information supplied by the Department of State or other sources. An AO must not disclose the details of the classified information to the asylee, either in the NOIT or later at the termination interview, in order to protect the security of the classified operation or

USCIS00004304

the safety of a confidential informant. The AO who conducts the interview and reviews the information must have the proper security clearance according to the level of the classified information.

### 2) Information from Overseas Source

If the information is from an overseas source, the transmittal memorandum from HQASM to the Asylum Office will suggest the appropriate disclosure of information, as needed, including suggested language to be included in the NOIT to balance security concerns with the need to provide an asylee with a meaningful opportunity to rebut. HQASM will also be available to discuss the issue with the interviewing AO. If the information is from a domestic source, the Asylum Office Director or his or her representative will liaise with HQASM to inform the AO what information may be disclosed, and to what degree of detail.

### 3) Information from Confidential Informant

An AO may not at any time disclose the identity of a confidential informant (or information that could reasonably lead to discovery of the identity of the informant), or the nature of an undercover or otherwise classified (e.g., terrorist or security) operation.

### 4) Information About Third Parties

The Asylum Office may not disclose information about third parties in the NOIT that is not publicly available. If the material from another agency contains information about a third person, the Asylum Officer should summarize the document, omitting the information about that individual and redact those portions of the document, if it is mentioned in the evidentiary statement on the NOIT.

### 4) Informant Letter

The Asylum Office should treat any informant letter as a lead, and follow up to obtain independent proof or evidence of the allegation in the informant letter. When it is possible to independently confirm the allegation through a system check or other investigation, the Asylum Officer will refer to the records or the investigation that confirmed the allegation, and not disclose the informant letter as the source of the lead.

### d. Issuing the NOIT and Recording Issuance
When the Asylum Office serves the NOIT, Asylum Office personnel enter the date of service in the ISSUE DATE – NOIT ONLY field on the Termination of Asylum (REVO) screen. When Asylum Office personnel enter a date in the ISSUE DATE – NOIT ONLY field, an update indicating "NOIT ISSUED" will appear on the Case Status (CHIS) screen. When the Asylum Office completes termination review of a case and determines that NOIT issuance is not appropriate, the Asylum Office records completion of the review in the appropriate ECN log.

### e. Scheduling the Termination Interview and Recording the Date
Upon service of the NOIT, Asylum Office personnel also enter an interview date, which must be at least 30 days after the service of the NOIT, in the TERMINATION INTERVIEW DATE field on the REVO screen. Entry of an interview date is required at the same time that the date of NOIT issuance is entered on the REVO screen. When Asylum Office personnel enter a date in the TERMINATION INTERVIEW DATE field, an update indicating "TERMINATION INTERVIEW" will appear on the CHIS screen..

### f. Attachments to the NOIT
Asylum Office personnel attach a Legal Provider List to the NOIT when sending it to the individual. A copy of the Optional Waiver of Rebuttal Period and Waiver of Opportunity to Rebut must also be attached to the NOIT.

USCIS00004305

### g. Address and Mailing Instructions for the NOIT

The NOIT must be personally served on the asylee within the meaning of 8 C.F.R. 103.5a(a)(2). This includes mailing a copy by registered or certified mail, return receipt requested, to the asylee's last known address. See Section III.A above for guidance on determining an asylee's most recent address. Because a significant amount of time may have passed since the asylum approval, Asylum Office personnel review the A-file, RAPS, CLAIMS, AR-11, and other available DHS systems for the most current address for the NOIT. If the Asylum Office has information indicating that the last address of record for the asylee is not valid and the Asylum Office has an alternate address from a reliable non-USCIS system or entity, the NOIT may be sent to the alternate address, but if an alternate is used, the NOIT must be sent to the asylee using Restricted Delivery, in addition to certified mail with return receipt.

### h. 30 Day Preparation Period and Rebuttal/Waiver

As noted above, if the Asylum Office conducts the termination proceedings, the termination interview is set for at least 30 days after the date of mailing of the NOIT. The asylee may waive this 30-day period and request an earlier interview, or may waive the interview entirely and admit the allegations in the NOIT in writing. A written waiver form is included as an attachment to the NOIT for this purpose. If the Asylum Office receives a written rebuttal, a request for an earlier interview, or a waiver of the interview, Asylum Office personnel enter the date received in the DATE REBUT/WAIVER RECVD field on the REVO screen. If the Asylum Office receives a request for an earlier interview, Asylum Office personnel may enter a date sooner than 30 days after the date of mailing of the NOIT in the TERMINATION INTERVIEW DATE field after Asylum Office personnel enter the date the request for an earlier interview was received in the DATE REBUT/WAIVER RECVD field. When Asylum Office personnel enter a date in the DATE REBUT/WAIVER RECVD field, an update indicating "REBUTTAL/WAIVER TO NOIT RECEIVED" will appear on the CHIS screen.

## 5. FOIA Requests During Termination Proceedings

After the issuance of a NOIT, an asylee or his or her representative may file a request for information in the asylee's file pursuant to the Freedom of Information Act (FOIA). Termination proceedings are to be delayed until the asylee has been provided a response to his or her request, and the file is returned to the Asylum Office. If the Asylee or his or her representative request a postponement of termination proceedings in order to file or receive a response to a FOIA request, the Asylee or his or her representative will provide the asylum office with a copy of the receipt of the FOIA request and/or the NRC Control Number assigned to the request. While the Asylum Office is required to delay termination proceedings until the Asylee or his or her representative receives a response to the initial FOIA request, the Asylum Office is not required to delay termination proceedings for a FOIA appeal. Upon receipt of the FOIA request, the Asylum Office should place the case on, "FOIA Hold" in RAPS.

## 6. Conducting the Termination Interview

### a. Placing Individuals under Oath

The AO places the individual, dependent family members, and the interpreter, if any, under oath. The AO, asylee, and interpreter, if any, complete a Record of Applicant and Interpreter Oaths (Appendix 2).

### b. Request Interpreter Monitor

If the asylee brings an interpreter to the asylum interview, the AO will request an interpreter monitor as per regular procedure for use of interpreter monitors.

USCIS00004306

### c. Non Adversarial Interview

The nature of the termination interview is non-adversarial, and the conduct of the interview is consistent with the procedural aspects of an asylum interview as outlined in Section II.J, AO Conducts an Asylum Interview, except that the termination interview need only explore issues relevant to termination of asylum.

### 7. Making a Determination

### a. Establishing Preponderance

USCIS has the burden of establishing that a preponderance of the evidence supports termination. For guidance on the preponderance of the evidence standard, see RAIO Combined Training Course: Evidence.

