# Exhibit 6



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

GREATER BOSTON LEGAL SERVICES, *et al.*
    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*
    Defendants.

Case No. 1:21-cv-10083-DJC

## Declaration of John Willshire-Carrera

1. I am an attorney licensed to practice in Massachusetts. I am currently the Lead Attorney for Immigration for Greater Boston Legal Services (GBLS), and co-assistant director of the Harvard Immigration and Refugee Clinic at GBLS. In this capacity, I have overseen numerous attorneys over the years handling hundreds of affirmative and defensive asylum cases, as well as cases for other forms of humanitarian relief.

2. I have been practicing immigration law since 1988 and have been counsel in more than 100 affirmative asylum cases.

3. In the context of affirmative asylum, asylum officers often question our clients on the basis of records that that I and other attorneys in our unit do not have access to, and may base their decision on these records. Because clients may wait many years before an asylum interview, these records may include documents that are very old and that our clients either do not remember or have never seen.

4. An affirmative asylum case that has been pending for about ten years can suddenly get an interview notice for an interview scheduled in three weeks. As of right, one continuance can be requested when this occurs. If I and other attorneys in my office had access to all of the records that the asylum officer bases their decision on, we would review them before an interview in order to prepare with our clients to address questions regarding these documents.

5. One key record that I have seen asylum officers rely on is visa application records. It is not uncommon for these records to be used to question the credibility of our clients, even though we do not have access to them.

6. Our clients often fled from their countries of origin under difficult circumstances and relied on others to prepare visa applications for them. Sometimes our clients are unaware of what was said on their behalf in these applications. Some clients have had to lie to get out of dangerous situations in their countries. We work to prepare our clients to testify truthfully at their asylum interviews about the circumstances of their departures from their countries. In my experience, there is often an explanation for an inconsistency.

7. Unfortunately, we are not provided access to these records. Without being able to view the visa records that are provided to the asylum officer, I and the attorneys I work with are hampered in our ability to fully prepare our clients to address statements that they made or that were made on their behalf—often years earlier and at some of the most difficult moments of their life.

8. Another category of records that we do not have access to but that asylum officers often use is records of encounters at the U.S.-Mexico border. Although most individuals who have had encounters with Customs and Border Protection (CBP) at the border are placed into removal proceedings and pursue asylum defensively, many people who have encountered CBP at the U.S.-Mexico border can wind up in affirmative asylum proceedings for a variety of reasons, including that the encounter with CBP did not result in being placed in removal proceedings, proceedings are later dismissed, or the noncitizens are unaccompanied minors with a right to apply affirmatively for asylum.

9. I have experienced circumstances in which affirmative asylum clients were asked questions that appeared to be based on documents that I did not have access to, which related to encounters with CBP at the border. In my experience with viewing records from the border—such as when they are introduced during cross-examinations of our clients during removal proceedings—these records can contain many errors. In the affirmative asylum context, there is little means to address these errors because we do not know what the clients are being asked about.

10. Visa records and records of encounters at the border are not the only records that asylum officers rely upon that they do not provide us access to. For example, one of my clients was called for a reinterview and asked questions about potential gang affiliation, presumably because of documents like the ones whose reliability was questioned by the First Circuit in its decision in *Diaz-Ortiz v. Garland*, 23 F.4th 1 (1st Cir. 2022)(en banc).

11. If I and other attorneys in my office had the opportunity to view the existing record on which the asylum officer will base their decision prior to the

interview, or even after it, we would review that record and would be able to prepare to address questions raised by these documents. Similarly, if we had the opportunity to view the record after the asylum officer has rendered a decision in the case, including the officer's notes and assessment of the case, we would review that record to be able to better prepare our clients for the questions that will arise during removal proceedings, in circumstances in which a case is referred for removal proceedings.

12. Being unable to view the records on which the asylum officers base their decisions causes us and our clients to go into interviews blind, and creates additional work to address issues later that we could have addressed up front, impeding our ability to serve as many clients as we can with quality representation. Moreover, when a case is referred to removal proceedings for reasons that could have been addressed before an asylum officer, our clients are further traumatized and spend many additional years of their lives living with uncertainty about their immigration status.

13. The Freedom of Information Act process is not a substitute for review of these records because, in addition to the delays that have often plagued the FOIA system, a FOIA response would not provide us with the complete record on which the asylum officer bases their decision. Our office even had a client whose I-589 itself was fully withheld in a FOIA response.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _11/21/24_ (date).

_John Willshire-Carrera_
John Willshire-Carrera