### b. Fraud based Termination and New Claim

If the reason for termination is based upon fraud, an AO may not affirm the grant of asylum based on a new "true" story offered by the alien for the first time at the termination interview. In most cases the Asylum Officer will not have a new I-589 reflecting the new "true" story. After having committed fraud in the affirmative system, the appropriate forum for the individual to present a new asylum claim is in defensive proceedings where adversarial methods such as cross-examination can further test the veracity of the new story.

### c. Asylee Appeared for the Interview
#### 1) AO makes Recommendation

If the individual appears for the interview, the AO makes a recommendation either to terminate or to continue the individual's asylum status based upon evidence presented. The Asylum Officer prepares a memorandum for the file recommending either termination or continuation of asylum status, depending upon whether a preponderance of the evidence supports termination. The memo includes a summary of the asylee's testimony, the original claim, the adverse information considered, and an analysis of why asylum status should be terminated or continued.

#### 2) Evidence of Additional Termination Ground Presented

If the Asylee presents information at the interview indicating that an additional termination ground may be applicable, other than the termination ground presented in the original NOIT, a new NOIT must be issued providing notice of the new ground of termination and an evidentiary statement to support the new ground of termination. See Section 3 above, Notifying Asylee of USCIS's Intent to Terminate Asylum Status for additional requirements.

#### 3) UPDATING RAPS

If the asylee appeared for the interview, Asylum Office personnel record T2 (Asylum Terminated) next to the TERMINATION DECISION field on the REVO screen. Asylum Office personnel also record the date of termination in the TERMINATION DATE field and record the reason for termination (either R1 (Changed Country Conditions), R2 (Fraud in Application), or R3 (Grounds for Denial Act)) next to the REASON FOR TERMINATION field. Before Asylum Office personnel may finalize entry of the decision, RAPS will remind Asylum Office personnel that a preponderance of the evidence is required to terminate asylum status. Asylum Office personnel press PF9 to terminate asylum status or PF3 to cancel the termination decision. Asylum Office personnel may also press PF3 to cancel the termination decision at any time before it becomes final. If Asylum Office personnel go through with the decision to terminate asylum status, an update indicating "ASYLUM STATUS TERMINATED" will appear on the Case History (CHIS) screen. The FINAL DECISION field on the Case Status (CSTA) screen will reflect "GRANT TERMINATED" and the reason for the termination. Asylum Office personnel also indicate to what immigration status (if any) the former asylee should be restored next to the RESTORE TO STATUS field on the REVO screen.

219

USCIS00004307

### d. Asylee Failed to Appear for Interview
#### 1) Waiting Period

If the individual fails to appear for the termination interview, the Asylum Office waits fifteen (15) calendar days from the date of the interview before taking further action to see if the individual submits an excuse for his or her failure to appear or a request to reschedule the interview.

#### 2) Failure to Appear Not Excused

If the individual fails to appear for the interview and the failure to appear is not excused in accordance with 8 C.F.R. 208.10, the Asylum Office follows the same procedures as discussed in Section 7c above (Asylee Appears for Interview), except that the recommendation memo also includes a brief statement of the circumstances surrounding the failure to appear, whether any excuse was submitted and, if so, why the excuse was insufficient.

#### 3) Preponderance Not Met

If the evidence constitutes less than a preponderance of the evidence and therefore appears insufficient to terminate asylum status, the Asylum Office Director or his or her representative may elect to coordinate with USCIS Area Counsel, the Office of Fraud Detection and National Security (FDNS), the ICE Office of the Principal Legal Advisor (OPLA), and/or ICE District Investigations HSI to follow up on the case and possibly issue an NTA when there are sustainable charges.

#### 4) UPDATING RAPS
##### i. Failure to Appear and Preponderance Met

If the asylee failed to appear for the interview, the failure to appear is not excused in accordance with 8 C.F.R. 208.10, and the Asylum Office intends to terminate asylum status based on a preponderance of the evidence, Asylum Office personnel follow these steps: On the REVO screen, Asylum Office personnel also record that the individual failed to appear for the interview by recording an X next to TERMINATION INTV NO-SHOW. Asylum Office personnel record T2 (Asylum Terminated) next to the TERMINATION DECISION field on the REVO screen. Asylum Office personnel also record the date of termination in the TERMINATION DATE field and record the reason for termination (either R1 (Changed Country Conditions), R2 (Fraud in Application), or R3 (Grounds for Denial Act)) next to the REASON FOR TERMINATION field. Before Asylum Office personnel may finalize entry of the decision, RAPS will remind Asylum Office personnel that a preponderance of the evidence is required to terminate asylum status. Asylum Office personnel press PF9 to terminate asylum status or PF3 to cancel the termination decision. Asylum Office personnel may also press PF3 to cancel the termination decision at any time before it becomes final. If Asylum Office personnel go through with the decision to terminate asylum status, an update indicating "ASYLUM STATUS TERMINATED" will appear on the Case History (CHIS) screen. The FINAL DECISION field on the Case Status (CSTA) screen will reflect "GRANT TERMINATED" and the reason for the termination. Asylum Office personnel also indicate to what immigration status (if any) the former asylee should be restored next to the RESTORE TO STATUS field on the REVO screen.

##### ii. Failure to Appear and Preponderance Not Met

If the asylee failed to appear for the interview, the failure to appear is not excused in accordance with 8 C.F.R. 208.10, and the evidence constitutes less than a preponderance of the evidence and therefore appears insufficient to terminate asylum status, Asylum Office personnel follow the steps in Section III.X.5.b above. On the REVO screen Asylum Office personnel also record that the individual failed to appear for the interview by recording an X next to TERMINATION INTV NO-SHOW. However, Asylum Office personnel do not terminate the individual's asylum status.

USCIS00004308

## 8. Asylum Office Terminates Asylum Status

### a. The AO prepares Notice

- · Notice of Termination of Asylum Status (Appendix 41),
- · Form I-213, if required,
- · NTA

Termination of asylum status applies to the principal as well as all individuals who obtained derivative asylum status from the principal, whether granted as dependents on the I-589 or through an I-730 Refugee/Asylee Relative Petition, as long as they have not yet adjusted to LPR status. See 8 C.F.R. 208.24(d), 208.21(g). The Notice of Termination of Asylum Status (Appendix 41) can be used to terminate either a principal or a derivative asylee. If terminating a derivative asylee, Asylum Office personnel do not use any of the language pertaining to dependents in the Notice.

### b. Notification to Other USCIS Offices

Once asylum status is terminated, and any pending I-485s or I-730s have been identified, the Asylum Office personnel notify the appropriate Service Center or Field Office responsible for the pending benefit, including a copy of the Notice of Termination of Asylum Status.

## 9. Reversing a Decision to Terminate

Supervisory Asylum Officers (SAOs) may reverse a final decision to terminate asylum status by pressing PF1. If an SAO elects to reverse a final decision to terminate asylum status, the SAO will need to reenter the information pertaining to the final grant of asylum into RAPS on the Final Decision (FDEC) screen.

## 10. EOIR Proceedings & Issuance of NTA for Terminated Cases

### a. Preparing the NTA with Appropriate Charges

After asylum status is terminated, the Asylum Office must place the individual before the Immigration Court. Asylum Office personnel note the deportation code on the REVO screen by recording either A1 (NTA Required), A5 (I-863), or A6 (No Deportation) next to the DEPORTATION CODE field and then place a charge and allegation on the NTA that corresponds to the reason for termination (e.g., commission of fraud, criminal conviction, etc.). Asylum Office personnel should consult the DHS field manual that lists all allegations and charges that DHS uses for NTAs, and local USCIS Area Counsel and/or the ICE Office of the Principal Legal Advisor (OPLA) for appropriate charges to list on the NTA.

### b. NTA for Termination of Dependent Only

If the termination grounds apply only to a dependent, only the asylee status of the dependent is terminated. If the derivative asylee status of an individual who was admitted pursuant to an I-730 is terminated, the NTA is prepared with the appropriate deportability charges under INA Section 237, most likely 237(a)(1)(B) [present in the U.S. in violation of law], with any additional charges. Asylum Office personnel send the Notice of Termination of Asylum Status (Appendix 41) to the dependent with a copy to the principal asylee.

### c. Parolees and Credible Fear of Persecution or Torture

If the asylee was paroled on or after April 1, 1997, not pursuant to advance parole, Asylum Office personnel must follow the procedures outlined in Section III.N.2.c.i.a (Parolees Ineligible for Asylum and AO finds credible fear of persecution OR torture) when preparing to initiate removal proceedings. The termination

USCIS00004309

of an asylee's status, in and of itself, does not negate the possibility that the asylee has a credible fear of persecution or torture.

## 11. Effect of Termination on Employment Authorization

Once asylum status is terminated, any employment authorization issued as a result of that status is automatically terminated. The former asylee must surrender any EAD issued under code "a5" (asylee) as soon as possible after termination of his or her asylum status. The Asylum Office Director will determine the appropriate method of surrender, for example to Asylum Office personnel, to an Assistant U.S. Attorney (in the case of an asylee whose asylum status is terminated on criminal grounds), or to ICE ERO in the case of an individual who is in custody. Asylum office personnel should also coordinate with USCIS District Office personnel to ensure that the former asylee's EAD information is properly updated in CLAIMS 3.

## 12. Asylum Office Continues the Individual's Asylum Status

### a. The AO prepares Notice

The AO prepares a Notice of Continuation of Asylum Status (Appendix 42)

### b. Updating RAPS

Asylum Office personnel record T1 (Asylum Continued) next to the TERMINATION DECISION field on the REVO screen. An update indicating "ASYLUM STATUS CONTINUED AFTER NOIT" will appear on the CHIS screen. The Case Status (CSTA) screen continues to reflect that the individual was granted asylum.

### c. Serving the Notice

Asylum Office personnel serve the letter by either regular or certified mail, as dictated by local Asylum Office policy, and place a copy in the asylee's file. If HQ QA review is required, Asylum Office personnel also scan a copy of the Notice of Continuation of Asylum Status and e-mail it to the "ASYLUM QA – AFFIRMATIVE" mailbox.

### d. Notification to Other USCIS Offices

Once asylum status is continued, if any pending I-485s or I-730s have been identified and Service Centers or Field Offices responsible for the pending benefits were notified, Asylum Office personnel will now provide an update notification that asylum status is continued. A copy of the Notice of Continuation of Asylum Status should be included in the notification.

## 13. Termination by EOIR When the Asylum Office Issued the Asylum Approval

Generally, an Asylum Office terminates asylum status when the asylum approval was issued by an Asylum Office if the asylee has not yet adjusted to LPR status. An Immigration Judge (IJ) may also terminate asylum status at any time after an Asylum Office has issued a NOIT to an asylee, if the asylee has not yet adjusted to LPR status.

### a. Cases Approved by Asylum Office and Subject to IJ Termination

The majority of the asylees whose asylum status is reviewed by an IJ are those individuals who will be or have already been placed into proceedings by another branch of DHS or are being detained based on a criminal conviction.

USCIS00004310

### b. Asylum Office Director's Determination on Process

The Asylum Office Director may elect to send an AO to a facility to conduct a termination interview and complete the adjudication, or can choose to have the individual's asylum status reviewed by the IJ in the context of a removal or deportation proceeding. However, there may be other circumstances where the Director feels it is appropriate to issue an NTA concurrently with the NOIT to vest jurisdiction over the termination proceedings with the Immigration Court.

### c. Steps for IJ Termination

If the Director determines that an IJ will review the individual's asylum status, the following occurs:

1) The Asylum Office obtains a copy of the court disposition, indicating the criminal record of the asylee, and a copy of the NTA (charging document), if any.
2) Asylum Office personnel prepare a Notice of Intent to Terminate Asylum Status by EOIR (Appendix 43), which indicates the IJ's role in reviewing the individual's asylum status.
3) Asylum Office personnel serve the NOIT and a Legal Provider List on the asylee either by certified mail or in-person by an Investigator. If in-person service is accomplished, the Asylum Office must obtain a copy of the NOIT signed by the asylee in order to verify receipt.
4) When the Asylum Office serves the NOIT on the asylee, Asylum Office personnel enter the date of service in the OR NOIT + NTA field on the REVO screen. When Asylum Office personnel enter a date in the OR NOIT + NTA field, an update indicating "NOIT + NTA ISSUED" will appear on the CHIS screen, and Asylum Office personnel will be automatically transferred to the NTA Generation (OSCG) screen to prepare the NTA.

### d. Consultation with Counsel

Asylum Office personnel consult with USCIS Area Counsel or the ICE Office of the Principal Legal Advisor (OPLA) to prepare and issue an NTA with the appropriate charge(s). If an NTA has already been issued, it may or may not be necessary for counsel to file an amended NTA.

### e. Updating RAPS

Whether the Asylum Office or another DHS component places the asylee in proceedings, Asylum Office personnel update the IJ Hearing (HEAR) screen in RAPS with the IJ hearing information.

Asylum Office personnel request that the USCIS Area Counsel or ICE OPLA and any other DHS component involved in the case notify the Asylum Office if asylum is terminated. The Asylum Office may not update the REVO screen to show that an individual is no longer an asylee unless the Immigration Judge terminates asylum status.

USCIS00004311

# III.W.  WITHDRAWAL REQUESTS

An applicant may withdraw an affirmative asylum application at any time prior to the issuance of a decision.  Asylum applicants are not required to withdraw their asylum applications in order to apply for or receive other immigration benefits.  The decision to withdraw is the applicant's alone.  The Asylum Office does not have the authority to deny an applicant the right to withdraw.  (8 C.F.R. 103.2(b)(6))

Procedurally, an applicant may choose to withdraw:

- Prior to the interview (by mail or in-person),
- On the day of the interview (in front of an IIO/CR or AO), or
- After the interview has been conducted, but before the decision has been served on the applicant.

    ("Decision" refers to the issuance and service of the applicant of an Asylum Approval, Final Denial or Referral.)

Whatever the case, the Asylum Office must have written evidence of the applicant's intent to withdraw.

### 1. Documenting the Applicant's Intent to Withdraw

If the applicant or his or her representative of record sends a written withdrawal request to the Asylum Office, Asylum Office personnel take the action requested in the written notice.

If the applicant appears at the Asylum Office to withdraw his or her request, Asylum Office personnel give the applicant a Declaration of Intent to Withdraw Asylum Application (Appendix 43) to complete.

### 2. Closing the Case in RAPS

If the applicant is maintaining valid immigrant, nonimmigrant, or temporary protected status, or parole is not terminated or expired, Asylum Office personnel:

- Administratively close the case in RAPS.  The reason for the closure is "withdrawal" (C3).  Indicate that an NTA/referral will NOT be issued to the applicant (Place "N" in "Send to IJ" section).

RAPS generates an Administrative Termination Mailer, which Asylum Office personnel mail to the applicant.  Local Asylum Office policy dictates whether the Asylum Office keeps the file or sends it to the NRC.

If the applicant is deportable or removable, the Asylum Office determines whether to initiate removal proceedings.  Factors to consider include, but are not limited to: whether the file contains sufficient information to establish the applicant's alienage and deportability/inadmissibility, or whether the applicant may be eligible for an adjustment of his or her status in the near future.  If charging documents will not be issued, update RAPS as indicated above.

(See Section III.N on the documentation requirements for parolees.)

USCIS00004312

If charging documents are to be issued, Asylum Office personnel:

- Administratively close the case in RAPS.   The reason for the closure is "withdrawal" (C3).  Indicate that an NTA/referral will be issued to the applicant (Place a "Y" in the "Send to IJ" section).
- Prepare NTA or I-863, as appropriate.
- Update OSSE upon service of the NTA or I-863.

USCIS00004313

# III.X. INDIVIDUALS WHO HAVE ADJUSTED TO LAWFUL PERMANENT RESIDENT (LPR) STATUS OR WHO HAVE NATURALIZED

### 1. Dismissal of Asylum Application of Lawful Permanent Resident (LPR)

An applicant may adjust to Lawful Permanent Resident (LPR) status while their asylum application is still pending with USCIS, or an applicant may apply for asylum after obtaining LPR status. 8 CFR 208.14 includes the following provision on how USCIS may handle pending asylum applications in these circumstances:

> (g) If an asylum applicant is granted adjustment of status to lawful permanent resident, the Service may provide written notice to the applicant that his or her asylum application will be presumed abandoned and dismissed without prejudice, unless the applicant submits a written request within 30 days of the notice, that the asylum application be adjudicated. If an applicant does not respond within 30 days of the date the written notice was sent or served, the Service may presume the asylum application abandoned and dismiss it without prejudice.

The process outlined in 8 C.F.R. 208.14(g), which presumes abandonment of a pending asylum application after an asylum applicant is granted adjustment of status, does not apply to ABC class members. For procedures addressing applicants who may be presumed to have abandoned their asylum applications for reasons other than adjusting to LPR status, please refer to AAPM Section III.D. Departing the U.S. Before a Final Decision.

*See* Langlois, Joseph E, Asylum Applicants who have Adjusted to Lawful Permanent Resident Alien (LPR) Status, Memorandum to Asylum Office Directors, 18 January 2000; *see also* Langlois, Joseph E, Asylum Applicants Who Have Adjusted to Lawful Permanent Resident Alien (LPR) Status or Been Naturalized, Memorandum to Asylum Office Directors, 7 February 2003.

#### a. Identification of Pending Asylum Applicants Who May Be LPRs

To identify pending asylum applications that may be presumed as abandoned under 8 C.F.R. 208.14(g), Asylum staff should access reports provided by Asylum HQ. These reports will include all A-numbers for pending asylum applications that are within the asylum office's control according to the Case Control Office (CCO) and that appear in CIS2 with Class of Admission (COA) codes as belonging to an LPR. Asylum staff can use these reports to determine ABC class membership and identify which process outlined below applies in the specific case. Staff should also review the list to determine if LPR cases have already been processed subject to these procedures to avoid re-processing cases that have already been identified as LPR cases and sent an LPR notice.

Asylum staff must also determine if a special group code applies to the case in Global by following the guidance in Section III.X.1.c Applicability to Special Groups below to determine whether the applicant is an ABC class member and the applicable procedures to follow.

#### b. Eligibility Review to Receive LPR Notice

To determine whether an asylum applicant is an LPR, compare the applicant's information (i.e. date of birth and name) in Global to the information in CIS2 and CLAIMS 3/ELIS indicating that the applicant is an

USCIS00004314

LPR. If the A-number in Global is for the same person as the A-number in CIS2 and CLAIMS 3/ELIS 2, follow the guidance in Section III.X.1.c Applicability to Special Groups below to determine whether the applicant is an ABC class member and Section III.X.1.e for the applicable procedures to follow for ABC class members.

If there is uncertainty as to whether the pending asylum applicant and individual in CIS2 and CLAIMS 3/ELIS 2 are the same person, Asylum staff should compare biometric records associated with both the asylum and adjustment adjudications within CPMS. Asylum staff should consult the ISCPM or Asylum Office Security Checks POCs for further guidance.

If Asylum staff are unable to confirm through review of systems records whether an individual listed in Global is the same individual in CIS2 and CLAIMS 3/ELIS 2, Asylum staff must not issue an LPR Notice to the applicant. The asylum office with jurisdiction over the applicant's address should schedule the applicant for an asylum interview following the Asylum Division's interview scheduling priorities. If the applicant appears for the interview, an asylum officer questions the applicant about whether they have LPR status and, if so, whether the applicant wishes to pursue the request for asylum or to withdraw their asylum application. In the event the applicant wishes to withdraw their asylum application during the interview, Asylum staff should process the case according to standard withdrawal procedures in AAPM Section III.W.

Withdrawal Requests. If the applicant fails to appear for the interview, Asylum staff process the case according to the procedures in AAPM Section III.I. Failure to Appear.

### c. Applicability to Special Groups
8 C.F.R. 208.14(g) applies only to LPRs who are not eligible for ABC settlement agreement benefits. The processing of an asylum application of an individual who is eligible for benefits under the ABC settlement agreement is governed by the 1990 asylum regulations and settlement agreement, which do not contain a similar provision allowing USCIS to presume an abandonment of an asylum application. Therefore, the abandonment procedures do not apply to any asylum application that is marked with a special group code that relates to a potential ABC class member including:

- ABC
- ABA
- ABB
- ABN
- ABQ
- ABR
- ABZ

The abandonment procedures for issuance of the LPR notices cover all other special groups outside of the ABC class member special group codes noted above. Please note that applicants with the special group code ABX have been determined not to be ABC class members and therefore may also be issued an LPR notice.

For information on how to process cases for an LPR who is an ABC class member see Section III.X.1.f. Preparation of Interview Notice – ABC Class Members

227

USCIS00004315

### d. Preparation of LPR Notice – Non-ABC Class Members

If the applicant is determined to be an LPR and is not an ABC class member, Asylum staff will generate the Lawful Permanent Resident Notice (Appendix 66) for service on the applicant and representative of record, if any. The LPR Notice (Appendix 66) informs an applicant who is an LPR and is not an ABC class member that to continue pursuing their asylum application, they must sign, date, and return the letter within 30 days of the date noted in the letter. If the applicant does not return the letter within that timeframe, USCIS will presume the applicant has abandoned their request for asylum and will dismiss the application without prejudice.

If Asylum staff have confirmed that the individual with a pending asylum application in Global is the same individual in CIS2 with LPR status, follow these steps:

- If there is a physical A-file, pull the A-file of the principal applicant and any dependent within the Asylum Division's control. If the A-file is not within the Asylum Division's control, create a T-file for the principal applicant and each dependent and enter them into RAILS. It is not necessary to order an A-file if it is located outside of the Asylum Division.
- Find the principal applicant's most recent address by checking Global, CLAIMS 3, ELIS 2, and AR-11 2.
    - If the asylum office has the A-file, check any documents in the record file along with systems checks to find the most recent address.
    - Ensure that the most recent address is updated on the Entry tab in Global.
- Generate the LPR Notice (Appendix 66). Ensure the notice is addressed to the principal applicant, listing all dependent A-numbers. The notice should be dated as of the date of mailing.
- If the applicant is represented, send a copy of the notice to the representative listed on the Form G-28 and/or in the attorney field on the Entry tab in Global.
- Ensure a copy of the notice is included in the record side of the principal applicant and each dependent files.
- If there is a physical A-file, store the file(s) in the asylum office for follow-up action.

### e. Follow-up after LPR Notice – Non-ABC Class Members

An applicant has 30 calendar days from the date on the LPR notice (Appendix 66) to notify the Asylum Division that they wish to pursue their asylum application. To account for mailing delays, Asylum staff does not take any action to dismiss an application until 45 days after mailing the notice.

#### i. Applicant Returns the LPR Notice

If an applicant returns the notice within the required timeframe or before Asylum staff dismisses the asylum application, Asylum staff should identify the case as a case where the applicant has LPR status, received and returned the LPR notice to continue their asylum application, and is pending an affirmative asylum interview. The asylum office with jurisdiction over the applicant's address should order the physical A-file of the principal applicant and dependents (if there are physical A-files and they are not already located within the asylum office) and schedule the case for an interview following the Asylum Division interview scheduling priorities.

USCIS00004316

If the post office returns the notice because it is undeliverable, Asylum staff should administratively close the case in Global. The reason for the closure is "Bad Address." No additional notices should be sent to the applicant at the invalid address. Because the applicant is an LPR, Asylum staff will not refer the application to immigration court.

### iii. Applicant Fails to Return the LPR Notice

After 45 days from when the LPR Notice (Appendix 66) has been sent to the applicant and no response is received, the case should be closed out in Global. If an applicant fails to return the notice within the required timeframe, Asylum staff should administratively close the case in Global, indicating that the reason for the closure is "Dismissed – LPR" and generate the Lawful Permanent Resident (LPR) Dismissal Notice (Appendix 117). Asylum staff should serve this notice to the applicant and their representative of record, if any, updating Global as appropriate. Because the applicant is an LPR, Asylum staff will not refer the application to immigration court.

#### f. Preparation of Interview Notice – ABC Class Members

### i. Schedule for Interview with Special Notice

LPR cases that are marked as ABC Class Members in Global with one of the special group codes ABC through ABZ from the bulleted list above should be scheduled for ABC asylum interviews following the Asylum Division interview scheduling priorities. When the case is scheduled for an interview, Asylum staff should send to the applicant and their representative of record, if any, the following documents:

1. ABC interview notice (*see* Section XI.E. of the ABC/NACARA Procedures Manual);
2. Appendix AD – ABC Interview Notice --- Notice 9 (*see* Section XI.E. of the ABC/NACARA Procedures Manual); and
3. Notice for ABC LPR Cases Scheduled for Interview (Appendix 116), with the words "Notice for ABC LPR Cases Scheduled for Interview" removed. This notice provides the applicant with an opportunity to withdraw their asylum application now that they are an LPR by completing the section at the bottom of the notice and returning the notice to the asylum office listed.

### ii. Follow-up Action after Interview Is Scheduled

1. Applicant returns signed request to withdraw asylum application

   If the applicant requests withdrawal of the asylum application by returning the Notice for ABC LPR Cases Scheduled for Interview (Appendix 116), with the bottom portion signed, and the document is received prior to the interview, the asylum interview is canceled. Asylum staff should process the case according to standard withdrawal procedures in AAPM Section III.W. Withdrawal Requests. The appropriate withdrawal notice should be issued to the applicant and their representative of record, if any, updating Global as appropriate. Because the applicant is an LPR, Asylum staff will not refer the application to immigration court.

USCIS00004317

2. Applicant appears for the interview

> If the applicant appears for the interview, an asylum officer questions the applicant about whether they have LPR status and, if so, whether the applicant wishes to pursue the request for asylum or to withdraw their asylum application. The asylum officer proceeds with the ABC interview and adjudication pursuant to procedures in the ABC/NACARA Procedures Manual. If the applicant wishes to withdraw their asylum application, the asylum officer has the applicant sign the bottom of the Notice for ABC LPR Cases Scheduled for Interview (Appendix 116). Asylum staff should process the case according to standard withdrawal procedures in AAPM Section III.W. Withdrawal Requests. The appropriate withdrawal notice should be issued to the applicant and their representative of record, if any, updating Global as appropriate. Because the applicant is an LPR, Asylum staff will not refer the application to immigration court.

3. Applicant fails to appear for the interview

> If the applicant fails to appear for the interview, Asylum staff follow the guidance in Section XII.B. of the ABC/NACARA Procedures Manual. For denials, Asylum staff issue Appendix J(2) – ABC No-Show Letter (No Charging Document / I-881 Already Approved) from the ABC/NACARA Procedures Manual. Prior to issuing the letter, Asylum staff revises the following sentence, "Since you were previously adjusted to lawful permanent resident status in the United States upon approval of your NACARA application, this denial is the final action that the U.S. Citizenship and Immigration Services (USCIS) will take on your asylum claim," to read, "Since your status was previously adjusted to lawful permanent resident, this denial is the final action that the U.S. Citizenship and Immigration Services (USCIS) will take on your asylum claim."

## 2. Dismissal of Asylum Application of U.S. Citizen (USC)

Individuals who have naturalized are no longer eligible to apply for asylum in the United States. The procedures below outline how to identify individuals with pending asylum applications who are USCs and how to notify the individuals and their representatives of record, if any, that they are no longer eligible to apply for asylum.

### a. Identification of Pending Asylum Applicants Who May Be USCs

To identify pending asylum applications where the principal applicant is now a USC, Asylum staff should access reports using reports provided by Asylum HQ. These reports list all Anumbers for pending asylum applications that are within the asylum office's control according to the Case Control Office (CCO), and that appear in CIS2 with the Class of Admission (COA) as belonging to a USC.

USCIS00004318

### b. Eligibility Review to Receive U.S. Citizen Notice

To determine whether an asylum applicant is no longer eligible to apply for asylum because they are a USC, compare the applicant's information in Global to the information in CIS2 and CLAIMS 3/ELIS 2 indicating that the applicant is a USC (i.e., date of birth, name). It is not necessary to order an A-file if it is located outside of the Asylum Division. If the A-number in Global is for the same person as the A-number in CIS2 and CLAIMS 3/ELIS 2, prepare a U.S. Citizen Dismissal Notice (Appendix 118) to the principal applicant as outlined below.

If there is uncertainty as to whether the pending asylum applicant and individual in CIS2 and CLAIMS 3/ELIS 2 are the same person, Asylum staff should compare biometric records associated with both the asylum and naturalization adjudications within CPMS. Asylum staff should consult the ISCPM or Asylum Office Security Checks POCs for further guidance.

If Asylum staff are unable to confirm through review of systems records whether the individual listed in Global is the same individual listed in CIS2 and CLAIMS 3/ELIS 2, Asylum staff must not issue a U.S. Citizen Dismissal Notice to the applicant. The asylum office with jurisdiction over the applicant's address should schedule the applicant for an asylum interview following the Asylum Division's interview scheduling priorities. If the applicant appears for the interview, an asylum officer questions the applicant about whether they have U.S. citizenship. If the applicant fails to appear for the interview, Asylum staff process the case according to procedures in AAPM Section III.I. Failure to Appear.

### c. Preparation of U.S. Citizen Dismissal Notice and Case Completion

If the applicant is determined to be a USC and ineligible to apply for asylum, Asylum staff will administratively close the case in Global, indicating that the reason for the closure is "Ineligible – USC." Asylum staff will generate the U.S. Citizen Dismissal Notice (Appendix 118). The notice should list all dependent A-numbers. Asylum staff will serve this notice to the applicant and their representative of record, if any. The U.S. Citizen Dismissal Notice (Appendix 118) informs the applicant that as a USC they are no longer eligible to apply for asylum and that USCIS will dismiss their asylum application. Because the applicant is a USC, Asylum staff will not refer the application to immigration court.

Ensure a copy of the notice is placed on the record side of the principal applicant and each dependent file. If the physical A-file is not located in the office, a copy of the mailer should be routed to the office where the file is located for interfiling in the A-file.

USCIS00004319

# IV. "HOW TO... "

## IV.A. WRITE AN ASSESSMENT OR NOID

For all Assessments and a NOID, see the RAIO Combined and ADOTP Training Materials:

- Decision Writing Part I: Overview and Components
- Reading Case Law
- Credibility
- Well Founded Fear
- Country Conditions Research and the Resource Information Center (RIC)

## IV.B. PREPARE A DECISION LETTER

The primary types of decision letters are:

- Asylum Approval (Appendices 17, 49, and 50)
- Referral Notice (Appendices 51, 52, 53, 54, 55, and 68)
- Final Denial (Appendices 56, 57, and 58)
- Cancellation of Recommended Approval (Appendices 22, 26, 27, and 28)  Note: As of August 25, 2020, USCIS no longer issues recommended approvals.
- Notice of Termination of Asylum Status (Appendix 40)
- Notice of Rescission of Asylum Grant (Appendix 36)

Asylum Office personnel may generate most decision letters automatically by using Global.

To prepare a decision letter, Asylum Office personnel generate one (1) decision letter per family that lists the A-number of the principal applicant and each dependent.  The file of the principal applicant and each dependent contains a copy of the letter, and the Asylum Office issues a copy to the representative of record, if any.

## IV.C. PREPARE A NOTICE TO APPEAR (NTA)

Asylum Office personnel generate this form through RAPS using the following commands:

- OSC Generation (OSCG) screen.
- OSC Print (OSCP) screen

*Update the highlighted fields.*

The information concerning the individual's date, place and manner of entry must be consistent with the same information gleaned during the asylum interview, or from the I-589, if the applicant failed to appear for an interview. See Section III.O, Overview of Pre-Reform and Reform Application Processes for

USCIS00004320

guidance on evidence that may be used to support an NTA in pre-reform cases. Check with local Asylum Office management concerning who is responsible for placing information about the hearing on the NTA.

At the time of service, Asylum Office personnel complete the section on page 1 for the place, date and time of the individual's hearing before the Immigration Court. Asylum Office personnel obtain this information through ANSIR.

An SAO signs and dates the NTA on the front page. The DHS officer who serves the NTA to the applicant completes the certificate of service section on page 2. The applicant receives a copy of the NTA. The NTA with the original signature of the SAO must be served on the Immigration Court.

## IV.D. PREPARE A FORM I-213 RECORD OF DEPORTABLE/INADMISSIBLE ALIEN

Asylum Office personnel generate this form through RAPS from the Print Notice to Appear (OSCP) screen. Each individual on a case receives his or her own Form I-213, if required. Information concerning the individual's date, place and manner of entry must be consistent with the same information gleaned during the asylum interview, or from the I-589, if the applicant failed to appear for an interview.

The individual who prepares the Form I-213 signs and the dates it at the "Signature and Title of INS Official" line. The SAO signs the form as the supervisory review official in the bottom right-hand corner box ("Examining Officer: [SAO signature]") For a description of the data to be entered in each field, see Melville, Rosemary Langley. Guidance for Completing Form I-213, Record of Deportable Alien. Memorandum to Asylum Office Directors, Supervisory Asylum Officers and Asylum Officers 12 May 1995, 5p.

## IV.E. PREPARE AN I-94 CARD

Each individual who is granted asylum, including dependents listed in the principal applicant's asylum application, receives his or her own I-94 card. There cannot be any crossed-out corrections or any corrections using "white-out."

The Asylum Officer must complete both the top and bottom portions of the I-94 card with the following mandatory information:
•A-number
•Complete last name and first name
•Birth date (DD/MM/YY format)
•Country of citizenship
•Address while in the United States

The Asylum Officer must endorse the I-94 card with the standard asylum approval stamp in both the top and bottom portions of the I-94 card. The asylum approval stamp must bear the date of asylum approval (corresponding to the decision date of the "Grant" in Global), and which states:

ASYLUM STATUS Granted Indefinitely Section 208 Immigration and Nationality Act.

USCIS00004321

The asylum approval stamp must be used exclusively with USCIS security ink. *See* Langlois, Joseph E. [Use of New Asylum Approval Decision Stamps](#), Memorandum to All Asylum Office Personnel, 19 December 2005, 2p.

The Asylum Officer must sign in both the top and bottom portions of the I-94 card along the signature line and indicate the three-letter Asylum Office code (e.g., ZAR) and his or her four-digit office ID number (e.g., 0041) in the appropriate spaces below the signature line.

USCIS00004322

# V. Appendices – List of Documents

| Number | Name | Last Modified |
|---|---|---|
| | Lafferty, John – Update to Interpreter Services Realignment (August 2018) | August 13, 2018 |
| 1) | Explanation of Use of Appendices | September 5, 2013 |
| 2) | Rescheduling of Asylum Interview – USCIS Interpreter Unavailable | September 2023 |
| 3) | Record of Applicant and Applicant Provided Interpreter Oaths During An Interview | September 2023 |
| 4) | EOIR Data Field Chart | September 5, 2013 |
| 5) | Notice of Scheduling of Fingerprinting Appointment – Employment Authorization, - Applicant Caused Delay | May 2022 |
| 6) | Notice of Scheduling of Fingerprinting Appointment | May 2022 |
| 7) | Rescheduling of Asylum Interview – Interpretation Problems | September 2023 |
| 8) | WAIVER OF PRESENCE OF REPRESENTATIVE DURING AN ASYLUM or a NACARA 203 INTERVIEW_final | September 3, 2021 |
| 9) | In-Person Reschedule Request | July 11, 2022 |
| 10) | Retention of Original Documents | August 30, 2013 |
| 11) | Pick Up Notice | October 26, 2023 |
| 12) | Mail Out Notice | October 26, 2023 |
| 13) | Response to Request to Add Dependent to Asylum Application | September 5, 2013 |
| 14) | Removal of Child from Asylum Application Rev. March 2021 | March 2021 |
| 15) | Removal of Former Spouse from Asylum Application Rev. March 2021 | March 2021 |
| 16) | Removal of Dependent from Asylum Application Rev. March 2021 | March 2021 |
| 17) | Asylum Approval Nunc Pro Tunc | October 26, 2023 |
| 18) | Denial of Asylum Status as a Principal Applicant | October 26, 2023 |
| 19) | Denial of Derivative Asylum Status | September 5, 2013 |
| 20) | Impact of Global Actions on the EAD 365-Day Waiting Period | July 11, 2022 |
| 21) | Notice of File Consolidation | September 5, 2013 |

USCIS00004323

| 22) | Cancellation of Recommended Approval (Lack of USCIS Jurisdiction) | September 5, 2013 |
|-----|------------------------------------------------------------------|-------------------|
| 23) | Request for Final Court Disposition(s) | September 5, 2013 |
| 24) | Appointment for Sworn Statement Request for Evidence (Rejection of Fingerprints) | September 5, 2013 |
| 25) | Appointment for Statement Request for Evidence (Waiver of Fingerprints) | September 5, 2013 |
| 26) | Cancellation of Recommended Approval and Dismissal (Failure to Comply with Identity and Security Checks Procedures) | May 2022 |
| 27) | Cancellation of Recommended Approval and Dismissal (Failure to Comply with Identity and Security Check Procedures) | October 26, 2023 |
| 28) | Cancellation of Recommended Approval (Reinstatement of Prior Order) | October 26, 2023 |
| 29) | Dismissal of Asylum Application Based on Failure to Comply With Identity and Security Check Procedures | September 29, 2016 |
| 30) | Dismissal of Asylum Application – Reinstatement of Prior Order | June 26, 2017 |
| 31) | Dismissal of Asylum Application Failure to Appear | October 26, 2023 |
| 32) | Grant of Reschedule Request of an Asylum Interview | May 2022 |
| 33) | Notice of Change in Decision Service from Pick-Up to Mail-Out | October 26, 2023 |
| 34) | Service Motion to Reconsider (Before EOIR) | September 5, 2013 |
| 35) | Service Motion to Reconsider (Outside U.S.) | September 5, 2013 |
| 36) | Notice of Rescission of Asylum Grant | October 26, 2023 |
| 37) | Affirmation of Asylum Grant After Motion to Reconsider | September 5, 2013 |
| 38) | Request for Evidence to Establish Residence | May 2022 |
| 39) | Notice of Intent to Terminate Asylum Status by USCIS | December 20, 2013 |
| 40) | Notice of Termination of Asylum Status | September 5, 2013 |
| 41) | Notice of Continuation of Asylum Status | October 26, 2023 |
| 42) | Notice of Intent to Terminate Asylum Status by EOIR | September 5, 2013 |
| 43) | Declaration of Intent to Withdraw Asylum Application | September 5, 2013 |

USCIS00004324

| 44) | Assessment to Grant | September 24, 2018 |
|---|---|---|
| 45) | Notice of Intent to Deny | October 6, 2021 |
| 46) | Assessment to Refer | September 24, 2018 |
| 47) | Standard Recommended Approval Letter | August 25, 2020 |
| 48) | Standard Recommended Approval After NOID Letter | August 25, 2020 |
| 49) | Standard Asylum Approval | October 26, 2023 |
| 50) | Asylum Approval After NOID | October 26, 2023 |
| 51) | Standard Referral Notice | October 26, 2023 |
| 52) | Referral After NOID No Rebuttal | October 26, 2023 |
| 53) | Referral after NOID + Rebuttal | October 26, 2023 |
| 54) | Referral Notice – 1 Year Deadline | October 26, 2023 |
| 55) | Referral – Prior Denial | October 26, 2023 |
| 56) | Standard Final Denial No Rebuttal | October 26, 2023 |
| 57) | Standard Final Denial + Rebuttal | October 26, 2023 |
| 58) | Final Denial – Parole | May 2022 |
| 59) | NOTICE OF LACK OF JURISDICTION (NON-TRANSFER, NON-FORWARD) | October 26, 2023 |
| 60) | Instructions for Dating Appendices | September 5, 2013 |
| 61) | Quick Reference Table – Split Decisions | September 5, 2013 |
| 62) | Asylum.Nacara 203 Processing Sheet for T-files | September 5, 2013 |
| 63) | Sworn Statement Template | August 30, 2013 |
| 64) | Notice of Institution of Removal Proceedings Following Positive Credible Fear Screening | October 26, 2023 |
| 65) | Notice of Dismissal – Abandonment of Asylum Application | October 26, 2023 |

USCIS00004325

| 66) | Lawful Permanent Resident Notice (5.24.23 v. 4.0) | May 2023 |
|-----|----------------------------------------------------|----------|
| 67) | List of Languages Into Which Asylum Forms and Letters Have Been Translated | September 5, 2013 |
| 68) | Referral Notice for Failure to Appear | October 26, 2023 |
| 69) | Determination of Exceptional Circumstances Worksheet | November 12, 2013 |
| 70) | Determination of Failure to Demonstrate Exceptional Circumstances | October 26, 2023 |
| 71) | Determination of Demonstrating Exceptional Circumstances | October 26, 2023 |
| 72) | Failure to Appear to Pick-Up your Asylum Decision | May 2022 |
| 73) | Denial of Interview Reschedule Request | May 2022 |
| 74) | Failure to Appear Warning | October 26, 2023 |
| 75) | Request for Additional Information Regarding Exceptional Circumstances | November 12, 2013 |
| 76) | Determination Demonstrating Exceptional Circumstances – In Status | October 26, 2023 |
| 77) | Determination of Failure to Demonstrate Exceptional Circumstances (In Status) | October 26, 2023 |
| 78) | USCIS 180-Day Asylum EAD Clock Notice | August 2023 |
| 79) | Form I213 Sample1 | November 6, 2013 |
| 80) | Form I213 Sample2 | November 6, 2013 |
| 81) | Form 903 Sample CBP UAC Screening Form | November 6, 2013 |
| 82) | UAC Initial Referral Placement Form Sample | November 6, 2013 |
| 83) | ORR Verification of Release Form | November 6, 2013 |
| 84) | EARM Screen Sample | November 6, 2013 |
| 85) | EARM Screen Sample 2 | November 6, 2013 |
| 86) | Handling Procedural Issues Related to Concurrent Filings by UACs | November 6, 2013 |
| 87) | UAC Decision Notice for Non-Eligibility | October 26, 2023 |

USCIS00004326

| 88) | X | |
|-----|---|---|
| 89) | X | |
| 90) | UAC Notice for Failure to Appear | October 26, 2023 |
| 91) | UAC cover sheet for transfer of a-file for UAC in removal proceedings | November 7, 2013 |
| 92) | Non-UAC Notice of Lack of Jurisdiction | October 26, 2023 |
| 93) | UAC Instruction Sheet (2013 version) | November 27, 2013 |
| 94) | Notice of Lack of Jurisdiction (Expedited Removal) | October 26, 2023 |
| 95) | Memo to File (No Jurisdiction for I-589 – Reinstatement) FINAL 10.04.17 | August 16, 2018 |
| 96) | REINSTATEMENT Notice of Lack of Jurisdiction | October 26, 2023 |
| 97) | Memo to File (No Jurisdiction for I-589 – FARO) FINAL 10.04.17 | August 16, 2018 |
| 98) | FARO Notice of Lack of Jurisdiction | October 26, 2023 |
| 99) | Cancellation of Recommended Approval (FARO) | October 26, 2023 |
| 100) | X | |
| 101) | X | |
| 102) | Record of Applicant Oath and USCIS Interpreter Consent During An Interview | September 2023 |
| 103) | Record of Applicant Oath During An Interview (using English) | September 2023 |
| 104) | Asylum Office Directors Consent for Filing at the Asylum Vetting Center FINAL UPDATE 11_02_2020 | April 13, 2021 |
| 105) | Simultaneous Filing Receipt | October 26, 2023 |
| 106) | Form I-589 Adjudication Reference Chart | October 2023 |
| 107) | NOTICE OF FORWARDING OF FORM I-589 TO EOIR OR NOTICE OF TRANSFER OF FORM I-589 TO EOIR (NON-EXPEDITED REMOVAL) | October 2023 |
| 108) | NOTICE OF FORWARDING OF FORM I-589 TO EOIR OR NOTICE OF TRANSFER OF FORM I-589 TO EOIR (EXPEDITED REMOVAL) | October 26, 2023 |

USCIS00004327

| 109) | Coversheet FOR Cases Forwarded to EOIR Where Application Cannot Be Entered into DHS Portal-ECAS by USCIS 2021-1 | January 31, 2022 |
|---|---|---|
| 110) | Denial of Request to Add Dependent to Asylum Application 2021-1 | January 22, 2021 |
| 111) | Email – Mendez Rojas Related Case File Request – ZGA to Asylum Office 2021-1 | January 22, 2021 |
| 112) | TRIG Referral Notice | August 11, 2022 |
| 113) | Form G-1593 Remote Attorney or Representative Participation in an Affirmative Asylum and-or NACARA 203 Interview | July 14, 2022 |
| 114) | Template Waiver Assessment to Refer | October 5, 2022 |
| 115) | User-Modified Referral Notice – 1 Year Deadline | October 5, 2022 |
| 116) | Notice for ABC LPR Cases Scheduled for Interview | May 2023 |
| 117) | LPR Dismissal Notice | May 2023 |
| 118) | USC Dismissal Notice | May 2023 |
| 119) | Record Of Applicant Oath During An Interview Conducted By The Asylum Officer In A Language Other Than English | July 26, 2023 |
| 120) | Notice of Issuance of Discretionary Notice to Appear (NTA) in Immigration Court | October 2023 |
| 121) | Global Affirmative Holds Guide | January 17, 2024 |

USCIS00004328